# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, <br><br> ASSOCIATION OF ADMINISTRATIVE LAW JUDGES, INTERNATIONAL FEDERATION OF PROFESSIONAL AND TECHNICAL ENGINEERS JUDICIAL COUNCIL 1, AFL-CIO, <br><br> VANESSA BARROW, GEORGE JONES, DEBORAH TOUSSANT, and DOES 1–100, <br><br>         Plaintiffs, <br><br>         v. <br><br> U.S. OFFICE OF PERSONNEL MANAGEMENT, an agency of the United States, <br><br> CHARLES EZELL, in his official capacity as Acting Director of the Office of Personnel Management, <br><br> U.S. DOGE SERVICE f/k/a U.S. DIGITAL SERVICE, <br><br> ACTING U.S. DOGE ADMINISTRATOR, <br><br> U.S. DOGE TEMPORARY SERVICE a/k/a the "DEPARTMENT OF GOVERNMENT EFFICIENCY," and <br><br> ELON MUSK, in his capacity as director of the U.S. DOGE TEMPORARY SERVICE, <br><br>         Defendants. | Case No. 1:25-cv-01237-DLC <br><br> **MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION .......................................................................................................................... 1

STATUTORY AND FACTUAL BACKGROUND ....................................................................... 2

LEGAL STANDARD .................................................................................................................. 12

ARGUMENT ............................................................................................................................... 12

    I.     Plaintiffs Have a Substantial Likelihood of Success on the Merits ............................... 12

          A.    Plaintiffs have standing. ..................................................................................... 12

          B.    Defendant OPM is illegally disclosing records to DOGE. ................................. 14

          C.    No exception to the Privacy Act applies. ........................................................... 15

          D.    Defendants are illegally failing to maintain the security of employee records. ................................................................................................................ 17

          E.    Defendants violated the Administrative Procedures Act & engaged in Ultra Vires Acts. ............................................................................................... 18

    II.    Plaintiffs Will Suffer Immediate, Irreparable Injury If Defendants Continue to Allow Unlawful Access to OPM Systems and Data. ..................................................... 19

    III.   The Balance of Equities and the Public Interest Support Granting of a TRO. .............. 22

CONCLUSION ............................................................................................................................ 23

CERTICICATE OF COMPLIANCE .......................................................................................... 25

CERTIFICATE OF SERVICE .................................................................................................... 26

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Clapper*,
  785 F.3d 787 (2d Cir. 2015) ................................................................. 13, 23

*Bartel v. F.A.A.*,
  25 F.2d 1403 (D.C. Cir. 1984) ...................................................................... 2

*Basank v. Decker*,
  449 F. Supp. 3d 205 (S.D.N.Y. 2020) ......................................................... 12

*Bell & Howell: Mamiya Co. v. Masel Co. Corp.*,
  719 F.2d 42 (2d Cir.1983) ........................................................................... 19

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ..................................................................................... 18

*Detroit Edison Co. v. NLRB*,
  440 U.S. 301 (1979) ....................................................................................... 3

*Doe v. City of New York*,
  15 F.3d 264 (2d Cir. 1994) .......................................................................... 23

*Doe v. Stephens*,
  851 F.2d 1457 (D.C. Cir. 1988) ................................................................... 16

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..................................................................................... 18

*Hirschfeld v. Stone*,
  193 F.R.D. 175 (S.D.N.Y. 2000) .................................................................. 19

*Issa v. Sch. Dist. of Lancaster*,
  847 F.3d 121 (3d Cir. 2017) ........................................................................ 22

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ................................................................... 22, 23

*Microsoft Corp. v. Does 1-2*,
  No. 23-CV-02447-LDH-JRC,
  2023 WL 11984986 (E.D.N.Y. Apr. 19, 2023) ........................................... 20

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010) .......................................................................... 19

*Nat'l Aeronautics & Space Admin. v. Nelson*,
  562 U.S. 134 (2011) .................................................................................. 3, 20

*Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*,
  604 F. Supp. 2d 665 (S.D.N.Y. 2009) ............................................... 13, 14, 19

*New York v. Trump*,
  490 F. Supp. 3d 736 (S.D.N.Y. 2020) ......................................................... 23

*Nken v. Holder,*
   556 U.S. 418 (2009) .................................................................................. 12, 22

*North America Soccer League LLC v. United States Soccer Federation,*
   883 F.3d 32 (2d Cir. 2018) ............................................................................ 12

*Planned Parenthood of N.Y.C. v. U.S. Dep't of Health and Hum. Servs.,*
   337 F. Supp. 3d 308 (S.D.N.Y. 2018) ............................................................ 23

*Reuters Ltd. v. United Press Int'l, Inc.,*
   903 F.2d 904 (2d Cir. 1990) .......................................................................... 19

*Saget v. Trump,*
   375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................................ 22

*Salazar v. Nat'l Basketball Ass'n,*
   118 F.4th 533 (2d Cir. 2024) ......................................................................... 12

*Steubing v. Brinegar,*
   511 F.2d 489 (2d Cir. 1975) .................................................................... 20, 23

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ...................................................................................... 13

*Trump v. Deutsche Bank AG,*
   943 F.3d 627 (2d Cir. 2019) .......................................................................... 19

*Trump v. Mazars USA, LLP,*
   591 U.S. 848 (2020) ...................................................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................... 12, 22

**Statutes**

18 U.S.C. §§ 203–209 ....................................................................................... 5, 6

5 U.S.C. § 1101 ..................................................................................................... 3

5 U.S.C. § 1104(a)(1) ........................................................................................... 3

5 U.S.C. § 552a(7) .............................................................................................. 16

5 U.S.C. § 552a(a)(1) .......................................................................................... 14

5 U.S.C. § 552a(a)(5) .......................................................................................... 15

5 U.S.C. § 552a(b) ....................................................................................... *passim*

5 U.S.C. § 552a(b)(3) .......................................................................................... 16

5 U.S.C. § 552a(e)(1) .......................................................................................... 20

5 U.S.C. § 552a(e)(10) ...................................................................................... 2, 3

5 U.S.C. § 552a(e)(4)(D) ..................................................................................... 16

5 U.S.C. § 552a(g)(1) ........................................................................................... 3

5 U.S.C. § 706(1) ................................................................................................ 18

5 U.S.C. § 706(2)(A) ................................................................................... 2, 3, 18

5 USC § 552a(a)(4) ................................................................................................ 14

PL 93–579, 88 Stat 1896 ................................................................................. *passim*

**Other Authorities**

5 U.S.C. § 552a(b)(1) ............................................................................................ 15

71 Fed. Reg. 35342 (June 19, 2006) ........................................................................ 4

77 Fed. Reg. 73694 (Dec. 11, 2012) ............................................................ 4, 15, 16

87 Fed. Reg. 5874 (Feb. 2, 2022) ......................................................................... 3, 9

90 Fed. Reg. 8247 (Jan. 20, 2025) ........................................................................... 6

90 Fed. Reg. 8441 (Jan. 20, 2025) .................................................................... 3, 4, 5

90 Fed. Reg. 8621 (Jan. 30, 2025) ........................................................................... 5

Annabelle Timsit and Matt Viser, "Elon Musk Is a 'Special Government Employee.'
    What Does that Mean?" *Washington Post* (Feb. 4, 2025) ......................................... 6

