**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al*., | Case No. 25-cv-1237-DLC |
| Plaintiffs, | |
| v. | |
| U.S. OFFICE OF PERSONNEL MANAGEMENT, *et al.*, | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR EXPEDITED DISCOVERY**

i

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………..………………..ii

INTRODUCTION AND BACKGROUND ..................................................................................1

   I.   Ambiguity Regarding DOGE's Purpose ...........................................................................2

   II.   Ambiguity Regarding Defendant Musk's Role at DOGE ....................................................5

   III.  Ambiguity Regarding DOGE's Access to OPM Systems and Records.............................7

PLAINTIFFS' PROPOSED DISCOVERY REQUESTS .............................................................9

ARGUMENT ...............................................................................................................................12

CONCLUSION ............................................................................................................................17

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*3M Co. v. HSBC Bank USA, N.A.*,
   No. 16 CIV. 5984 (PGG), 2016 WL 8813992 (S.D.N.Y. Oct. 21, 2016) ...............................11

*AFL-CIO v. Dep't of Labor*,
   No. 1:25-cv-339-JDB (D.D.C. Feb. 19, 2025), ECF No. 43....................................................2

*Am. Fed'n of Gov't Emp. v. OPM*,
   Case No. 3:25-cv-1780 (N.D.Ca. Feb. 27, 2025)……………………………………………12

*Am. Fed'n of Teachers v. Bessent*,
   Case No. 8:25-cv-430-DL, ECF No. 38 (D. Md. Feb. 24, 2025) ...........................................12

*Am. Fed'n of Labor and Congress of Ind. Orgs. v. Dep't. of Labor*,
   Case No. 1:25-cv-339-JDB (D.D.C. Feb. 27, 2025)……………………...…………………..12

*Arista Records, LLC v. Doe 3*,
   604 F.3d 110 (2d Cir. 2010) .................................................................................................13

*Attkisson v. Holder*,
   113 F. Supp. 3d 156 (D.D.C. 2015)........................................................................................15

*AttorneyFirst, LLC v. Ascension Ent., Inc.*,
   144 F. App'x 283 (4th Cir. 2005) ...........................................................................................17

*Ayyash v. Bank Al-Madina*,
   233 F.R.D. 325 (S.D.N.Y. 2005)......................................................................................13, 14

*Camp v. Pitts*,
   411 U.S. 138 (1973) ...............................................................................................................16

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ...............................................................................................................16

*Deide v. Day*,
   No. 23-CV-3954, 2023 WL 5960831 (S.D.N.Y. Aug. 28, 2023) ...........................................11

*Disability Rts. Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*,
   234 F.R.D. 4 (D.D.C. 2006) ...................................................................................................15

*Dopico v. Goldschmidt*,
   687 F.2d 644 (2d Cir. 1982) ...................................................................................................16

*Edakunni v. Mayorkas*,
  No. 2:21-CV-00393-TL, 2022 WL 16949330 (W.D. Wash. Nov. 15, 2022) .........................11

*Educata Corp. v. Scientific Computers, Inc.*,
  599 F. Supp. 1084 (D. Minn. 1984) ...............................................................................13

*Elrod v. Burns,*
  427 U.S. 347 (1976) ......................................................................................................8

*In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*,
  No. 14-CV-4242, 2014 WL 12959675 (S.D.N.Y. July 23, 2014)...........................................11

*Irish Lesbian & Gay Org. v. Guiliani*,
  918 F. Supp. 728 (S.D.N.Y 1996) ..................................................................................10

*Neema v. Renaud*,
  No. 5:21-CV-9, 2021 WL 6803282 (D. Vt. Mar. 4, 2021) .....................................................11

*Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Hous. & Urb. Dev.*,
  No. 11-CV-1312 RLW, 2011 WL 3611461 (D.D.C. Aug. 17, 2011) ......................................12

*North Am. Soccer League LLC v. U.S. Soccer Fed'n*,
  883 F.3d 32 (2d Cir. 2018) ............................................................................................15

*Pension Benefit Guar. Corp. v. LTV Steel Corp.*,
  119 F.R.D. 339 (S.D.N.Y. 1988).................................................................................15, 16

*Pleasant East Associates v. Martinez*,
  No. 02 Civ.4144 (LMM), 2002 WL 31458224 (S.D.N.Y. Nov. 4, 2022).............................16

*Russell Reynolds Assocs., Inc. v. Usina*,
  No. 23 CIV. 2369 (JHR), 2023 WL 3270344 (S.D.N.Y. May 5, 2023) .................................11

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) ......................................................................................................8

**Statutes**

18 U.S.C. §§ 203–209 .......................................................................................................3

5 U.S.C. § 552a(e)(10) .......................................................................................................9

Fed. R. Civ. P. 26(d)(1) ......................................................................................................13

iv

**Other Authorities**

Aaron Rupar (@atrupar.com),  Bluesky (Feb. 24, 2025, 12:35 PM),
    https://bsky.app/profile/atrupar.com/post/3liwv43xjzp2s (last visited February 26, 2025)........6

Alena Botros, et al., *Trump directly contradicts White House over who really runs DOGE,
    saying he 'put a man named Elon Musk in charge'*, FORTUNE (Feb. 20, 2025),
    https://www.yahoo.com/news/trump-directly-contradicts-white-house-182458914.html..........6

