# EXHIBIT B

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Ward Brehm**, <br><br> Plaintiff, <br><br> v. <br><br> **Pete Marocco,** *et al.*, <br><br> Defendants. | **Civil Case No. 25-cv-660** |

## DECLARATION OF ELISABETH FELEKE

I, Elisabeth Feleke, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1. I am the Chief Program Officer at the United States African Development Foundation (USADF).

2. I have been with USADF since October 2020. I oversee the program division within USADF, with activities in more than 20 countries in Africa.

3. On February 20, 2025, Chris Young, a senior member of the Department of Government Efficiency (DOGE) team met with the USADF leadership team, including me, at headquarters. Young explained that he was there to introduce DOGE to the Agency. He also announced that two software engineers would be assigned to the Agency to modernize the Agency's IT systems and create efficiencies in our operations. During discussions, I stated to Mr. Young that modernizing our IT systems and databases was welcome news and that we fully supported the mission of

1

using technology to create a more efficient workforce. Mr. Young spoke about his experience in Africa as a child of missionaries and stated that he has seen first-hand the many problems that USADF is trying to address. He mentioned that due to the urgency of responding to the President's Executive Order aimed at USADF, the two engineers would come to the Agency the next day on February 21st.

4. On February 21, Ethan Shaotran, Jacob Altik, and Nate Cavanaugh arrived at USADF. Shaotran and Cavanaugh introduced themselves as IT personnel from GSA. Altik stated that he was a lawyer from the White House Personnel Office. They explained that we needed to immediately sign a memorandum of understanding for their detail assignment.

5. Once the MOU was signed, Altik explained the true purpose of the meeting, which was to provide USADF leadership with DOGE's interpretation of the "minimum presence and function" required by USADF's statute. DOGE read the statute to mean: 1) only the USADF Board and President/CEO are statutorily required, 2) only one or two grants funded by private sector partnerships are required, and 3) all other personnel/employees therefore needed to be eliminated under the Executive Order.

6. Altik stated that his next step was to present a RIF plan (where all USADF staff would be fired) to the board for approval by Monday, February 24. Altik threatened that if the Board didn't approve the plan, the Board would be dismissed. Both Mathieu Zahui and I tried to explain to Altik that the President's Executive

2

Order gave the agency 14 days to respond and that we intended to comply with the order.

7. Cavanaugh and Altik then demanded immediate access to USADF systems including financial records and payment and human resources systems, which include staff job descriptions, personnel files, salaries, and organizational structure.

8. Mathieu Zahui outlined the administrative process—which includes security clearances—required to access sensitive data and personally identifiable information from the Agency's systems. He provided forms for the software engineers to complete to begin background checks.

9. Cavanaugh requested waivers on the clearance process from the USADF board. Altik demanded contact information for all board members and further stated that if the Board was unable to provide immediate clearance to access USADF systems, that he would issue a notice of dismissal to all board members the same day.

10. I informed Altik that we have only personal contact information for our Board. I further stated that I would need their approval before providing personal contact information to DOGE. While I was in the process of sending emails to the Board, Cavanaugh found contact information on Google for one of our board members and proceeded to call him. The board member informed Cavanaugh that he was at the airport about to catch a flight and unable to have a conversation.

11. I left the conference room while Shaotran, Altik, and Cavanuagh were searching for contact information on the internet and returned within a few minutes

to collect the access forms they completed to start the background check required to access personally identifiable and sensitive HR information.

12. That same day, February 21, after learning that the DOGE team had secured the memorandum of understanding under false pretenses—stating that they would modernize our computer systems but then attempting to shut down USADF—our General Counsel withdrew the MOU.

13. On February 24, Ward Brehm informed USADF that he had received an email from Trent Morse notifying Brehm that he had been dismissed as a board member of USADF. The email was very brief and did not specify any reasons for the dismissal.

14. On February 28, Mathieu Zahui shared an email that he received from Trent Morse that because USADF was "Board-less," Peter Marocco had been appointed as Acting Board Chair of USADF. After consultations with the USADF Board, Zahui responded that, because under USADF's statute, a board nomination requires Senate confirmation, USADF could not recognize Marocco's authority as USADF board chair.

15. On February 21, I was informed by the CEO of Inter-American Foundation, Sara Aviel, that DOGE staff were at their headquarters the day before and that IAF provided them access to their IT systems. I related to Sara that DOGE staff came to our offices with a lawyer and threatened to cancel all our contracts and grants and dismiss our board and all staff. At the same time, Sara was waiting for

DOGE staff to arrive at their offices, and she confirmed later in the evening that DOGE threatened to dismantle IAF.

16. A few days later, I received a call from Aviel informing me that she had been dismissed as CEO of IAF. I do not believe that dismissal was legal.

17. On February 28, I heard from USADF staff that Marocco arrived at IAF with DOGE staff. The timing of his arrival, late afternoon, meant that most staff had already gone home for the day. Marocco decided to hold an impromptu Board meeting, with himself as the sole member thus constituting a quorum. During this meeting, he appointed himself as President and CEO of IAF.

18. On Monday, March 4, Marocco announced to IAF staff that he was the new President and CEO of IAF and began the systematic dismantling of the agency by canceling all contracts and grants. He placed all IAF staff on administrative leave with the intention of implementing a reduction in force within 30 days. We were informed that IAF grantees, who mostly live in poor communities across Latin America, were told their grants were canceled. Even more troubling, they were informed they now must return any unused funds currently in their bank accounts.

19. I fear that Marocco will do the exact same thing to USADF. I believe he will claim he has full authority to dismiss our board, our President, and all USADF staff. Marocco has never written directly to USADF leadership nor provided documents of his intentions or his plans. Despite requests, Marocco did not indicate how and when he was nominated as Chair of USADF Board. Nor do I believe he

5

submitted any paperwork for Senate confirmation. The two or three written communications to USADF have all come from DOGE staff.

20. Marocco destroyed decades of hard work at IAF within a few hours. I believe his actions will undermine our work and more importantly American interests in Africa. He will create severe hardships on those who relied on USADF funding commitments. Our grant recipients face legal and financial liabilities based on the pause or cancellation of agreements signed with USADF. Our co-funding partners, both African governments and private sector entities, are worried their financial contributions will be lost in the chaos without proper review and accountability, and economic activities in their countries abandoned. For decades, USADF has worked to build relationships across the African continent and with our stakeholders.

21. Attached as Exhibit D are the Amended and Restated By-Laws of USADF.

22. Attached as Exhibit E is the Memorandum of Understanding referenced in paragraph 4 above.

23. Attached as Exhibit F is the resolution of the Board of Directors of USADF appointing Ward Brehm as the President of USADF.

24. Attached as Exhibit G is a report submitted by Mr. Brehm on behalf of USADF on March 4, 2025, to the Office of Management and Budget.

| | |
|---|---|
| Washington, DC |   /s/  Elisabeth Feleke |
| March 6, 2025 | Elisabeth Feleke |