Brian Witte, "Trump Administration Orders Federal Agencies to Provide Lists of
    Underperforming Employees," *Associated Press*, (Feb. 7, 2025) ............................ 8

Caleb Ecarma and Judd Legum, "Musk Associates Given Unfetter Access to
    Private Data of Government Employees," *Musk Watch* (Feb. 3, 2025) ............... 7, 8, 16

Charlie Warzel & Ian Bogost, "The Government's Computing Experts Say
    They Are Terrified," *The Atlantic* (Feb. 7, 2025) ............................................... 10

Congressional Research Service, "Department of Government Efficiency
    (DOGE) Executive Order: Early Implementation," (updated Feb. 6, 2025) ............... 6

Congressional Research Service, "Federal Workforce Statistics Sources: OPM
    and OMB" (Sept. 29, 2023) ................................................................................. 3

Dan De Luce, "CIA Sent Unclassified Email with Names of Recent Hires,"
    *NBC News* (Feb. 5, 2025) .................................................................................... 8

Dana Hull, "White House Says Musk Will Police His Own Conflicts of Interest,"
    *Bloomberg* (Feb. 5, 2025) ................................................................................... 7

David E. Sanger and Julian E. Barnes, "C.I.A. Sent an Unclassified Email With
    Names of Some Employees to Trump Administration," *N.Y. Times*, (Feb. 5, 2025) ....... 8

David Ingram, "With Elon Musk watching, Trump says he's giving DOGE
    even more power," *NBC News* (Feb. 11, 2025) ............................................... 13, 21

Dep't of Gov't Efficiency, "Meet the U.S. Government: National Reconnaissance
    Office" ............................................................................................................ 13

Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov. 12, 2024) .................... 6

E.O. 9830, 12 F.R. 1259 ........................................................................................ 3

v

E.O., "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," (Feb. 11, 2025) ................................................................. 6

Ellen Knickmeyer, "Elon Musk Says President Donald Trump Has 'Agreed' USAID Should Be Shut Down," *AP* (updated Feb. 2, 2025) ....................................... 10

Eric Lipton and Kirsten Grind, "Elon Musk's Business Empire Scores Benefits Under Trump Shake-Up," *N.Y. Times* (Feb. 11, 2025) ............................................................ 21

Eric Lipton, "Elon Musk Is a 'Special Government Employee.' What Does that Mean?" *N.Y. Times* (Feb. 5, 2025) ..................................................................................... 6

Isaac Stanley-Becker and Hannah Natanson, "Some DOGE Agents Removed from Sensitive Personnel Systems after Security Fears," *Washington Post* (Feb. 8, 2025) .......... 9, 22

Isaac Stanley-Becker, *et al.*, "Musk's DOGE Agents Access Sensitive Personnel Data, Alarming Security Officials," *Washington Post* (Feb. 6, 2025) ...................................... *passim*

Jason Koebler, "Anyone Can Push Updates to the DOGE.gov Website," 404 Media (Feb. 14, 2025) ................................................................................................... 21

Jeff Stein, "Treasury Revoked Editing Access 'Mistakenly Given to DOGE Staffer," *Washington Post* (Feb. 11, 2025) ................................................................................ 11

Jennifer Bendery, "Elon Musk's DOGE Posts Classified Data On Its New Website," *HuffPost* (Feb. 14, 2025) ........................................................................................... 13

Karen Sloan, "Administrative judges' lawsuit says DOGE inquiry threatens their safety," *Reuters* (Feb. 12, 2025) .......................................................................................... 21

Letter from Rep. Deborah Ross, et al. to Pam Bondi, Attorney General and David Huitema, Director, U.S. Office of Government Ethics (Feb. 7, 2025) ...................................... 7

Letter from Rep. Gerald Connolly & Rep. Shontel Brown to Charles Ezell, Acting Director, Office of Personnel Management (Feb. 4, 2025) .................................. *passim*

Letter from Senator Adam Schiff to Susan Wiles, White House Chief of Staff (Feb. 10, 2025) ........................................................................................................ 7

Letter from Senator Elizabeth Warren to President-Elect Donald Trump (Dec. 16, 2024)............ 7

Memorandum from Charles Ezell, OPM Acting Director, to Heads and Acting Heads of Departments and Agencies (Feb. 6, 2025) ................................................................. 9

Miranda Nazzaro, "Trump Says US Doesn't Have 'Very Good Security' Amid DOGE Access Concerns," *The Hill* (Feb. 7, 2025) ............................................................ 9, 16

Office of Personnel Management, "Cybersecurity Incidents"...................................................... 11

Office of the Director of National Security (DNI), National Counterintelligence and Security Center, "Cyber Aware Case Study: Office of Personnel Management" ............. 11, 21

OPM, "Records Management" ................................................................................................ 3

Patrick Svitek, "Musk to Rehire DOGE Staffer with History of Racist Tweets," *Washington Post* (Feb. 7, 2025).......................................................................... 11, 18

Restatement (Second) of Torts § 652D............................................................................ 12

Richard Forno, "Is DOGE a Cybersecurity Threat? A Security Expert Explains the Dangers of Violating Protocols and Regulations that Protect Government Computer Systems," *The Conversation* (Feb. 6, 2025) ............................................................... 8

Sam Sabin, "Musk's 'Move Fast, Break Things,' Ethos Threatens U.S. Security," *Axios* (Feb. 9, 2025) ........................................................................................... 10

Stephen Fowler, "With a New Home for DOGE in the White House, Here's What You Need to Know," *NPR* (Jan. 29, 2025) ............................................................ 5

Theodore Schleifer *et al.*, "Young Aides Emerge as Enforcers In Musk's Broadside against Government," *N.Y. Times* (Feb. 7, 2025) ............................................. 11, 18

Tim Reid, "Exclusive: Musk Aides Lock Workers Out of OPM Computer Systems," *Reuters* (Feb. 2, 2025) ........................................................................................ 8

## INTRODUCTION

The employment records of more than 20 million Americans have been breached. In violation of the Privacy Act, the Office of Personnel Management (OPM) illegally disclosed and is continuing to disclose databases full of sensitive personal data to the so-called Department of Government Efficiency ("DOGE"), and an unknown number of individuals who have no right to access it. DOGE has illegally collected those records without justification and without establishing appropriate security. Plaintiffs ask the Court to stop these ongoing and systematic privacy violations.

On January 20, 2025, President Trump signed an executive order creating a temporary government entity named "the U.S. DOGE Service Temporary Organization," commonly known as DOGE, with the purported purpose of "modernizing Federal technology and software." On the day DOGE was created, DOGE agents demanded and were granted administrative access to OPM's systems and personnel files. DOGE, and its agents allied with Defendant Elon Musk—the world's wealthiest person and President Trump's top campaign donor—now have access to sensitive records of tens of millions of Americans. DOGE has no legitimate need for this information and obtained it without establishing the requisite safeguards. DOGE is populated by unvetted staff with ties to Defendant Musk who may not even have been government employees at the time they unlawfully accessed OPM records.