Bobby Allyn, *21 DOGE staffers resign, saying they won't help 'dismantle' public services*, NPR
    (Feb. 25, 2025), https://www.npr.org/2025/02/25/nx-s1-5308095/doge-staff-resignations-elon-
    musk (last visited Feb. 27, 2025)...........................................................................................5

Colson Thayer, *Elon Musk Tells Government Employees to List 5 Things They Did Last Week or
    Be Fired to See Who Has 'Two Working Neurons'*, PEOPLE (Feb. 24, 2025),
    https://people.com/elon-musk-email-ultimatum-five-accomplishments-11685549 ..................6

Department of Government Efficiency (@DOGE),  X (Feb. 12, 2025, 6:47 PM),
    https://x.com/DOGE/status/1889838663833645309 (last visited Feb. 26, 2025)......................4

Declaration of Joshua Fisher,
    *J. Doe 1 v. Musk*, No. 8:25-cv-462-TDC (D. Md. Feb. 17, 2025) ...........................................6

Declaration of Joshua Fisher,
    *New Mexico v. Musk*, No. 1:25cv-429-TSC (D.D.C. Feb. 17, 2025).......................................6

Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) .......................................................2, 3

Feb. 25, 2025 Resignation Letter of 21 USDS Employees,
    https://www.documentcloud.org/documents/25544180-usds-resignation-letter/ (last visited
    Feb. 27 , 2025 ...........................................................................................................................5

Makena Kelly, *USDS Engineering Director Resigns: 'This Is Not the Mission I Came to Serve'*,
    WIRED (Feb. 19, 2025),  https://www.wired.com/story/doge-engineering-director-resign/ (last
    visited Feb. 26, 2025). ..............................................................................................................4

Matt Bai, *The blinding contempt of the DOGE bros*, WASHINGTON POST (Feb. 24, 2025),
    https://www.washingtonpost.com/opinions/2025/02/24/musk-doge-usaid-cuts-dc/ (last visited
    Feb. 26, 2025)............................................................................................................................4

Rachael Levy and Marisa Taylor, *Exclusive: FDA staff reviewing Musk's Neuralink were
    included in DOGE employee firings, sources say*, REUTERS (Feb. 18, 2025),
    https://www.reuters.com/world/us/fda-staff-reviewing-musks-neuralink-were-included-doge-
    employee-firings-sources-2025-02-17/ (last visited Feb. 26, 2025). ........................................4

Stephen Fowler, *With a New Home for DOGE in the White House, Here's What You Need to Know*, NPR (Jan. 29, 2025), https://www.npr.org/2025/01/29/nx-s1-5270893/doge-united-states-digital-service-elon-musk-usds-trump-white-house-eop-omb. ........................................3

Tara Copp, *DOGE is getting lists of the military's probationary workers from the Pentagon*, ASSOCIATED PRESS (Feb. 18, 2025), https://apnews.com/article/doge-pentagon-trump-probationary-workers-military-414b369147fdd043af586c76c0b716c9  (last visited Feb. 26, 2025)..........................................................................................................................4

Theodore Schleifer, et al., *Young Aides Emerge as Enforcers in Musk's Broadsides Against Government*, NEW YORK TIMES (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html (last visited Feb. 26, 2025)..............................................................................................................................7

Tim Hains, *Speaker Johnson: "Elon Has Cracked The Code," "Gotten Into The Belly Of The Beast,"* (C-SPAN2 broadcast Feb. 24, 2025), https://www.realclearpolitics.com/video/2025/02/24/speaker_johnson_elon_has_cracked_the_code.html. ..............................................................................................................5

## INTRODUCTION AND BACKGROUND

The employment records of more than 20 million Americans have been breached.  In violation of the Privacy Act, the Office of Personnel Management ("OPM") illegally disclosed and is continuing to disclose databases full of sensitive personal information to the so-called Department of Government Efficiency ("DOGE") and an unknown number of individuals who have no lawful right to access it.  Plaintiffs have sought emergency relief to stop the ongoing privacy violations resulting from this unlawful access to their and their members' protected records.[1]  At the same time, the key facts before the Court about the status of DOGE personnel at OPM, DOGE's nature and authority, and the scope of DOGE agents' ongoing access and activities remain incomplete.  These missing facts, solely in Defendants' possession, are critical to assessing Plaintiffs' likelihood of success and the irreparability of their injuries.  Tailored discovery into these limited questions will provide the Court a sufficient record on which to evaluate Plaintiffs' motion for a preliminary injunction.

Determination of Plaintiffs' entitlement to a preliminary injunction requires a fact-specific inquiry.  The Court must evaluate Defendants' conduct under the Privacy Act and the Administrative Procedure Act ("APA") and as *ultra vires* action.  The Court must also evaluate Plaintiffs' showing of a risk of irreparable harm.  Defendants have made multiple representations to the Court about DOGE's organization and operations and about who has access to OPM

---

[1] On February 14, 2025, Plaintiffs filed a motion for a temporary restraining order ("TRO").  ECF No. 27.  The Court scheduled a hearing on that motion for February 27.  ECF No. 43.  On February 23, Plaintiffs joined Defendants' request to convert their motion for a TRO to one for a preliminary injunction and notified the Court that they would file this motion for expedited discovery in aid of that motion.  ECF No. 45.  On February 24, the U.S. District Court for the District of Maryland in *American Federation of Teachers, et al. v. Scott Bessent, et al.,* Case No. 8:25-cv-430-DLB (D. Md. Feb. 24, 2025), entered a TRO against OPM and Acting Director Ezell that provides much of the relief Plaintiffs had requested in their TRO motion in this case; that TRO expires on March 10.  *See* ECF Nos. 46 and 46-1.