Congress charged OPM with maintaining the sensitive personnel records of current and former federal employees, contractors, and job applicants. These records can include name, social security number, job performance, race, union activities, health records and benefits, information about family members and other third parties referenced in background checks and health records, and other sensitive information. After President Donald Trump's January 20, 2025, inauguration, OPM immediately brought on top officials with ties to Defendant Musk and sidelined other career

information technology staff.

OPM's illegal and ongoing disclosure of OPM records to DOGE has created an information security nightmare. It has already caused harm and will continue to do so without this Court acting immediately to stop it. Sensitive personal information from OPM's database is now in the hands of government agents who have no legitimate need for it. This new access makes the records vulnerable to other attackers, like the ones who breached OPM's systems in 2015 and exposed the records of 21.5 million Americans. Employees' and former employees' information can be used by bad actors to threaten or harass, or to commit fraud or otherwise seek financial gain.

Defendants' actions flagrantly violate the Privacy Act, 5 U.S.C. § 552a(b) and (e)(10). OPM is illegally disclosing records to DOGE without consent, and both OPM and DOGE are failing to maintain the security of records. Defendants' actions are also contrary to law and arbitrary and capricious in violation of the Administrative Procedures Act, 5 U.S.C. § 706(2)(A). Accordingly, Plaintiffs ask the Court to (1) enjoin Defendants from any further unlawful disclosure of OPM data; (2) ensure future disclosures conform with the law; (3) order the DOGE Defendants to purge the illegally obtained records; and (4) order Defendants to update the Court within 48 hours of their compliance with the other Court-ordered relief.

## STATUTORY AND FACTUAL BACKGROUND

**The Privacy Act**

The preamble to the 1974 Privacy Act identifies privacy as a personal and fundamental right. PL 93–579, 88 Stat 1896. It recognizes that government databases and computer systems have "greatly magnified the harm to individual privacy." *Id.* "The Privacy Act safeguards the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records. It does so by allowing an individual to participate in ensuring that his records are accurate and properly used[.]" *Bartel v. F.A.A.*, 725 F.2d 1403, 1407 (D.C. Cir. 1984).

It gives "forceful recognition" to the confidentiality and sensitivity of "personnel files" at issue in this case. *Nat'l Aeronautics & Space Admin. v. Nelson*, 562 U.S. 134, 156 (2011) (quoting *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 318, n. 16 (1979)).

The Privacy Act, among other things, prohibits agencies from disclosing personal records contained in government systems to any other person or agency without consent, including other government employees, subject to 13 specific exceptions. 5 U.S.C. § 552a(b). The statute requires agencies to safeguard these records. § 552a(e)(10). Finally, the statute creates a private cause of action for individuals to protect their rights. § 552a(g)(1). The Administrative Procedures Act provides an independent cause of action to restrain unlawful agency action. *See* 5 U.S.C. § 706(2)(A). And the Court has inherent authority to stop *ultra vires* government action like DOGE's illegal accessing of OPM records.

**Office of Personnel Management (OPM)**

OPM is an "independent establishment in the executive branch" responsible for the "personnel management" of federal government employees. 5 U.S.C. §§ 1101, 1104(a)(1); E.O. 9830, 12 F.R. 1259.

OPM is "responsible" for a "wide array" of highly sensitive "employment-related records" for more than 20 million current and former federal employees and contractors working for more than 500 federal agencies and their components.[1] OPM maintains more than 40 systems of records. 87 Fed. Reg. 5874, 5875–76 (Feb. 2, 2022). Those records include: identifying information like

---

[1] OPM, "Records Management," https://www.opm.gov/information-management/records-management/ (last accessed Feb. 10, 2025); Congressional Research Service, "Federal Workforce Statistics Sources: OPM and OMB," at 3 (Sept. 29, 2023), https://crsreports.congress.gov/product/pdf/R/R43590; Isaac Stanley-Becker, *et al.*, "Musk's DOGE Agents Access Sensitive Personnel Data, Alarming Security Officials," *Washington Post* (Feb. 6, 2025), https://www.washingtonpost.com/national-security/2025/02/06/elon-musk-doge-access-personnel-data-opm-security/.

name, birthdate, home address, phone, and social security number; demographic information like race/ethnicity, national origin, and disability; education and training information; employment information like work experience, union activities, salaries, performance, and demotions; personal health records and life insurance and health benefits; financial information like death-benefit designations and savings programs; classified-information nondisclosure agreements; and information concerning family members and other third parties referenced in background checks and health records. *See, e.g.*, 77 Fed. Reg. 73694 ("OPM/GOVT-1") (Dec. 11, 2012).

OPM also maintains records about every person who applied for a federal job through USAJobs—even those who were not hired, including candidates "believed or found to be unsuitable for employment on medical grounds." 71 Fed. Reg. 35342, 35351–54 (June 19, 2006). More than 24.5 million applied for those federal jobs last year alone.[2] These job-applicant records "contain identifying information including name, date of birth, social security number, and home address" and "information on work and education, military services, [and] convictions." 71 Fed. Reg. 35342, 35351.

**Department of Government Efficiency (DOGE)**

The DOGE Defendants include U.S. DOGE Service f/k/a Digital Service ("USDS"), the unidentified Acting Director of USDS, the U.S. DOGE Service Temporary Organization a/k/a the "Department of Government Efficiency" ("DOGE"), and Elon Musk, in his capacity as director of DOGE.

President Donald Trump established the so-called "Department of Government Efficiency" ("DOGE") by executive order on January 20, 2025. Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("E.O."). Organized within the Executive Office of the President, DOGE allegedly

---

[2] Isaac Stanley-Becker, *et al.*, *supra* n.1.

4

exists "to implement the President's DOGE agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." *Id.* DOGE consists of two organizations: the United States DOGE Service (USDS) and the U.S. DOGE Temporary Service Organization. *Id.* USDS was an existing entity—President Trump's E.O. renamed the United States Digital Service—under the Office of Management and Budget (OMB).[3] The E.O. also created the Temporary Organization to "advance[e] the President's 18-month DOGE agenda." E.O. 14,158. The E.O. also requires federal agencies to create a "DOGE team" of employees that works with DOGE to implement its agenda at their respective agencies. *Id.* The Temporary Organization is subject to more relaxed hiring rules than standard federal agencies, allowing it to bypass the normal federal hiring process and hire "special government employees," who are subject to less stringent ethics and transparency requirements than most federal employees.[4]

The E.O. casts DOGE as an information technology entity. It directs DOGE to "commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Id.* It also orders DOGE "to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.*

In a separate executive order, President Trump instructed DOGE to work with other federal agencies to develop and implement "a Federal Hiring Plan" designed to "prevent the hiring of individuals who are unwilling…to faithfully serve the Executive Branch," among other things. E.O. 14,170, 90 Fed. Reg. 8621 (Jan. 30, 2025) ("E.O. 2"). In a memorandum to the heads of

---

[3] Stephen Fowler, "With a New Home for DOGE in the White House, Here's What You Need to Know," *NPR* (Jan. 29, 2025), https://www.npr.org/2025/01/29/nx-s1-5270893/doge-united-states-digital-service-elon-musk-usds-trump-white-house-eop-omb.