1

records, those actors' need for access, and measures taken by OPM to ensure compliance with the Privacy Act. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for a Temporary Restraining Order, ECF No. 39 ("Def. Mem.") at 19-22. But the representations in Defendants' brief are inconsistent with the single declaration on which those representations are based. They also are inconsistent with reams of public reporting, and with admissions by Defendants and their agents. Defendants' papers leave unanswered critical questions about Defendants' conduct.

Granting limited, expedited discovery into these issues would be an appropriate exercise of this Court's discretion. These issues are well-suited to expedited discovery. Because Plaintiffs' claims challenge unwritten, unacknowledged policy changes by Defendant OPM, no administrative record likely exists about key issues to facilitate judicial review. The limited factual discovery that Plaintiffs seek will provide the Court a more complete record to assess the need for a preliminary injunction when that motion is briefed and will assist the Court's fact-finding function to assess the truth and reliability of the parties' representations and evidence.[2]

## I.    Ambiguity Regarding DOGE's Purpose

President Donald Trump established the so-called "Department of Government Efficiency" ("DOGE") by executive order on January 20, 2025. Exec. Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025) ("E.O."). Organized within the Executive Office of the President, Defendant DOGE allegedly exists "to implement the President's DOGE agenda, by modernizing Federal technology and software to maximize governmental efficiency and

---

[2] The limited discovery sought by Plaintiffs should proceed simultaneously with briefing on Defendants' motion to dismiss, as is occurring in at least one other case with claims parallel to this one. *See AFL-CIO v. Dep't of Labor*, No. 1:25-cv-339-JDB (D.D.C. Feb. 19, 2025), ECF No. 43 (order). Moreover, the arguments that Defendants intend to raise in their motion to dismiss have already been rejected by another court in issuing a TRO against OPM on claims similar to those of Plaintiffs' here. ECF No. 46-1.

productivity." *Id.* DOGE consists of two organizations: the United States DOGE Service (USDS) and the U.S. DOGE Temporary Organization. *Id.* USDS was an existing entity—President Trump's E.O. renamed the United States Digital Service—under the Office of Management and Budget (OMB).[3] The E.O. also created the Temporary Organization to "advance[e] the President's 18-month DOGE agenda." E.O. 14,158. The E.O. requires federal agencies to create a "DOGE team" of employees that works with DOGE to implement its agenda at their respective agencies. *Id.* The Temporary Organization is subject to more relaxed hiring rules than standard federal agencies, allowing it to bypass the ethical and security safeguards of the normal federal hiring process and hire "special government employees," who are subject to less stringent ethics and transparency requirements than most federal employees.[4]

The E.O. casts Defendant DOGE as an information-technology entity. It directs DOGE to "commence a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems." *Id.* It also orders DOGE "to promote inter-operability between agency networks and systems, ensure data integrity, and facilitate responsible data collection and synchronization." *Id.* In their opposition to Plaintiffs' motion for a temporary restraining order, Defendants emphasize the supposedly limited purpose of DOGE. Def. Mem. at 3. According to Defendants, the work of the DOGE and/or OPM employees is purely internal to OPM and therefore avoids any Privacy Act concerns. *Id.* But that is patently inconsistent both with admissions by President Trump and Defendant Musk and with innumerable, credible media reports, which together demonstrate that

---

[3] Stephen Fowler, "With a New Home for DOGE in the White House, Here's What You Need to Know," *NPR* (Jan. 29, 2025), https://www.npr.org/2025/01/29/nx-s1-5270893/doge-united-states-digital-service-elon-musk-usds-trump-white-house-eop-omb (last visited Feb. 27, 2025).
[4] *Id.*; 18 U.S.C. §§ 203–209.

DOGE's activities far exceed DOGE's information-technology mandate.  For example:

- On February 15-16, 2025, DOGE fired approximately 20 employees at the Food and Drug Administration's Office of Neurological and Physical Medicine Devices, including workers overseeing the review of Defendant Musk's Neuralink brain implant company. Rachael Levy and Marisa Taylor, "Exclusive: FDA staff reviewing Musk's Neuralink were included in DOGE employee firings, sources say," *Reuters* (Feb. 18, 2025), https://www.reuters.com/world/us/fda-staff-reviewing-musks-neuralink-were-included-doge-employee-firings-sources-2025-02-17/ (last visited Feb. 27, 2025).

- On February 18, 2025, U.S. officials said that DOGE agents were at the Pentagon attempting to access lists of probationary employees and gave departments until the end of the day to produce employees' names.  Tara Copp, "DOGE is getting lists of the military's probationary workers from the Pentagon," *Associated Press* (Feb. 18, 2025), https://apnews.com/article/doge-pentagon-trump-probationary-workers-military-414b369147fdd043af586c76c0b716c9 (last visited Feb. 27, 2025).