[4] Fowler, *supra* n.3; 18 U.S.C. §§ 203–209.

5

federal agencies, President Trump also directed DOGE to work with other federal agencies to recommend "a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attribution." Memorandum on Hiring Freeze, 90 Fed. Reg. 8247 (Jan. 20, 2025). President Trump has stated that DOGE's "large scale structural reform" will "drastic[ally] change" the federal government and "pave the way" for the Trump Administration to "dismantle" federal agencies, "slash" regulations, and "cut" spending.[5] On February 11, 2025, President Trump signed an executive order, which instructed agencies to create a new hiring approval process with consultation from DOGE agents.[6]

Billionaire and top Trump campaign donor Defendant Elon Musk serves as a special government employee and directs DOGE.[7] In this role, Musk is subject to more lenient conflict-of-interest and financial-disclosure rules than ordinary federal employees, and the Trump administration may waive many of those rules.[8] The White House has refused to disclose whether it has granted such a waiver to Defendant Musk.[9] Numerous lawmakers have expressed concerns

---

[5] Donald J. Trump (@realDonaldTrump), TRUTH SOCIAL (Nov. 12, 2024), https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.

[6] E.O., "Implementing the President's 'Department of Government Efficiency' Workforce Optimization Initiative," (Feb. 11, 2025), https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-workforce-optimization-initiative/.

[7] Congressional Research Service, "Department of Government Efficiency (DOGE) Executive Order: Early Implementation," (updated Feb. 6, 2025), https://crsreports.congress.gov/product/pdf/IN/IN12493.

[8] 18 U.S.C. §§ 203–209; Annabelle Timsit and Matt Viser, "Elon Musk Is a 'Special Government Employee.' What Does that Mean?" *Washington Post* (Feb. 4, 2025) https://www.washingtonpost.com/politics/2025/02/04/elon-musk-special-government-employee-meaning/.

[9] Eric Lipton, "Elon Musk Is a 'Special Government Employee.' What Does that Mean?" *N.Y. Times* (Feb. 5, 2025), https://www.nytimes.com/2025/02/05/us/politics/elon-musk-special-government-employee-explainer.html.

about Musk's potential conflicts of interest because he "is the CEO of several companies that have significant interests before the federal government."[10] OPM holds records that could be used to obtain a commercial competitive edge. The White House has allowed Musk to decide whether to "excuse himself" from a DOGE matter due to a conflict of interest.[11] Thus far, there's no evidence he has.

**OPM Illegally Disclosed Sensitive Personal Records To DOGE.**

In late January, Defendant OPM provided "administrative" access to several DOGE agents—including inexperienced persons in their late teens to early twenties— to highly sensitive OPM computer systems that allowed them to access personnel records and other data about millions of current and former government employees.[12] Defendant DOGE also is able to install, modify, and delete files on government computers.[13] At least six DOGE employees obtained access to all OPM personnel systems on Jan. 20, 2025, the day that DOGE was created, and at least three more DOGE agents were given access the following week.[14] DOGE agents also have

---

[10] Letter from Senator Elizabeth Warren to President-Elect Donald Trump (Dec. 16, 2024), https://www.warren.senate.gov/imo/media/doc/letter_to_trump_transition_reelonmuskconflictsof interest.pdf; *see also, e.g.,* Letter from Senator Adam Schiff to Susan Wiles, White House Chief of Staff (Feb. 10, 2025), https://www.schiff.senate.gov/wp-content/uploads/2025/02/20250210-Sen-Schiff-Letter-to-COS-Wiles-on-Musk.pdf; Letter from Rep. Deborah Ross, et al. to Pam Bondi, Attorney General and David Huitema, Director, U.S. Office of Government Ethics (Feb. 7, 2025), https://ross.house.gov/_cache/files/b/7/b73e22b7-cb95-42d2-8ff7-e4eb5a3151f1/7D7EEB40C4C345844710558A4A3F5022.musk-letter-final-2.7.pdf.

[11] Dana Hull, "White House Says Musk Will Police His Own Conflicts of Interest," *Bloomberg* (Feb. 5, 2025), https://www.bloomberg.com/news/articles/2025-02-05/white-house-says-musk-will-police-his-own-conflicts-of-interest (quoting White House Press Secretary Karoline Leavitt).

[12] Isaac Stanley-Becker, *supra* n.1; Caleb Ecarma and Judd Legum, "Musk Associates Given Unfetter Access to Private Data of Government Employees," *Musk Watch* (Feb. 3, 2025), https://www.muskwatch.com/p/musk-associates-given-unfettered.

[13] *Id.*

[14] *Id.*

access to personal information regarding everyone who applied to work for the federal government through the website USAJobs, which received 24.5 million applications in 2024 alone.[15] DOGE employees reportedly revoked access for career OPM employees.[16]

Defendant OPM is giving Defendant DOGE "direct access" to OPM data pertaining to employees in highly sensitive roles for whom even acknowledging their government employment may be dangerous and give rise to serious security risks.[17] For example, in response to a January 20, 2025, OPM memorandum, the Central Intelligence Agency sent OPM an unclassified email that listed all employees hired by the CIA over the last two years—which Senator Mark Warner said would "put a direct target on their backs" because they do "extremely sensitive work."[18] And on February 6, 2025, Defendant Ezell reportedly ordered "all agencies" to provide the names, job titles, and other personal information of "[a]ll employees" who received an unsatisfactory performance rating at any time within the last three years, without providing an exception for employees in sensitive positions.[19]

---

[15] *Id.*

[16] Tim Reid, "Exclusive: Musk Aides Lock Workers Out of OPM Computer Systems," *Reuters* (Feb. 2, 2025), https://www.reuters.com/world/us/musk-aides-lock-government-workers-out-computer-systems-us-agency-sources-say-2025-01-31/.

[17] Richard Forno, "Is DOGE a Cybersecurity Threat? A Security Expert Explains the Dangers of Violating Protocols and Regulations that Protect Government Computer Systems," *The Conversation* (Feb. 6, 2025), https://theconversation.com/is-doge-a-cybersecurity-threat-a-security-expert-explains-the-dangers-of-violating-protocols-and-regulations-that-protect-government-computer-systems-249111.

[18] David E. Sanger and Julian E. Barnes, "C.I.A. Sent an Unclassified Email With Names of Some Employees to Trump Administration," *N.Y. Times*, (Feb. 5, 2025) https://www.nytimes.com/2025/02/05/us/politics/cia-names-list.html; Dan De Luce, "CIA Sent Unclassified Email with Names of Recent Hires," *NBC News* (Feb. 5, 2025), https://www.nbcnews.com/politics/national-security/cia-sent-unclassified-email-names-recent-hires-rcna190872.