- On February 18, 2025, according to *WIRED*, two DOGE members met with USDS employees and told them that DOGE would be "increasingly hands-on with the organization"–and that anyone remaining at USDS after layoffs would become absorbed into DOGE.  Makena Kelly, "USDS Engineering Director Resigns: 'This Is Not the Mission I Came to Serve'," *WIRED* (Feb. 19, 2025),  https://www.wired.com/story/doge-engineering-director-resign/ (last visited Feb. 27, 2025).

- The *Washington Post* has reported that DOGE affiliates have used their access to USAID systems to unilaterally veto the disbursement of foreign aid, *even in instances where the Secretary of State himself had ordered disbursements be made*.  Matt Bai, "The blinding contempt of the DOGE bros," *Washington Post* (Feb. 24, 2025), https://www.washingtonpost.com/opinions/2025/02/24/musk-doge-usaid-cuts-dc/ (last visited Feb. 27, 2025).

- On February 21, 2025, the DOGE account posted the following on Defendant Musk's "X" social media platform: "Today's contract update: 95 cancellations with savings of ~$115M (ceiling value of ~$235M), including two USDA contracts: - $265k for a "food and nutrition service 3 day leadership retreat in Atlanta" - $30K for "Malaysia study tour facilitation services".  On February 13, 2025, the DOGE X account posted that they had cancelled an additional 58 contracts worth over $150 million. Department of Government Efficiency (@DOGE),  X (Feb. 12, 2025, 6:47 PM), https://x.com/DOGE/status/1889838663833645309 (last visited Feb. 27, 2025).

- On February 24, 2025, Speaker of the House Mike Johnson reported a conversation with

Elon Musk in which Musk described DOGE's actions inside the agencies, including OPM, in terms far different than the ones Defendants use in this case: "But Elon has cracked the code. He is now inside the agencies. He has created algorithms that are constantly crawling through the data. As he told me in his office, the data doesn't lie." Tim Hains, *Speaker Johnson: "Elon Has Cracked The Code," "Gotten Into The Belly Of The Beast,"* (C-SPAN2 broadcast Feb. 24, 2025), https://www.realclearpolitics.com/video/2025/02/24/speaker_johnson_elon_has_cracked _the_code.html (last visited Feb. 27, 2025).

More recently, on February 25, more than 20 civil-service employees resigned from DOGE, publicly announcing their refusal to use their technical expertise to "dismantle critical public services." Bobby Allyn, "21 DOGE staffers resign, saying they won't help 'dismantle' public services," *NPR* (Feb. 25, 2025), https://www.npr.org/2025/02/25/nx-s1-5308095/doge-staff-resignations-elon-musk (last visited Feb. 27, 2025); Feb. 25, 2025, Resignation Letter of 21 USDS Employees, https://www.documentcloud.org/documents/25544180-usds-resignation-letter/ (last visited Feb. 27 , 2025 ("USDS Resignation Letter"). The DOGE employees described having been interviewed by unidentified people with "White House visitor badges" who had "limited technical ability" and who were "asking questions about political loyalty." *Id*. The USDS Resignation Letter also pointed to actions "not compatible with [a] mission … to deliver better services to the American people through technology and design" and which included "firing technical experts, mishandling sensitive data and breaking critical systems." *Id*. Discovery will provide the Court with the information necessary to assess Defendants' now publicly contradicted assertions of the limited role of the DOGE agents at OPM.

## II. Ambiguity Regarding Defendant Musk's Role at DOGE

There are significant questions about Defendant Musk's position within DOGE, when, and if, he became a government employee, his access to OPM records, and his direction and control of individuals with access to those records that are material to Defendants' compliance

with the Privacy Act.  For example, the Trump administration has identified Defendant Musk as being in charge of DOGE, and Speaker Johnson's comments confirm that view.  Alena Botros, *et al*., "Trump directly contradicts White House over who really runs DOGE, saying he 'put a man named Elon Musk in charge'," *Fortune* (Feb. 20, 2025), https://www.yahoo.com/news/trump-directly-contradicts-white-house-182458914.html (last visited Feb. 27, 2025).  But in various litigation matters the government has represented that Musk is not affiliated with DOGE and has no authority there.  *See, e.g., J. Doe 1 v. Musk*, No. 8:25-cv-462-TDC, Decl. of Joshua Fisher, ¶ 6 (D. Md. Feb. 17, 2025); *New Mexico v. Musk*, No. 1:25cv-429-TSC, Decl. of Joshua Fisher, ¶ 6 (D.D.C. Feb. 17, 2025).

But the public record appears to contradict the government's assertion in the courts.  For example, Defendant Musk tweeted on February 22 that all federal government employees would receive an email from OPM demanding that they list five weekly accomplishments or be fired.  Colson Thayer, "Elon Musk Tells Government Employees to List 5 Things They Did Last Week or Be Fired to See Who Has 'Two Working Neurons'," *People* (Feb. 24, 2025), https://people.com/elon-musk-email-ultimatum-five-accomplishments-11685549 (last visited Feb. 27, 2025).  Shortly thereafter, OPM indeed sent such an email, showing that Musk had the ability to direct OPM to act.  And on February 24, Speaker Mike Johnson publicly stated that Defendant Musk "is now inside the agencies." Aaron Rupar (@atrupar.com), Bluesky (Feb. 24, 2025, 12:35 PM), https://bsky.app/profile/atrupar.com/post/3liwv43xjzp2s (video) (last visited February 27, 2025).  These inconsistencies are material to determining who has access to Defendant OPM's records and why, as required by the Privacy Act, and to Musk's status as a defendant here.