[19] Brian Witte, "Trump Administration Orders Federal Agencies to Provide Lists of Underperforming Employees," *Associated Press*, (Feb. 7, 2025),

President Trump admitted that DOGE did not need the highly sensitive personal data it accessed from other agencies—like social security numbers—but said that it could still "get it very easily" because "we don't have very good security in our country."[20]

OPM's leadership reportedly issued non-public directives that indicated DOGE agents should be withdrawn from two systems called the Electronic Official Personnel Folder and the Enterprise Human Resources Integration.[21] But these are just two of more than 40 OPM information systems maintained by Defendant OPM. 87 F.R. 5874. It is unclear whether those directives were followed, or if any of the DOGE agents retained copies of personal information in these systems. Additionally, DOGE reportedly revoked career OPM employees' access to the system, precluding oversight over DOGE's use of the data.[22]

Defendant DOGE's access to the OPM systems makes those systems more vulnerable to

---

https://apnews.com/article/trump-federal-employees-lists-underperforming-layoffs-80755cea03a93c2b6d00e21fb1716e39; Memorandum from Charles Ezell, OPM Acting Director, to Heads and Acting Heads of Departments and Agencies (Feb. 6, 2025), https://chcoc.gov/sites/default/files/OPM%20Memo%20Request%20for%20Agency%20Performance%20Management%20Data%202-6-2025%20FINAL.pdf.

[20] Miranda Nazzaro, "Trump Says US Doesn't Have 'Very Good Security' Amid DOGE Access Concerns," *The Hill* (Feb. 7, 2025), https://thehill.com/policy/technology/5133409-trump-says-u-s-doesnt-have-very-good-security-amid-doge-access-concerns/.

[21] Isaac Stanley-Becker and Hannah Natanson, "Some DOGE Agents Removed from Sensitive Personnel Systems after Security Fears," *Washington Post* (Feb. 8, 2025), https://www.washingtonpost.com/nation/2025/02/08/doge-opm-musk/.

[22] Letter from Rep. Gerald Connolly, Ranking Member, House Committee on Oversight and Government Reform & Rep. Shontel Brown Ranking Member, House Committee on Oversight and Government Reform, Subcommittee on Cybersecurity, Information Technology, and Government Innovation to Charles Ezell, Acting Director, Office of Personnel Management (Feb. 4, 2025), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/evo-media-document/2025.02.04.%20GEC%20and%20Brown%20to%20OPM-Ezell-%20DOGE%20Emails.pdf.

attack.[23] According to federal officials, DOGE's activities pose "inherent" risks to "sensitive IT systems," which include: "cybersecurity vulnerabilities," "insider threat risks," and "access to sensitive data elements."[24] Throughout its rapid takeover of sensitive agency systems, DOGE employees repeatedly flouted cybersecurity and privacy protocols.[25] In separate litigation, Treasury Department officials declared that, despite "mitigation measures," the agency "mistakenly" gave a DOGE-affiliated engineer "read/write permissions" that allowed him to modify the source code of a sensitive system.[26] In their work at other agencies, DOGE agents allegedly used unauthorized devices to handle sensitive information, created an email system that subverted cybersecurity controls on government emails, and improperly obtained classified information."[27]

DOGE's actions compound existing cybersecurity risks. Foreign intelligence services have repeatedly hacked OPM databases; in 2014 and 2015, for example, attackers obtained background

---

[23] *Id.*; Charlie Warzel & Ian Bogost, "The Government's Computing Experts Say They Are Terrified," *The Atlantic* (Feb. 7, 2025), https://www.theatlantic.com/technology/archive/2025/02/elon-musk-doge-security/681600/.

[24] Declaration of Joseph Giorli III, *State of N.Y. v. U.S. Dep't of Treasury*, No. 1:25-cv-01144, ECF No. 34, ¶¶ 11, 13, 15 (S.D.N.Y. Feb. 11, 2025); Declaration of Thomas H. Krause, *State of N.Y.*, ECF No. 33, ¶ 15 (Feb. 11, 2025).

[25] Sam Sabin, "Musk's 'Move Fast, Break Things,' Ethos Threatens U.S. Security," *Axios* (Feb. 9, 2025), https://www.axios.com/2025/02/09/elon-musk-doge-federal-it-national-security.

[26] Giorli Decl. ¶ 20; *contra* Def's Br. in Support of Emergency Mot. to Dissolve *Ex Parte* TRO, *State of N.Y.*, ECF No. 12, at 6 n.2 (engineer had restricted "read only" access); Transcript of Sched. Confr., *Alliance for Retired Americans v. Bessent*, 14:23–15:2, No. 25-cv-00313 (D.D.C. Feb. 5, 2025) (same).

[27] Letter from Reps. Connolly and Brown, *supra* n.22; Ellen Knickmeyer, "Elon Musk Says President Donald Trump Has 'Agreed' USAID Should Be Shut Down," *AP* (updated Feb. 2, 2025), https://apnews.com/article/doge-musk-trump-classified-information-usaid-security-35101dee28a766e0d9705e0d47958611.

investigations records of more than 20 million people seeking security clearances.[28] The government attributed the attacks to OPM's failure to reliably implement or comply with security protocols.[29] DOGE's risky actions are part of a pattern of behavior that experts say threatens the security of other agency systems as well.[30] This leave Plaintiffs at imminent risk. Toussant Decl. ¶ 5; Kelley Decl; ¶ 10; Ramrup Decl. ¶ 8.

At least some DOGE agents reportedly did not undergo standard background checks or have backgrounds that suggest they are not appropriate custodian of sensitive government information. The *New York Times* reported that Edward Coristine, a 19-year-old now widely known by his online identity "Big Balls," was fired from cybersecurity firm Path Network in 2022 following (according to a recent firm statement) "an internal investigation into the leaking of proprietary information that coincided with his tenure."[31] Marco Elez—a DOGE staffer who had permissions to edit a sensitive Treasury payments system—resigned after the *Wall Street Journal* reported his racist social-media posts, but was rehired shortly thereafter.[32]

---

[28] Office of Personnel Management, "Cybersecurity Incidents" (last accessed Feb. 14, 2025), https://www.opm.gov/cybersecurity-resource-center/#url=Cybersecurity-Incidents.

[29] Office of the Director of National Security (DNI), National Counterintelligence and Security Center, "Cyber Aware Case Study: Office of Personnel Management" (last accessed Feb. 14, 2025), https://www.dni.gov/ncsc/e-Learning_CyberAware/pdf/Cyber_Aware_CaseStudy_OPM.pdf.

[30] Letter from Reps. Connolly and Brown, *supra* n.22.

[31] Theodore Schleifer, *et al.*, "Young Aides Emerge as Enforcers In Musk's Broadside against Government," *N.Y. Times* (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html.

[32] Patrick Svitek, "Musk to Rehire DOGE Staffer with History of Racist Tweets," *Washington Post* (Feb. 7, 2025), https://www.washingtonpost.com/politics/2025/02/07/elon-musk-marko-elez-vance-trump/; Jeff Stein, "Treasury Revoked Editing Access 'Mistakenly Given to DOGE Staffer," *Washington Post* (Feb. 11, 2025), https://www.washingtonpost.com/business/2025/02/11/doge-treasury-access-marko-elez/.