**III.    Ambiguity Regarding OPM's Disclosure of Records to DOGE and DOGE's Access to OPM Systems and Records**

Congress charged Defendant OPM with maintaining the sensitive personnel records of current and former federal employees, contractors, and job applicants.  These records can include name, social security number, job performance, race, gender identity, union activities, health records and benefits, information about family members and other third parties referenced in background checks and health records, and other sensitive information.  On January 20, 2025, immediately following DOGE's formation, its agents demanded and were granted administrative access to OPM's systems and personnel records.  Compl. ¶¶ 8-9.  DOGE is populated by unvetted staff with ties to Defendant Musk who may not even have been government employees at the time they unlawfully accessed OPM records.[5]  *Id.*  ¶¶ 7-9.

Defendants' response to these concerns substantially heightens the uncertainty around their conduct.  The only factual support for Defendants' representations is the declaration of Defendant OPM's Chief Information Officer, Greg Hogan, himself appointed to the position on January 20, 2025.  But Mr. Hogan's declaration omits critical basic information, including which individuals have been given access to each OPM database since January 20, 2025, when access was granted, who authorized it, what systems and records have been accessed, for what purpose, and whether copies of those records have been created.  *See* ECF No. 40 ("Hogan Decl.").

---

[5] According to credible media reports, Defendants OPM and Ezell gave unrestricted, wholesale access to OPM systems and records to DOGE agents including Musk, Akash Bobba, Luke Farritor, Gautier Cole Killian, Gavin Kliger, Ethan Shaotran, and Edward Coristine.  Coristine is a 19-year-old who is now widely known by his online identity "Big Balls" and who, according to the *New York Times*, was fired from cybersecurity firm Path Network in 2022 following (according to a recent firm statement) "an internal investigation into the leaking of proprietary information that coincided with his tenure."  Compl. ¶ 8; Theodore Schleifer, *et al.*, "Young Aides Emerge as Enforcers in Musk's Broadsides Against Government," *New York Times*, (Feb. 7, 2025), https://www.nytimes.com/2025/02/07/us/politics/musk-doge-aides.html (last visited Feb. 27, 2025).

Plaintiffs' complaint includes well-pleaded allegations that presumptively establish Defendants' violations of the Privacy Act. *See Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981); *Elrod v. Burns,* 427 U.S. 347, 350 n. 1 (1976). Rather than proffering specific evidence that sufficiently rebuts those allegations, Defendants rely on conclusory statements without factual support. For example, Defendants assert that Defendant OPM has not granted access to OPM systems to anyone who is not an OPM employee. Def. Mem. at 1. But that unqualified statement is not consistent with reams of public reporting—*and is not supported by Mr. Hogan's declaration*. Mr. Hogan admits that at least three engineers had apparently unlawful access to OPM records systems before OPM revoked that access "in early February." Hogan Decl. ¶12. Defendants provide no information about the nature of those engineers' prior access or about any collection of OPM data those unauthorized persons made, or about the use of that OPM data.

In fact, Hogan makes no categorical statements about outsiders' access to OPM systems at all. The declaration leaves questions about which other agencies employ specific individuals referenced in his declaration; who these individuals report to; which agency's mission are these individuals meant to advance; what proportion of their work is done at each agency. *See id.* ¶12, ¶14. Notably, Mr. Hogan does *not* testify that no DOGE agents currently have access to OPM systems, that no DOGE agents copied or shared records from OPM systems, or that no DOGE agents will receive such access in the future. He says that OPM "regularly reviews access permissions" for individuals outside OPM "to ensure they are appropriately limited." *Id.* Additionally, Defendants claim that "all of the relevant OPM employees also have the requisite 'need for the record'" under the Privacy Act," Def. Mem. at 22, but the Hogan Declaration does not establish that; nor have Defendants explained what the need is and whether it qualifies under the Privacy Act's exemptions. And while Mr. Hogan's declaration identifies two OPM systems

that he says outsiders did not have access to, the declaration is silent about access to other OPM systems that contain confidential information.

Beyond the basic "who, what, where, when, why" facts about access that Defendants have not answered, there is uncertainty about whether OPM has undertaken any of the security measures that the Privacy Act requires to safeguard access. 5 U.S.C. § 552a(e)(10). Mr. Hogan states that he believes "to the best of [his] knowledge" that the OPM employees with access completed training related to records management, cybersecurity, and data privacy. Hogan Decl. ¶ 13. His caveat introduces a question of whether, in fact, such training was completed—and if it was completed before records were accessed and/or distributed. Key questions also remain unanswered about whether information was transferred or shared outside of OPM systems, whether equipment or systems outside of OPM were connected to OPM's systems, and whether records of access were properly maintained, as expressly required by the Privacy Act. 5 U.S.C. 552a(e)(10). Questions also remain about whether granting OPM records access to DOGE personnel represented a change in or a violation of existing OPM policy, and if so, the circumstances surrounding the change in policy. And, of course, core questions surround how Defendants DOGE, Musk, and their agents used their records access to wreak havoc across government programs and employees far broader than merely upgrading information-technology services.