## LEGAL STANDARD

The purpose of a temporary restraining order is to preserve the status quo before the illegal acts occurred—"that is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *North America Soccer League LLC v. United States Soccer Federation*, 883 F.3d 32, 37 (2d Cir. 2018) (citations omitted).  "It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction." *Basank v. Decker*, 449 F. Supp. 3d 205, 210 (S.D.N.Y. 2020). Both require the plaintiff to establish that they are (1) "likely to succeed on the merits"; (2) "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" tips in their favor; and (4) the injunction "is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Have a Substantial Likelihood of Success on the Merits

#### A.    Plaintiffs have standing.

Defendants' ongoing Privacy Act violations are themselves enough to confer standing on Plaintiffs. Plaintiffs and Plaintiffs' members are current and former federal employees whose sensitive personal data OPM maintains and who are at immediate risk of significant personal, professional, and financial harm from disclosure. *See* Toussant Decl.; Kelley Decl.; Ramrup Decl. Just as in the context of the tort of disclosure of private facts, OPM's ongoing disclosure of Plaintiffs' highly sensitive information constitutes a harm to be redressed. *See* Restatement (Second) of Torts § 652D. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 542 (2d Cir. 2024) (finding standing when "core allegation is that his personally identifiable information was exposed to an unauthorized third party").

Moreover, Defendant OPM has disclosed and is disclosing information to Defendant

DOGE, another government entity. OPM's illegal disclosure and DOGE's illegal collection of personal information is the concrete harm to be redressed. *See ACLU v. Clapper*, 785 F.3d 787, 801 (2d Cir. 2015) (standing when "alleging injury from the very collection" by the government). Here, Plaintiffs' harm is not impending—it has happened and remains ongoing.

In any event, Plaintiffs exposed to a risk of future harm—including the cybersecurity threats detailed above at an agency that suffered a previous data breach that resulted in identity theft and fraud—may pursue forward-looking injunctive relief to prevent the harm from occurring. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 435–36 (2021). *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 50 (D.C. Cir. 2019) (describing fraud and identity theft). Toussant Decl. ¶ 5*;* Kelley Decl. ¶ 10*;* Ramrup Decl. ¶¶ 6-11. Preventing harm is justified here. In addition to threats from outsider attackers, Defendant Musk has said DOGE is looking into the net worth of federal employees, but did not reveal how DOGE acquired the data.[33] And DOGE has posted other sensitive information online.[34]

The union Plaintiffs representing current federal employees whose records are in OPM databases also have associational standing to sue. Kelley Decl. ¶¶ 2-8; Ramrup Decl. ¶¶ 2-6. *See Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 669 (S.D.N.Y. 2009) (finding union had associational standing for Privacy Act injunction). Union Plaintiffs' federal-employee members would otherwise have standing to sue as detailed above; worker

---

[33] David Ingram, "With Elon Musk watching, Trump says he's giving DOGE even more power," *NBC News* (Feb. 11, 2025), https://www.nbcnews.com/politics/doge/elon-musk-trump-doge-executive-order-rcna191751.

[34] *See* Dep't of Gov't Efficiency, "Meet the U.S. Government: National Reconnaissance Office," (last accessed Feb. 14, 2025); *see also* Jennifer Bendery, "Elon Musk's DOGE Posts Classified Data On Its New Website," *HuffPost* (Feb. 14, 2025), https://www.huffpost.com/entry/elon-musk-doge-posts-classified-data_n_67ae646de4b0513a8d767112 (DOGE posted classified personnel data of the Department of Defense's National Reconnaissance Office, which has a $1.8 billion contract with Musk's SpaceX).

privacy rights are germane to the unions' mission of protecting workers, especially because some

of the records include union activity; and the claims and injunctive relief do not require individual

proof because all workers records are in the OPM systems and Plaintiffs ask for identical injunctive

relief. *Id.*

### B.    Defendant OPM is illegally disclosing records to DOGE.

Defendant OPM violated the Privacy Act by intentionally and willfully disclosing millions

of employee files to Defendant DOGE without consent or any valid exception. The Privacy Act

bars agencies from "disclos[ing]" a "record" contained in government "systems of records" to any

other "person" or "agency," subject to certain exceptions. 5 U.S.C. § 552a(b).

Defendant OPM disclosed employee files to DOGE and its agents, which are "person[s]"

or "another agency." 5 U.S.C. § 552a(a)(1). As reported, OPM gave broad access to all OPM

personnel systems to at least six newly installed DOGE agents starting on January 20, 2025.[35]

More agents later gained access. *Id.* As reported, "the DOGE team's demand for access to OPM

files and networks came as Musk deputies arrived at the agency promising to wipe out 70 percent

of its staff." *Id.*

The records contain "information about an individual" that OPM maintains. 5 USC §

552a(a)(4). The records contain sensitive details about more than 20 million current and former

federal employees and contractors, including: identifying information like name, birthdate, home

address and phone, and social security number; demographic information like race/ethnicity,

national origin, and disability; education and training information; employment information like

work experience, union activities, salaries, performance, and demotions; personal health records

and related information like life insurance and health benefits; financial information like death-

---

[35] Isaac Stanley-Becker, *et al*, *supra* n.1.

benefit designations and savings programs; and classified-information nondisclosure agreements. *See, e.g.*, OPM GOVT-1 (General Personnel Records).

The records are maintained in a "system of records." 5 U.S.C. § 552a(a)(5). Given that OPM records contain individuals' names, social security numbers, and phone numbers, the records can be "retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.*

OPM cannot justify its past or ongoing disclosure.

**C.    No exception to the Privacy Act applies.**

The "written consent" exception in 5 U.S.C. § 552a(b) does not apply because millions of current and former employees whose records were disclosed were not aware of these disclosures until they were reported in the media.

The "performance of their duties" exception in § 552a(b)(1) does not apply because the DOGE agents who obtained the records are not employees of OPM—"the agency which maintains the records." *Id.* And DOGE agents have not justified a "need" for the millions of employee records for the performance of their duties. *Id.*  Defendant DOGE is primarily comprised of special government employees, including Defendant Musk. These types of employees typically do not have access to such sensitive personal records. Officials of other agencies have confirmed that DOGE agents obtained access to systems with sensitive data elements "broader in scope than what has occurred in the past."[36] Therefore, their use is neither needed nor routine. At a press conference, President Trump said DOGE did not need the highly sensitive personal data it accessed from other agencies—like social security numbers—but said that it could still "get it very easily" because "we

---

[36] Gioeli Decl. ¶¶ 11, 13.

don't have very good security in our country."[37]

The "routine use" exception in § 552a(b)(3) does not apply because there is nothing routine about a newly created government entity demanding access to millions of personnel records of people it does not employ, while threatening to fire staff that maintains those records. *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988) ("It is by now well-established that agencies covered by the Privacy Act may not utilize the 'routine use' exception to circumvent the mandates of the Privacy Act."). To start, Defendant DOGE's use was not published in the Federal Register upon notice and comment as required to meet this exception. § 552a(e)(4)(D). And DOGE's use of the records is not "compatible with the purpose for which it was collected," § 552a(7). DOGE did not even exist when the records were collected from employees by OPM, and DOGE's purported mandate of improving government efficiency by cutting expenditures has nothing to do with the purposes for which OPM collected employee data. Personnel records are collected to screen qualification and determine rights, benefits, and length of service. *See, e.g.*, OPM GOVT-1 (General Personnel Records). Those uses are not compatible with the mission of DOGE, which does not employ the people whose information it collected.