**PLAINTIFFS' PROPOSED DISCOVERY REQUESTS**

As described above, the record as it currently stands leaves unresolved substantial questions of material fact regarding (1) the nature of DOGE regarding OPM data access and the relationship to and authority over DOGE agents at OPM; (2) the extent of OPM access by DOGE agents; (3) the reasons for each DOGE agent's access; (4) whether OPM adhered to or changed its existing policies before granting access to DOGE agents; (5) whether DOGE agents

connected outside equipment to, and/or removed protected personal information from, OPM's

systems; (6) how DOGE agents used (or more likely, misused) their access to data; and (7)

whether the security procedures required by the Privacy Act were followed by OPM personnel

and/or DOGE agents to ensure sensitive personal data and systems remain protected.

Plaintiffs accordingly move for expedited discovery to fill in the limited factual record

before the Court.  Attached as Exhibit 1 are Plaintiffs' proposed interrogatories, requests for

production, and deposition topics.  Plaintiffs have narrowly tailored their requests to seek only

the most relevant information essential to their claims in a manner that minimizes the burden on

Defendants and can be completed in a reasonable period.  *See Irish Lesbian & Gay Org. v.*

*Guiliani*, 918 F. Supp. 728, 7321 (S.D.N.Y 1996) (expedited discovery appropriate where it is

"reasonably tailored to the time constraints under which both parties must proceed or to the

specific issues that will have to be determined at the preliminary injunction hearing").

Plaintiffs request at this time four depositions: of Defendant Musk, Mr. Hogan, and

organizational representatives of Defendants DOGE and OPM under Rule 30(b)(6).  These

depositions are necessary to resolve material ambiguities in the record.  The proposed topics are

detailed in the attached proposed discovery requests.  In short, (1) Defendant Musk's deposition

is necessary to address his and his deputies' role, responsibilities, and authority over DOGE

personnel and activities; (2) Mr. Hogan's deposition is necessary to test the truth of and clarify

discrepancies between his declaration and Defendants' representations (as described above); (3)

the Rule 30(b)(6) deposition of Defendant OPM is necessary to determine the security and

privacy policies in place, the roles and responsibilities of DOGE personnel working at OPM, and

the nature, extent, and purpose of access granted to DOGE personnel to OPM systems and

records; and (4) the Rule (30)(b)(6) deposition of Defendant DOGE is necessary to determine its

mission, structure, and responsibilities, leadership, scope of authority at OPM, and the roles and responsibilities of DOGE personnel working at OPM regarding access to OPM systems and records.

Courts have routinely granted depositions, including Rule 30(b)(6) depositions, as part of expedited discovery, including those of government officials, for narrowly-focused topics critical to evaluating preliminary relief. *See, e.g., Deide v. Day*, No. 23-CV-3954, 2023 WL 5960831, at *1 (S.D.N.Y. Aug. 28, 2023) (in lawsuit against county, granting expedited depositions of "high-ranking government official" defendants); *Russell Reynolds Assocs., Inc. v. Usina*, No. 23 CIV. 2369 (JHR), 2023 WL 3270344, at *2 (S.D.N.Y. May 5, 2023) (granting expedited deposition of Defendant); *3M Co. v. HSBC Bank USA, N.A.*, No. 16 CIV. 5984 (PGG), 2016 WL 8813992, at *1 (S.D.N.Y. Oct. 21, 2016) (granting expedited Rule 30(b)(6) deposition of Defendant concerning fifteen topic areas); *In re Keurig Green Mountain Single-serve Coffee Antitrust Litig.*, No. 14-CV-4242, 2014 WL 12959675, at *1-3 (S.D.N.Y. July 23, 2014) (granting limited, expedited discovery, including 30(b)(6) depositions from *Keurig*, before filing of preliminary injunction motions).

Additionally, expedited depositions, including Rule 30(b)(6) depositions, are appropriate in the context of APA claims. *See, e.g., Neema v. Renaud*, No. 5:21-CV-9, 2021 WL 6803282, at *1 (D. Vt. Mar. 4, 2021) (in APA case challenging delayed review of H1-B visas, granting expedited deposition of Section Chief at Vermont U.S. Customs and Immigration Service Center, as well as Rule 30(b)(6) deposition concerning change in policies); *Edakunni v. Mayorkas*, No. 2:21-CV-00393-TL, 2022 WL 16949330, at *4 (W.D. Wash. Nov. 15, 2022) (in APA case challenging delayed visa applications, granting expedited deposition of U.S. Customs and Immigration Service Deputy Associate Director, as well as Rule 30(b)(6) deposition

11

regarding policies and exceptions applicable to plaintiffs); *Neighborhood Assistance Corp. of Am. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 11-CV-1312 RLW, 2011 WL 3611461, at *1 (D.D.C. Aug. 17, 2011) (in APA case challenging a HUD regulation and basis for plaintiff organization's audit, granting expedited three depositions of HUD officials involved in the audit, as well as Rule 30(b)(6) deposition of official most familiar with adoption of the regulation at issue).