In addition to Defendant OPM, Defendant DOGE, too, violated 5 U.S.C. § 552a(b) because it acted in concert with OPM when OPM unlawfully disclosed records to DOGE. OPM's new leadership allied with Musk-directed civil servants who oversee OPM's IT services to give DOGE's team "access [to] the system as an admin user" and "code read and write permissions."[38] As reported, "the DOGE team's demand for access to OPM files and networks came as Musk

---

[37] Miranda Nazzaro, *supra* n.20.

[38] Caleb Ecarma and Judd Legum, *supra* n.12.

deputies arrived at the agency promising to wipe out 70 percent of its staff."[39]

**D.    Defendants are illegally failing to maintain the security of employee records.**

Defendants further violated the Privacy Act because they have intentionally and willfully collected, maintained, and used millions of federal-employee records without establishing appropriate safeguards to ensure the security of records. 5 U.S.C. § 552a(e)(10). Under the Privacy Act, each agency that maintains a system of records shall "establish appropriate administrative, technical, and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained." *Id. See also In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d at 68 (finding lack of basic and necessary information security safeguards).

On the day DOGE was established, newly installed OPM officials handed over access to its own systems of records.[40] OPM did this despite DOGE having no time to establish any appropriate security safeguards or training for new agents. No description of DOGE's safeguards has been publicly released. Instead, appropriate safeguards have been cast aside. For example, OPM gave DOGE agents "administrative" access to OPM files, meaning DOGE agents can alter internal logs that document their own activities inside the system. *Id.* DOGE's access also allows it to alter existing employee records. *Id.* Some of the actions appear to have made OPM's system less secure. An OPM email system established around the same time of DOGE's access subverted other agencies' cybersecurity controls, according to members of Congress, leading individuals to

---

[39] Isaac Stanley-Becker, *et al.*, *supra* n.1.

[40] *Id.*

expend time thwarting phishing attacks.[41] Finally, OPM did not properly vet the DOGE agents who accessed OPM's records. One 19-year-old DOGE agent was fired by a previous employer related to an investigation for improperly sharing data.[42] Another 25-year-old agent recently resigned from DOGE (before being immediately rehired) for past racist social media posts.[43] And officials at other agencies admitted that safeguards do "not fully eliminate the risks" of DOGE's "broad access" to sensitive systems.[44]

### E.    Defendants violated the Administrative Procedures Act & engaged in Ultra Vires Acts.

Defendant OPM illegally disclosed Plaintiffs' records to DOGE, and OPM illegally failed to maintain the security of Plaintiffs' records. § 552a(b) & (e)(10). These illegal acts should be enjoined under the Administrative Procedures Act ("APA").

Under the APA, courts shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A decision by an agency to "disclose" a plaintiffs' records is a "reviewable agency action" that the court can enjoin. *Chrysler Corp. v. Brown*, 441 U.S. 281, 318–19 (1979) (discussing reverse-FOIA actions). Similarly, through the APA, Congress imposes a "duty of agencies to find and formulate policies that can be justified by neutral principles and a reasoned explanation." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537, (2009) (Kennedy, J., concurring). The APA thus requires courts to set aside agency actions that are arbitrary and capricious. 5 U.S.C. §§ 706(1), (2)(A).

Separately, unlawful government action can also be challenged as *ultra vires*, by exceeding

---

[41] Letter from Reps. Connolly and Brown, *supra* n.22

[42] Theodore Schleifer, *et al.*, *supra* n.31.

[43] Patrick Svitek, *supra* n.32.

[44] Gioeli Decl., ¶¶ 11, 17.

authority. *Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 673 (S.D.N.Y. 2009) (entertaining injunction for Privacy Act claim when agency "exceeds its authority" by impermissibly collecting records).    Defendant OPM's unreasoned and hasty disclosure of records to Defendant DOGE in violation of the Privacy Act is both contrary to law and arbitrary and capricious.    Defendant DOGE's non-existent data security practices and access to millions of personnel records are *ultra vires* actions outside the scope of its lawful authority.

## II.    Plaintiffs Will Suffer Immediate, Irreparable Injury If Defendants Continue to Allow Unlawful Access to OPM Systems and Data.

"[A] showing of probable irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction,'" *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990) (quoting *Bell & Howell: Mamiya Co. v. Masel Co. Corp.*, 719 F.2d 42, 45 (2d Cir.1983)) (some quotation marks omitted). Plaintiffs need only show a "*threat* of irreparable harm, not that irreparable harm already [has] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010) (emphasis in original). "Irreparable harm must be shown by the moving party to be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters Ltd.*, 903 F.2d at 907 (citation omitted).

"Public disclosure of highly personal and confidential information, the likes of which are at issue in this case, result in a harm that is both substantial and irreversible," and "is the quintessential type of irreparable harm that cannot be compensated or undone by money damages." *Hirschfeld v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000); *see also Trump v. Deutsche Bank AG*, 943 F.3d 627, 637 (2d Cir. 2019), *vacated and remanded on other grounds sub nom. Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020) (citation omitted) ("compliance with the subpoenas" seeking plaintiffs' personal information "would cause irreparable harm because 'plaintiffs have an interest in keeping their records private from everyone, including congresspersons,'" and the

Congressional committees that issued the subpoenas "'have not committed one way or the other to keeping plaintiffs' records confidential from the public once received.'"); *Microsoft Corp. v. Does 1-2*, No. 23-CV-02447-LDH-JRC, 2023 WL 11984986, at *2 (E.D.N.Y. Apr. 19, 2023) ("immediate and irreparable harm will result from Defendants' ongoing violations of…the Electronic Communications Privacy Act…").

Absent a TRO, Plaintiffs will continue to face immediate and irreparable harm because Defendants will continue to violate Plaintiffs' strong interest in the privacy of their statutorily protected personal information. "The Privacy Act…allows the Government to maintain records 'about an individual' only to the extent the records are 'relevant and necessary to accomplish' a purpose authorized by law." 5 U.S.C. § 552a(e)(1). The Act requires written consent before the Government may disclose records pertaining to any individual. § 552a(b). These requirements, as we have noted, give 'forceful recognition' to a government employee's interest in maintaining the 'confidentiality of sensitive information...in his personnel files.'" *Nat'l Aeronautics & Space Admin.*, 562 U.S. at 156. As explained above, Defendants accessed Plaintiffs' sensitive personal information for improper purposes without their consent. *See* Section I.B, *supra*. This violates Plaintiffs' privacy rights.

First, Defendant DOGE's access to OPM data gives rise to immediate harm by violating Plaintiffs' reasonable expectation that their sensitive personal and employment information will be securely held in accordance with governing law. "The plaintiffs had a right to assume that federal officials would comply with applicable law." *Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir. 1975). But they are not—DOGE agents continue to access Plaintiffs' personal information, despite not having any lawful right to access such information. Moreover, Plaintiffs reasonably fear that Defendants will use the information against them, such as by terminating Plaintiffs'

employment based on information DOGE had no right to access in the first place[45] or cutting off their benefits. Toussant Decl. ¶ 6; Kelley Decl. ¶ 11.