Today, in a case similar to this one, the U.S. District Court for the District of Columbia granted the plaintiffs' motion for expedited discovery to gather evidence prior to filing their preliminary injunction motion. The case involves APA claims alleging DOGE gaining access to data systems at the Departments of Health and Human Services and the Consumer Financial Protection Bureau, and the court there granted plaintiffs proposed discovery consisting of interrogatories, document requests, and four Rule 30(b)6) depositions, one for DOGE and one for each of the three agency defendants. *Am. Fed'n of Labor and Congress of Ind. Orgs. v. Dep't. of Labor,* Case No. 1:25-cv-339-JDB (D.D.C. Feb. 27, 2025) (ECF No. 48) (order). Also today, the U.S. District Court for the Northern District of California granted plaintiffs' motion for expedited discovery after granting a temporary restraining order enjoining OPM from terminating of tens of thousands of probationary federal employees. *Am. Fed'n of Gov't Emp. v. OPM*, Case No. 3:25-cv-1780 (N.D.Ca. Feb. 27, 2025) (ECF No. 41) (order). In assessing *ultra vires* and APA claims, that court found that the plaintiffs were likely to succeed on the merits that the OPM terminations were illegal, and in requesting discovery plaintiffs had highlighted discrepancies between representations by OPM Acting Director Ezell and various public admissions by government agencies. *Id.*, ECF No. 39 at *6 (Feb. 26, 2025) (Pl. Reply Brief).

**ARGUMENT**

The Court has broad discretion to manage discovery, especially in the context of a

preliminary injunction where the urgency of the case and risk of harm make it impractical for discovery to wait for the ordinary course. *See* Fed. R. Civ. P. 26(d)(1) (permitting deviation from normal rule when "authorized . . . by court order"); Advisory Committee Notes ("This subdivision is revised to provide that formal discovery . . . not commence until the parties have met and conferred as required by subdivision (f). Discovery can begin earlier if authorized . . . by . . . order . . . . This will be appropriate in some cases, such as those involving requests for a preliminary injunction . . . ."). Expedited discovery is particularly appropriate in the preliminary injunction context because such discovery "better enable[s] the court to judge the parties' interests and respective chances for success on the merits." *Educata Corp. v. Scientific Computers, Inc.*, 599 F. Supp. 1084, 1088 (D. Minn. 1984) (granting expedited discovery).

The prevailing standard for granting expedited discovery is the "flexible standard of good cause and reasonableness." *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 326 (S.D.N.Y. 2005). The Court should consider "the *reasonableness* of the request in light of all the surrounding circumstances." *Id.* at 327 (emphasis in original). The principal factors courts consider when determining whether expedited discovery is appropriate include: (1) the plaintiff's showing of a *prima facie* claim of actionable harm, (2) the specificity of the discovery request, (3) the absence of alternative means to obtaining the information, (4) the need for the information to advance the claim, and (5) the defendant's expectation of privacy. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010). All five factors favor granting limited, expedited discovery here.

**First**, Plaintiffs have established a prima facie case of actionable harm. Their complaint sets forth sufficient claims of Privacy Act, APA violations, and *ultra vires* conduct, including Defendants' disclosure of Plaintiffs' and their members' records without consent or any valid exception and the failure to maintain the security of those records. Compl. ¶¶ 47-59; *see*

13

Memorandum of Law in Support of Plaintiffs' Motion for Temporary Restraining Order, ECF No. 28 ("Pl. Mem.") at 14-18.  Plaintiffs have also shown the risk of irreparable harm they face as a result of Defendants' conduct.  Compl. ¶¶ 41-43; Pl. Mem at 19-22.  Through these allegations and supporting declarations, Plaintiffs have satisfied the higher burden of likelihood of success on the merits required for granting a preliminary injunction, and therefore *ipso facto* they have satisfied as well the lower prima facie standard for expedited discovery.  *Cf. Ayyash*, 233 F.R.D. at 326-27 (explaining that it "makes little sense" to use the same standard for evaluating a motion for expedited discovery as a motion for a preliminary injunction).  Indeed, in a parallel case alleging substantially the same facts, a judge in the District of Maryland already has found that plaintiffs have shown a likelihood of success on the merits of the claims that the facts alleged here violate the APA and the Privacy Act.  *Am. Fed'n of Teachers v. Bessent,* Case No. 8:25-cv-430-DL (D. Md. Feb. 24, 2025) (ECF No. 38) (order).

**Second**, Plaintiffs have narrowly tailored their discovery requests to information at the heart of the claims at issue, focusing on the basic "who, what, why, where, when, and how" regarding access to OPM systems, use of the information acquired with that access, and other information regarding safeguards required by the Privacy Act.  This information is critical to assessing both Defendants' compliance with the Privacy Act and APA and the extent of Plaintiffs' irreparable injury.

**Third**, the requested information is exclusively in Defendants' control.  It would be impractical, if not impossible, for Plaintiffs to obtain this information from any source other than Defendants and their agents.  Simply put, absent the requested discovery, Plaintiffs will effectively be barred from litigating their well-pleaded claims.

**Fourth**, the discovery requested is material to advance Plaintiffs' claims.  As discussed

14

above, the scant information proffered by Defendants raises more questions than it answers. The discovery sought will ensure that the Court has a sufficient record to evaluate the preliminary injunction motion.