Plaintiffs' reasonable fears go beyond concerns of retaliation. Musk has significant financial conflicts of interest,[46] including lucrative government contracts with his businesses, and owns a large social media platform. This creates a very specific fear that federal employees will be retaliated against, using their personal data, for deciding matters in which Musk has a massive financial stake.

The government is "fully aware of the risks" of granting DOGE agents "broad access" to agency systems, which on at least one occasion led to errors in which a separate federal agency's system was misconfigured.[47] And journalists have found security holes in DOGE's own website, allowing security researchers to edit the website themselves.[48] And DOGE's access has compromised the cybersecurity of Plaintiffs' personnel records, significantly heightening the risk that their information will be far more vulnerable to hacking, or that their personnel file will be compromised.[49] OPM data is a highly attractive target for hackers, and once they gain access, "[t]here's no fixing it."[50]

---

[45] David Ingram, *supra*, n.33.

[46] Eric Lipton and Kirsten Grind, "Elon Musk's Business Empire Scores Benefits Under Trump Shake-Up," *N.Y. Times* (Feb. 11, 2025), https://www.nytimes.com/2025/02/11/us/politics/elon-musk-companies-conflicts.html.

[47] Gioeli Decl., ¶¶ 11, 15, 20.

[48] Jason Koebler, "Anyone Can Push Updates to the DOGE.gov Website," *404 Media* (Feb. 14, 2025), https://www.404media.co/anyone-can-push-updates-to-the-doge-gov-website-2/.

[49] Karen Sloan, "Administrative judges' lawsuit says DOGE inquiry threatens their safety," *Reuters* (Feb. 12, 2025), https://www.reuters.com/legal/government/administrative-judges-lawsuit-says-doge-inquiry-threatens-their-safety-2025-02-12/; Letter from Reps. Connolly and Brown, *supra* n.22.

[50] DNI, *supra* n.29 (quoting former CIA Director Michael Hayden).

The violation remains ongoing. A report suggests that Defendant OPM might have recently issued directives that DOGE agents should be withdrawn from two OPM systems.[51] But those directives are not public and have not been confirmed by OPM itself. And the government has had to correct its statements about DOGE's level of access in other cases.[52] Even if issued, it is unclear if any such directives were followed. Moreover, OPM has not revoked DOGE access to other systems with personal data, and DOGE might retain personal data from the reportedly revoked systems.

## III.    The Balance of Equities and the Public Interest Support Granting of a TRO.

To obtain preliminary injunctive relief, Plaintiffs must also show that the balance of equities tips in their favor, and that the injunction is in the public interest. *Winter*, 555 U.S. at 20. When the federal government is a party, these factors merge. *Nken*, 556 U.S. at 435.

As an initial matter, Plaintiffs have established both an overwhelming likelihood of prevailing on the merits of their challenge to the agency action and irreparable harm. The Plaintiffs' "extremely high likelihood of success on the merits is a strong indicator that a preliminary injunction would serve the public interest." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *see also Saget v. Trump*, 375 F. Supp. 3d 280, 377 (E.D.N.Y. 2019) ("Because Plaintiffs have shown both a likelihood of success on the merits and irreparable harm, it is also likely the public interest supports preliminary relief.") (citing *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 143 (3d Cir. 2017)).

---

[51] Stanley-Becker and Natanson, *supra*, n.21.

[52] *Compare* Gioeli Decl. ¶ 20, *with* Def's Br. in Support of Emergency Mot. to Dissolve *Ex Parte* TRO, *State of N.Y.*, ECF No. 12, at 6 n.2; Tr., *Alliance for Retired Americans*, 14:23–15:2, No. 25-cv-00313.

"[O]f course, '[t]here is generally no public interest in the perpetuation of unlawful agency action. To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations.'" *New York v. Trump*, 490 F. Supp. 3d 736, 747 (S.D.N.Y. 2020) (quoting *League of Women Voters*, 838 F.3d at 12); *see also Planned Parenthood of N.Y.C. v. U.S. Dep't of Health and Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (collecting cases). "Plaintiffs are attempting to effect compliance by public officials with duties imposed by Congress" under the Privacy Act and Administrative Procedures Act, and there is "a strong public interest in effecting such compliance." *Steubing v. Brinegar*, 511 F.2d 489, 495 (2d Cir. 1975); *Planned Parenthood of N.Y.C.*, 337 F. Supp. 3d at 343. As Plaintiffs have shown, Defendant OPM's Disclosure and Defendant DOGE's access to OPM systems violates the Privacy Act and the Administrative Procedures Act. There is therefore a strong public interest in enjoining Defendants from continuing to grant access to, and to access, OPM systems in violation of federal law.

Individual privacy is an important public interest. *Doe v. City of New York*, 15 F.3d 264, 267 (2d Cir. 1994). Additionally, the public has a strong interest in "maintaining national security, which of course is a public interest of the highest order." *ACLU*, 785 F.3d at 826. Defendants' actions threaten national security by making OPM's systems more vulnerable to cyberattacks by foreign adversaries and intelligence services.[53] This strongly weighs in favor of granting the TRO.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order should be

---

[53] U.S. House of Representatives, Committee on Oversight and Government Reform, "The OPM Data Breach: How the Government Jeopardized Our National Security for More than a Generation," (Sept. 7, 2016).

granted.

Dated: February 14, 2025                    Respectfully submitted,

                                            */s/ Rhett O. Millsaps II*
                                            Rhett O. Millsaps II
                                            Mark A. Lemley*
                                            Mark P. McKenna (admitted *pro hac vice*)
                                            Christopher J. Sprigman
                                            LEX LUMINA LLP
                                            745 Fifth Avenue, Suite 500
                                            New York, NY 10151
                                            (646) 898-2055

                                            F. Mario Trujillo (admitted *pro hac vice*)
                                            Victoria Noble
                                            ELECTRONIC FRONTIER FOUNDATION
                                            815 Eddy Street
                                            San Francisco, CA 94109
                                            (415) 436-9333

                                            Norman L. Eisen (admitted *pro hac vice*)
                                            STATE DEMOCRACY DEFENDERS FUND
                                            600 Pennsylvania Avenue SE #15180
                                            Washington, DC 20003

                                            Subodh Chandra*
                                            THE CHANDRA LAW FIRM LLC
                                            The Chandra Law Building
                                            1265 W. 6th Street, Suite 400
                                            Cleveland, OH  44113

                                            **pro hac vice* application pending

                                            *Counsel for Plaintiffs*

## CERTICICATE OF COMPLIANCE

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order contains 6,638 words, calculated using Microsoft Word for Mac, which complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

Dated: February 14, 2025             */s/ Rhett O. Millsaps II*_____
                                     Rhett O. Millsaps II

## CERTIFICATE OF SERVICE

Counsel for Plaintiffs certify that they have sent—through Defendants' counsel Christopher Hall at the U.S. Department of Justice Federal Programs Branch —notice of this motion.

Plaintiffs' counsel will immediately send electronically copies of the filing to Defendants' counsel and will serve subsequent registered participants electronically and paper copies will be sent to any non-registered participants.

Dated: February 14, 2025                    */s/ Rhett O. Millsaps II*_____
                                             Rhett O. Millsaps II