**Fifth**, Defendants have no valid privacy concern because the Privacy Act calls for transparency by the government about disclosures it made concerning sensitive personal information in which Plaintiffs and their members themselves have privacy interests. Failing to grant discovery would exacerbate Plaintiffs' privacy harms, contrary to the plain terms of the Privacy Act, by denying Plaintiffs and their members basic facts about who has accessed their personal information, for what purposes, and what safeguards were followed to protect their privacy rights.

Additionally, "[w]hen the plaintiff will be irreparably harmed without expedited discovery, this factor weighs in favor of granting a motion for expedited discovery." *Attkisson v. Holder*, 113 F. Supp. 3d 156, 164 (D.D.C. 2015). Here, Plaintiffs are seeking to preserve the status quo and stop greater harm from occurring. *See Disability Rts. Council of Greater Wash. v. Wash. Metro. Area Transit Auth.*, 234 F.R.D. 4, 7 (D.D.C. 2006) (A proper purpose for expedited discovery is found where "the plaintiff seeks to gain evidence to get the court to preserve the status quo.") The status quo in this case is "the last actual, peaceable uncontested status which preceded the pending controversy"—*i.e.*, the status of OPM's records systems before DOGE agents unlawfully gained access to them. *North Am. Soccer League LLC v. U.S Soccer Fed'n*, 883 F.3d 32, 37 (2d Cir. 2018) (citation omitted).

Finally, and contrary to Defendants' claim that discovery should not be permitted in an APA case, "litigants challenging agency decisions have succeeded in obtaining limited discovery to ensure that the administrative record before the court is complete." *Pension Benefit Guar.*

15

*Corp. v. LTV Steel Corp.*, 119 F.R.D. 339, 341 (S.D.N.Y. 1988) (collecting cases); *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (per curiam) (holding that where "there was such failure to explain administrative action as to frustrate effective judicial review," a court reviewing an agency decision may "obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary."); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("But since the bare record may not disclose the factors that were considered or the [decisionmaker's] construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the [decisionmaker] acted within the scope of his authority and if [his] action was justifiable under the applicable standard"); *Dopico v. Goldschmidt*, 687 F.2d 644, 654 (2d Cir. 1982) (reversing district court's decision to grant summary judgment because the parties had a dispute as to whether the administrative record presented to the Court was indeed the full record that had been before the agency); *Pleasant East Associates v. Martinez*, No. 02 Civ.4144 (LMM), 2002 WL 31458224, at *1-2 (S.D.N.Y. Nov. 4, 2022) (permitting discovery on claims brought under the APA).  Discovery is especially appropriate here precisely because Defendants are acting pursuant to an unannounced and unacknowledged policy for which there is no administrative record.  In any event, because Plaintiffs bring Privacy Act and *ultra vires* claims in addition to the APA claims, at a minimum discovery is warranted on those claims.

In short, the expedited discovery sought by Plaintiffs is narrow, precisely tailored to the key issues at this stage in the proceeding, will allow the Court to fully consider the arguments to be presented in Plaintiffs' motion for preliminary injunction, and present only a minimal burden on Defendants.

Finally, this Court has asked the parties to address whether the preliminary injunction

motion should be consolidated into an early bench trial on the merits. Plaintiffs do not oppose such consolidation provided that they are afforded the opportunity and reasonable time to engage in the requested discovery. But it would be unreasonable and prejudicial to ask Plaintiffs to proceed to a trial on the merits without the benefit of discovery into the facts of OPM's data disclosures and the inconsistencies in the scant evidence the government has provided.

*AttorneyFirst, LLC v. Ascension Ent., Inc.*, 144 F. App'x 283, 287 (4th Cir. 2005) ("A litigant applying for a preliminary injunction should seldom be required either to forego discovery in order to seek emergency relief or to forego a prompt application for an injunction in order to prepare adequately for trial.") (quoting *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.,* 463 F.2d 1055, 1057 (7th Cir.1972)).

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' Motion for Expedited Discovery.

Dated: February 27, 2025                    Respectfully submitted,

                                            */s/ Rhett O. Millsaps II*
                                            Rhett O. Millsaps II
                                            Mark P. McKenna (admitted pro hac vice)
                                            Christopher J. Sprigman
                                            Mark A. Lemley (pro hac vice application pending)
                                            LEX LUMINA LLP
                                            745 Fifth Avenue, Suite 500
                                            New York, NY 10151
                                            (646) 898-2055

                                            F. Mario Trujillo (admitted pro hac vice)
                                            Victoria Noble
                                            ELECTRONIC FRONTIER FOUNDATION
                                            815 Eddy Street
                                            San Francisco, CA 94109
                                            (415) 436-9333

                                            Norman L. Eisen (admitted pro hac vice)
                                            STATE DEMOCRACY DEFENDERS FUND
                                            600 Pennsylvania Avenue SE #15180
                                            Washington, DC 20003

                                            Subodh Chandra*
                                            THE CHANDRA LAW FIRM LLC
                                            The Chandra Law Building
                                            1265 W. 6th Street, Suite 400
                                            Cleveland, OH  44113

                                            *Pro hac vice application forthcoming

                                            *Counsel for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing Memorandum in Support of Plaintiffs' Motion for a Temporary Restraining Order contains 5,252 words, calculated using Microsoft Word for Mac, which complies with Rule 7.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.


Dated: February 27, 2025                    */s/ Rhett O. Millsaps II*
                                             Rhett O. Millsaps II