P5TKAME1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    AMERICAN FEDERATION OF
     GOVERNMENT EMPLOYEES, AFL-CIO,
4    et al.,

5                    Plaintiffs,

6           v.                            25 CV 01237 (DLC)

7    U.S. OFFICE OF PERSONNEL
     MANAGEMENT, et al.,
8                                         Hearing

9                    Defendants.

10   ------------------------------x
                                          New York, N.Y.
11                                        May 29, 2025
                                          10:00 a.m.
12   Before:
                         HON. DENISE COTE,
13
                                          District Judge
14
                              APPEARANCES
15
     LEX LUMINA LLP
16        Attorneys for Plaintiffs
     BY:  RHETT O. MILLSAPS, II
17        CHRISTOPHER J. SPRIGMAN

18        -AND-

19   DEMOCRACY DEFENDERS FUND
     BY:  ANDREW H. WARREN
20
          -AND-
21
     ELECTRONIC FRONTIER FOUNDATION
22   BY:  JAMIE COHN
          FRANK MARIO TRUJILLO
23
          -AND-
24
     THE CHANDRA LAW FIRM LLC
25   BY:  SUBODH CHANDRA

P5TKAME1

                    APPEARANCES (Continued)


JAY CLAYTON
      United States Attorney for the
      Southern District of New York
DAVID E. FARBER
JEFFREY S. OESTERICHER
      Assistant United States Attorneys

P5TKAME1

1           (Case called)

2           THE DEPUTY CLERK:  Who's appearing for the plaintiffs?

3           MR. MILLSAPS:  Good morning.  It's Rhett Millsaps, of

4    Lex Lumina, for the plaintiffs.  And with me are my partner,

5    Chris Sprigman, at the end of the table; Cindy Cohn and

6    Mario Trujillo, cocounsel from Electronic Frontier Foundation;

7    Andrew Warren is next to me — he's our cocounsel from Democracy

8    Defenders Fund — and then we have Subodh Chandra, cocounsel

9    from the Chandra Law Firm.

10          THE DEPUTY CLERK:  For the defendants?

11          MR. FARBER:  Good morning, your Honor.  Assistant

12   United States Attorney David Farber, appearing on behalf of the

13   defendants.  I'm joined by my colleague, Assistant United

14   States Attorney Jeffrey Oestericher.

15          THE COURT:  Welcome, everyone.

16          We're here for a preliminary injunction hearing on the

17   plaintiffs' motion against OPM and other defendants.  Just give

18   me a moment to put my materials in order.

19          (Pause)

20          THE COURT:  Thank you, counsel.

21          We had a brief telephone conversation two days ago to

22   talk about the procedures for this hearing.  Among other

23   things, I outlined the fact that the parties would have, if

24   they wished, an opportunity to make an opening statement.

25          Mr. Millsaps, do the plaintiffs wish to make an

P5TKAME1

1    opening statement?

2         MR. MILLSAPS:  We'd like to make a very brief

3    statement.

4         THE COURT:  Certainly.  Please proceed.

5         MR. MILLSAPS:  Thank you, your Honor, and good

6    morning.  I'll be brief because I know that the Court has read

7    the papers.

8         We're here today because the government defendants in

9    this case have deliberately trampled the rule of law and

10   millions of Americans' privacy rights.  The record shows that

11   on January 20th, agents from the newly formed so-called

12   Department of Government Efficiency, or DOGE, rushed into the

13   Office of Personnel Management, or OPM, and demanded sweeping

14   access to OPM's systems containing the protected personal

15   information of millions of government employees, former

16   employees, job applicants, and beneficiaries.

17        The record shows that the OPM Defendants here rushed

18   to give the DOGE agents that sweeping access in response to a

19   911esque call while revoking access from career OPM employees

20   under the guise of modernizing OPM's systems.

21        The record shows that the OPM Defendants disregarded

22   or abused exceptions to the normal rules for vetting and

23   training of the DOGE agents detailed to OPM.  Though no reason

24   was given that would justify the need to act in such haste.

25        The OPM Defendants' actions documented in the record

1    are the definition of arbitrary and egregious action prohibited

2    by the Administrative Procedure Act.

3         And the record shows the defendants admitted that they

4    never needed to grant such sweeping access to the newly

5    installed DOGE agents.  So their actions also violated the

6    Privacy Act of 1974, which strictly limits access to the

7    personal information at issue here to agency employees on a

8    need-to-know basis in order to protect the privacy and security

9    of this extremely sensitive personal data.

10        The Court does not need to look beyond the

11   administrative record to determine that a preliminary

12   injunction is warranted in this case, but other DOGE-related

13   court cases and voluminous news reports give context to what's

14   going on here.

15        Based on the President's executive orders, DOGE agents

16   have infiltrated agencies throughout the federal government,

17   pushing aside career employees, and gaining broad and rushed

18   access to nearly every American's personal information.

19        THE COURT:  So, counsel, we're just going to focus on

20   the case filed before me.

21        MR. MILLSAPS:  Okay.  Thank you, your Honor.

22        THE COURT:  Thank you.

23        MR. MILLSAPS:  The defendants' actions in this case

24   are precisely why Congress passed the Privacy Act in the first

25   place.  Plaintiffs seek a prohibitory preliminary injunction to

P5TKAME1

1    restore the status quo as it was on January 19th, before

2    defendants' illegal actions began.  Modernizing OPM's systems

3    is a worthy endeavor, but the defendants must follow the law in

4    doing so.  Without a preliminary injunction from this Court,

5    plaintiffs will be irreparably harmed both by the ongoing

6    violation of their privacy rights and by the threat of imminent

7    harm from breach and misuse of their information by both

8    internal bad actors and foreign governments.

9              Thank you, your Honor.

10             THE COURT:  Thank you.

11             Mr. Farber, will you be giving an opening statement,

12   or not?

13             MR. FARBER:  Your Honor, the defendants will defer to

14   your suggestion from the May 27th conference and reserve

15   argument for closing.

16             THE COURT:  Thank you.

17             Counsel, before we begin with the presentation of the

18   plaintiffs' evidence, I think it would be helpful to both

19   sides, and to me, to make sure that we're using terms

20   consistently and with a joint understanding of their meaning.

21             One of the terms just used in the plaintiffs' opening

22   statement was "DOGE agents," and both sides use that shorthand,

23   and it's nice to have a shorthand, but let's make sure we know

24   what we're referring to when we do use that term.

25             May I suggest the following — and feel free to revise

P5TKAME1

1    it in responding — that is, in terms of OPM -- let me begin

2    again.

3          Federal employees who were primarily working on an

4    agenda associated with DOGE, including working on projects

5    associated with executive orders issued by the President, in

6    which DOGE, which used to be known as the U.S. Digital Service,

7    was involved.

8          So, when it comes to OPM's employees itself, and to

9    the extent that they're referred to as "DOGE agents," I think

10   it's going to be those individuals newly hired or working at

11   OPM -- well, newly hired at OPM who are working on a DOGE

12   agenda — as I've broadly described that DOGE agenda — that is

13   working on an agenda associated with any Presidential executive

14   order issued on January 20th or thereafter, in which DOGE is

15   also working.

16         Any objection to using the term "DOGE agents" in that

17   way, so we all are communicating effectively?

18         MR. MILLSAPS:  No objection from the plaintiffs.

19         MR. FARBER:  Your Honor, just to clarify, the DOGE

20   agents, as you defined it, involves newly hired OPM employees,

21   not employees solely of the DOGE service; is that correct?

22         THE COURT:  That's right.

23         MR. FARBER:  Okay.  We have no objection to that.

24         THE COURT:  And to just make sure we're talking about

25   the specifics, there is this document in the administrative

P5TKAME1

1    record — I think it's 103 — and it refers to a variety of

2    individuals who have been given anonymized names, OPM 2 through

3    18.  One of those has now been -- his identity has been

4    revealed — Mr. Sullivan — but each of those individuals would

5    be referred to as a DOGE agent.

6            Is that agreeable?

7            MR. MILLSAPS:  That's agreeable for plaintiffs.

8            MR. FARBER:  Yes, your Honor.  I just would like to

9    point out that the folks that were -- had anonymized monikers,

10   OPM 2 through 18, I don't know that they would necessarily fall

11   within the definition of DOGE agents that you described, but if

12   you want to also include them in that definition, I think

13   that's agreeable to the defendants.

14           The folks who were represented with anonymized

15   monikers, that is a carryover from the Maryland District Court

16   case, and the term that was used there was "DOGE affiliates,"

17   and it had a specific definition in an opinion that

18   Judge Boardman had issued, and so that is what we had used for

19   the administrative record --

20           THE COURT:  Excuse me one second.

21           (Pause)

22           THE COURT:  Thank you.  I didn't mean to interrupt.

23           MR. FARBER:  And so I just want to clarify that I'm

24   not certain that all of these individuals, OPM 2 through

25   OPM 18, would necessarily fit within the definition, as you had

P5TKAME1

1    just described it, as folks who are working on the DOGE agenda

2    and executive orders that reference DOGE.

3            THE COURT:  So, actually, I looked — and I think it's

4    in a footnote in Judge Boardman's decision — for a definition

5    of DOGE agents, and, actually, I think 2 through 19, that list

6    was created by OPM in response to the broad definition.  So, I

7    think I'm glad we're having this conversation.

8            So, I think all of them fit within that definition as

9    OPM was able to identify the relevant employees for

10   Judge Boardman.

11           MR. FARBER:  That's correct.  I think all of these

12   DOGE employees, OPM 2 through 18, fit within the definition as

13   DOGE affiliates, as Judge Boardman cited in, I think,

14   footnote 3 of her decision on the temporary restraining order.

15           THE COURT:  So what distinction are you making?

16   Because I'm not getting it.

17           MR. FARBER:  I think that that decision came down at a

18   point in time, a certain point in time, in late February, so

19   there are additional executive orders that may have been issued

20   that reference DOGE.  I just don't know that all of these folks

21   are necessarily working on DOGE executive orders, as that term

22   is used -- as I think your Honor --

23           THE COURT:  So, are you saying that there may be more

24   individuals?

25           MR. FARBER:  No.  I think some of these individuals

P5TKAME1

1      may not fall within that definition, but --

2                 THE COURT:  Any longer?  They once did, but they no

3      longer do?

4                 MR. FARBER:  I think that's right, your Honor.

5                 THE COURT:  Okay.

6                 So I'll revise this definition to say:  Any new

7      employees who at any time were working on, as I've described it

8      in broad definition, the DOGE agenda.

9                 MR. FARBER:  Understood, your Honor.  That's

10     agreeable.

11                THE COURT:  Good.  Thanks so much.

12                So, the plaintiffs may begin with the presentation of

13     their evidence.

14                Do you have documents you wish to offer into evidence?

15                MR. MILLSAPS:  Yes, your Honor.

16                The parties met and conferred before the hearing and

17     prepared exhibit lists under your Honor's individual rules for

18     trials, using the star system that you outlined, and I have two

19     copies for the Court.  Here is plaintiffs' exhibit list, if I

20     may approach?

21                THE COURT:  And you've given the government this

22     document?

23                MR. MILLSAPS:  Yes, your Honor.  The government has

24     reviewed it, and the government has noted objections using the

25     one or two stars under the objections column.

P5TKAME1

1              THE COURT:  So you're now offering -- well, let's mark

2     this as an exhibit.  It's a 21-page document.  It will be

3     Plaintiffs' Exhibit what number?

4              MR. MILLSAPS:  This would be Plaintiffs' Exhibit 0, if

5     that --

6              THE COURT:  No.

7              MR. MILLSAPS:  Okay.  Then we would make it

8     Plaintiffs' Exhibit 99.

9              THE COURT:  Okay.  Okay.

10             So you're offering the documents listed in Plaintiffs'

11    Exhibit 99.

12             Any objection?

13             MR. FARBER:  Yes, your Honor, we do have objections to

14    several of these documents.  As the Court noted at the

15    conference on May 27th, we raised issues concerning hearsay for

16    a lot of these documents, and so we could go through one by

17    one, if you would like --

18             THE COURT:  Let's take an exemplar with respect to

19    each of those to which you have an objection.

20             MR. FARBER:  Okay.

21             So, for the expert declarations of Mr. Nesting,

22    Ms. Lewis, and Mr. Schneier, the objection is that those

23    declarations are not based on reliable facts and data, and they

24    also refer to hearsay within hearsay.  So that's the objection

25    to those --

P5TKAME1

1          THE COURT:  Excuse me.  I'm going to have

2  Mr. Whertvine assist you so you don't have to lean over.  Just

3  move that microphone up to the front of the table.

4          To just cut through this, we'll get specific.  Which

5  declaration do you want to point me to?  And at what paragraph

6  are you objecting?

7          MR. FARBER:  So, for instance, the first declaration

8  of David Nesting — this is at ECF No. 87 — and I would point,

9  as an example only, to paragraph 37 in that declaration.  And

10  at paragraph 37 --

11          THE COURT:  Okay.  That's a statement by Mr. Nesting,

12  based on his experience and public information, that he did not

13  believe that the DOGE personnel who received full

14  administrative access to OPM's IT systems had been sufficiently

15  vetted.

16          It's his view as an expert.  You're not challenging

17  his expertise, are you?

18          MR. FARBER:  I'm not challenging his expertise, no.

19          THE COURT:  Okay.  So overruled.

20          Next?

21          MR. FARBER:  So, the next category would be news

22  articles that have been introduced as exhibits to attorney

23  declarations.  And I would point the Court, as an example -- it

24  starts at P52, Plaintiffs' Exhibit 52, which is on page 10 of

25  21 of plaintiffs' exhibit list.

P5TKAME1

1          THE COURT:  This is a Washington Post article.  Let

2     me, hopefully, cut through this as well.  I believe the date of

3     the article is May 7th, 2025, and it's described in the exhibit

4     list as addressing DOGE aims to pool federal data.

5          So, I'm not taking press reports for the truth of

6     their contents, and I think that should deal with most of the

7     government objections about receipt of these documents.

8          Am I right, counsel?

9          MR. FARBER:  Yes, it does, your Honor.

10          THE COURT:  Good.

11          Next?

12          MR. FARBER:  The last page of Plaintiffs' exhibit

13     list, which lists Exhibits P96, P97, P98, these are purportedly

14     public statements by individuals who are not named, officials

15     of the defendants in this case.  One is a -- P98, for instance,

16     is a social media post by President Trump; P97 is a video,

17     apparently, of House Speaker Johnson discussing DOGE and

18     Mr. Musk; and then P96 is President Trump's speech to Congress.

19     I don't know what exception those would fall under or how they

20     would be admissible, and so we object to their introduction

21     into evidence.

22          THE COURT:  Okay.  Overruled.

23          MR. FARBER:  Your Honor, I think the only other issue

24     that we have, based on the rulings, is that there are several

25     documents that plaintiffs seek to introduce that were not even

submitted with plaintiffs' preliminary injunction papers.  The

list includes articles and documents that were cited in

plaintiffs' motion for a temporary restraining order, and that

were cited in plaintiffs' motion for expedited discovery, but

were not referenced at all in the preliminary injunction

papers.

So, we would object to those documents, as well.

THE COURT:  So, have you been prejudiced in any way by

the plaintiffs not reoffering those exhibits in connection with

this particular motion?

MR. FARBER:  Your Honor, we did not scour the record

to determine -- we got this list last night.  So it's

unfortunate that this happened a day before the hearing, but we

did not know that they were going to seek to introduce

materials that were cited in briefs, for instance, not even

exhibits.  So, I don't think we've been able to determine the

prejudice.

I will say that a lot of these documents are news

articles or other hearsay statements.  So to extent the Court

is not going to accept hearsay statements for the truth of the

matters asserted, I think that may resolve the objection, and

we'd be happy for the Court to review those materials and

decide what weight to give them.

So I don't think we need to belabor the point, but I

want to place the objection to those documents on the record.

P5TKAME1

1        THE COURT:  Duly noted.

2        MR. MILLSAPS:  Your Honor --

3        THE COURT:  And at lunchtime, counsel can discuss with

4    each other whether the defendants, after that conversation,

5    want to move to strike any of these exhibits.

6        MR. FARBER:  Very well, your Honor.  Thank you.

7        THE COURT:  Thank you.

8        So --

9        MR. MILLSAPS:  Your Honor, may I just briefly respond?

10       THE COURT:  You have to stand, counsel.

11       MR. MILLSAPS:  All right.

12       THE COURT:  And you can move the microphone up to the

13   front of your table.

14       MR. MILLSAPS:  Thank you, your Honor.

15       I just wanted to briefly respond to the government's

16   objections.

17       So, in our notice of motion, we did state that the

18   motion would be based on the memorandum of law, the

19   declarations, and all prior pleadings and proceedings herein.

20   And that's the basis under which we have included basically all

21   of the record evidence that plaintiffs have submitted on those

22   other submissions as part of plaintiffs' exhibits.

23       THE COURT:  Thank you for that statement and

24   clarification.  I appreciate it.

25       So, the exhibits listed in Plaintiffs' Exhibit 99 are

P5TKAME1

1    received, with the noted restrictions, as I've described them

2    today on the record.

3        (Plaintiffs' Exhibit 99 received in evidence)

4        THE COURT:  So, do those exhibits, then, include the

5    declarations of Mr. Schneier, Mr. Nesting, and Ms. Lewis?

6        MR. MILLSAPS:  Yes, your Honor.

7        THE COURT:  Okay.

8        So they have been then received into evidence.

9        Next?

10        MR. MILLSAPS:  So, your Honor, the plaintiffs, for our

11    principal case, we stand on our briefing and the materials that

12    have been received into the record.  And we would move on to

13    the cross-examination of David Nesting, who's offered as an

14    expert in the field described in his declaration.

15        THE COURT:  Thank you.

16        And is Mr. Nesting in the courtroom?

17        Bring in Mr. Nesting, please, so he can be

18    cross-examined.

19        So, the objection to the receipt of the declarations

20    of Mr. Schneier and Ms. Lewis, which were the basis, as I

21    understood it, for the government wishing to cross-examine

22    them — Mr. Nesting, please come up here and take the witness

23    stand, thank you — was that, to some extent, they were relying

24    on news reports, and, as already described, I am not receiving

25    those news reports for the truth of the matters asserted

P5TKAME1

1    therein.

2    DAVID NESTING,

3          called as a witness by the Plaintiffs,

4          having been duly sworn, testified as follows:

5          THE COURT:  So, to just complete my statement, so I

6    don't understand that the government had any further need for

7    cross-examination of Mr. Schneier or Ms. Lewis, and, therefore,

8    their affidavits are being received without cross-examination.

9          However, the defendants did want to cross-examine

10   Mr. Nesting, so I'm going to ask the plaintiffs, please, to

11   present Mr. Nesting with his first and second declarations in

12   this action so he can swear to the truth of those declarations

13   before me here in court.

14         Counsel.

15         MR. MILLSAPS:  Yes, your Honor.

16         Plaintiffs offer David Nesting under Federal Rule of

17   Evidence 702 as an expert, and plaintiffs offer the declaration

18   of David Nesting, which includes his CV — it's been marked

19   Plaintiffs' Exhibit 5 — and plaintiffs offer the second

20   declaration of David Nesting, dated May 3rd, 2025, which has

21   been marked as Plaintiffs' Exhibit 6.

22         THE COURT:  Can you present Mr. Nesting with copies of

23   those, please.  Or the originals, really.

24         MR. MILLSAPS:  Yes, your Honor.

25         THE COURT:  Copies will do for our purposes if you

P5TKAME1

1    don't have the originals at hand.

2              MR. MILLSAPS:  We have copies, your Honor.

3              THE COURT:  Thank you.

4              Mr. Nesting, you are being presented with two

5    declarations, which have been marked Plaintiffs' Exhibits 5 and

6    6.

7              Let's start with Exhibit 5, your declaration from

8    April 22.

9              Have you read that declaration with care?

10             THE WITNESS:  I have.

11             THE COURT:  And is your signature on page 8 of that

12   declaration?

13             THE WITNESS:  Yes, that's my signature.

14             THE COURT:  Do you swear to the truth of its contents?

15             THE WITNESS:  I do.

16             THE COURT:  So let's turn to Plaintiffs' Exhibit 6.

17             Have you reviewed that declaration with care?

18             THE WITNESS:  I have.

19             THE COURT:  Is your signature on page 7 of that

20   declaration?

21             THE WITNESS:  Yes, it is.

22             THE COURT:  Do you swear to the truth of its contents?

23             THE WITNESS:  I do.

24             THE COURT:  Tendered for cross.

25             MR. FARBER:  Your Honor, just to clarify, this is

P5TKAME1                          Nesting - Cross

 1    Mr. Warren.

 2              MR. WARREN:  Sorry, I want to make sure that the

 3    Court --

 4              THE COURT:  Excuse me, could you identify yourself for

 5    the record, please?

 6              MR. WARREN:  Of course, your Honor.

 7              Andrew Warren, on behalf of the plaintiffs.

 8              Just to be clear, I believe that the Court may have

 9    identified those two declarations.  I want to make sure that we

10    have them marked as Plaintiffs' Exhibit 5 and

11    Plaintiffs' Exhibit 6.

12              THE COURT:  Thank you.

13    CROSS-EXAMINATION

14    BY MR. FARBER:

15    Q.  Good morning, Mr. Nesting.

16    A.  Good morning.

17    Q.  Do you have your two declarations that were submitted in

18    this case in front of you still?

19    A.  I do.

20    Q.  You served as deputy chief information officer at OPM from

21    February 2019 to August 2021; is that right?

22    A.  That sounds right.

23    Q.  And you also served as one of OPM's --

24              THE COURT:  Excuse me.

25              Mr. Nesting, can you move that mic towards you — it

1    moves — and just place it under your chin and keep your voice

2    up.

3            Thank you.

4    BY MR. FARBER:

5    Q.  Mr. Nesting, you also served as one of OPM's deputy chief

6    data officers, correct?

7    A.  That's correct.

8    Q.  Was that role, deputy chief data officer, concurrent with

9    your role as deputy chief information officer?

10   A.  Yes.

11   Q.  Turning to your first declaration, which has been marked as

12   Plaintiffs' Exhibit 5, and submitted at Docket No. 87, at

13   paragraph 3 of that first declaration, you wrote that you had

14   reviewed the declaration of Greg Hogan.

15           Is that the first Hogan declaration, dated

16   February 19, 2025, that was submitted at Docket No. 40 in this

17   case?

18   A.  I believe so.  The only declaration.

19   Q.  The only declaration you have reviewed?

20   A.  No.  At the time, that was the only one.

21   Q.  At the time, that was the only declaration, correct?  Okay.

22           At paragraph 3 of your first declaration, you also

23   wrote that you had reviewed the defendants' memorandum of

24   points and authorities in support of dismissal.

25           Does that refer to the defendants' memorandum of law

P5TKAME1                      Nesting - Cross

1   in support of their motion to dismiss?  Is that right?

2   A.  I'm not -- I don't recall the exact title of the document.

3   Q.  Was it a legal brief that defendants had submitted?

4   A.  It was a document they had shared with me.

5   Q.  That plaintiffs' counsel had shared with you or -- but was

6   it a legal memorandum that was filed in the case or something

7   else?

8   A.  Yes.

9   Q.  Okay.

10          In your first declaration, you did not state that you

11  reviewed the administrative record filed in this case, correct?

12  A.  I don't believe I -- yeah, I did not say that in the

13  declaration.

14  Q.  But in your second declaration, which is dated May 22nd,

15  2025, at Plaintiffs' Exhibit 6, and submitted at

16  Docket No. 110, at paragraph 2 of that second declaration, you

17  stated that you had reviewed the public portions of the

18  administrative record prior to submitting your first

19  declaration.

20          Do you have that second declaration in front of you?

21  A.  I do, yeah.

22  Q.  Do you see that at paragraph 2?

23  A.  I do.

24  Q.  If you had reviewed the administrative record filed in this

25  case prior to signing your first declaration, why did you not

P5TKAME1                        Nesting - Cross

1  state that in your first declaration?

2  A.  It was an oversight.

3  Q.  It was an oversight?  Okay.

4          Turning to paragraph 4 of your second declaration, you

5  cite to Document 51-1 and Document 64-1.

6          Do you see that?

7  A.  I do.

8  Q.  But those citations are to docket numbers from a related

9  case in *American Federation of Teachers v. Bessent* that was

10  filed in federal district court in the District of Maryland,

11  correct?

12  A.  I don't know.

13  Q.  Are you aware that the administrative record that was filed

14  in this case had a docket number of 78-2?

15  A.  No, I'm not aware.

16  Q.  So you didn't review the administrative record that was

17  filed in this case at the Docket Number 78-2?

18  A.  I don't recall.

19  Q.  Well, I'd like to show you a copy of that administrative

20  record, if I might, just so you can verify whether you had

21  reviewed it or not.

22          THE COURT:  And what is the exhibit number?

23          MR. FARBER:  This is Exhibit No. J2, Joint Exhibit 2,

24  your Honor.

25          THE COURT:  Thank you.

P5TKAME1                      Nesting - Cross

1   BY MR. FARBER:

2   Q.  Mr. Nesting, the OPM administrative record that was filed

3   in this case, a portion of that record had previously been

4   produced in the Maryland action, and those pages went up to

5   OPM-000129.

6           Are you aware of that?

7   A.  No.

8   Q.  I want to turn your attention to the administrative record

9   right there, and turn your attention to the page OPM-000130.

10  That's the Bates number at the bottom right of the page.

11          You see the title of this document says "Introduction:

12  Welcome To The Office of Personnel Management OPM Cybersecurity

13  and Privacy Awareness Training"?

14  A.  That's what it says, yes.

15  Q.  Had you reviewed this document prior to today?

16  A.  Prior to today, yes.

17  Q.  So you did review the administrative record that was filed

18  in this case?

19  A.  Yes.

20  Q.  You can set that aside.

21          I want to turn your attention back to your first

22  declaration, Mr. Nesting, to paragraph 37.  And just let me

23  know when you're there.

24  A.  Okay.

25  Q.  At paragraph 37 of your first declaration, you state,

1    "Based upon my experience and the public information I have

2    reviewed, I do not believe that DOGE personnel that have

3    obtained or are seeking full administrative access to OPM's IT

4    systems have been sufficiently vetted."

5            Did I read that accurately?

6    A.  Yes, I believe so.

7    Q.  The term "DOGE personnel" in that sentence, does that refer

8    to individuals who were newly hired as employees of OPM?

9    A.  At least, yes.

10   Q.  Are you aware of anything in the administrative record

11   filed in this case that shows that individuals who were not OPM

12   employees were granted access permissions to OPM's IT systems?

13   A.  Not specifically, no.

14   Q.  What do you mean, "not specifically"?

15   A.  I'm unaware of any specific -- I have no specific reason to

16   believe that the DOGE personnel at OPM -- so, apologies, could

17   you ask the question again?

18   Q.  Yes.

19           Are you aware of anything, any document in the

20   administrative record filed in this case, that shows that

21   individuals who were not OPM employees were granted access

22   permissions to OPM's IT systems?

23   A.  No.

24   Q.  Now, what public information did you review that led you to

25   believe that "DOGE personnel at OPM were not sufficiently

P5TKAME1                    Nesting - Cross

1    vetted"?

2    A.  The primary piece of information was the executive order

3    directing that members of DOGE be allowed access, unlimited

4    access, with abbreviated security clearances.  Like I don't

5    recall what the executive order said precisely, but it

6    basically said they shall be granted security clearances

7    immediately before their investigations had been completed.

8    That was probably the big one that gave me concern.

9    Q.  And in terms of public information, generally just the

10   news, referring to people being DOGE employees landing at

11   various agencies and immediately engaging in their activities

12   being swept through GSA's security without presenting ID, those

13   sorts of things?

14           That all came from news reports?

15   A.  That information did, yes.

16   Q.  Nothing in the administrative record suggested that any of

17   these individuals had not been sufficiently vetted?

18   A.  No.

19   Q.  Prior to signing your second declaration, you also reviewed

20   the publicly filed materials that were filed by defendants in

21   opposition to plaintiffs' preliminary injunction, correct?

22   A.  Yes.

23   Q.  That's at paragraph 2 of your second declaration.  You say,

24   "I have now also reviewed the publicly filed materials filed by

25   defendants in opposition to plaintiffs' preliminary

P5TKAME1                     Nesting - Cross

1  injunction."

2          Now, Mr. Nesting, those publicly filed materials

3  include the declaration of OPM's director of facilities

4  security and emergency management, Everette Hilliard.  That was

5  at Docket No. 97.

6          Do you recall reviewing the declaration of

7  Everette Hilliard?

8  A.  No.

9  Q.  Well, Mr. Hilliard, his declaration, lays out the process

10 for vetting new OPM employees, including the new OPM personnel

11 at issue in this case, but you didn't review that declaration?

12 A.  For the declaration, no, I did not.

13 Q.  Okay.

14         Well, I'll read from Mr. Hilliard's declaration.  He

15 states:  Quote --

16         MR. WARREN:  Objection, your Honor.  The witness said

17 he didn't look at the document.  There's no basis for him to

18 question him on it.

19         THE COURT:  Overruled.

20 BY MR. FARBER:

21 Q.  Mr. Hilliard, in his declaration, states, "At no point did

22 FSEM" — that's Facilities Security and Emergency Management —

23 "deviate from any of these required vetting and credentialing

24 procedures in connection with the vetting and credentialing of

25 these employees or in connection with any employees who have

P5TKAME1                    Nesting - Cross

1   been appointed to OPM during his time as the director of FSEM.

2   Furthermore, at no point did anyone direct me or any of my

3   staff" — that's Mr. Hilliard — "at FSEM to deviate from these

4   established vetting and credentialing procedures."

5            Now, that's what Mr. Hilliard states in his sworn

6   declaration.

7            Is it still your opinion that OPM DOGE personnel at

8   issue in this case were not, quote, sufficiently vetted?

9   A.  That is not my position any longer for those individuals,

10  yes.

11  Q.  Turning to paragraph 9 of your first declaration, you

12  stated that you worked for the U.S. Digital Service from 2014

13  to 2019, correct?

14  A.  Yes.

15  Q.  And you are aware that the U.S. Digital Service was renamed

16  as the U.S. DOGE Service on January 20, 2025, correct?

17  A.  Yes.

18  Q.  I want to turn your attention to paragraphs 22 through 31

19  of your first declaration.  These paragraphs mention projects

20  that you undertook at different federal agencies across the

21  government to modernize IT systems while you were an employee

22  of the U.S. Digital Service, correct?

23  A.  Yes.

24  Q.  And, in fact, even when you became deputy chief information

25  officer at OPM, you still collaborated with the U.S. Digital

P5TKAME1                           Nesting - Cross

1    Service on IT modernization projects, correct?

2    A.   Loosely, yes.

3    Q.   Mr. Nesting, I'd like to show you what has been premarked

4    as Defendants' Exhibit 14.

5              MR. FARBER:  And I also have a copy for your Honor.

6              THE COURT:  Do you have another copy, as well?

7              MR. FARBER:  Yes, I do.

8    BY MR. FARBER:

9    Q.   Mr. Nesting, do you recognize this Exhibit D14 as a privacy

10   impact assessment issued by OPM for the SME Assessment Review

11   Prototype, dated October 28, 2020?

12   A.   Yes.

13   Q.   If you turn to the last page of this privacy impact

14   assessment, at the very top, you are listed as one of the

15   responsible officials from OPM for this project.

16             Do you see that?

17   A.   I do.

18   Q.   Do you recall this SME Assessment Review Prototype system?

19   A.   I do.

20   Q.   Turning back to the second page of this document, under the

21   heading "Overview" --

22             THE COURT:  Are you offering this document?

23             MR. FARBER:  Your Honor, the defendants offer this

24   document into evidence at this time.

25             THE COURT:  Any objection?

P5TKAME1                        Nesting - Cross

1              MR. WARREN:  No, your Honor.

2              THE COURT:  Received.

3              (Defendants' Exhibit 14 received in evidence)

4    BY MR. FARBER:

5    Q.  Turning back, again, to that second page under "Overview,"

6    this privacy impact assessment states, "The United States

7    Digital Service (USDS) is partnering with the Office of

8    Personnel Management's OPM USA staffing program to develop a

9    new assessment strategy to engage subject matter experts."

10             Do you see that?

11   A.  I do.

12   Q.  And the next sentence reads:  "This effort also supports

13   the executive order on modernizing and reforming the assessment

14   and hiring of federal job candidates issued on June 26, 2020."

15             Do you see that?

16   A.  I see it.

17   Q.  Do you recall the U.S. Digital Service partnering with OPM,

18   while you were deputy chief information officer, to develop a

19   new assessment strategy program with respect to the USA

20   staffing platform?

21   A.  If you're referring to this project, yes, I remember.

22   Q.  And is it correct that this project also supported

23   President Trump's June 26, 2020 executive order on modernizing

24   and reforming the assessment and hiring of federal job

25   candidates?

P5TKAME1                              Nesting - Cross

1  A.  I don't know.  I'm not sure how to answer that, sorry.

2  Q.  Well, that's what this sentence reads here, the second

3  sentence under "Overview," "This effort also supports the

4  executive order on modernizing and reforming the assessment and

5  hiring of federal job candidates issued on June 26, 2020."

6          That would have been in President Trump's first term

7  in office?

8  A.  Yeah, I'm not familiar with that executive order.

9  Q.  And you were the responsible official from OPM who oversaw

10  this IT modernization project; is that correct?

11  A.  Yes.

12  Q.  Turning to page 5 of this privacy impact assessment, under

13  Section 2.1, this assessment describes that there was personal

14  information contained in the ARP, the Assessment Review

15  Prototype, the name of the system, correct?

16  A.  Yes.

17  Q.  The personal information included the applicant's first,

18  middle, and last names, a unique identification number, an

19  assessment of whether the applicant had met each competency,

20  and an explanation for that assessment.  That's personal

21  information, correct?

22  A.  I am aware that at least the first item is personal

23  information.  I don't know...

24  Q.  That data is subject to the Privacy Act, though, can we

25  agree on that?

 1  A.  I don't know all that data is subject to the Privacy Act.

 2  Q.  You think that the subject matter expert's assessment of

 3  whether an applicant has met competencies and an explanation

 4  for that assessment about a particular applicant would not be

 5  personal information?

 6  A.  If it's combined with their name, I could see a case for

 7  that, sure.

 8  Q.  That's right.

 9          And this privacy impact assessment says that the data

10  includes both the name and that personal information about the

11  assessment, correct?

12  A.  Yes.

13  Q.  So, when it's combined together, that would be subject to

14  the Privacy Act, correct?

15  A.  I don't know that I'm qualified to answer that.

16  Q.  You're not qualified to answer questions about the legal

17  implications of the Privacy Act?

18  A.  To some extent, I am.

19  Q.  But just not this question?

20  A.  No, I'm not -- yeah.

21  Q.  I want to turn your attention to page 8 of the privacy

22  impact assessment under Section 3.3.  The second sentence of

23  that section reads, "USDS and participating agencies human

24  resource specialists will also have access to the ARP," to the

25  system at issue.

P5TKAME1                        Nesting - Cross

1              Do you see that?

2   A.   Yes.

3   Q.   Is that accurate, that individuals from the U.S. Digital

4   Service had access to the underlying personal data in this OPM

5   data system?

6   A.   Some would have, yes.

7   Q.   Why did employees from U.S. Digital Service need access to

8   that data to create this system?

9   A.   It was a small team operating fairly independently from the

10  rest of USA staffing, and somebody on the team has to have

11  access.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

P5T1AME2                    Nesting - Cross

1   BY MR. FARBER:

2   Q.  Okay.  Did you review whether or not those individuals on

3   the U.S. Digital Service team should have access to that data?

4   A.  Not individually.

5   Q.  Okay.  Did anyone prepare a separate memorandum for each

6   employee of the U.S. Digital Service justifying their need for

7   access to those records?

8   A.  I don't know.

9   Q.  Okay.  Was it a violation of the privacy act for USDS

10  personnel to have access to this OPM data system?

11  A.  I don't believe so.

12  Q.  I turn your attention back to the bottom of page 3 of this

13  privacy impact assessment.  The last paragraph on the page,

14  beginning with, "The goals in extending this prototype," do you

15  see that?

16  A.  I see it.

17          (Discussion off the record)

18  Q.  Mr. Nesting, turning your attention to the bottom of page 3

19  of this privacy impact assessment, the last paragraph on that

20  page that begins with, "The goals in extending."  Do you see

21  that?

22  A.  I do.

23  Q.  Okay.  That paragraph—that sentence reads, rather, "The

24  goals in extending this prototype SME tool are to maximize

25  flexibility so that the USDS team can iterate quickly on the

P5T1AME2                       Nesting - Cross

1    ARP in order to build, test, and learn during live agency

2    hiring actions."  Do you see that?

3    A.  I do.

4    Q.  Is this an accurate description of the goals of this IT

5    project?

6    A.  I think so.

7    Q.  What does it mean to provide "maximize flexibility so that

8    the USDS team can iterate quickly"?

9    A.  I'm not sure what "maximize flexibility" specifically

10   means, what they're asking for there, but——yeah.

11   Q.  Does that mean that the USDS team would need maximum

12   flexibility to make changes quickly to the system?

13   A.  I——that doesn't seem like a plausible reading, but

14   possibly.

15   Q.  Well, what does it mean, "iterate quickly"?  Is that a term

16   that's used for software developers?

17   A.  Yeah, that's what agile software development is all

18   about——quick iterations, quick review cycles, testing for any

19   users.

20   Q.  You referred to agile.  What is agile?

21   A.  It is a philosophy of software development, where you are

22   quickly, on maybe a daily or weekly cadence, reviewing what

23   works in your application, designing changes, pushing changes,

24   deploying new versions of the software, assessing whether it's

25   meeting your goals or not.

P5T1AME2                        Nesting - Cross

1    Q.  Got it.  So this could have been part of this agile

2    software development framework.  Was this a framework that U.S.

3    Digital Service used, in your experience?

4    A.  I——I'm not specifically referring to the agile framework,

5    but just the principles behind it.

6    Q.  The principles behind that, making changes in iterations

7    quickly, pushing those changes to the software, to the

8    production environment, that's something that U.S. Digital

9    Service employed those techniques?

10   A.  Yes.

11   Q.  Okay.  When you were at OPM, was it part of the normal

12   process at OPM to give software developers data access so that

13   they had maximum flexibility to make changes quickly?

14   A.  As a general rule, that's not my recollection.

15   Q.  But in this instance, these U.S. Digital Service employees

16   did have access to the underlying personal data.

17   A.  Some of them, yes.

18   Q.  Some of them.  Do you know which ones had access and which

19   ones did not?

20   A.  Not personally, no.

21   Q.  Okay.  When you were at OPM, you also were required to move

22   quickly to fix IT systems, correct?

23   A.  I don't know that I would use the word "required," but——I

24   feel like that could have been an expectation of the role,

25   sure.

1   Q.  I'll rephrase.  When you were deputy chief information

2   officer at OPM, there were instances where you were required to

3   move quickly to fix IT systems, correct?

4   A.  Sure.

5   Q.  Okay.  And I'll turn your attention to your first

6   declaration, to your résumé attached at Exhibit A, and

7   specifically on the second page of your résumé.

8   A.  My résumé is not attached to this document.

9   Q.  I will bring you a copy of your declaration with the

10  exhibit attached.

11          So drawing your attention to Exhibit A, just for the

12  record, the document number is 87-1, and I want to turn your

13  attention to the second page of your résumé.  That details your

14  time as deputy CIO at OPM.  Do you see that?

15  A.  Yes.

16  Q.  And the fourth bullet point down, in this section about

17  your experience at OPM, you wrote, "Built a fully functional,

18  call-accepting reproduction of the call center using cloud

19  tools in about three hours to disprove the belief that this was

20  a multiyear level of effort."  Is that description accurate?

21  A.  I believe so.

22  Q.  So it's true that some government IT modernization projects

23  can be completed in as little as three hours without a

24  multiyear level of effort, correct?

25  A.  No, no.  That's not what I said.

P5T1AME2                        Nesting - Cross

1  Q.  Okay.  Well, did you complete an IT modernization project

2  within three hours without a multiyear level of effort?

3  A.  I don't believe——I can't recall a time when I've done that.

4  Q.  Okay.  Well, sometimes software engineers such as yourself

5  need to move quickly to make changes to data systems, right?

6  A.  Yeah, yes.

7  Q.  In fact, you also list as one of your accomplishments as

8  deputy CIO that one time you had to "reverse-engineer OPM's

9  correspondence-tracking system because it finally died and

10 nobody knew how it worked and we needed the records out of it."

11 Correct?

12 A.  Yes.

13 Q.  And you needed access to the underlying personal data in

14 that system in order to reverse-engineer that

15 correspondence-tracking system, correct?

16 A.  I don't know how much of the data in that system was

17 personal data.  I don't know how much that system——

18 Q.  Sorry.  You don't know how much what?

19 A.  I don't know what of that system there was——I don't know

20 what information in that system would be considered PII or not.

21 I think there were names of employees in there, but I don't

22 recall if there's anything more than that.

23 Q.  Well, there's correspondence in the correspondence-tracking

24 system, correct?

25 A.  Yes.

P5T1AME2                        Nesting - Cross

1   Q.  So it would be names and correspondence, personal

2   correspondence?

3   A.  I don't know.

4   Q.  Okay.  Would you differentiate between personal

5   correspondence and correspondence concerning an employee's

6   official job duties?

7   A.  I don't recall exactly what information was in that system.

8   I'm sorry.

9   Q.  Okay.  You can set that aside.

10         Now you've worked in both the government and private

11  sector, correct?

12  A.  Yes.

13  Q.  And turning back to your first declaration——I'm sorry——at

14  paragraph 11, you state, "Industry and government best

15  practices for systems including sensitive data are quite

16  similar, and both include strict access controls, sometimes

17  called the principle of least privilege."  Do you see that?

18  A.  I do.

19  Q.  Is it accurate that implementing the principle of least

20  privilege is a best practice in both the private sector and

21  government sector?

22  A.  Yes.

23  Q.  Okay.  What is your understanding of the term "principle of

24  least privilege"?

25  A.  It would be identifying what specifically a person would

1    need to do in a system and ensuring that they could do no more

2    than that.

3    Q.  Okay.  So in an ideal world, you would give privilege

4    access to whoever needs it only for the limited time they

5    actually need it, correct?

6    A.  Limited scope and limited time.

7    Q.  But sometimes you don't know in advance which access

8    permissions would be enough for a particular user to do their

9    job, correct?

10   A.  Sure.

11   Q.  Okay.  You might think that a user may need elevated access

12   permissions in order to perform a task, but it might turn out,

13   in hindsight, that they never needed that level of access,

14   correct?

15   A.  I'm not sure that I would agree with that framing, but

16   possibly.

17   Q.  Are you familiar with the term "overprivileging"?

18   A.  Not explicitly.

19   Q.  Okay.  Let's put it this way.  Sometimes you're not sure if

20   individuals will actually need to use the access privileges

21   that they are granted; is that fair to say?

22   A.  I'm sure those situations exist.  I think that that would

23   be an indication that you're doing it wrong.

24   Q.  Okay.  So when you were chief information officer, or in

25   private sector, government sector, when you were deciding

P5T1AME2                      Nesting - Cross

1    whether to grant access permissions to somebody, you knew with

2    full certainty that they would use all of the elevated access

3    permissions you were providing them, and only for the limited

4    time that they had those permissions?

5    A.  Generally, yes.

6    Q.  Okay.  You knew with a certainty before they even entered

7    the system to actually make the system changes.

8    A.  We would only grant privileged access if there was a

9    demonstrable need for that access, yes.

10   Q.  All right.  But you may not actually need all of the access

11   permissions that are granted when you get down to performing

12   the IT modernization task itself, correct?

13   A.  I don't know that I know how to answer that.

14   Q.  You don't know how to answer that question?

15   A.  I'm not sure what you mean.  Sorry.

16   Q.  Okay.  I'll move on.

17           Part of the principle of least privilege involves the

18   periodic review of assigned user privileges to determine if the

19   rationale for assigning such privileges is still valid; isn't

20   that right?

21   A.  Yes.

22   Q.  Okay.  And that periodic review, which is part of this

23   principle of least privilege, exists because sometimes people

24   are granted access permissions that are over and above what

25   they actually need; isn't that right?

P5T1AME2                     Nesting - Cross

1    A.  Yes.

2    Q.  So it happens routinely, or routinely enough that you, best

3    practices, do a periodic review to determine if the rationale

4    for assigning such elevated privileges is still valid, correct?

5    A.  I don't know that I would agree with your use of the word

6    "routinely" there, but it happens, and therefore we should have

7    a mitigation for that risk.

8    Q.  Okay.  And in fact, in this case, OPM's chief information

9    officer asked that a review of user privileges be performed,

10   and he removed access permissions for individuals who did not

11   need access to EHRI and eOPF systems at OPM; isn't that right?

12   A.  I believe that's my understanding from reading the

13   declaration.

14   Q.  Mr. Nesting, are you familiar with Microsoft Entra ID?

15   A.  At a high level.

16   Q.  Okay.  What is Entra ID?

17   A.  I think it's Azure's identity and access management

18   component.

19   Q.  It used to be called Azure Active Directory or Azure AD.

20   You may have known by that term when you were deputy CIO at

21   OPM.  Is that more familiar?

22   A.  A little more familiar, yes.

23   Q.  Were you aware that OPM used that technology for role-based

24   access control for some of its data systems when you were

25   deputy chief information officer?

P5T1AME2                    Nesting - Cross

1   A.  No.

2   Q.  You weren't aware of that?

3   A.  I——no, I'm not aware of us making use of those tools while

4   we were there.

5   Q.  You weren't aware that OPM used Azure Active Directory

6   role-based access control while you were deputy chief

7   information officer at OPM?

8   A.  There may——there might have been an island of people

9   attempting to use it within the organization.  Microsoft Azure

10  was not a widely used piece of infrastructure at OPM while I

11  was there.

12  Q.  Are you aware that since you've left, though, Microsoft

13  Entra ID is the tool that is used by OPM to ensure role-based

14  access control for the majority, vast majority of OPM's data

15  systems?

16  A.  Yeah, I'm aware that they're modernized.

17  Q.  Okay.  So do you understand that there isn't just one type

18  of "administrative access" in Entra ID?  You understand that,

19  right?

20  A.  Very well, yes.

21  Q.  Yeah.  There's multiple different privilege roles that a

22  user could be assigned with varying elevated privileges based

23  on that specific role, correct?

24  A.  Yes.

25  Q.  Turning your attention to paragraph 5 of your second

P5T1AME2                          Nesting - Cross

1   declaration.  At paragraph 5, you state, "It was not specified

2   what admin meant in the emails requesting or granting access to

3   these systems."  Do you see that?

4   A.  I do.

5   Q.  Okay.  And that's referring to emails that were in the

6   administrative record; is that right?

7   A.  Yes.

8   Q.  Okay.  So you don't know what level of administrative

9   access the OPM employees at issue were granted; is that right?

10  A.  There were indications further on in the email threads

11  about what they were granting access to, yes.

12  Q.  So you do know the level of administrative access they were

13  granted?

14  A.  Not with any specificity, but——

15  Q.  Got it.  At paragraph 6, you state that you "saw nothing to

16  suggest this access was being tailored to any of these

17  individuals or the particular work that they planned to do with

18  that access, which is the normal process at OPM and other

19  agencies to comply with their obligations under the Privacy

20  Act."  Do you see that?

21  A.  Yes.

22  Q.  Okay.  You refer in this paragraph to the "normal process

23  at OPM and other agencies," but each agency has its own chief

24  information officer, correct?

25  A.  Yes.

P5T1AME2                         Nesting - Cross

1   Q.  And each agency is responsible for establishing and

2   implementing its own access controls, correct?

3   A.  Subject to the law, yes.

4   Q.  Subject to the law?  Which law are you referring to?

5   A.  The Federal Information Security Management Act for——is the

6   main one.

7   Q.  Got it.  And so FISMA, F-I-S-M-A?

8   A.  Yes.

9   Q.  FISMA directs that agencies should implement appropriate

10  controls, correct?

11  A.  Yes.  It's very specific.

12  Q.  The FISMA statute is very specific?

13  A.  FISMA mandates a certain set of controls; NIST provides the

14  actual specific controls that agencies are to comply with,

15  yeah, or incorporated into their processes, I guess.

16  Q.  So the National Institute of Standards and Technology,

17  NIST, N-I-S-T, they're the ones who actually put out these best

18  practices?

19  A.  There's a very——the specific controls, yes.

20  Q.  Okay.  So FISMA, though, does not mandate——the statute does

21  not mandate any specific controls, correct?

22  A.  I think it mandates the use of a risk management framework

23  that NIST describes, is my recollection.  I'm not a lawyer.

24  Q.  Do agencies have discretion in the way that they implement

25  access controls?

P5T1AME2                        Nesting - Cross

1   A.  Yes.

2   Q.  Okay.  Is it fair to say there's no uniform normal process

3   for granting data access permissions used by all federal

4   agencies, right?

5   A.  I think that's fair, yeah.

6   Q.  Okay.  And there's no uniform normal process for granting

7   data access permissions that is required by the Privacy Act,

8   correct?

9   A.  Correct.

10  Q.  In your second declaration at paragraph 15, you state that,

11  "The government emphasizes that being granted administrative

12  access to OPM's systems did not necessarily mean that the DOGE

13  agents had full 'god mode powers.'"  Do you see that?

14  A.  I do.

15  Q.  But it is actually the declaration of Ann Lewis, which is

16  at Docket No. 86, that refers to administrative access as "god

17  mode," correct?

18  A.  I recall that in her declaration, yes.

19  Q.  Okay.  You reviewed and even cited to the Lewis declaration

20  in your second declaration at paragraph 9.  Do you see that?

21  A.  Yes.

22  Q.  I want to show you the Lewis declaration, which is at

23  Docket No. 86.

24          I want to turn your attention to paragraph 7 in her

25  declaration.  Ms. Lewis states, "I understand that several DOGE

P5T1AME2                          Nesting - Cross

1    personnel have 'root access,' sometimes called 'administrator

2    access,' or more colloquially, 'god mode.'"  Do you see that?

3    A.  I do.

4    Q.  Okay.  But you know that the system OPM used for access

5    control, Entra ID, doesn't utilize the terms "root access" or

6    "god mode," correct?

7    A.  Yeah, I don't believe those terms are a term of art.

8    Q.  Okay.  And you know, because you have familiarity with this

9    Entra ID, at least at a high level, that OPM did not grant the

10   highest and most powerful level of administrative access to

11   each of the "DOGE" engineers at issue in this case, correct?

12   A.  Correct.

13   Q.  Okay.  And you'd agree that the fact that a user was

14   granted administrative access does not necessarily mean that

15   user had access to all of the personal data in those OPM

16   systems, correct?

17   A.  It does not necessarily follow, yeah.

18   Q.  Okay.  In fact, in your second declaration at paragraph 16,

19   you state that "The Privacy Act is concerned only with access

20   to personally identifiable information contained within these

21   systems," correct?

22   A.  Yes.

23   Q.  Now if the individuals at issue——if we want to call them

24   DOGE agents or newly hired OPM employees——never actually logged

25   into one of these OPM data systems with their administrative

1    access permissions, then they logically did not access the

2    personally identifiable information contained within those

3    systems, correct?

4    A.  I don't know that that follows, no.

5    Q.  Okay.  If you never logged into a system that contains

6    sensitive personal information, how did you access sensitive

7    personal information?

8    A.  So you——you made reference specifically to the Microsoft

9    Entra.  I do not believe that Microsoft Entra fully gates

10   access do every system at OPM.

11   Q.  But you don't know, correct?

12   A.  Well, in the declaration, I think they——Mr. Hogan I think

13   mentioned that only most of OPM's services were covered by

14   Microsoft Entra, and I am aware that systems deployed under

15   Microsoft Azure could have their own access control that

16   is——has nothing to do with Microsoft Entra.

17   Q.  Got it.  So if the OPM data systems——let's assume that the

18   vast majority of OPM data systems, Entra ID controls access

19   control.  Logically, if individuals did not access——did not use

20   their administrative access to log into these systems, then

21   they didn't review personal information or even have access to

22   personally identifiable information, correct?

23   A.  Yes to the first part.  Whether they had access or not is a

24   semantic.

25   Q.  Is semantic?

P5T1AME2                         Nesting - Cross

1    A.  Yeah.

2    Q.  Why is it semantic?

3    A.  If the door is unlocked, then you have access to what's

4    behind the door even if you don't go through the door.

5    Q.  Got it.  So you understand, though, that when you are

6    granted access permissions in Entra ID, that doesn't mean you

7    can go through the door right away, right?

8    A.  Certainly it would allow you to go through Microsoft Entra

9    to access the root sources that Entra gave you access to.  I'm

10   not sure I understand your question.

11   Q.  Well, you actually have to create an account——you're aware

12   of that——for these data systems in Entra ID?

13   A.  Yes, yes, that's fair.

14   Q.  So there's another step, right?  The first step is, a user

15   is assigned elevated access privileges, right, in Entra ID?

16   A.  I would have assumed that you would need the account

17   created before you can assign them privileges, but, again, I'm

18   not super familiar with the Entra——how the Entra product

19   specifically works.

20   Q.  So you just don't really know how the Entra ID product

21   works, is that——

22   A.  Not at——in detail, no.

23   Q.  You would defer to someone who is working at OPM right now

24   who has knowledge of that system; is that fair?

25   A.  I would defer to anyone with more knowledge than me, yeah.

P5T1AME2                        Nesting - Cross

1  Q.  Okay.  Now in your second declaration you do identify that

2  Mr. Hogan was granted a higher level of privileged access,

3  correct?

4  A.  Yes.

5  Q.  And in your second declaration at paragraph 21, you stated,

6  "I observed that Mr. Hogan himself was granted sweeping 'global

7  admin' privileged access to OPM systems."  Do you see that?

8  A.  I do.

9  Q.  What does "global admin access" mean?

10 A.  In Microsoft Entra, that is the role that you would attach

11 to one, two, maybe up to five people.  These people are the

12 ones that define the role-based access control within Azure,

13 within any systems protected by Entra, so it would be the

14 system that gives you permission to describe the permissions

15 model and the roles and access controls for the entire

16 environment.

17 Q.  Okay.  It's a highly privileged role, right?

18 A.  The most highly privileged, yes.

19 Q.  And global admin, that refers to the global administrator

20 role in Microsoft Entra ID, correct?

21 A.  That's my understanding, yes.

22 Q.  Mr. Hogan is the chief information officer at OPM, right?

23 A.  Yes.

24 Q.  He is the individual ultimately in charge of all of OPM's

25 information technology systems, correct?

P5T1AME2                         Nesting - Cross

1    A.  Yes.

2    Q.  Okay.  And you do know that Microsoft Entra ID requires

3    that there be at least one individual assigned to the global

4    administrator role, correct?

5    A.  Yes.

6    Q.  And you do know that there can be multiple global

7    administrators in Microsoft Entra ID, correct?

8    A.  Yes.

9    Q.  Do you believe it is inappropriate for Mr. Hogan to have

10   global administrator privileges in Microsoft Entra ID?

11   A.  Yes.

12   Q.  Why is that?

13   A.  Mr. Hogan would be acting as the authority to determine who

14   by policy should have access to these systems.  I would not

15   expect a CIO to be acting in an operational capacity, where

16   they would actually be logging into Azure cloud systems and

17   actually managing these things at that level.  I think that

18   would be an irresponsible move for a CIO, but—

19   Q.  Well, someone has to have access to this role, right?

20   A.  Absolutely, absolutely, yes.

21   Q.  Who do you think should have access?

22   A.  I would probably want somebody in the organization that was

23   maybe running the infrastructure team or maybe one or two

24   trusted infrastructure engineers on that team that have been

25   specifically trained in all aspects of Azure and what the

1    global admin role, for instance, is capable of doing and how to

2    effectively secure it.

3    Q.  Got it.  So you want trusted individuals to have the global

4    administrator role?

5    A.  Trusted and ed——like, trained, competent, capable.

6    Q.  Okay.  You don't know if Mr. Hogan is not capable; is that

7    fair to say?

8    A.  I don't——I do not know.

9    Q.  You never met him?

10   A.  No.

11   Q.  You don't know his capabilities with respect to software

12   systems?

13   A.  I don't.

14   Q.  You don't know his level of understanding of OPM's data

15   systems, right?

16   A.  I don't.

17   Q.  In fact, he probably has a deeper understanding of OPM data

18   systems than you do at this point, correct?

19   A.  Quite likely.

20   Q.  Yeah.  Any reason to believe that he's not a trustworthy

21   individual?

22   A.  Not specifically, no.

23   Q.  Yeah.  Okay.  Mr. Nesting, do you know whether a user

24   assigned to the global administrator role can disable audit

25   logs in Entra ID?

P5T1AME2                    Nesting - Cross

1    A.  I don't know the answer to that.

2    Q.  Okay.  Well, in fact, the entries in Microsoft Entra ID's

3    audit logs are system generated and cannot be changed or

4    deleted, correct?

5    A.  I have no knowledge of that.  Seems like a good security

6    practice, though.

7    Q.  Mr. Nesting, I want to show you what's been premarked as

8    Defense Exhibit D12.

9           Mr. Nesting, do you see what's been marked as Exhibit

10   D12 is an article from Microsoft Entra ID Microsoft Learn, and

11   the title is, "What Are Microsoft Entra Audit Logs," and the

12   date of this article is January 31, 2025.  Do you see that?

13   A.  I do.

14          MR. FARBER:  Okay.  Your Honor, I move to enter this

15   document into evidence at this time.

16          MR. WARREN:  No objection.

17          THE COURT:  Received.

18          (Defendant's Exhibit 12 received in evidence)

19   Q.  Mr. Nesting, if you turn to the second page of this

20   document, towards the top, there's a note with a box around it.

21   Do you see that?

22   A.  Yes.

23   Q.  And it says, "Entries in the audit logs are system

24   generated and can't be changed or deleted."  Do you see that?

25   A.  I do.

P5T1AME2                          Nesting - Cross

1    Q.  Okay.  So is it right that there's no risk that an

2    individual granted administrative access to OPM's data systems

3    in Entra ID can disable or delete those Entra ID audit logs?

4    A.  That seems consistent, yes.

5    Q.  So you reviewed Ms. Lewis's declaration, right?

6    A.  Yes.

7    Q.  And she says that this administrative access includes the

8    ability to disable or delete audit logs, right?  That's what

9    she says in her declaration?

10   A.  If I can recall correctly, yes.

11   Q.  So that's incorrect, right?

12   A.  I don't know that that's necessarily incorrect.

13   Q.  Well, we just read here that the audit logs are system

14   generated and can't be changed or deleted.

15   A.  Yes, the Entra audit logs.

16   Q.  I see.  So you're referring to some other audit logs that

17   may be able to be changed or deleted.

18   A.  Yeah, there could be, yeah.

19   Q.  Okay.  You're just not aware of what those audit logs would

20   be?

21   A.  I am aware that other systems at OPM had audit logs that

22   were at the application level.  I don't know how Entra enters

23   into the picture, if Entra has taken those away or——I don't——I

24   don't have a systems design at the moment.

25   Q.  You're not sure how the systems are actually run at this

P5T1AME2                          Nesting - Cross

1   point in time.

2   A.  At this point in time, no.

3   Q.  Mr. Nesting, I'd like to turn to the topic of USA Staffing,

4   and turn your attention to your second declaration,

5   paragraphs 28-30.

6           Paragraphs 28-30 of your second declaration, you

7   discuss the access to the USA Staffing system at issue in this

8   case.  Do you see that?

9   A.  Yes.

10  Q.  And at paragraph 28, you wrote, "Mr. Hogan separately

11  confirms that before March 6, 2025, four DOGE individuals," I

12  assume you mean OPM employees?

13  A.  I did not know how many of them were OPM employees, but

14  yeah.

15  Q.  You didn't review the administrative record to determine

16  that?

17  A.  I did, yeah.  I don't——yes, I think that's broadly who I'm

18  referring to, yeah.  I don't know if there's any other people

19  that might have had access to OPM systems, aside from those

20  people, but yeah, primarily that's what I'm referring to.

21  Q.  There's no evidence to that effect.

22  A.  Yeah, I agree.

23  Q.  "——four DOGE individuals were granted 'administrative

24  access' to the USA Staffing system so that they could make

25  unspecified 'system changes' to automate hiring/onboarding, and

1    job posting processes and develop a data-driven hiring plan."

2    Do you see that?

3    A.   Yes.

4    Q.   As we discussed, the individuals referenced by Mr. Hogan

5    who had access to USA Staffing were all OPM employees, correct?

6    A.   Yes.

7    Q.   Okay.  Now paragraph 30 of your declaration, you state,

8    "Without further specificity, it is impossible to know what

9    these 'system changes' were, whether they involved access to or

10   manipulation of personal data stored in these systems, which

11   included information about prospective hires."  Do you see

12   that?

13   A.   Yes.

14   Q.   Is it right that without more details, you don't know one

15   way or another whether these system changes justified granting

16   administrative access to USA Staffing?

17   A.   Yes.

18   Q.   Okay.  Well, Mr. Nesting, I'd like to show you what's been

19   premarked as Defendant's Exhibits 10 and Defendant's

20   Exhibit 11.

21        And I'll turn your attention first to the document

22   marked D10, Defendant's Exhibit 10.  This is a printout from

23   the USA Staffing Resource Center website with the title, Hiring

24   Freeze Announcement Confirmation Process in USA Staffing.  Do

25   you see that?

P5T1AME2                    Nesting - Cross

1   A.  Yes.

2          MR. FARBER:  Your Honor, at this time I move to enter

3   this document into evidence.

4          MR. WARREN:  No objection.

5          THE COURT:  Received.

6          (Defendant's Exhibit 10 received in evidence)

7   Q.  And specifically, if you look at the url listed at the

8   bottom of the page, you see it comes from the USA Staffing

9   Resource Center, right?

10  A.  Yes.

11  Q.  And this document describes certain recent changes to the

12  USA Staffing program which "was updated to support the federal

13  hiring freeze enacted as part of Executive Order 14170."  Do

14  you see that?

15  A.  I do.

16  Q.  Okay.  And this document notes that "USA Staffing added a

17  confirmation pop-up that requires HR specialists to select one

18  of six options when releasing a job announcement."  Do you see

19  that?

20  A.  Yes.

21  Q.  And the second page of this document shows what this

22  confirmation pop-up looks like.  Do you see that?

23  A.  Yes.

24  Q.  Were you familiar with these system changes prior to today?

25  A.  No.  Or yesterday, yes.

P5T1AME2                         Nesting - Cross

1    Q.  Yesterday.  Okay.  So when defense counsel provided these

2    exhibits in advance, you were able to look at this?

3    A.  Yes.

4    Q.  Okay.  But you had looked at the USA Staffing Resource

5    Center in preparing your second declaration, right?

6    A.  Briefly, yeah.

7    Q.  In fact, if you turn to page 2 of your second declaration,

8    at footnote 1, you also reference material from this same USA

9    Staffing Resource Center website.

10   A.  Yes.

11   Q.  You just didn't come across this information.

12   A.  No.

13   Q.  Okay.  Now having reviewed this material, would you agree

14   that someone would need administrative access to the USA

15   Staffing system to implement this system change, correct?

16   A.  For some definition of administrative access, yeah.

17   Q.  The confirmation pop-up states that, "There is a hiring

18   freeze in effect per the president's executive order" and that

19   "to proceed with this announcement, you must personally verify

20   that this announcement is exempt from the hiring freeze or that

21   you are completing activities which are purely operational."

22   Do you see that?

23   A.  Sorry.  I lost where we were exactly in the document.

24   Q.  This is the second page with the confirmation pop-up.

25   A.  Oh, D10?

P5T1AME2                          Nesting - Cross

1   Q.  D10, at the very top of the second page.

2   A.  Okay, yes, I see it.

3   Q.  Okay.  Do you see where it references the hiring freeze?

4   A.  Yes.

5   Q.  Okay.  And the confirmation pop-up also notes, in the

6   second——or the third paragraph, rather, that OPM audits these

7   requests regularly.  Do you see that?

8   A.  Yes.

9   Q.  And one of the options in this list below——it's actually

10  the fifth option down——reads, "The chief of staff of the Office

11  of Personnel Management explicitly and in writing verified this

12  announcement is not subject to the freeze."  Do you see that?

13  A.  Yes.

14  Q.  And you were aware that two of the individuals granted

15  administrative access to USA Staffing were the former OPM chief

16  of staff, Amanda Scales, and the current OPM chief of staff,

17  James Sullivan, correct?

18  A.  Yes.

19  Q.  Do you believe that OPM's chief of staff does not need

20  administrative access to USA Staffing to review and audit these

21  job announcement confirmations in support of the hiring freeze?

22  A.  It would depend on how you're defining administrative

23  access, I think.

24  Q.  Okay.  Hold on.  Why would it depend?

25  A.  Because these are just words, right?  They could mean

P5T1AME2                         Nesting - Cross

1    any——many different kinds of privileged access.  There is some

2    version of admin privileges that she could reasonably want to

3    have in order to effect content changes, I guess.

4    Q.  But setting the system changes aside, if the chief of staff

5    is reviewing these requests, they're going to need elevated

6    privileges to review underlying personal data information

7    involved in potential job announcements, correct?

8    A.  Actually, I wouldn't call that administrative privileges at

9    all.

10   Q.  You wouldn't call it administrative privileges.

11   A.  No.  That sounds like a role——a regular, maybe more

12   privileged role in a system, but not necessarily anything I

13   would call an admin.

14   Q.  Got it.  So you think there's some other admin; admin is

15   different from elevated access permissions.

16   A.  I think elevated access is a part of the definition for

17   administrative access, but I don't think it is sufficient.

18   Q.  Okay.  Well, Mr. Nesting, I'd now like to turn your

19   attention to the document marked D11.  This is another printout

20   from the USA Staffing Resource Center website entitled Hiring

21   Freeze, New Hire Confirmation Process in USA Staffing.  Do you

22   see that?

23   A.  Yes.

24           MR. FARBER:  Your Honor, at this time defendants move

25   to offer Defendant's Exhibit D11 into evidence.

P5T1AME2                         Nesting - Cross

1          MR. WARREN:  No objection.

2          THE COURT:  Received.

3          (Defendant's Exhibit 11 received in evidence)

4    Q.  This document from the USA Staffing Resource Center also

5    notes that there were changes made to the new hire area in USA

6    Staffing to implement the president's hiring freeze, correct?

7    A.  Sorry.  I don't see that.

8    Q.  So this is the first paragraph under the title.

9    A.  Oh, I see.  Okay.  Yeah.  Yes, I see that.

10   Q.  That there were recent changes to the new hire area within

11   USA Staffing.  Do you see that?

12   A.  Yup.

13   Q.  And that was to implement the president's hiring freeze,

14   correct?

15   A.  Yes.

16   Q.  And it details, this document, a different confirmation

17   pop-up screen that's on the second page that was implemented

18   for when a new hire record was created in USA Staffing.  Do you

19   see that?

20   A.  Yes.

21   Q.  Okay.  Now having seen these system changes that were

22   implemented to USA Staffing, you would agree that someone

23   needed administrative access in order to implement those system

24   changes, correct?

25   A.  Some degree of elevated privileges.  You could call that

P5T1AME2                          Nesting - Cross

1    admin access, sure.

2    Q.  Okay.  And do you have any reason to believe that the

3    individuals that had access to USA Staffing should not have had

4    that administrative access to implement these changes?

5    A.  It would depend on what level of access they were given,

6    but you shouldn't need significant admin privileges to make

7    these changes, no.

8    Q.  Okay.  And you just simply don't know what level of access

9    they were provided.

10   A.  I think I saw some indications in the audit, the audit logs

11   that were in the administrative record, but I don't know the

12   full scope, no.

13   Q.  Well, you reviewed the administrative record.  Do you know

14   what level of access they had?

15   A.  I think I saw some——I don't recall exactly if it was Amanda

16   Scales or whomever, but I know that some people were placed in

17   like collaborator groups in Microsoft Entra which would have

18   given them some broad system-level privileges, but I don't

19   recall exactly what level of privileges they had.

20   Q.  And you don't know if assigning someone to that

21   collaborator role means that they had more privileges than

22   necessary?

23   A.  Generally that means they would have far more privileges

24   than would be needed to make a content change, yeah.

25   Q.  To make a content change, but Amanda Scales is the chief of

P5T1AME2                        Nesting - Redirect

1    staff.  She has to review changes to the system, job

2    announcements, new hire announcements, correct?

3    A.  Yes.

4            MR. FARBER:  Okay.  I have no further questions on

5    cross-examination, your Honor.

6            THE COURT:  Redirect.

7            MR. WARREN:  Thank you, your Honor.

8    REDIRECT EXAMINATION

9    BY MR. WARREN:

10   Q.  Mr. Nesting, good morning.

11   A.  Good morning.

12   Q.  You were asked questions about Everette Hilliard's

13   declaration—do you recall that—early in the

14   cross-examination?

15   A.  Yes.

16   Q.  And you were asked about whether the information that

17   counsel gave you based on a declaration that you had not read

18   changes your opinion about whether the vetting process could

19   have been proper.  Do you recall that question and answer?

20   A.  I do, yes.

21   Q.  And you never had a chance to review what Mr. Hilliard

22   said, correct?

23           MR. FARBER:  Objection, your Honor, leading.

24           THE COURT:  We'll just see if this is a setup to get

25   us to a point.  Overruled.

P5T1AME2                    Nesting - Redirect

```
 1              THE WITNESS:  If I can clarify.  If I may.

 2              THE COURT:  So we don't have a question that requires

 3    an answer yet.

 4              THE WITNESS:  Okay.

 5    BY MR. WARREN:

 6    Q.  You never actually reviewed Mr. Hilliard's declaration?

 7    A.  I reviewed it yesterday.

 8    Q.  In your experience how long did it take to properly vet OPM

 9    and other personnel handling sensitive data?

10              MR. FARBER:  Objection, your Honor.  Beyond the scope

11    of cross.

12              THE COURT:  Overruled.

13    A.  Could you ask the question again.

14    Q.  Of course.  In your experience how long did it take to

15    properly vet OPM staff who were handling or had access to

16    sensitive data?

17    A.  Generally months, if I recall correctly.  It would depend

18    on the level of access.

19    Q.  Are you aware of how long it took to vet the DOGE agents at

20    issue in this case?

21    A.  I don't remember exactly.  It seemed like on the order of

22    weeks.

23    Q.  Are you aware of what Mr. Hilliard did to determine

24    whether, in his opinion, that vetting was proper?

25    A.  I did skim his declaration.  I don't recall exactly.
```

P5T1AME2                        Nesting - Redirect

1   Q.  You were asked questions about Defendant's Exhibit 12.  Do

2   you still have that in front of you?

3   A.  Yes.

4   Q.  And you were asked questions about audit logs and

5   concealing access.  Do you recall that?

6   A.  Yes.

7   Q.  Are you familiar with the concept of antiforensics in

8   information technology?

9            MR. FARBER:  Objection, your Honor.  Beyond the scope.

10           THE COURT:  It may be, but I don't know enough about

11  the term to be able to rule on that, so we'll just take it one

12  step at a time.  Overruled.

13  A.  I'm familiar, yes.

14  Q.  Please explain what that means, as a general concept.

15  A.  Yeah, my general understanding is that it would be any—any

16  techniques or strategy you might take to—to deny someone the

17  access to do forensics, to see what you've been up to.

18  Q.  For someone to hide their tracks.

19  A.  Yeah, basically.

20  Q.  And you were asked whether the Microsoft Entra platform

21  prohibits someone from being able to conceal their tracks.  Do

22  you recall that, those questions and answers?

23           MR. FARBER:  Objection, your Honor.  Misstates the

24  testimony and the questioning.

25           THE COURT:  Please give me one second.

1              Overruled.  You may answer.

2    A.  I'm sorry.  You'll have to repeat the question.

3    Q.  Do you recall being asked questions and giving answers

4    about the Microsoft Entra and whether it allows somebody to

5    hide their tracks, to engage in these antiforensics?

6    A.  Yes.

7    Q.  And just to digress for a quick moment on that point.

8    During Mr. Farber's questioning you were asked about

9    Mr. Hogan's declaration, and you started to say something about

10   Mr. Hogan's declaration says that Microsoft Entra was not used

11   to protect all the OPM systems but most; is that correct?

12   A.  Yes, I believe that "most" was the word that was used in

13   the declaration.

14   Q.  So if this Entra program platform only protects most but

15   not all of OPM's systems, do questions about audit trails and

16   audit logs have any impact or any bearing on the systems that

17   are not using Microsoft Entra?

18   A.  Yeah, it would be unrelated, yeah.

19   Q.  So let's just——

20              THE COURT:  It would be what?

21              THE WITNESS:  Unrelated.

22              THE COURT:  Thank you.

23   Q.  So for the next few questions let's just focus on whatever

24   systems are using the Microsoft Entra platform.

25              You had mentioned the term "application level."  What

P5T1AME2                    Nesting - Redirect

1   does that mean?

2   A.  So with this Azure environment that Microsoft Entra

3   provides identity and access management for, that largely

4   describes the infrastructure into which you deploy

5   applications, and so you could use Entra to do access

6   management for, you know, application level, your role-based

7   access control within USA Staffing, for instance, it would be

8   up to the application actually to define how all of that works,

9   and application level, at the application level, you may have a

10  completely different set of access management, access controls,

11  and audit logs.

12  Q.  So the OPM systems are at an application level; is that

13  correct?

14  A.  It would be, yeah.  A lot of the OPM applications, I

15  would——I mean, like the USA Staffing, I would describe as an

16  application, or a service that runs on infrastructure, which is

17  Azure protected by Entra.

18  Q.  And that's called an infrastructure, infrastructure level?

19  A.  Yeah, that's how I would distinguish, yeah.

20  Q.  Okay.  So we have two different levels then, correct?  We

21  have the infrastructure level and the application level.

22  A.  Yes.

23  Q.  Do any of the prohibitions within Microsoft Entra about

24  these antiforensic steps——so concealing somebody's tracks——have

25  any bearing on what happens at the application level within

1    OPM's systems such as USA Staffing?

2    A.  They could.  It would depend on if the application was

3    designed to take advantage of those.

4    Q.  And in this context you were asked questions about

5    Ms. Lewis's declaration and her statement about whether people

6    with this type of access could have concealed their tracks.

7    Anything that you were asked on cross-examination make you

8    doubt what was in Ms. Lewis's declaration on this point?

9    A.  I'm not sure I understand.

10   Q.  Sure.  You're familiar with Ms. Lewis's declaration where

11   she discusses——

12   A.  Yes.

13   Q.  ——this, what I'm calling hiding your tracks, the

14   antiforensics.

15   A.  Yes.

16   Q.  Any questions that you were asked on cross-examination, or

17   anything in that exhibit, D12, change your opinion about the

18   accuracy of Ms. Lewis's statement with regard to the ability to

19   conceal one's tracks at the application level?

20   A.  Yeah, no.

21   Q.  I'm sorry.  Your answer was yeah, no?

22   A.  Sorry.  Nothing about that led me to think that her——what

23   was in her declaration was something that could be dismissed.

24   Q.  And is part of the justification for the principle of least

25   privilege to limit someone's ability to actually conceal their

P5T1AME2                          Nesting - Redirect

1    tracks?

2              MR. FARBER:  Objection, your Honor.  Beyond the scope.

3    Now we're just testifying on direct.

4              THE COURT:  Can you rephrase, counsel.

5              MR. WARREN:  Of course.

6    Q.  How does the principle of least privilege intersect with

7    the idea of preventing antiforensics, of limiting somebody's

8    ability to conceal their tracks within a data system?

9              MR. FARBER:  Objection, your Honor.  Beyond the scope.

10             THE COURT:  Sustained.

11   Q.  Mr. Nesting, at the end of the cross-examination you were

12   asked questions about Defendant's Exhibits 10 and 11.  Do you

13   still have those in front of you?

14   A.  Yes.

15   Q.  And you were asked questions about the difference between

16   elevated access permission and administrative access.  Let me

17   ask it this way:  To effectuate the changes needed that are

18   reflected in Defendant's Exhibits 10 and 11, did someone need

19   elevated access permissions or administrative access?

20   A.  They would have needed some elevated privileges, yes.

21   Q.  What access to private user data would a person have needed

22   to make those changes as reflected in Exhibits 10 and 11?

23   A.  I would——I would be shocked if anyone had access to private

24   information in order to accomplish those changes.

25   Q.  What other personally identifiable information would

1   someone need to make those changes described in those two

2   exhibits?

3           MR. FARBER:  Objection, your Honor.  Just restates the

4   same question using different terms.  Asked and answered.

5           THE COURT:  Sustained.

6   Q.  How does granting administrative access to private user

7   data for this project comport with the principle of least

8   privilege?

9           MR. FARBER:  Objection, your Honor.  Assumes facts in

10  evidence that aren't in evidence, lack of foundation, and

11  beyond the scope of cross.

12          THE COURT:  Overruled.

13  A.  Could you restate the question.  I apologize.

14  Q.  Of course.  I'm trying to read it from afar.

15          How does granting administrative access to private

16  user data for this project comport with the principle of least

17  privilege?

18          MR. FARBER:  Objection, your Honor.

19          THE COURT:  Overruled.

20  A.  The principle of least privilege would have——would have you

21  completely isolate any sort of content changes.  Assuming we're

22  talking about any changes needed to move between 10 and 11, you

23  would only have the bare necessary set of privileges in order

24  to effect that change in the system.  It would be only——only to

25  the data systems that are relevant to the content of the——of

P5T1AME2                    Nesting - Redirect

1    the site.

2    Q.  In response to one of counsel's questions, you answered

3    generally there was far more privilege than necessary that was

4    granted as your understanding with regard to this project.  Was

5    the level of access granted relevant and necessary to achieving

6    the specific goal of this project?

7            MR. FARBER:  Objection, your Honor.  Leading.

8            THE COURT:  When you refer to "this project"——excuse

9    me, counsel, just to make sure that I can understand your

10    objection and we're both understanding the question

11    correctly——which project are you referring to?

12            MR. WARREN:  My apologies, your Honor.  To the

13    platform change that's reflected in Defense Exhibit 10 and 11.

14            THE COURT:  Okay.  Overruled.

15            Do you need the question again?

16            THE WITNESS:  I think so, yes.  I'm trying to watch

17    the screen, but——

18            MR. WARREN:  I can't quite read it.  I'll try to ask

19    it again in the same way.

20    BY MR. WARREN:

21    Q.  Was this level of access relevant and necessary to

22    achieving the goal of the project as reflected in Defense

23    Exhibit 10 and 11?

24            MR. FARBER:  Objection, your Honor.  Vague as to this

25    level of access.  The witness testified he doesn't know what

P5T1AME2                    Nesting - Redirect

1    level of access they had.

2            THE COURT:  So what level of access was needed, as you

3    understand it, to achieve the goals of the projects reflected

4    in Defendant's Exhibits 10 and 11?

5            THE WITNESS:  Sorry.  Was that directed to me?

6            THE COURT:  Yes.

7            THE WITNESS:  I don't know how the application was

8    designed so it's hard for me to specifically say what level of

9    access controls they would have had to enable these types of

10   changes, but the access that I would have imagined would be

11   required to make a change to move from stated in D10 to D11

12   would be limited to the portions of the applications that

13   generated content, possibly some logics, there may be some code

14   changes.  None of those should require access to any data

15   systems of the application whatsoever, aside from those which

16   hold maybe the content, for the pages.

17   BY MR. WARREN:

18   Q.  Mr. Nesting, do you still have Defense Exhibit 14 in front

19   of you?

20   A.  Yes.

21   Q.  Can you provide just a brief summary of this project.

22           MR. FARBER:  Objection, your Honor.  Beyond the scope

23   of cross.

24           THE COURT:  Overruled.

25   A.  So this was a project that was intended to demonstrate the

P5T1AME2                    Nesting - Redirect

1   value of lean agile systems in enabling I think subject matter

2   experts to review résumés for potential——for applicants to

3   potential federal positions.

4   Q.  Do you recall how many users were part of this project?

5   A.  I believe during the pilot it was——I think we limited it to

6   I think a hundred users.

7   Q.  And counsel asked you questions about that——he was

8   referring to Section 3.3, which is on page 8, and he asked you

9   questions about whether some access to personal data was

10  needed.  What access to personal data——or excuse me——what

11  personal data was actually accessed as part of this project

12  referenced in D14?

13  A.  Yeah, we were very careful to limit what personal data went

14  into this system, and we were able to minimize it to

15  essentially just the person's name.  It's possible email

16  address got in there at some point as well, but I believe it

17  was just the name, at least for the pilot, and then whatever

18  internal USA Staffing identifiers that were associated with

19  that.

20  Q.  And what private data was being stored as part of this

21  project?

22  A.  Only that, that information.

23  Q.  Why prepare the privacy impact assessment?

24  A.  Because it reflected——the intent was to potentially

25  integrate with USA Staffing systems, and so there's obviously a

P5T1AME2                     Nesting - Redirect

1    tremendous amount of sensitive data in those systems.  Anything

2    that even seems like it's going to touch those data systems is

3    something we're very interested in making sure that everything

4    is——everything is kosher, everything is, you know——we're doing

5    our due diligence to protect the data, and so the privacy

6    impact assessment is just one way that we would use to

7    assert——to get everybody on the same page about what——what data

8    was being accessed and how it was being managed so that we

9    could get everyone feeling comfortable about them taking their

10   next step, which was to the pilot initially.

11   Q.  During the time that you were at OPM, did it have policies

12   about when privacy impact assessments would be prepared?

13         MR. FARBER:  Objection, your Honor.  Beyond the scope

14   of cross.

15         THE COURT:  Sustained.

16   Q.  Are you aware of any privacy impact assessments similar to

17   what's in Defense 14 having been completed or even contemplated

18   regarding DOGE officials being given access to OPM data

19   systems?

20         MR. FARBER:  Objection, your Honor.  Beyond the scope

21   of cross.

22         THE COURT:  Sustained.

23         MR. WARREN:  Court's indulgence.

24   Q.  Mr. Nesting, you were asked questions about overprivilege.

25   Do you recall that?

1    A.   Yes.

2    Q.   And there were questions specifically about whether it

3    happened sometimes that more privilege or more access is given

4    than is necessary at the time because there was uncertainty

5    about what the project will be.  Do you recall that?

6    A.   Yes.

7    Q.   And in one of your responses, you said that there needs to

8    be a demonstrable need for the access.  Do you recall that?

9    A.   Yes.

10   Q.   When does that need to be demonstrated, before or after

11   access is granted?

12   A.   Before.

13   Q.   Would it be proper to give broad administrative access with

14   no demonstrated need?

15   A.   No.

16   Q.   Would it be proper to give broad administrative access in

17   the contemplation that there may be some need down the road

18   that hasn't been determined yet?

19   A.   No.

20   Q.   Why not?

21   A.   Because that would be——I mean, it would be creating an

22   exposure from a security standpoint; it would be, you know, a

23   violation of the separation of privileges, principle of least

24   privileges; it would——it would create risk, unnecessary risk of

25   credentials being compromised early on; and it also just

P5T1AME2                          Nesting

1   suggests that you don't really know, like——I don't mean to be

2   flippant, but it suggests you don't know what you're doing.  If

3   you have no ability to articulate what exactly you need

4   somebody to be able to do, then they shouldn't be given access.

5   Q.  Mr. Nesting, you were asked some questions about a line on

6   your résumé with regards to a project and questions about that

7   sometimes you need to be able to move quickly, I believe you

8   used the word "agile" at one point in your cross-examination.

9   Do you recall that?

10  A.  Yes.

11  Q.  When does the need to move quickly justify departing from

12  the principle of least privilege?

13  A.  Never.

14  Q.  When does it justify ignoring security protocols?

15  A.  Never.

16  Q.  When does the need to move quickly justify not complying

17  with OPM policy?

18  A.  Never.

19  Q.  Not complying with the Privacy Act?

20  A.  Never.

21          MR. WARREN:  One moment, your Honor.

22          Pass the witness, your Honor.

23          THE COURT:  Any recross?

24          MR. FARBER:  No, your Honor.

25          THE COURT:  Let's take a brief recess.

1          Mr. Nesting, please remain.  I may have some questions

2     for you.

3          Counsel, shall we say ten minutes, and then return?

4     Thank you so much.

5          THE DEPUTY CLERK:  All rise.

6          (Recess)

7          THE COURT:  So Mr. Nesting, you've been asked a lot of

8     questions about administrative access, and you've talked about

9     elevated access, and I've understood that to mean that there

10    are different levels of access under the broad term of

11    administrative access; am I right?

12         THE WITNESS:  Yes, yes.

13         THE COURT:  Is there a kind of access to data systems

14    that contain PII that are not administrative access?  For

15    instance, something we could call user access?

16         THE WITNESS:  There——in any——in any application, you

17    define roles within that application.  Often those roles will

18    have some degree of elevated privileges, almost by definition.

19    You can't really be given access to a system without——without

20    it being elevated in some way.  But if I understand your

21    question, you could have some level of access to personal data

22    within a system using a role that's not necessarily described

23    with the word admin.

24         THE COURT:  For instance, a read-only role.

25         THE WITNESS:  Yes.

P5T1AME2                        Nesting

1          THE COURT:  And how would that typically, if you know,

2    at OPM be referred to?  If you just had the ability to open an

3    application and look at its contents, would you require

4    administrative access to do that?

5          THE WITNESS:  Not necessarily.  Well, it——these are

6    just words, right?  They——I'm not sure how to answer that

7    question.  I'm sorry.

8          THE COURT:  Good.  So let's make it specific.

9          You have the administrative record before you?

10         THE WITNESS:  Yes.

11         THE COURT:  And if you go to page 103.

12         THE WITNESS:  Yes.

13         THE COURT:  And that's a document that identifies

14   certain people by name and names of systems in another column

15   and the date created, which I think is access to a system, for

16   that person.

17         THE WITNESS:  Yes, that's what I believe.

18         THE COURT:  And then you go over two columns and then

19   it says Administrative Access, Yes/No.  Do you see that at the

20   top?

21         THE WITNESS:  I do.

22         THE COURT:  That implied to me that you could have

23   access other than administrative access, and if that access had

24   been given, it would be No entered in that column.  Am I

25   understanding that correctly, based on your experience at OPM?

P5T1AME2                          Nesting

1          THE WITNESS:  I believe it could, yes.

2          THE COURT:  Okay.  And just between ourselves, so you

3    can answer my questions, let us say that nonadministrative

4    access is going to be user access, so someone can go in and

5    read the contents of an application, and then for

6    administrative access, based on what you've told me, there are

7    various levels——

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  You testified that in your

10   experience, it took a long time to vet individuals before they

11   were given access to applications that contained sensitive

12   data, which I understood to include PII.  Did I understand that

13   correctly?

14         THE WITNESS:  Yes.

15         THE COURT:  And are you talking about user access or

16   administrative access, or any access?

17         THE WITNESS:  The times when I've seen,

18   administrative-level access.  So anything with significantly

19   elevated privileges, we would want a full adjudication of some

20   background investigation, security clearance, quite possibly

21   before we would grant any sort of system administrator access

22   to a system that contained the PII.

23         THE COURT:  So not every OPM employee; somebody who

24   was onboarded according to human resources' protocols would

25   qualify as a result of their onboarding for access,

1    administrative access to OPM data systems containing PII.

2            THE WITNESS:  Yes, it would be part of that

3    onboarding.  And the declaration of Mr. Hilliard, the vetting

4    he described there seems completely insufficient and

5    inappropriate for granting that level of access.

6            MR. WARREN:  Your Honor?

7            THE COURT:  I'm not sure that I understand your

8    answer.

9            THE WITNESS:  Okay.

10           THE COURT:  So don't refer to somebody else's

11   declaration.

12           Okay.  So when you testified that vetting was required

13   before someone would be given administrative access to a data

14   system containing PII, what were you referring to?

15           THE WITNESS:  The background investigations typically

16   conducted at the start of employment.

17           THE COURT:  Okay.  But if you have temporary

18   employment, you're not required, according to the record before

19   me, to have a background investigation other than a fingerprint

20   check.  So what are you referring to?

21           THE WITNESS:  A suitability check that is done by OPM

22   to determine suitability for employment, and then if it's a

23   sensitive system, like I think——I think broadly, those——those

24   checks I think——I think for sensitive systems, we require

25   security clearances for people, even though it's not a

P5T1AME2                          Nesting - Recross

1    classified system.  I'm a little fuzzy on specifically what

2    we——what we required of people at OPM, but some of those checks

3    did take place.

4               THE COURT:  Did you require training to occur before

5    access was given?

6               THE WITNESS:  Yes, absolutely.

7               THE COURT:  Okay.  Thank you.  I have no other

8    questions.

9               Does the government have any further questions for

10   this witness before I let the plaintiffs ask any further

11   questions again, just based on my questioning?

12              MR. FARBER:  Yes, I just have a few limited questions,

13   your Honor.

14   RECROSS EXAMINATION

15   BY MR. FARBER:

16   Q.  Mr. Nesting, you have no experience in performing any sort

17   of adjudication or vetting of individuals that you just

18   described, correct?

19   A.  Correct.

20   Q.  Okay.  That's handled by a different group at OPM, correct?

21   A.  Yes.

22   Q.  In fact, it's handled by Mr. Hilliard's group; that would

23   have been the same group that would handle the vetting when you

24   were there.

25   A.  Yes.

P5T1AME2                    Hogan

1   Q.  You both overlapped, actually, at OPM, correct?

2   A.  Yes.

3   Q.  And so you would rely on that group to perform the

4   necessary vetting to determine whether someone was suitable and

5   able to have them have access to OPM data systems, correct?

6   A.  Yes.

7            MR. FARBER:  Okay.  Thank you.

8            THE COURT:  Thank you.

9            Does plaintiff's counsel have any questions?

10           MR. WARREN:  No, your Honor.

11           THE COURT:  Thank you.  You may step down.

12           (Witness excused)

13           THE COURT:  Do the plaintiffs have any further

14   evidence to offer?

15           MR. MILLSAPS:  No, your Honor.  We've offered our

16   evidence.  Although, you know, of course we may rely on

17   Mr. Hogan's testimony that will take place later as part of our

18   evidence as well.

19           THE COURT:  Good.  Good.

20           So I think we're ready to bring Mr. Hogan online.  I

21   think that's been set up.  And I know we want to use his time

22   well.  So I'll turn to defense counsel and ask you what you

23   prefer.  Do you prefer to begin immediately with his testimony

24   or to offer your other evidence first?

25           MR. FARBER:  I think we would prefer to begin

P5T1AME2                          Hogan

1  immediately, but I do think offering the other evidence first

2  will be quite quick.  I just asked Mr. Hogan to join the

3  Microsoft Teams link so that may take a moment, and in the

4  meantime, we can take care of entering the rest of defendant's

5  exhibits into evidence.

6            THE COURT:  Good.

7            I think Mr. Hogan has just appeared on screen.

8            MR. FARBER:  Oh.

9            THE COURT:  Is that possible?

10           MR. FARBER:  Yes, that is Mr. Hogan.  So why don't we

11 proceed with the testimony, your Honor.

12           THE COURT:  Okay.  And Mr. Hogan, this is Judge Cote

13 speaking.  I don't know if you can see me on your screen.  Can

14 you see me?

15           THE WITNESS:  I do not believe I can see you.

16           THE COURT:  Okay.  And counsel is going to now move to

17 the podium.  I want to make sure that you can see counsel who

18 will be examining you.  Can you see counsel at the podium?

19           THE WITNESS:  I can see most of him.

20           THE COURT:  Okay.  So our visuals are not great, but

21 let's make sure our audio is working.  So far it seems you can

22 hear me, Mr. Hogan.  Is that right?

23           THE WITNESS:  Correct.

24           THE COURT:  Good.  Counsel, speak into the microphone,

25 please.

P5T1AME2                         Hogan

1          MR. FARBER:  Yes.  Mr. Hogan, can you hear me?

2          Mr. Hogan, can you hear me?

3          THE WITNESS:  Yes, I can hear you.

4          THE COURT:  Okay.  Good.  So Mr. Hogan, again, this is

5    Judge Cote, and we thank you for making yourself available for

6    today's preliminary injunction hearing.  The plaintiffs have

7    agreed that you can be testifying from Washington, DC.  We're

8    going to try to use your time well here.

9          I'm going to begin by administering the oath.  Please

10   raise your right hand.

11          (Continued on next page)

P5TKAME3                          Hogan - Direct

1    GREGORY J. HOGAN,

2         called as a witness by the Defendants,

3         having been duly sworn, testified as follows:

4              THE COURT:  Defense counsel has declarations to

5    present to you, and I think you have copies before you.

6              I'm going to turn this over to you, counsel, to make

7    sure that the declarations are properly identified by the

8    witness, and then I'll ask him if he swears to the truth.

9              MR. FARBER:  Yes, your Honor.

10   DIRECT EXAMINATION

11   BY MR. FARBER:

12   Q.  Mr. Hogan, do you have, in front of you, your first and

13   second declarations that you submitted in this case?

14   A.  Yes, I do.

15              Is that document 40?  And document 51 -- no, not 51-1?

16   Q.  I believe it's document 40 and document 98.

17   A.  Yes, I do.

18   Q.  So, keep those in front of you.

19              MR. FARBER:  The first declaration of Gregory Hogan,

20   dated February 19, 2025, is at Docket No. 40, and the second

21   declaration of Gregory J. Hogan is at ECF Docket No. 98.

22              Those are the two declarations that were submitted,

23   your Honor.

24              THE COURT:  And, counsel, could you give me the

25   exhibit numbers that have been assigned to them for this

P5TKAME3                              Hogan - Direct

1    hearing?

2              MR. FARBER:  Yes.

3              The first declaration, at Docket No. 40, is assigned

4    Exhibit No. D8, and the second declaration, at Docket No. 98,

5    is assigned Exhibit D9.

6              THE COURT:  So, Mr. Hogan, I'm going to refer to them

7    by those numbers, D8 and D9.

8              So, I am going to ask you first about Defense

9    Exhibit No. 8.  And I understand that is your declaration in

10   this case, that you executed on February 19th.

11             Do you have that document before you?

12             THE WITNESS:  Yes, I do.

13             THE COURT:  Have you read it with care?

14             THE WITNESS:  I have, yes.

15             THE COURT:  Do you swear to the truth of its contents?

16             THE WITNESS:  Yes, I do.

17             THE COURT:  Let's turn, then, to D9, and that's the

18   second declaration you filed in this action.  It was filed on

19   your behalf in this action.  And it bears the date May 16th.

20             Did you read that document with care before signing

21   it?

22             THE WITNESS:  Yes, I did.

23             MR. FARBER:  Your Honor, before you ask the next

24   question, we had discussed at that court conference that there

25   was a correction to Mr. Hogan's second declaration.  So I would

P5TKAME3                              Hogan - Direct

1    ask that we be given the chance to ask that question and let

2    Mr. Hogan explain that correction.

3         THE COURT:  Terrific.  Why don't you do that now.

4    BY MR. FARBER:

5    Q.  Mr. Hogan, in your second declaration, at paragraph 14, you

6    referred to individuals who had access to USA Staffing system,

7    including an individual listed as OPM 7, and that also refers

8    to the systems access spreadsheet in the administrative record

9    at OPM-000103.

10        I understand that there is a correction needed, and

11   why don't you explain to the Court what that correction is.

12   A.  Yes.  So, I was informed that the person you identified as

13   OPM 7 actually never did log into USA Staffing.  The timestamp

14   that was attributed to OPM 7 was actually the last time that

15   Charles Ezell logged into that system, who was a federal

16   employee at the time and had such access at that time.

17   Q.  Is it correct that Charles Ezell is the acting director of

18   OPM currently?  Correct?

19   A.  That is correct.

20   Q.  So, the paragraph 14 of your second declaration, the fact

21   that OPM 7 accessed USA Staffing is incorrect, and it should be

22   removed?

23   A.  Yes, that's correct.

24   Q.  And, similarly, at the systems access spreadsheet, at

25   OPM-000103, that spreadsheet should reflect that OPM 7 never

P5TKAME3                         Hogan - Cross

1   actually logged into USA Staffing; is that correct?

2   A.  Yes, that's my understanding.

3              MR. FARBER:  That's all, your Honor.

4              THE COURT:  Thank you.

5              And but for that one change, do you swear to the truth

6   of the contents of D9?

7              THE WITNESS:  Yes, I do.

8              THE COURT:  Thank you.

9              Cross-examination.

10  CROSS-EXAMINATION

11  BY MR. WARREN:

12  Q.  Mr. Hogan, good afternoon.

13             Can you hear me okay?

14  A.  Yes, I can.

15  Q.  Can you see me okay?

16  A.  Most of you.

17  Q.  The important parts of me?

18  A.  Yes.

19  Q.  Thank you for being here today virtually.

20             You have 20 years' plus experience in the private

21  sector information technology arena, correct?

22  A.  Yes, that's correct.

23  Q.  And you understand the importance of information technology

24  security?

25  A.  Yes, I do.

P5TKAME3                          Hogan - Cross

1   Q.  And part of it is to protect sensitive data?

2   A.  Yes, I agree with that.

3   Q.  To prevent operational disruptions?

4   A.  Yes.

5   Q.  To ensure compliance with the law?

6   A.  Yes.

7   Q.  And those goals and importance of IT security are the same,

8   if not even heightened, in the government sector, correct?

9   A.  I would agree.

10  Q.  You have been the acting CIO and CIO of OPM since

11  January 20th, yes?

12  A.  Yes.

13          MR. FARBER:  Objection to the form of the question.

14  He said that he had been acting CIO since January 20th, but

15  he's now the permanent chief information officer.  So it

16  doesn't --

17          MR. WARREN:  Your Honor, the question was acting CIO

18  and CIO.

19          MR. FARBER:  I see.  I'm sorry, I withdraw the

20  objection.

21  BY MR. WARREN:

22  Q.  And, Mr. Hogan, in that capacity, you're responsible for

23  the development and maintenance of information technology

24  systems, yes?

25  A.  Yes, I am.

P5TKAME3                          Hogan - Cross

1    Q.  To make sure that OPM is developing security protocols?

2    A.  Yes, I'm ultimately responsible for that.

3    Q.  And to make sure that they're followed?

4    A.  Yes.

5    Q.  And you submitted two declarations in this case, as well as

6    a record certification, correct?

7    A.  Yes.

8    Q.  You're familiar with the allegations in this case?

9    A.  I am familiar, yes.

10   Q.  Familiar with alleged violations of the Privacy Act?

11   A.  Yes, I understand.

12   Q.  And are you generally familiar with the Privacy Act?

13   A.  Generally, yes.

14   Q.  Did your familiarity with the Privacy Act come as part of

15   your responsibilities as CIO -- when I say CIO, I'm including

16   the time as acting CIO — or did it come prior, with regard to

17   your work in the private sector?

18   A.  I would say with -- I would say mostly with my time as

19   acting CIO or CIO.

20   Q.  Have you read the complaint in this case?

21   A.  Yes, I have.

22   Q.  You're aware that it was filed on February 1st?  Excuse me,

23   February 11th?

24   A.  Off the top of my head, I don't know the exact date.

25   Q.  Do you recall when you first learned about the suit?

P5TKAME3                        Hogan - Cross

A.  I do not recall the exact date that I learned about it.

Q.  You've discussed this lawsuit with government counsel?

A.  Yes, I have.

Q.  And your declaration was submitted, the second one, with
regard to the motion for preliminary injunction, that was filed
on April 25th, correct?

          MR. FARBER:  Objection, your Honor.

          I think you got the date wrong.  That was the date
that you filed the motion, but did you say that's when he filed
his declaration?

          MR. WARREN:  No, the date of the motion for the PI.

          MR. FARBER:  Okay.  Maybe I just didn't understand.

          THE COURT:  Just rephrase, counsel.

          MR. WARREN:  Of course.

BY MR. WARREN:

Q.  Your declaration, the second declaration, was submitted in
response to the plaintiffs' motion for preliminary injunction,
that motion having been filed on April 25th?

A.  I'm not aware of the exact date, but, yes, it was in
response to what you described.

Q.  Did you read the motion for preliminary injunction and the
memo of law in support of it?

A.  I believe, yes, I did.

Q.  And did you discuss it with government counsel?

          MR. FARBER:  Objection, your Honor.

P5TKAME3                        Hogan - Cross

1           THE COURT:  Sustained.

2           MR. WARREN:  Your Honor, I'm not asking what he

3     discussed, just whether --

4           THE COURT:  That's fine.  Keep going.

5     BY MR. WARREN:

6     Q.  And, Mr. Hogan, you're aware of other suits against OPM

7     regarding similar allegations in this case, correct, including

8     the one in Maryland?

9           MR. FARBER:  Objection, your Honor; beyond the scope.

10          THE COURT:  Sustained, but place your next question.

11    BY MR. WARREN:

12    Q.  Mr. Hogan, you submitted declarations in that case --

13          THE COURT:  In what case?

14          MR. WARREN:  *American Federation of Teachers v.*

15    *Bessent, et al.*, in Maryland.

16          MR. FARBER:  Is there a question pending?

17          THE COURT:  Did you, Mr. Hogan, submit a declaration

18    in a lawsuit filed in Maryland known as -- counsel, what's the

19    name?

20          MR. WARREN:  *American Federation of Teachers v.*

21    *Bessent*, B-e-s-s-e-n-t.

22          THE WITNESS:  Yes, I believe I did.

23    BY MR. WARREN:

24    Q.  You certified the administrative record in this case,

25    correct?

P5TKAME3                           Hogan - Cross

1    A.  Which case are we referring to now?

2    Q.  I'm sorry, the present case, before --

3    A.  Yes, I did.

4    Q.  And you understand that the purpose of the certified record

5    is to provide a basis to the Court to understand what the

6    agency did, and why, with regard to the allegations at issue,

7    correct?

8              MR. FARBER:  Objection, your Honor; calls for a legal

9    conclusion.  We're talking about --

10             THE COURT:  Sustained.

11   BY MR. WARREN:

12   Q.  Mr. Hogan, what was your understanding of why you provided

13   a certified record?

14             MR. FARBER:  Objection, your Honor; similarly, it

15   calls for attorney work product and attorney privileged

16   information.

17             THE COURT:  No.  It's just his understanding now.  He

18   certified something.  What does he understand his certification

19   to represent to the Court.

20             MR. FARBER:  Understood.  I just don't want this to

21   delve into conversations with counsel about that certification.

22             THE COURT:  Sure.

23             So, Mr. Hogan, I want to be sure you understand that

24   you are protected by the attorney-client privilege here, and

25   your conversations with government counsel should stay

P5TKAME3                          Hogan - Cross

1    confidential, and no answer that you give here should reveal

2    the conversations you've had with counsel.

3            Is that sufficient, counsel?

4            MR. FARBER:  Yes, it is, your Honor.

5            THE COURT:  Thank you so much.

6            So, what did you understand your certification of the

7    administrative record to convey to this Court, Mr. Hogan?

8            THE WITNESS:  It would have been what the counsel

9    explained to me, the purpose of it.

10           THE COURT:  Okay.

11           Again, I don't want that conversation, and, of course,

12   anything that you're going to testify here today depends on

13   life experience, many conversations, and sources of

14   information, but, as you testify today, what do you believe you

15   were saying to me when you certified the record?

16           THE WITNESS:  I believe I was providing the relevant

17   information for this case, and certifying that that information

18   was true.

19           THE COURT:  Thank you.

20           Counsel.

21           MR. WARREN:  Thank you, your Honor.

22   BY MR. WARREN:

23   Q.  And, Mr. Hogan, you certified the record in the Maryland

24   case that I had referenced previously, correct?

25           MR. FARBER:  Objection, your Honor; beyond the scope.

P5TKAME3                         Hogan - Cross

1            THE COURT:  Overruled.

2            THE WITNESS:  I don't know, off the top of my head,

3    the details of all the documents I signed for that case.

4            MR. WARREN:  Your Honor, forgive the clumsiness as we

5    stumble through this with a witness who's not in the courtroom.

6    BY MR. WARREN:

7    Q.  Mr. Hogan, do you have a copy of the certification of the

8    administrative record in that case, again, in the Maryland

9    case?  Do you have that handy?

10           MR. FARBER:  There are two certifications.  Are you

11   referring to one of them?  You want to give him a document?

12           MR. WARREN:  Thank you, counsel.

13   BY MR. WARREN:

14   Q.  Yes, I'm referring to the first one, dated March 7, 2025,

15   which was -- again, this is in the Maryland case, ECF No. 51-1.

16   A.  I don't have it immediately readily available.  I could

17   potentially find it.

18   Q.  If you could and it only takes a moment, otherwise, I don't

19   intend to ask you many questions about it, and I can read from

20   it here, and if it refreshes your recollection, then you can

21   answer; if not, then I would suggest you can pull it up.

22           MR. WARREN:  Your Honor, would the Court like a copy

23   of the document?  We don't intend to offer it at this point,

24   but we can mark it as an exhibit.

25           THE COURT:  No.

P5TKAME3                          Hogan - Cross

1          THE WITNESS:  Would you like me to search for it

2     quickly?

3     BY MR. WARREN:

4     Q.  If you can.  Thank you.

5     A.  Can you give me the date of that document?

6     Q.  Yes.  The file date was March 7th, 2025.

7     A.  Are you referring to a declaration or -- oh, you're

8     referring to a certification?

9     Q.  That's correct.

10         MR. WARREN:  Just to be clear for the record, this is

11    the certification of administrative record in *American*

12    *Federation of Teachers, et al. v. Bessent, et al.*, in the

13    District of Maryland, Case No. 8:25 CV 430-DLC.  It's

14    Document 51-1 in the ECF docket.

15         THE COURT:  So, Mr. Hogan, we're not going to ask you

16    to keep searching.

17         So, counsel, next question.

18         THE WITNESS:  Okay.

19         MR. WARREN:  Thank you, your Honor.

20    BY MR. WARREN:

21    Q.  Mr. Hogan, do you recall in that certification that you

22    certified, "To the best of my knowledge, that the accompanying

23    administrative record is complete and contains all

24    nondeliberative documents and materials directly or indirectly

25    considered regarding the OPM actions alleged in this case"?

P5TKAME3                          Hogan - Cross

1          MR. FARBER:  Objection, your Honor; relevance, beyond

2     the scope.

3          THE COURT:  Overruled.

4          Do you remember if your certification said that or

5     not, Mr. Hogan, on March 7th?

6          THE WITNESS:  I remember there was some certification

7     for some court case that I said that.  I don't remember

8     specifically which one off the top of my head.

9     BY MR. WARREN:

10    Q.  Mr. Hogan, are you aware that this Court ordered that the

11    administrative record that was produced in the Maryland case,

12    accompanying your declaration on March 7th, was produced as the

13    administrative record in this case?

14    A.  Can you state that one more time for me, please?

15    Q.  Of course.

16         Are you aware that the administrative record that you

17    produced on March 7th in the Maryland case was ordered to be

18    included in the administrative record in this case?

19         MR. FARBER:  Objection to the wording of the question.

20    Mr. Hogan didn't produce the record, he signed a certification.

21         THE COURT:  Thank you.

22         Sustained.

23    BY MR. WARREN:

24    Q.  Mr. Hogan, I'll rephrase, I'm sorry.

25         Are you aware that the administrative record that you

P5TKAME3                           Hogan - Cross

1   certified in the Maryland case was ordered to be produced as

2   part of the administrative record in this case?

3   A.  I am aware that it was used in this case.  I do not know,

4   off the top of my head, if there was any additions or

5   subtractions or modifications.

6   Q.  And you submitted a second certification of the

7   administrative record in the Maryland case on March 15th.

8          Do you recall that?

9   A.  Specific dates and specific documents?  Not off the top of

10  my head.  I apologize.

11  Q.  Do you recall certifying a second -- excuse me, do you

12  recall submitting a second certification of the administrative

13  record in the Maryland case?

14  A.  I do not off the top of my head.  I apologize.

15  Q.  Do you recall whether or not that certification includes

16  similar language about the accompanying documentation being

17  complete and thorough?

18          MR. FARBER:  Objection, your Honor; the witness just

19  stated that he doesn't remember this.

20          THE COURT:  Overruled.

21          THE WITNESS:  I do not remember that specific detail

22  about this -- about these two certifications.

23  BY MR. WARREN:

24  Q.  Mr. Hogan, I'd like to turn, then, to the certification of

25  the administrative record in this case, ECF 78-1, dated

P5TKAME3                                  Hogan - Cross

1   March 23, 2025.

2              Do you have that document in front of you?

3   A.  Yes.

4              Can you give me that document ID?  I believe I do have

5   it in front of me.

6   Q.  78-1.

7   A.  Yes, I have it right here.

8   Q.  In this certification of the administrative record, do you

9   see that you certified, to the best of your knowledge, that the

10  administrative record consists of the accompanying documents as

11  listed in the enclosed index?

12  A.  Yes, I see that.

13  Q.  Your certification in this case did not include any

14  representation that it was complete and contained all

15  nondeliberative documents, did it?

16  A.  Yes, I do not see that in this certification.

17  Q.  Without getting into any conversations you had with

18  counsel, do you understand why, in this case, your

19  certification does not attest to the completeness of the

20  administrative record?

21             MR. FARBER:  Objection, your Honor.  His understanding

22  about the certification would necessarily involve conversations

23  with counsel.  That's the only way he has understanding of this

24  cert.

25             THE COURT:  Not necessarily.  I don't know -- I would

P5TKAME3                          Hogan - Cross

1    hope a certification was accompanied by more than conversations

2    with counsel.

3              MR. FARBER:  Why it doesn't include certain things in

4    it would necessarily come from conversations with agency

5    counsel, with --

6              THE COURT:  Not necessarily.

7              MR. FARBER:  -- defendants' counsel --

8              THE COURT:  Overruled.

9              MR. FARBER:  I would just caution the witness not to

10   reveal attorney-client privileged information.

11             THE COURT:  I've already instructed him on that,

12   counsel.

13             So, place your question to Mr. Hogan again.

14             MR. WARREN:  Thank you, your Honor.

15   BY MR. WARREN:

16   Q.  Mr. Hogan, do you know why, in this case, your

17   certification did not include any attestation that the

18   accompanying administrative record is complete and contains all

19   nondeliberative documents and materials related to the claims?

20   A.  That decision was strictly based on conversations I had

21   with counsel.

22   Q.  What steps, in this case, did you take to ensure that the

23   administrative record was complete?

24             MR. FARBER:  Objection, your Honor; we're getting into

25   attorney work product here.

P5TKAME3                          Hogan - Cross

1            THE COURT:  Did you do anything, other than talk with

2     counsel, to determine whether or not the administrative record

3     presented to this Court in this action was complete?

4            THE WITNESS:  I'm trying to think if there was

5     anything -- can you state that one more time for me, please?

6            THE COURT:  Sure.

7            We don't want to know about your conversations with

8     attorneys representing the government, whether in-house counsel

9     at OPM or representatives of the U.S. Attorney's Office.

10           So, apart from that, did you do anything to make sure

11    that the administrative record that you presented in this Court

12    in this action was complete?

13           THE WITNESS:  I believe all such actions were with the

14    advice of counsel.

15           THE COURT:  Thank you.  You've answered.

16           THE WITNESS:  I can't think of anything that wasn't in

17    conversations with counsel.

18           THE COURT:  Thank you.

19           Next question.

20    BY MR. WARREN:

21    Q.  Mr. Hogan, I'd like to turn your attention to page 13 in

22    the administrative record, JX 2.

23           MR. FARBER:  He has it.

24           THE WITNESS:  Is this 78-2 now?

25

P5TKAME3                     Hogan - Cross

1    BY MR. WARREN:

2    Q.  78-2, sir.

3    A.  And do you have a page number?  OPM-something?

4    Q.  OPM-13.

5    A.  Okay.  Let me get to that.

6            Okay.  I found OPM-13.

7    Q.  This is a memo of understanding between the Social Security

8    Administration, OPM, and the Department of Education, and

9    Appointee OPM 3, correct?

10   A.  Yes, that's correct, that's what the title is.

11   Q.  This is a standard form interagency MOU, as you understand

12   it?

13   A.  I haven't seen enough of these to understand what a

14   standard one would look like.

15   Q.  If I direct you to paragraph 10.

16   A.  Yes, I see it.

17   Q.  Do you see where it says, "The appointee shall not share

18   any personally identifiable information accessed or obtained

19   through the use of SSA systems or work performed for SSA with

20   any external entity, organization, or agency, federal or state,

21   including OPM, and the Department of Education"?

22   A.  Yes, I see that.

23   Q.  And your understanding is this is standard language in an

24   MOU regarding information-sharing between agencies?

25   A.  I'm not aware of what is standard, but I do see it in this

P5TKAME3                          Hogan - Cross

1    one.

2    Q.  If I can direct you back to the exhibit attached to your

3    certification of the administrative record — so this is going

4    to be document 78-1, pages 2 through 5.

5            MR. WARREN:  Excuse me, I said exhibit.  I meant

6    index, your Honor.

7            THE WITNESS:  I'm on the second page, and I do see

8    number 2 through 5 listed at the top.

9    BY MR. WARREN:

10   Q.  And this is the index to the administrative record that you

11   certified, correct?

12   A.  Yes.

13   Q.  And what's listed as number 10 would be the OPM-3 employee

14   memo of understanding that we just looked at, correct?

15   A.  Yes, that looks correct.

16   Q.  Are there any other memoranda of understanding listed in

17   this index?

18   A.  I do not see any other documents titled memorandum of

19   understanding.

20   Q.  Mr. Hogan, are you familiar with a declaration of

21   Carmen Garcia-Whiteside in this case?

22           MR. FARBER:  Objection, your Honor; beyond the scope

23   of cross.  He's asking him --

24           THE COURT:  Sustained.

25           MR. WARREN:  Your Honor, my questions are focused on

P5TKAME3                           Hogan - Cross

1   the completeness of the administrative record and the exhibit

2   that he certified.

3          THE COURT:  Sustained.  Next.

4   BY MR. WARREN:

5   Q.  Mr. Hogan, can you please turn to what's Bates stamped as

6   OPM 23 within the administrative record.  It's an email chain,

7   again, pages 23 to 29.  This is in JX 2.

8   A.  Yes, I'm on OPM-23.

9   Q.  If we turn to the last email in that chain — this is on

10  page 20 -- the bottom of page 28 — this is an email from

11  Charles Ezell to MC Price on January 27th, at 4:20 p.m.,

12  correct?

13         THE COURT:  So when you say "last," you mean first?

14         MR. WARREN:  Yes, your Honor.

15         THE COURT:  Okay.

16         MR. WARREN:  The earliest chronologically.

17         THE COURT:  Okay, good.

18         THE WITNESS:  Yes, I found the email from

19  Charles Ezell to MC Price, dated January 27, 2025, at 4:20 p.m.

20  BY MR. WARREN:

21  Q.  And Ms. Price is, at this time, the associate CIO?

22  A.  Yes, that's correct.

23  Q.  She reports to you?

24  A.  She may have reported to the deputy CIO, but indirectly,

25  yes, she reports to me.

1    Q.  And Mr. Ezell writes:  We are rapidly ramping up some

2    engineers here.

3              Do you see that?

4    A.  Yes, I do.

5    Q.  To accomplish this goal, these engineers need the following

6    items urgently.

7              Do you see any reference to what goal is being

8    referred to?

9    A.  No, I do not.

10   Q.  If you continue on the next page at the top, Mr. Ezell

11   writes:  Right now, we don't have immediate plans to change

12   anything, but if we need to, we might need to move quickly.

13             Do you see that?

14   A.  Yes, I do.

15   Q.  And then he has a list of what is needed, or what he writes

16   is needed, for each computer system, that includes code read

17   and write permissions in the first bullet point.

18             Do you see that?

19   A.  Yes, I do.

20   Q.  That includes the authority to change code?

21   A.  Yes, it does.

22   Q.  And that includes the ability to access sensitive

23   information and personally identifying information?

24   A.  Changing code itself would?  I would say, no.

25   Q.  I'm sorry, the reading code, the reading permissions,

P5TKAME3                          Hogan - Cross

1   you're saying no?

2   A.  I'm not aware of sensitive information inside the code.

3   Q.  Thank you.

4          Down below, the last two bullet points, the ability to

5   access the system as a regular user — I'm paraphrasing — the

6   ability to access as an administrative user.

7          You see those?

8   A.  Yes, I do.

9   Q.  That would include access, login access?

10  A.  Yes.  Ability to log in, yes.

11  Q.  Look around access?

12  A.  That ability, yes.

13  Q.  And then at the bottom of the email, Mr. Ezell says:

14  I think OPM 5 and 3 have already been set up with some access?

15  A.  Yes, I do.

16  Q.  Again, does the email provide any reason for why they need

17  access?

18  A.  I do not see any specific reason provided in this email.

19  Q.  If we go to the next email chronologically, that begins on

20  page 28?

21          Ms. Price --

22  A.  Yes.

23  Q.  -- responds and says:  Sure.  Just send me a list of names,

24  and we'll give them access.  Again, I'm paraphrasing and

25  reading part of the quote.

P5TKAME3                           Hogan - Cross

1              Do you see that?

2   A.  I see that, yes.

3   Q.  She writes below:  I'm assuming these engineers have

4   GFE PIVs or will get them soon.

5              Do you see that?

6   A.  Yes, I do.

7   Q.  GFE is government-furnished equipment?

8   A.  Correct.

9   Q.  And PIV is personal identity verification?

10  A.  Yes.

11  Q.  These are security measures for access?

12  A.  They are utilized to restrict how access is -- they are

13  utilized to restrict access to systems, yes.

14  Q.  And those security measures should be in place before

15  access is granted?

16  A.  I'm not aware of a system at OPM that you could get access

17  to without having those items.

18  Q.  Anywhere in this email, does Ms. Price ask Mr. Ezell why

19  access is needed?

20              MR. FARBER:  Objection, your Honor; the document

21  speaks for itself.

22              THE COURT:  Sustained.

23  BY MR. WARREN:

24  Q.  Mr. Hogan, the response came at 4:32, 12 minutes after the

25  initial email?

P5TKAME3                           Hogan - Cross

1   A.  Yes, I see that.

2   Q.  In your role as CIO, are you aware of any conversations

3   that Ms. Price or Mr. Ezell had during those 12 minutes?

4            MR. FARBER:  Objection, your Honor; beyond the scope.

5            THE COURT:  Overruled.

6            THE WITNESS:  I do not remember this specific set of

7   12 minutes on this date, so I couldn't say for certain.

8   BY MR. WARREN:

9   Q.  Do you recall speaking with Mr. Ezell or Ms. Price during

10  that time period?

11  A.  I certainly talked to them most likely on this day, but

12  during this time period, I could not tell you for certain just

13  because I do not remember.

14  Q.  Mr. Hogan, if we look at the bottom of page 27, Mr. Ezell's

15  response back — this is now at 5:03 p.m. on the same Monday —

16  he wrote:  Yep, I understand they won't have a lot of time to

17  go through a lot of presentations on what the systems are and

18  what the program officers feel.

19            Do you see that?

20  A.  I do see that.

21  Q.  And, again, no discussion about the need for access here?

22            MR. FARBER:  Objection, your Honor; the document

23  speaks for itself.

24            THE COURT:  Sustained.

25

P5TKAME3                          Hogan - Cross

1    BY MR. WARREN:

2    Q.  Mr. Hogan, on the next email — this is now the middle of

3    page 27 — Mr. Ezell copies you and others at 5:29 p.m.,

4    correct?

5    A.  Yes, that's correct.

6    Q.  Is that the first time you became aware of this need to

7    rapidly ramp up engineers and grant them the access that's

8    requested in Mr. Ezell's initial email?

9    A.  I don't recall when exactly that would have been.

10   Q.  I'm sorry, my question is, is this the first time that you

11   became aware of this?

12   A.  It may or it may not have been; I don't recall.

13   Q.  Okay.  Thank you.

14          So, after those four emails sent in the span of

15   69 minutes, we see in the next email -- I'm sorry, the next

16   series of emails, that access was granted, as Mr. Ezell

17   requested, right?  This is now the top of page 27, we see a

18   reference to five different DOGE agents who may have been

19   granted access to certain systems?

20          MR. FARBER:  Your Honor, I would just note, for the

21   witness, that we've -- the definition of DOGE agents that we

22   had discussed.  Mr. Hogan wasn't here.  I don't want to disrupt

23   the questioning, but I just wanted Mr. Hogan to understand that

24   DOGE agents includes newly hired OPM employees who are

25   implementing executive orders that involve the DOGE service.

P5TKAME3                          Hogan - Cross

1  Hopefully, I put that succinctly.

2         MR. WARREN:  Thank you, counsel.

3  BY MR. WARREN:

4  Q.  Mr. Hogan, I'm sorry, I was using a shorthand rather than

5  list the names, but not knowing their exact positions at the

6  time.  That's the general reference.

7         So, as counsel said, my references to DOGE agents

8  means people whose responsibility involved implementing the

9  DOGE agenda at OPM.

10        My question specifically is --

11        MR. FARBER:  Well, wait a second.  We had a definition

12  of DOGE agents, and you've just changed it.  So are we going to

13  use the definition we decided on, or do you want to change the

14  definition?

15        THE COURT:  So, does this help in connection with

16  these emails:  I think this is a discussion of something in the

17  subject line called "DOGE Engineers."

18        MR. WARREN:  Thank you, your Honor.

19  BY MR. WARREN:

20  Q.  Mr. Hogan, let's refer to it that way, the subject of the

21  email chain is "Getting DOGE engineers access."

22        Do you see that?

23  A.  That is the subject of many emails in this chain, yes.

24  Q.  Okay.  And, again, we see those four emails in the span of

25  a little over an hour, and then we see that access was granted

P5TKAME3                      Hogan - Cross

1   rapidly, as Mr. Ezell requested, correct?

2   A.   Let me see if one --

3          MR. FARBER:  Objection, your Honor; lack of

4   foundation, at least with respect to the document we're looking

5   at.

6          THE COURT:  Sustained.

7   BY MR. WARREN:

8   Q.   Mr. Hogan, if we look at the next email in the chain — this

9   is at the bottom of page 26 — you now respond on February the

10  6th to Ms. Price and Mr. Ezell, correct?

11  A.   Yes, that's correct.

12  Q.   And this is ten days later?

13  A.   Yes, that's correct.

14  Q.   During this ten-day period, do you have any other written

15  communication with Mr. Ezell or Ms. Price about the access

16  requests that Mr. Ezell made?

17         MR. FARBER:  Objection, your Honor; this is not a

18  deposition.  This goes beyond the cross-examination, scope of

19  cross.

20         THE COURT:  You mean the scope of direct?

21         MR. FARBER:  Scope of direct, I'm sorry, yes.

22         THE COURT:  That's okay.

23         I think this is a fair question with respect to the

24  administrative record that Mr. Hogan put in, and the emails on

25  which he is copied or which he is sending here.  So let's just

P5TKAME3                        Hogan - Cross

1    make sure we understand what the proper scope of cross is.

2         So far, there have been a series of questions about

3    these emails, and no objection.  So the question now is

4    whether, in this ten-day interim period, there was any further

5    email traffic with Mr. Hogan on this topic.

6         I assume, if there had been, it would have been

7    produced as part of the administrative record.  Am I wrong,

8    counsel?

9         MR. FARBER:  I am not certain of that.  This is

10   plaintiffs', I think, attempt to, I guess, pursue a motion to

11   supplement the record or for extra-record discovery that they

12   had abandoned prior to filing their motion for a preliminary

13   injunction.

14        The government has never represented that this is the

15   end-all be all.  In fact, the nebulous nature of this final

16   agency action, the granting of access, it's very hard to

17   determine which documents would necessarily fall within the

18   complete administrative record.

19        So, Mr. Hogan's certification does not say that it's

20   complete.  Plaintiffs' counsel has crossed him on that.  But I

21   don't think that this is an appropriate scope of -- this

22   cross-examination goes beyond the scope of the direct, because

23   now we're getting into extra-record discovery — what emails are

24   there?  Did you talk with anyone else outside of what's listed

25   in the record?  That could have all been raised in a renewed

P5TKAME3                         Hogan - Cross

1    motion for extra-record discovery, which you had given

2    plaintiffs the opportunity to file, and they neglected to do

3    so.  But now they're trying to get that deposition.  They're

4    trying to depose Mr. Hogan about other communications that are

5    not in the record, that he doesn't reference in his

6    declaration, and that is beyond the scope of direct.

7              THE COURT:  Okay.  So let's just make sure we

8    understand what the rules of the road are here, because it may

9    help cut through some of this.

10             So, the government produced, as part of the

11   administrative record, a series of emails.  And on this subject

12   matter, it is objecting to questions that would ask whether

13   this is the complete set of emails on this subject.

14             You're objecting?

15             MR. FARBER:  That's correct, your Honor.

16             THE COURT:  Okay, fine.  We have clarity there.

17             And the plaintiffs, you are right, did not renew a

18   motion for discovery after the administrative record was

19   produced in this action, and they chose to proceed with their

20   motion for a preliminary injunction with this set of

21   documents — absolutely correct.

22             So, there can be no inference that this is a complete

23   set of email communications on this topic.  The government is

24   not representing to the Court that it's complete.  And this

25   witness is not certifying that this is complete.  So that's the

P5TKAME3                          Hogan - Cross

1    record we're proceeding on.

2              Next question, counsel.

3              MR. WARREN:  Thank you, your Honor.

4    BY MR. WARREN:

5    Q.  Again, Mr. Hogan, during those ten days, were there other

6    written communications or discussions with Mr. Ezell about the

7    need for the access that he had requested?

8              MR. FARBER:  Objection, your Honor.

9              THE COURT:  Sustained.

10             MR. WARREN:  Your Honor --

11             THE COURT:  Next question.

12             MR. WARREN:  Your Honor --

13             THE COURT:  The government has put in what it's put

14   in.

15             MR. WARREN:  Understood, your Honor.  The plaintiffs

16   are not asking with regard to the certification of the record.

17   That was counsel's assumption about why we're asking questions.

18   Mr. Hogan's declaration says, in his second declaration, which

19   is his direct examination — this is paragraph 15 of ECF 98 —

20   that OPM has consistently followed appropriate safeguards in

21   the connection of granting access permissions.

22             In the record, there's documentation, and there's been

23   witness testimony about the need --

24             THE COURT:  So you'll be making your argument --

25             MR. WARREN:  Absolutely.

P5TKAME3                        Hogan - Cross

1              THE COURT:  -- as to whether or not that's consistent,

2      but the government is taking the position that the

3      administrative record is not necessarily complete, and that it

4      doesn't want you to inquire with respect to other

5      communications other than those it's produced here.

6              Next question.

7              MR. WARREN:  Understood, your Honor.

8              Do I have permission to inquire about nondocuments,

9      but communications that go to the reasons for access that are

10     at issue in this case?

11             THE COURT:  We'll take it one question at a time --

12             MR. WARREN:  Thank you, your Honor.

13             THE COURT:  -- and so the government can object.

14             MR. WARREN:  Of course.  Thank you.

15     BY MR. WARREN:

16     Q.  Mr. Hogan, at the top of page 26, in the same email

17     chain --

18     A.  Yes.

19     Q.  -- excuse me, this is your response now, you write to MC —

20     that's Ms. Price — in the meantime, we have never needed access

21     to ERHI/eOPF.  So if any access was granted there, it can be

22     removed immediately.

23             Who is the "we"?

24     A.  I believe it would be the people who were granted access,

25     and I guess when I said "we," I guess I was including myself.

P5TKAME3                         Hogan - Cross

1    Q.  Then we turn to the prior page, OPM 25.  At the bottom, we

2    see Ms. Price responds to you — again, this is on

3    February 6th — and she writes:  OPM 6 and OPM 2 had access to

4    eOPF and EHRI, but never logged in.  OPM 4 never completed the

5    process to get access.

6            Do you see that?

7    A.  Yes, I see that.

8    Q.  And eOPF is the electronic Official Personnel Folder?

9    A.  Yes.

10   Q.  It includes personally identifiable information, such as

11   Social Security numbers, employment history, financial

12   disclosures, et cetera?

13   A.  I know it at least includes some of the things that you

14   mentioned.

15   Q.  It's a sensitive data system?

16   A.  Yes.

17   Q.  EHRI is Enterprise Human Resources Integration?

18   A.  Yes.

19   Q.  This is the system responsible for maintaining the

20   integrity of eOPF, correct?

21           MR. FARBER:  Objection.

22           THE WITNESS:  I'm not sure I would describe it --

23           MR. FARBER:  Foundation.

24   BY MR. WARREN:

25   Q.  How would you describe EHRI?

P5TKAME3                              Hogan - Cross

1  A.  I believe EHRI has a large amount of -- it has data pushed
2  to it from payroll systems, for example, from other parts of
3  the federal government, along with other data, also.
4  Q.  That's also a sensitive data system?
5  A.  That data is -- it has personal identifiable information,
6  for certain.
7  Q.  In the middle of page 25, we see a Mr. Foster, who's
8  identified as a supervisory IT specialist, respond, and he
9  writes that OPM 6 and OPM 2 accounts have been disabled for
10 EHRI in eOPF.
11            Do you see that?
12 A.  I do see that, yes.
13 Q.  And, again, your follow-up, in the next email in the chain,
14 at the bottom of page 24, is February 16th, ten days later,
15 where you're asking Ms. Price:  Did we follow up on OPM 3, 4,
16 and 5?
17            And her -- I'm sorry, do you see that?
18 A.  Yes, I do.
19 Q.  And then the email immediately prior — so in the middle of
20 page 24 — Mr. Foster says:  All access is disabled removed.
21 Verified users never logged on for EHRI and eOPF, correct?
22            MR. FARBER:  I believe it says never logged in.
23            MR. WARREN:  Excuse me.  Thank you, counsel.
24            THE WITNESS:  Yes, it says that.
25

P5TKAME3                         Hogan - Cross

1    BY MR. WARREN:

2    Q.  So these three were then granted the access, but never

3    logged in?

4    A.  Yes, that is my understanding.

5    Q.  Mr. Hogan, you can put that document aside for a moment.

6            I'd like to turn to your declaration in this case, the

7    first declaration, document 40, which is --

8            THE COURT:  Defendants' Exhibit 8.

9            MR. WARREN:  8, thank you, your Honor.

10           THE WITNESS:  One moment?

11           (Pause)

12           THE WITNESS:  I have document 40.

13   BY MR. WARREN:

14   Q.  If I can direct your attention to paragraph 11 on page 2.

15           Are you there?

16   A.  Yes, I am.

17   Q.  This is a description of OPM data systems, including the

18   two we just described and others, correct?

19   A.  It includes eOPF, EHRI, USAJOBS, USA Staffing,

20   USA Performance, et cetera, yes.

21   Q.  And in the last sentence of the paragraph, you write:

22   Systems requiring authentication are designed to default to no

23   access, and access is granted on a least-privilege or

24   need-to-know basis by the system owner and relevant authorizing

25   official.

P5TKAME3                              Hogan - Cross

1    A.   Yes, I see that.

2    Q.   That means access is only given when people need it for

3    their job responsibilities, correct?

4    A.   That is the goal, yes.

5    Q.   And access that's given is the least amount of access

6    needed to do the job, right?

7    A.   Yes, that is the goal.

8    Q.   That's the principle of least privilege?

9    A.   The principle of least privilege is people getting the

10   least access necessary to perform their job.

11   Q.   There's a reference to, at the end of that sentence in

12   paragraph 11, by the system owner and relevant authorizing

13   official.

14        Those are the people granting the access, that is,

15   making the determination about whether somebody else who is

16   requesting access actually needs it, correct?

17   A.   Can you state the last part of that one more time, please?

18   Q.   Of course.

19        It says the access here is granted on a least

20   privilege or need-to-know basis by the system owner and

21   relevant authorizing official.

22        So, the system owner and relevant authorizing official

23   need to understand why the people whose access is being

24   requested need it?

25   A.   Yes, they should understand -- it would not be good if they

P5TKAME3                         Hogan - Cross

1    did not understand that, I agree.

2    Q.  It would not be good because then they'd be asked to be

3    granting access when they have no idea whether it comports with

4    the least privilege or need-to-know basis?

5              MR. FARBER:  Is there a question?

6    Q.  Correct?

7    A.  Can you state that one more time, please?

8    Q.  Of course.

9              You said it would be bad if they didn't know, and it

10   would be bad because then they couldn't actually comply with

11   the least privilege or need-to-know principles?

12   A.  I don't believe it's a requirement to adhere to those

13   principles.

14   Q.  Your paragraph 11 here, I don't see any reference to

15   requirements, but you say that the systems requiring

16   authentication require access to be granted on a least

17   privilege or need-to-know basis, right, by the system owner or

18   authorizing official?

19             MR. FARBER:  Objection, your Honor; misstates the

20   content of his declaration.  It doesn't say or, rather, an

21   authorizing official.  It says system owner and relevant

22   authorizing official.  If he just wants to read the words as

23   written, that might be better.

24             THE COURT:  So do you see the last sentence,

25   Mr. Hogan, in paragraph 11?

P5TKAME3                        Hogan - Cross

1          THE WITNESS:  Yes, I do.

2          THE COURT:  Place your next question, counsel.

3   BY MR. WARREN:

4   Q.  Mr. Hogan, if you could look to your second declaration,

5   D9.  I'm sorry, this is ECF No. 98, your May 16th declaration

6   in this case.

7   A.  Yes, I have it.

8   Q.  If you turn to paragraph 15, on the last page, you write:

9   OPM has consistently followed appropriate safeguards in

10  connection with a granting of access permissions to OPM data

11  systems to individuals who onboarded on or after January 20th.

12  A.  Yes, it says that.

13  Q.  It says the principle of least privilege and need-to-know,

14  part of those appropriate safeguards you referenced?

15  A.  They may or may not be.  I don't believe it's a

16  requirement, and you would want to consider all measures

17  related to security when determining what appropriate

18  safeguards are.

19  Q.  Well, I'm asking what your position on this is.  You're the

20  author of this document -- or, excuse me, you're the declarant.

21          When you write, OPM has consistently followed

22  appropriate safeguards in connection with a granting of access

23  permissions to OPM data systems, are you including the

24  principle of least privilege as part of that appropriate -- as

25  one of those appropriate safeguards?

P5TKAME3                          Hogan - Cross

1   A.  That would have to be determined on a system-by-system

2   basis, considering all security measures in place for each

3   system.

4   Q.  Are there systems where access was granted to DOGE agents

5   after January 20th that did not follow the principle of least

6   privilege?

7   A.  I believe at the time access was granted, there was --

8   access was granted with the intention that they could perform

9   actions that were related to those permissions.

10  Q.  I'm sorry, I just want to make sure I understand that.

11          You said at the time access was granted, it was

12  granted with the idea that they could perform actions regarding

13  those privileges, but not that it was the least amount of

14  privilege required?  That's your testimony?

15  A.  I am saying that the access that was granted to them was so

16  that they could potentially perform actions that those

17  permissions required.

18  Q.  So, in some cases, the access granted — and, again, I'm

19  talking about with regard to DOGE agents after January 20th.

20  With regard to those individuals, you're saying sometimes the

21  access granted followed the principle of least privilege and

22  other times it may not have?

23          MR. FARBER:  Objection, your Honor.  I just want to

24  cabin this maybe a little further.  I --

25          THE COURT:  Overruled.

P5TKAME3                        Hogan - Cross

1              MR. FARBER:  Okay.  There's a time limitation in the

2        question that goes beyond March 6th, that was my concern,

3        because he's asking about since January 20th, and if -- I don't

4        think the scope goes up till today.

5              THE COURT:  It sure does.

6              MR. FARBER:  Of the scope of direct?  The declaration

7        goes through March 6, 2025.

8              THE COURT:  The declaration goes through May 16th.

9              MR. FARBER:  But only refers to systems access through

10       March 6th of 2025.

11             THE COURT:  No.  Some paragraphs do.  Paragraph 15,

12       where we are, does not.

13             MR. FARBER:  Okay.

14             THE COURT:  Thank you.

15             Counsel.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

P5T1AME4                    Hogan - Cross

1   BY MR. WARREN:

2   Q.  Mr. Hogan, I'll repeat the question.

3          I want to make sure that I understand your testimony

4   over the last few questions.  So it's your position that

5   sometimes the granting of the access to DOGE agents after

6   January 20th complied with the principle of least privilege and

7   other grants of access may not have?

8   A.  No.  I'm saying I believe when access was granted to those

9   individuals in all cases I'm aware of, the intention was that

10  they may have a need to use those permissions.

11  Q.  Okay.  And I was asking about least privilege.  Let's talk

12  about need to know.

13         Again, in paragraph 15, when you refer to these

14  appropriate safeguards, does that encompass need to know basis?

15         MR. FARBER:  Objection, your Honor, vague.  I don't

16  know what "need to know basis" means.

17         THE COURT:  Excuse me one second.

18         Place it in a complete sentence, counsel.  You may

19  inquire.

20  Q.  Mr. Hogan, in paragraph 15, your reference to appropriate

21  safeguards in connection with the granting of access, is need

22  to know basis one of those appropriate safeguards?

23         MR. FARBER:  Objection, your Honor.  Vague.  Again,

24  lack of foundation.

25         THE COURT:  Sustained.  Lay a foundation, counsel.

P5T1AME4                          Hogan - Cross

1  Q.  Mr. Hogan, you're familiar with the concept of need to know

2  access?

3  A.  Yes.

4  Q.  And please briefly state your understanding of that

5  principle.

6  A.  Any access that somebody is granted, they should have

7  a—they should have a need to have that access.

8  Q.  And that need should be determined before the access is

9  granted?

10  A.  If you were to follow the principle of need to know access,

11  yes, you would need to determine that the access was

12  appropriate before granting that access.

13  Q.  So based on the definition of need to know access that you

14  just provided to the Court, is need to know access one of these

15  appropriate safeguards that you assert was consistently

16  followed in connection with the granting of access permissions

17  to DOGE agents?

18  A.  I believe it is a consideration for all systems, not a

19  requirement.  It is a guideline that should be considered for a

20  system in combination with all other security measures that are

21  in place for a system.

22  Q.  Mr. Hogan, I appreciate that distinction between guidelines

23  and requirements, but I'm asking about your representation, so

24  when you say OPM has consistently followed appropriate

25  safeguards, is need to know access one of those appropriate

P5T1AME4                          Hogan - Cross

1  safeguards that, in your opinion, OPM consistently followed?

2              MR. FARBER:  Objection, your Honor.

3              THE COURT:  Overruled.

4  A.  I believe you should consider each system on an individual

5  basis, along with all security measures that are in place for

6  that system, before determining if any one specific security

7  control is one that should be considered and enforced.

8  Q.  Mr. Hogan, that wasn't responsive to my question, however.

9  My question is straightforward.  Is need to know access, as you

10 just defined it, one of the appropriate safeguards that you

11 declare was consistently followed?

12             MR. FARBER:  Objection, your Honor.  This need to know

13 basis only applies to personally identifiable information, so

14 this—paragraph 15 is a general statement about all OPM data

15 systems, not granting access permissions.

16             THE COURT:  So counsel, if you have an objection, just

17 say the word "objection."

18             MR. FARBER:  Yes, your Honor.

19             THE COURT:  If I am absolutely at a loss as to what

20 you could be objecting to, I'll ask for more.  Thank you.

21             MR. FARBER:  Yes, your Honor.

22             THE COURT:  Overruled.

23 A.  Can you state the question again, please.

24 Q.  Yes.  Is need to know access one of the appropriate

25 safeguards that you were declaring was consistently followed in

P5T1AME4                         Hogan - Cross

1    connection with the granting of the access permissions to DOGE

2    agents?

3    A.   We would have to——we——we should——it's not a blanket

4    consideration.  Each system, that should be one security

5    control that is considered, and if that security control is

6    necessary, it would be in combination and dependent on other

7    controls for each system.

8    Q.   Mr. Hogan, paragraph 13 of your declaration, you discuss 17

9    individuals who were granted permission to access USA

10   Performance.  Do you see that, or do you recall that?

11   A.   Yes, I do.

12   Q.   And USA Performance is a sensitive data system that

13   contains personally identifiable information, correct?

14   A.   Yes, it does.

15   Q.   Were all 17 people determined to need access, according to

16   the need to know principle you just defined?

17   A.   I would have to refer to the list of all 17.  Which——

18   Q.   The 17 individuals are identified per your declaration, in

19   OPM 103.

20   A.   Defined——let's see real quick.

21        I apologize.  I have 102.  I'm in 109.  I wonder if

22   there is——is there a redacted and unredacted and maybe one of

23   them has a different number than 103?

24   Q.   No.  103 is a single-page spreadsheet.  It's untitled.  It

25   has five columns, I believe.  It's the list of——it's the

P5T1AME4                         Hogan - Cross

1   systems access log.

2   A.  Is it in 78-2 also?

3        THE COURT:  It's in the administrative record.

4   Q.  It's in the administrative record, 78-2.  It's Bates

5   stamped 103.

6   A.  I did find that.  Thank you.

7   Q.  Mr. Hogan, before I ask the same question again, now that

8   you found the page, I want to go back to something.

9        Need to know access is required for any data system

10  involving personally identifying information, correct?

11  A.  That is reasonable.  I can't say if that is true for

12  certain, but that is certainly reasonable.

13  Q.  That would be part of those appropriate safeguards that

14  you're referencing in paragraph 15.

15  A.  I believe yes, for those types of sensitive systems.

16  Q.  Okay.  So then my question with regard to paragraph 13,

17  you're discussing the 17 individuals.  My question is:  Were

18  all 17 determined to have need to know access for USA

19  Performance?

20  A.  Let me go through the list here quick.

21       I cannot say for certain for some of these——for some

22  of these people because I was not directly involved in

23  requesting access for some of them.

24  Q.  Did the determination to grant access to these 17

25  individuals comport with the principle of least privilege?

1    A.  I cannot say for certain because of the fact that I don't

2    recall at least being involved in decisions around giving these

3    people——some of these people access.

4    Q.  Mr. Hogan, at around or on February 6th, you directed your

5    team to remove access for three DOGE engineers, correct?

6    A.  Can you direct me to that email.

7    Q.  Yes.  So it's on page 26 of that email chain.  It's also

8    referenced in paragraph 10 of your declaration, the second

9    declaration that you have in front of you.

10   A.  Okay, yes, I have that email up.

11   Q.  In the email in the middle of page 26, you write, "If any

12   access was granted, they can be removed immediately," correct?

13   A.  Yes, that is correct.

14   Q.  And then in your declaration——this is declaration

15   2——paragraph 10, in the middle of the paragraph, you're

16   discussing those permissions were subsequently disabled, those

17   individuals never had utilized those accounts, no longer needed

18   access.  Do you see that?

19             MR. FARBER:  Objection, your Honor.

20             THE COURT:  Sustained.

21   Q.  Mr. Hogan, I just want to make sure we're discussing the

22   same thing here.

23             In paragraph 10, you're discussing people who were

24   granted permission to EHRI and eOPF, and permissions were

25   subsequently disabled.  And then you're referring to OPM

P5T1AME4                          Hogan - Cross

1    pages 23-26.  Do you see that in the middle of paragraph 10?

2    A.  Are you referring to I instructed OPM's associate CIO to

3    remove access to EHRI and eOPF for those individuals?

4    Q.  Yes.

5    A.  See OPM-000026, yes.

6    Q.  That's exactly what I'm referring to.

7    A.  I see that email.

8    Q.  So to go back a few questions ago, you instructed three

9    individuals——excuse me——you instructed that access was removed

10   for three of the DOGE engineers who had been granted access,

11   correct?

12   A.  You are correct that I instructed three people's access to

13   be removed, yes.

14   Q.  So they needed access on January 27th but they didn't need

15   it on February 6th?

16   A.  I believe that there was a possibility that they would use

17   that access on the date they were granted that access, and on

18   the date that it was revoked, I was aware that that was no

19   longer a consideration, or that was no longer a system that I

20   would expect them to be working on at that time.

21   Q.  You understood it based on what?

22   A.  Based on the priorities that I had set, based on the work

23   that we were doing when they were granted the access.

24   Q.  Are those priorities reflected in the email chain that we

25   looked at, pages 23-29, or are you referring to some other

P5T1AME4                          Hogan - Cross

1   source of information?

2          MR. FARBER:  Objection.

3          THE COURT:  Sustained.

4   Q.  Mr. Hogan, OPM regularly reviews access permissions to

5   ensure they're appropriately limited, correct?

6   A.  Yes, that's my understanding.

7   Q.  And it conducts these reviews on a regular basis?

8   A.  Yes, that's what I've been told.

9   Q.  That's what you represented in your declarations, right?

10  A.  Yes, that's correct.

11  Q.  Are you aware of any news reports published between

12  January 20th and February 6th discussing concerns among U.S.

13  security officials about DOGE members having obtained systems

14  access to various government agencies, including OPM?

15         MR. FARBER:  Objection.

16         THE COURT:  Overruled.

17  A.  Can you tell me what article you're referring to.

18  Q.  I'm asking if you're aware of any news reports published

19  between January 20th and the date that Mr. Ezell asked for

20  access to be granted in a rapid fashion to the DOGE engineers,

21  until February 6th, when you directed their privileges or some

22  of their privileges to be revoked.  During that time period,

23  are you aware of any news reports that came out discussing

24  concerns among U.S. security officials about DOGE members

25  having obtained systems access to OPM or other government

P5T1AME4                        Hogan - Cross

1    agencies?

2            MR. FARBER:  Objection, your Honor.

3            THE COURT:  Overruled.  You may answer, Mr. Hogan.

4    A.  I don't recall what dates I became aware of specific

5    articles in that time frame.  It may help if you indicated a

6    specific article.

7    Q.  Are you aware of a *Washington Post* article on February 6th

8    specifically discussing security concerns among U.S. officials

9    about Russia, China, Iran, or other adversaries taking

10   advantage of disruptions that DOGE had caused at OPM?

11           MR. FARBER:  Objection, your Honor.

12           THE COURT:  Overruled.

13   A.  That sounds somewhat familiar.  I——I don't recall the

14   specifics of that article.

15   Q.  Is that article what caused you to email about the

16   engineers' access on February 6th, 10 days after their need to

17   have access urgently granted was documented?

18   A.  I don't recall the exact reason of requesting revocation of

19   access.

20   Q.  Mr. Hogan, I'd like to direct you to pages 53 and 54 in the

21   administrative record.  So again, this is Joint Exhibit 2 and

22   on your screen, Mr. Hogan, ECF 78-2.

23   A.  This is OPM-000056?

24   Q.  I'm sorry.  53 and 54.

25   A.  Okay.  I am there.

P5T1AME4                          Hogan - Cross

1    Q.  And I'm on the second page.  So the first email

2    chronologically, Ms. Rowell, who is the acting chief

3    information security officer at the cybersecurity division at

4    OPM, sends an email, and I'm paraphrasing, but she's requesting

5    a review of all internal OPM user accounts created between

6    January 20th and February 12th.  Correct?

7               MR. FARBER:  Objection, your Honor.

8               THE COURT:  Overruled.

9               Do you see the email, Mr. Hogan——

10              THE WITNESS:  Yes, I'm looking at it.

11              THE COURT:  ——on page 44?  Great.

12              Place your question, counsel.

13   BY MR. WARREN:

14   Q.  This request that Ms. Rowell is asking came from you?

15   A.  Yes, that's correct.

16   Q.  So she's conducting an audit here of all the internal OPM

17   user accounts.  This is sent with high importance on

18   February 12th, right?

19   A.  Yes, that's correct.

20   Q.  You mentioned you became aware of this lawsuit after it was

21   filed.  The lawsuit in this case, filed on February 11th,

22   didn't have any connection with your asking Ms. Rowell to

23   conduct a review of all internal OPM user systems the following

24   day?

25              MR. FARBER:  Objection.

P5T1AME4                           Hogan - Cross

1           THE COURT:  Overruled.

2    Q.  You may answer.

3    A.  Oh, I apologize.  I——I don't recall any connection between

4    those two things.

5    Q.  The Maryland case that we've referenced, the suit was filed

6    on February 10th.  Do you remember if that's what caused you to

7    direct Ms. Rowell to conduct this internal review of all OPM

8    user accounts?

9           MR. FARBER:  Objection, your Honor.

10           THE COURT:  Overruled.

11   A.  I don't recall those two being connected.

12   Q.  Mr. Hogan, if you could turn to page——

13           THE COURT:  So Mr. Hogan, then what caused you, on

14   February 12th, to request this audit?

15           THE WITNESS:  I believe I decided that I wanted to

16   make sure that we had properly collected all requests for

17   access and approvals in preparation because if there was any

18   requests that perhaps went outside the normal route of making

19   requests for access, that we collected that as soon as

20   possible.

21           THE COURT:  Because of the litigation?

22           THE WITNESS:  No.  It was to ensure that we——when we

23   got to any normal audit that would have been scheduled, that we

24   had preemptively taken care of any potential gaps that may have

25   came up in that audit.

P5T1AME4                          Hogan - Cross

1              THE COURT:  Counsel.

2              MR. WARREN:  Thank you, your Honor.

3    BY MR. WARREN:

4    Q.  Mr. Hogan, have any other similar account audit reviews

5    been conducted since the one that you instructed Ms. Rowell to

6    undertake on February 12th?

7    A.  I——I want to say there have been——there has certainly been

8    other situations where people's access has been removed outside

9    of a normal audit that would have considered who should still

10   have access.  This audit was perhaps the most broad audit, and

11   the other audits were perhaps much more targeted.

12   Q.  So nothing similar to this comprehensive audit since

13   February 12th.

14             MR. FARBER:  Objection.

15             THE COURT:  Overruled.

16   A.  Nothing as comprehensive as this.  The others would have

17   been targeted perhaps at several systems.  This comprehensive

18   target——audit would have supported an understanding of where

19   potential future, more targeted audits perhaps would be a good

20   idea.

21   Q.  Mr. Hogan, I'd like to turn your attention to the systems

22   access spreadsheet, which is at OPM 103.  That's the Bates

23   stamped number.  Again, this is part of document 78-2 in front

24   of you and part of JX 2 for the Court.

25   A.  I'm there.

P5T1AME4                    Hogan - Cross

1  Q.  Now this document is not dated from the document itself

2  other than the filing across the top, correct?  The filing

3  date, that is?

4  A.  I do not see a date that is the date that this document was

5  collected.

6  Q.  I don't want to make you flip back through documents, but

7  the index to the certification of the administrative record,

8  which we looked at before, lists this as Systems Access

9  Spreadsheet, March 13, 2025.  Is that consistent with your

10  recollection of when this was prepared?

11  A.  That sounds——that sounds reasonable that that was the date

12  that this was——that the information in this document would be

13  as of that date.

14  Q.  And this is a list of who was given access to sensitive OPM

15  data systems from January 20, 2025, through mid-February,

16  correct?

17          MR. FARBER:  Objection.

18  A.  I don't recall the——

19          THE COURT:  Overruled.

20  Q.  You may answer, sir.

21  A.  I don't recall the exact cutoff date for this, for this

22  document.

23  Q.  Fair point, sir.  I mentioned mid-February because if you

24  look at the date created, I don't believe we see anything after

25  approximately mid-February, but I'll move on.

1              I just want to walk through what the document

2      encompasses relatively quickly.

3              In the first column we see employee names?

4      A.  Yes.

5      Q.  And then we see the system names, and it lists the OPM data

6      system to which the employee was granted access?

7      A.  Yes.

8      Q.  And then we have a date created; that's the date the access

9      was granted?

10     A.  Yes.

11     Q.  And then we have a date removed where applicable?

12     A.  Yes.

13     Q.  And then we have, in the fifth column, Administrative

14     Access Yes or No.  This refers to, where it says yes, that the

15     employee was granted administrative access to the system

16     listed?

17     A.  Yes.  That can——that does mean different things for

18     different systems, but yes.

19     Q.  Understood.  And where it says no, it means no

20     administrative access was granted but some other type of access

21     was granted, such as what I'll call user access?

22     A.  Yes, I believe that's true.

23     Q.  And I'm not going to walk through every system name in

24     here, but these are sensitive data systems that include PII of

25     government employees, former employees, applicants, and their

P5T1AME4                    Hogan - Cross

1   beneficiaries?

2   A.  Yes, multiple of these systems have PII in them.

3   Q.  And we see——again, we don't need to do an exhaustive search

4   through this document, but in the administrative access column,

5   we see a fair number of yeses, maybe more than half, and in the

6   login column to the right of it, we see lots of nos, correct?

7   A.  Yes, that's correct.

8   Q.  And you'd agree that means that people were granted

9   administrative access but they didn't log in, they didn't

10  utilize that access.

11  A.  Yes, I agree.

12  Q.  Do you still have your——I don't want you to put away that

13  document yet because we're going to come back to it in just a

14  moment, but if you have your second declaration——this is

15  Defense Exhibit 9——handy, and it's——

16  A.  Yes, I do.

17  Q.  Thank you.  Paragraph 14, on page 7.

18  A.  I'm there.

19  Q.  And you list that the only OPM data system which any of the

20  relevant individuals——by "relevant individuals" would mean the

21  DOGE agents?

22          THE COURT:  Is that a question?

23          MR. WARREN:  Yes.

24          THE COURT:  What do you mean by "relevant

25  individuals"?

P5T1AME4                         Hogan - Cross

1          MR. WARREN:  I'm sorry.  Mr. Hogan, the Court's asking

2     for you.

3          THE WITNESS:  Oh, I apologize.  It would be the

4     individuals in the spreadsheet, OPM 103, in document 78-2, I

5     would believe.

6          THE COURT:  Thank you.

7     BY MR. WARREN:

8     Q.  So in paragraph 14, you're discussing the USA Staffing

9     platform, and you identify four individuals who actually logged

10    in prior to March 6th——Amanda Scales, James Sullivan, OPM-7,

11    and OPM-6, correct?

12    A.  Your question was?  I do see those names.  Can you state

13    what your question was about those names again, please?

14    Q.  Sure.  I'm just making sure I understand your

15    representation here, that those four individuals were the only

16    ones who actually logged into the USA Staffing platform.

17         MR. FARBER:  Objection, your Honor.  Just with respect

18    to OPM-7, we have——Mr. Hogan had corrected himself on that.

19         THE COURT:  So yes, thank you for that, counsel.  So

20    there's been a correction of the record.

21         MR. WARREN:  Thank you, your Honor.

22    Q.  So the three individuals then are the ones who accessed USA

23    Staffing, Ms. Scales, Mr. Sullivan, and OPM-6?

24    A.  Yes, that's correct.

25    Q.  Now if we turn back to page 103——

P5T1AME4                          Hogan - Cross

1    A.  Yes, I'm there.

2    Q.  ——and we go maybe about three quarters of the way down the

3    page.  I'm sorry, Mr. Hogan.  It's a little bit tricky on very

4    small print here to identify where I'm trying to direct you.

5    But do you see the listings on OPM 103 from the bottom?  We see

6    OPM-9, OPM-8, OPM-7, and then above that we have OPM-6?

7    A.  Yes, I do.

8    Q.  And it looks like about four lines up from OPM-7, we see

9    OPM-6, USA Staffing Corps Plus Admin Portal in the system name,

10   and then we move over to the admin access, and we see yes, they

11   were granted access.

12   A.  Correct.

13   Q.  And that's consistent with your statement in paragraph 14

14   that the only OPM data system which any of the individuals

15   logged onto was USA Staffing, correct?

16   A.  This is one of the I believe three people that logged in.

17   Q.  Thank you for the correction.  The three people who logged

18   in.  So if we go one, two, three, four lines up from there,

19   which is the first row for OPM-6, the system name is OPM Data

20   Azure Data Bricks Admin.  Do you see that?

21   A.  Yes.

22   Q.  And this is a different data system; this is USA Data, not

23   USA Staffing, correct?

24   A.  This is——this is——references OPM Data.  That's the name of

25   the system.

1   Q.  Okay.  And that's a different data system than USA

2   Staffing, correct?

3   A.  Yes.

4   Q.  And if we go across in that column, we see date created,

5   January 28th; administrative access, yes, indicating that

6   administrative access was granted to this data system.  Did I

7   read that correctly?

8   A.  Yes, that's correct.

9   Q.  And then in the next column, login, yes, indicating that

10  OPM-6 logged into this data system, correct?

11  A.  Yes, that's correct.

12  Q.  That's not listed in paragraph 14, though, where you say,

13  the only data system which any of the relevant individuals

14  actually logged into was the USA Staffing platform.  Correct?

15  A.  Yes, that's—that seems to be correct.

16  Q.  Mr. Hogan, you can set your declaration aside for the

17  moment.

18          I'd like to you pull up OPM 89-102.  This is in the

19  administrative record, No. 78-2, still Joint Exhibit 2 for the

20  Court.

21  A.  All right.  I'm on OPM 89, from document 78-2.

22          MR. WARREN:  And your Honor, my apologies to the

23  Court.  The print on these documents is extremely small.  I

24  just want to make sure that your Honor can read what I'm

25  pointing.  Would the Court prefer—I don't know if we—

P5T1AME4                    Hogan - Cross

1          THE COURT:  That's okay.  Keep going.  I'm going to

2    manage.

3          MR. WARREN:  Would it help your Honor if we——I could

4    have a colleague perhaps use the Elmo to show exactly where we

5    are and blow it up.  I know that Mr. Hogan can see it.  He

6    seems okay reading it.  I'd like the Court to be able to see

7    what we're doing.

8          THE COURT:  Let's just continue, and I'll let you know

9    if I'm having trouble.

10         MR. WARREN:  Thank you, your Honor.

11   BY MR. WARREN:

12   Q.  All right.  Mr. Hogan, this document actually has a title

13   on it, Account Creation Audit Between 1/20/25 and 2/12/2025,

14   right?

15   A.  Yes.

16   Q.  And this is the document referenced in the internal user

17   access audit email chain with Ms. Rowell that we looked at a

18   few minutes ago, right?

19   A.  I don't recall that email.  Oh, let me——let me refresh my

20   memory here for one second.

21   Q.  Sure.  That email is pages 53-54, the email chain.

22   A.  Let me review that quick.

23   Q.  Mr. Hogan, while you're looking, I may be able to

24   accelerate things.  Do you recall we were discussing you

25   directing Ms. Rowell to conduct a system account approval?

P5T1AME4                        Hogan - Cross

1   A.  Yes, I do recall that.

2   Q.  Is this document we're looking at now, beginning on OPM 89,

3   that system account approval between January 20th and

4   February 12th?

5   A.  Yes, I believe it is.

6   Q.  And this document is set up in a similar way to the last

7   document, where we see colors are a little different but we're

8   seeing employee name in the left column, then we——two columns

9   over, we see the system name, the date created, etc.  Do you

10  see that?

11  A.  I do see that, yes.

12  Q.  Is the purpose of this document the same as the purpose of

13  OPM 103 that we were just looking at, to document who at OPM

14  had access to what databases and when?

15  A.  Yes, it was to understand——well, the purpose of this

16  document was to understand who had access on the——on

17  February 12th or——who had access on February 12th to——to be

18  reviewed for consideration as to who maybe we should clean up

19  their access, and——oh, I'm sorry.  It was also to make sure we

20  had collected evidence necessary to pass an audit for people

21  who had been granted access.

22  Q.  Mr. Hogan, I'm going to spoil the ending here, but there

23  appear to be significant discrepancies between these two

24  documents, and before I walk you through and show you those

25  discrepancies, I want to understand if there is a reason why

P5T1AME4                        Hogan - Cross

1    there should be discrepancies in terms of the system names

2    listed in terms of who had access on OPM 89 through 102 versus

3    OPM 103.

4    A.  Can you point me to any specific instances of that?

5    Q.  I can.  But I was hoping we could shortcut that if you—so

6    let me ask it this way.  Should there be discrepancies between

7    these documents in the substantive information about who had

8    access to what systems on what date?

9    A.  I'm trying to recall the nature of the request, to think.

10   It's a request for who has access with the intention of

11   ensuring we collected the evidence for an audit would be

12   different than the request for the lawsuit.

13   Q.  Okay.  Well, let's walk through an example, and maybe you

14   can help me understand.

15          I'm starting with the OPM 103.  About halfway down the

16   page, there are two entries for OPM Employee No. 3.  Do you see

17   that?

18   A.  Yes, I do.

19   Q.  And the references are for the OPM Data platform and USA

20   Performance platform, and the administrative access was granted

21   in both, and login access, there was no login for either.  Am I

22   reading that correctly, interpreting that correctly from 103?

23   A.  Yes, that is correct.

24   Q.  Okay.  So two systems for OPM-3, if you look at the very

25   top of OPM 89.

P5T1AME4                              Hogan - Cross

1   A.  Yes, I see that.

2   Q.  The first six entries are for OPM-3, with different system

3   names listed.

4   A.  Okay.  I see that.

5   Q.  Okay.  Sorry.  Thank you.  And then we see different system

6   names two columns over, and we see the dates January 20th,

7   January 21st, I think for——or January 21st for all six of

8   those, and then if we drop down maybe——I'm sorry.  Do you see

9   that?

10  A.  Yes, I do.

11  Q.  And if we drop down maybe ten rows below Ms. Scales and

12  then we have OPM-9, OPM-2, there are two more entries for

13  OPM-3.  Do you see that?

14  A.  Yes, I see that.

15  Q.  And that's for USA Performance and GitHub Enterprise,

16  correct?

17  A.  Yes, I see that.

18  Q.  Where the date created and the date access granted was

19  January 20th in both?

20  A.  Yes.

21  Q.  Okay.  So in OPM 103, it appears that——let me rephrase

22  that.

23          On page 103, we see that OPM Employee No. 3 received

24  access to two databases.  But on OPM 89, there are eight

25  databases listed.  Why the discrepancy?

P5T1AME4                         Hogan - Cross

1   A.  It could be due to how the request was made to the person

2   who composed this, this list.  Maybe it was asked in different

3   ways that resulted in different output.

4   Q.  Well, how many——

5   A.  And——

6   Q.  I'm sorry.  Continue.

7   A.  And it is also possible that these——these logs——or this

8   access list is for two different dates, and if someone gained

9   or lost access in between the two, I suppose that could also

10  cause a discrepancy.

11  Q.  But you don't know sitting here today why the discrepancy

12  with regard to OPM-3.

13  A.  I——I cannot say exactly why there would be different

14  systems listed in each one.

15  Q.  And at the risk of not spending more of your time or the

16  Court's time walking through the document, to the extent that

17  there are discrepancies with regard to other OPM employees

18  listed here, would you be able to explain the cause of the

19  discrepancy between the two documents?

20  A.  My——my——I believe I explained my best guess, which would be

21  potentially, I made one of these requests directly, and perhaps

22  someone else making a request for the other documents asked in

23  a different way that produced different results, or someone's

24  access may have changed if these two documents are showing

25  access for the same date.

P5T1AME4                    Hogan - Cross

1    Q.  Why was OPM page 103, the one-page list, created?

2    A.  I don't recall exactly.  I'm not sure if I should guess.

3    Q.  You don't need to guess.

4            In your declaration that we looked at before, your

5    second declaration, you talk about OPM consistently following

6    appropriate safeguards.  And at the risk of repeating a lot of

7    what we've covered over the last little while, we discussed how

8    those safeguards include the principle of least privilege, need

9    to know, need to know access.  So your representation that

10   safeguards were followed, was it based on your review of who

11   had access to what data systems?

12   A.  Can you point me to the statement that you're referring to.

13   Q.  Yes, it's paragraph 15 in your second declaration.

14   A.  And repeat your question, please.

15   Q.  Sure.  The basis for your statement that all safeguards

16   were followed——and we've established that those safeguards

17   include need to know access and the principle of least

18   privilege——were you relying on either of these two documents in

19   determining who was granted access and for what reason, and

20   when?

21   A.  So my statement says appropriate safeguards were followed.

22   I didn't reference specific security controls such as least

23   privilege or——or separation of duties or anything like that,

24   and I'm not sure what you're——how your question relates to 89

25   and 103.

P5T1AME4                    Hogan - Cross

1   Q.  Did you review the access that was granted to

2   individuals——to DOGE agents and before offering your conclusion

3   that OPM consistently followed appropriate safeguards?

4   A.  I do not believe I would have considered who had access a

5   relevant factor in if appropriate safeguards were followed.

6   Q.  Mr. Hogan, I'd like to move on to a different topic.

7           THE COURT:  So counsel, let's talk about a schedule

8   for a lunch break.  It's a little after 2.  You probably are

9   used to eating lunch well before this time.  And Mr. Hogan, I

10  include you in that.  I hope you regularly eat lunch.  So

11  counsel, how much longer for direct?

12          MR. WARREN:  Your Honor, I think I can tighten it up a

13  bit, and maybe half an hour.

14          THE COURT:  Okay.  So let's take our lunch break now,

15  and let's resume at 2:45.

16          Good.  Anything we need to address before we separate?

17          MR. FARBER:  Your Honor?

18          THE COURT:  Yes.

19          MR. FARBER:  Would it be okay for the witness to exit

20  off the Teams and then I can contact him again, Mr. Hogan

21  again, to come back on?  How do you want to do that?  I don't

22  want to——

23          THE COURT:  Yes.  He may exit Teams.  He may leave his

24  desk.

25          MR. FARBER:  Okay.

P5T1AME4                        Hogan - Cross

 1              THE COURT:  Yes.

 2              MR. FARBER:   Thank you.

 3              THE COURT:  Good.   Good.   Thanks.   See you at 2:45.

 4              THE DEPUTY CLERK:   All rise.

 5              (Luncheon recess)

P5TKAME5                          Hogan - Cross

                          AFTERNOON SESSION

                               2:45 PM

             (Hearing resumed)

             THE COURT:  Cross-examination may continue.

             MR. WARREN:  Thank you, your Honor.

GREGORY J. HOGAN,

CROSS-EXAMINATION CONTINUED

BY MR. WARREN:

Q.  Mr. Hogan, I'd like to refer you to paragraph 9 of your

second declaration.  It's DX 9.

A.  I'm there.

Q.  I'm about halfway down the paragraph.  It says that --

sorry.

             The third line from the top, it says:  It also does

not mean that individual has the highest and most powerful

level of access to a data system.

             We're talking about the granting of permissions to

administrative access, correct?

A.  Is this in 9?

Q.  Yes.  Paragraph 9 of Defendants' Exhibit 9, which is your

second declaration, on page 4.

A.  What line are you referring to?

Q.  Three lines from the bottom of the page.

A.  Oh, from the bottom?  I understand now.

             All right.  I'm there, yes.

P5TKAME5                          Hogan - Cross

1  Q.  I just want to make sure that I'm understanding your

2  declaration here correctly.

3        You're saying that the granting of permissions,

4  including administrative access, does not mean that the

5  individual has the highest and most powerful level of access to

6  a data system, correct?

7  A.  What I'm describing here is that administrative access

8  could mean different things based on what administrative access

9  is being granted.  And those different things can be at

10  different levels of the application that actually give you

11  access to different parts of the system as a whole, if that

12  makes sense.

13  Q.  Thank you.

14        Different levels of administrative access, meaning

15  different levels of privilege and different levels of authority

16  within a system?

17  A.  Correct.  So, for example, you could be an administrator at

18  the user level on a website inside -- through the website

19  itself, or you could be an administrator of the infrastructure

20  that the website runs on, and these are two very different

21  things, what you have access to.

22  Q.  And you continue:  And it does not mean that a user with

23  such access can necessarily -- and I will paraphrase, but you

24  talk about delete critical data, disable, modify, or destroy

25  data, disable login or audit trails, or take systems fully

P5TKAME5                              Hogan - Cross

1    offline.

2            Again, it would depend on the level of access that the

3    person is granted to know whether they had the information

4    technology permission to do any of those?

5    A.  Yes.

6    Q.  And, in this case, you testified, before lunch, you didn't

7    review the two logs of administrative access, so you don't know

8    what levels of administrative access people were actually

9    granted, do you?

10           MR. FARBER:  Objection; misstates his testimony.

11           THE COURT:  That is actually what I remember him

12   saying.  But let's just start at the beginning.

13           Did you review the log so that you know what level of

14   administrative access each of the individuals was given?

15           THE WITNESS:  I can confirm I recall reading what I

16   submitted to this Court.

17           THE COURT:  As you are here today, do you recall what

18   level of administrative access each of the individuals was

19   given?

20           THE WITNESS:  Not off the top of my head.  I would

21   refer to documents I submitted to the Court to give that deep

22   of an understanding.

23           THE COURT:  Great.

24           Counsel.

25

P5TKAME5                         Hogan - Cross

1    BY MR. WARREN:

2    Q.  Mr. Hogan, in declaration number 1 — this is

3    Defense Exhibit 8 — at paragraph 5, you assert that you

4    completed your -- excuse me, you have completed OPM's privacy

5    IT security and ethics trainings, correct?

6    A.  Yes, that is correct.

7    Q.  And you wrote in paragraph 13, on the following page, that,

8    "To the best of my knowledge, all" — and this is the five key

9    system engineers — "have completed the ethics trainings and

10   training related to records management, cybersecurity, and data

11   privacy," correct?

12   A.  It looks like it refers to five specific people, and my

13   understanding is, yes, they have completed those trainings.

14   Q.  Did you review the training records before making that

15   representation?

16          MR. FARBER:  Objection, your Honor.

17          THE COURT:  Overruled.

18          THE WITNESS:  I believe, yes, because they are in the

19   documents that I submitted, although I don't remember exact

20   timelines of documents this old.

21   BY MR. WARREN:

22   Q.  Mr. Hogan, we looked at the email chain from January 27

23   through February 16th a few times.  That's the getting DOGE

24   engineers access email chain.

25   A.  Yes.

P5TKAME5                          Hogan - Cross

1    Q.  You understood that the directive to grant the DOGE

2    engineers access was coming from higher-ups at DOGE, correct?

3              MR. FARBER:  Objection, your Honor.

4              THE COURT:  Is this a matter of privilege?

5              MR. FARBER:  No, it's lack of foundation.

6              THE COURT:  Overruled.

7              THE WITNESS:  Can you state the question again,

8    please?

9    BY MR. WARREN:

10   Q.  Yes.

11             It was your understanding that the order to get the

12   DOGE engineers access, and the granting of access that is at

13   issue in this case, came from higher-ups at DOGE, correct?

14   A.  Can you direct me what request for access you are referring

15   to?

16   Q.  I'm talking about two different pieces of access, the email

17   chain in OPM 23 to 27 that we've looked at.  That's the

18   January 27th email chain that continues through February 6th

19   and February 16th.

20             Did you understand that the order to grant those DOGE

21   engineers rapid access was coming from higher-ups at DOGE?

22   A.  I don't recall, and I didn't make that specific request, as

23   you can see in the email.

24   Q.  Outside of this specific access for those engineers, the

25   access that we're talking about with regard to the 17 people

P5TKAME5                       Hogan - Cross

1  who were granted different levels of access, is it your

2  understanding that the directive to grant that access came from

3  people at DOGE, outside of OPM?

4  A.  What I can say is that access was granted to implement

5  executive orders and to build the email system.

6  Q.  And to make sure I understand, executive orders coming from

7  President Trump, through the senior leadership of DOGE, through

8  the people who were then the DOGE agents working at OPM?

9            MR. FARBER:  Objection, your Honor.

10           THE COURT:  Overruled.

11           MR. FARBER:  Lack of foundation.

12           THE WITNESS:  I can't speak to specifically how

13  requests flowed.  I just know that, for example, a hiring

14  freeze executive order was issued, and the access grants were

15  in support of that, for example.

16  BY MR. WARREN:

17  Q.  You're aware that many of the people at DOGE who worked at

18  OPM since January 20th had a prior connection with Elon Musk,

19  correct?

20           MR. FARBER:  Objection, your Honor; lack of

21  foundation.

22           THE COURT:  I'm going to overrule that objection.

23           You may answer.

24           THE WITNESS:  Can you state the question again,

25  please?

P5TKAME5                         Hogan - Redirect

1   BY MR. WARREN:

2   Q.  Yes.

3           You're aware that many of the DOGE agents that came to

4   work at OPM had a prior connection with Elon Musk or worked for

5   one of his companies, correct?

6   A.  Can you tell me who you're referring to?

7   Q.  Sure.

8           For example, Amanda Scales, are you aware that she

9   used to work at one of Mr. Musk's companies?

10          MR. FARBER:  Objection; outside the scope.

11          THE COURT:  Sustained.

12  BY MR. WARREN:

13  Q.  Mr. Hogan, rather than --

14  A.  Can you repeat?

15          THE COURT:  You don't have to answer, Mr. Hogan.

16          THE WITNESS:  Okay.

17          MR. WARREN:  The Court's indulgence, your Honor?

18          (Pause)

19          MR. WARREN:  Your Honor, I have no further questions

20  at this time.

21          THE COURT:  Any redirect?

22          MR. FARBER:  Yes, just a few.

23  REDIRECT EXAMINATION

24  BY MR. FARBER:

25  Q.  Good afternoon, Mr. Hogan.

P5TKAME5                        Hogan - Redirect

1              Mr. Hogan, do you recall being asked questions about

2    appropriate safeguards that were implemented by OPM on or after

3    January 20, 2025?

4    A.  Generally, yes.

5    Q.  And there were questions about the principle of least

6    privilege.

7              Is it your understanding that the principle of least

8    privilege is an absolute rule?

9    A.  I do not understand it to be an absolute rule.

10   Q.  What do you understand the nature of the principle of least

11   privilege to be?

12   A.  That people should have only the access necessary to

13   perform the tasks that they are expected to perform.

14   Q.  Are there situations where the principle of least privilege

15   may give way to other concerns?

16   A.  Yes.  I believe because it's a policy that is not always

17   required, there are other considerations that may negate the

18   need for it.

19   Q.  What are some of those other considerations?

20   A.  If there's not personally identifiable information,

21   perhaps, in the system — the sensitivity of the data in the

22   system, for example, perhaps if it was all public data or if

23   there was other controls in place that would mitigate the risk

24   sufficiently.

25   Q.  Would the need to make system changes quickly, would that

P5TKAME5                      Hogan - Redirect

1   be one of those other considerations?

2   A.  Potentially, if other controls were in place to create a

3   complete system that was sufficiently secure.

4   Q.  In January of 2025, when individuals who had been newly

5   hired at OPM were granted administrative access, was it your

6   understanding that there might be a need to move quickly to

7   make system changes?

8            MR. WARREN:  Objection to leading, your Honor.

9            THE COURT:  Sustained.

10  BY MR. FARBER:

11  Q.  Mr. Hogan, I want to direct your attention to the

12  administrative record, Document No. 78-2, specifically

13  page OPM 29.

14           This is the email from acting director of OPM,

15  Chuck Ezell, to MC Price requesting access for certain

16  individuals.

17           At the top of the page on OPM 29, he writes, "Right

18  now, we don't have immediate plans to change anything, but if

19  we need to, we might need to move quickly."

20           Do you see that?

21  A.  Yes, I do.

22  Q.  Do you have an understanding of what Mr. Ezell was

23  referring to about "we might need to move quickly"?

24  A.  I would believe he would be referring to implementing

25  changes related to things like the executive orders.

P5TKAME5                          Hogan - Redirect

1   Q.  What sort of changes were being contemplated in relation to

2   those executive orders?

3   A.  An example would be the hiring freeze and being able to

4   stop agencies from hiring people and remove job postings.

5   Q.  Was the expectation to implement the hiring freeze in a

6   quick manner?

7   A.  There was a desire to implement the hiring freeze quickly.

8   Q.  At the time that these newly onboarded OPM employees were

9   granted administrative access to OPM data systems, did you

10  believe they might need that access to make changes to those

11  systems?

12          MR. WARREN:  Objection; leading.

13          THE COURT:  Sustained.

14  BY MR. FARBER:

15  Q.  Do you believe that the grant of administrative access to

16  newly onboarded OPM employees to OPM data systems was

17  appropriate?

18          MR. WARREN:  Objection; leading.

19          THE COURT:  Well, I don't know what it's referring to.

20  So, if you can ask a complete question.

21  BY MR. FARBER:

22  Q.  Mr. Hogan --

23          THE COURT:  Are you referring to page 29?

24          MR. FARBER:  No.

25          THE COURT:  Oh, okay.

P5TKAME5                        Hogan - Redirect

1   BY MR. FARBER:

2   Q.  You can set aside the administrative record.  I'm asking in

3   general, Mr. Hogan.

4              In January of 2025, January 20th and January 27th, and

5   February 3rd, individuals -- sorry, strike that.

6              Director Ezell and Chief of Staff Amanda Scales

7   requested, administrative access, for certain individuals for

8   certain OPM data systems.

9              Do you recall that?

10             MR. WARREN:  Objection; leading.

11             THE WITNESS:  Yes, I do.

12             THE COURT:  Overruled.

13  BY MR. FARBER:

14  Q.  When those grants of administrative access were requested,

15  do you believe that that was appropriate, that those requests

16  for administrative access were appropriate?

17             MR. WARREN:  Same objection.

18             THE COURT:  So, counsel, you have -- I'm happy to have

19  you open the door, but you objected on cross to examination

20  that would have probed behind these emails and with respect to

21  some of this data.

22             Now, if you want to open the door on this, it's your

23  choice, but I'm happy to have you have the witness give his

24  opinion and information with respect to this, but I will allow

25  recross.

P5TKAME5

1           MR. FARBER:  I can withdraw the question, your Honor.

2           No further questions, your Honor.  Thank you.

3           THE COURT:  Any redirect?

4           MR. WARREN:  No, your Honor.

5           THE COURT:  So, Mr. Hogan, thank you.  I really

6    appreciate you being here and the government making you

7    available in connection with this preliminary injunction

8    hearing so I can have a better understanding about how things

9    worked here, other than the cold document record that contains

10   these emails and audits and other important information, but

11   doesn't have someone who can respond to questions.

12          I have some questions about both of your affidavits.

13   I'm going to start with the earlier one, Defense Exhibit 8.

14          THE WITNESS:  I have it.

15          THE COURT:  Good.

16          So let's turn to paragraph 13.  Of course, this was

17   submitted early in this litigation, on February 19th, and it

18   was a time — in fairness to you, I want to make sure you're

19   focused on the things that I'm aware of as I place this

20   question to you — litigation had just been filed, not just in

21   this court, but in other courts.  And this is, I think, at

22   least the third declaration that you had filed because you were

23   filing on behalf of the government in various lawsuits at that

24   time.

25          THE WITNESS:  Yes.

P5TKAME5

1          THE COURT:  So, in paragraph 13, I think this is a

2    paragraph that doesn't appear in your other earlier

3    declarations, but it is the first one submitted in this

4    lawsuit, and you're talking about five key systems engineers.

5    I think that those are the individuals we understand now are

6    OPM 2 through OPM 6.

7          Is that right?

8          THE WITNESS:  I can't say for certain, but that is

9    reasonable it is those six.  There may be some record I have

10   somewhere that would clarify that.

11         THE COURT:  Okay.

12         THE WITNESS:  But I don't have it in front of me right

13   this moment.

14         THE COURT:  If you'd look at page 27 of the

15   administrative record.

16         THE WITNESS:  This is Document 78-2; is that correct?

17         THE COURT:  Yes.

18         And at --

19         THE WITNESS:  What page?

20         THE COURT:  Page 27, at the top.

21         THE WITNESS:  Sorry.

22         THE COURT:  There are five individuals listed by name,

23   and I think we know of them as OPM 2 through 6.  And --

24         THE WITNESS:  Yes.

25         THE COURT:  -- in that email chain, they're referred

P5TKAME5

1    to as the DOGE engineers.

2              THE WITNESS:  Yes, I see that.

3              THE COURT:  Okay.

4              So I assumed, in paragraph 13, that that is who you

5    were referring to, OPM 2 through 6.

6              Am I right?

7              THE WITNESS:  Yes, that is consistent.

8              THE COURT:  Okay.

9              And you said that these were the key systems

10   engineers, besides yourself, who were working on implementing

11   Executive Order 14158.

12             That's the modernization of IT systems executive

13   order; am I right?

14             THE WITNESS:  Yes, that is correct.

15             THE COURT:  Okay.

16             And your understanding at that time — that is,

17   February 19th — that they were all employees of OPM, right?

18             THE WITNESS:  That is my understanding, they were all

19   onboarded as OPM employees.

20             THE COURT:  Okay.

21             Well, this is for the attorneys and me to discuss —

22   what makes someone an OPM employee — but that's fine.  Your

23   understanding is here.

24             Anyway, you said, to the best of my knowledge, all

25   have completed ethics training and training related to, and

P5TKAME5

1    then you list some things.

2                You see that in your next sentence?

3                THE WITNESS:  Yes, I do.

4                THE COURT:  Now, I believe that three of those

5    individuals — OPM 3, 4, and 6 — didn't complete their ethics

6    training until that very day, the 19th.

7                Were you aware of that at the time you wrote that

8    declaration?

9                THE WITNESS:  I believe at least one person, I was

10   aware that they were working on completing that.

11               THE COURT:  Okay.

12               Now, you did not include in this declaration, when you

13   said "all have completed," you didn't say anything about

14   whether or not they had completed that training before they had

15   been given access to OPM record systems, did you?

16               THE WITNESS:  That would have been a discussion with

17   counsel.

18               THE COURT:  Okay.

19               And then the next sentence says:  None of these

20   individuals has access to, and you list one system, EHRI.

21               Now, had any of those individuals, before

22   February 19th, been given access to EHRI?

23               THE WITNESS:  I don't remember the dates this long ago

24   that well.  I would have to check.

25               THE COURT:  Okay.

P5TKAME5

1              I think the record will reflect that accounts were

2      created for them, and the login information will be what it

3      will be.  But when you said, in this declaration, that none of

4      them has access, was there a reason you did not mention whether

5      they'd had been given access in the past, but it had since then

6      been revoked?

7              THE WITNESS:  I don't recall.  And I don't recall if

8      they had access before this specific date, for example.

9              THE COURT:  Okay.  Thank you.

10             Paragraph 14 focuses in on one of the engineers, and

11     piecing bits of the record together, I think who you're

12     referring to there is OPM 3.

13             Am I correct?

14             THE WITNESS:  Let me review this quick.

15             (Pause)

16             THE COURT:  That's the employee where there was the

17     memorandum of understanding that was reviewed with you and

18     counsel earlier today.

19             THE WITNESS:  Yes, that is correct.

20             THE COURT:  Thank you.

21             Let's turn to your next declaration.  That is

22     Defense Exhibit 9, and that's the declaration of May 16th.

23             THE WITNESS:  Yes.

24             THE COURT:  If you could turn to paragraph 5, and you

25     talk about a GFE, or government furnished equipment.

P5TKAME5

1          THE WITNESS:  Yes.

2          THE COURT:  As I understood that paragraph, what you

3     were describing to me was that if someone had been given access

4     to an OPM database, the way they could utilize that access was,

5     in essence, through a fairly secure system; they accessed it

6     through a government furnished laptop that had some embedded

7     privileges, they had to have a personal identification number

8     and a Personal Identity Verification Card.

9          Did I understand that correctly?

10          THE WITNESS:  Yes.  The way it works is, you insert

11     this PIV Card into your government laptop, and it has to be a

12     government-issued -- it has to be an OPM-issued government

13     laptop.  And access to the systems, I'm aware of, requires both

14     of those to be required to have access.  And the PIV Card is

15     also a multifactor authentication.  It's both something you

16     have and a PIN number that you type in to be able to log in.

17          THE COURT:  Good.

18          Now, if you have all of that and have been given

19     access to a data system at OPM that contains PII, and you pull

20     up that data on your laptop, are you able to send that data

21     anywhere, including outside OPM?

22          THE WITNESS:  Not necessarily.  The OPM laptops

23     monitor what data is being sent out and what, for example,

24     websites you are using.  And many websites, for example, are

25     blocked from OPM laptops.

P5TKAME5

1          THE COURT:  But is there an audit trail so one can

2     tell whether or not a database containing PII that has been

3     accessed through this OPM-furnished laptop has been sent

4     anywhere else?

5          THE WITNESS:  I believe -- I know many of the systems

6     have robust access logs, and then on top of that, the laptops

7     themselves have access logs that could be reviewed to

8     understand situations like you're describing.

9          THE COURT:  Are you permitted to take the

10    OPM-furnished laptop off-premises?

11         THE WITNESS:  Yes.  It is not required to stay inside

12    of a government building.

13         THE COURT:  Thank you.

14         There is a reference on page 3, in footnote 3, to

15    Azure, and as was pointed out by counsel to you in the

16    administrative record, page 103, there is a reference to OPM 9

17    being given access to an Azure Databricks admin system.  I'm

18    looking at roughly ten lines down on page 103, and I'm not

19    going to read that whole descriptor into the record, but I'm

20    referring to the Azure system that's described in that line.

21    It's the first line under "Scales."

22         THE WITNESS:  You're referring to OPM 103 right now?

23         THE COURT:  Yes.

24         And about ten lines down, the first line that refers

25    to OPM 9.  And he was given access to an Azure system, and I

P5TKAME5

1    wondered if you could tell me what that system is.

2              THE WITNESS:  So I see Amanda Scales, Charles Ezell,

3    Greg Hogan, and then OPM 10.  I'm not seeing OPM 9, where

4    you're referring to it yet.

5              THE COURT:  Maybe I've written this down wrong.

6    Sorry.  Let me check.

7              No, for me, it lists 9 on my list of identifying

8    individuals.  The first name and the last name begin with an A.

9              THE WITNESS:  Yes.  I'm aware of the identity of

10   OPM 9.

11             THE COURT:  And you see the first line of data there

12   is a line of data about Azure?

13             THE WITNESS:  No.  I think I'm looking at the wrong

14   document, perhaps.  I'm looking at OPM-000103 on Document 78-2.

15             THE COURT:  Counsel, are you seeing what I'm seeing?

16             MR. WARREN:  Yes, your Honor.  So the discrepancy is

17   the Court is looking at the unredacted document and anonymizing

18   the person.  My understanding is when counsel submitted a

19   redacted document, it was realphabetized.

20             THE COURT:  Oh.

21             MR. WARREN:  So, OPM 9 doesn't appear ten lines down

22   where the person's unredacted name appears.  It took us a

23   little while to figure that out, your Honor, as well.

24             THE COURT:  Okay.

25             MR. FARBER:  That's also my understanding, your Honor.

P5TKAME5

1          THE COURT:  So, fine.  I apologize, Mr. Hogan.  I

2   thought you and I were looking at the same document.

3          Anyway, it doesn't matter except for me to understand

4   what Azure, as captured on 103, refers to, what kind of

5   database that is and what kind of privileges were given.

6          So, you talk about Azure in footnote 3.  I thought

7   maybe you could explain the references to Azure on page 103.

8          THE WITNESS:  Let's see.  There's more than one system

9   that mentions Azure in the name.

10          THE COURT:  Yes.

11          THE WITNESS:  So, yes, there is.

12          THE COURT:  Yes.

13          THE WITNESS:  So all these systems are systems that

14   the infrastructure that the systems are hosted on is in a cloud

15   provider called Azure.

16          THE COURT:  Right.  But does the Azure cloud system

17   contain, then, all of OPM's data systems?  So when there's a

18   reference to Azure here, it means you basically have access to

19   every data system, or do these directories that are reflected

20   here, or permissions that are reflected here, indicate

21   something less than all of the systems that are OPM systems

22   that are in the cloud?

23          THE WITNESS:  So, there's an important distinction

24   here.  Not all systems are in Azure, but systems that aren't in

25   Azure, they -- as far as I'm aware, all the systems I can think

P5TKAME5

1    of, they still use a component of Azure called Entra for their

2    authentication, and that authentication is what's requiring the

3    PIV Card and the government laptop.

4            THE COURT:  Okay.  But just choose one of the OPM --

5    I'm sorry, one of the Azure references on 103.

6            THE WITNESS:  Okay.

7            THE COURT:  And tell me which individual you're

8    looking at, and I'll try to find it on my document.

9            THE WITNESS:  So we can take myself, for example.

10            THE COURT:  Okay.

11            THE WITNESS:  Near the top, underneath the Amanda

12    Scales and Charles Ezell, and there is myself, OPM data, Azure

13    Databricks, and so on.

14            THE COURT:  Yes, I see it.

15            What does that mean?  What did you have access --

16    permission to have access to when you were given that

17    permission?

18            THE WITNESS:  So, OPM data is a system -- this OPM

19    data system is running on a component of Azure called

20    Databricks, which has data from several systems that are used

21    for building reports, for example.  The system would have PII

22    inside of it.

23            THE COURT:  Okay.  Thank you.

24            Turning to paragraph 8 -- I'm sorry, 9 --

25            THE WITNESS:  I'm there.

P5TKAME5

1          THE COURT:  -- at the very end of that paragraph, you

2     say that you're not aware of anyone at OPM taking the actions

3     you've just listed, which are numbered 1 through 4, or even

4     requesting that those actions be taken.

5          Was an investigation done such that you can make that

6     representation based on an inquiry, or is it just, as you were

7     drafting this affidavit, you were at that moment not aware?

8          THE WITNESS:  I was at that moment not aware, and I

9     believe I was aware of the work that was being done by these

10    people, and it was to do things like implement executive orders

11    for the hiring freeze.

12         THE COURT:  Okay.  Thank you.

13         In paragraph 10, at the very end, you discuss a

14    request you made on February 16th.  It's my understanding that

15    that might have been an inadvertent error on your part, and

16    that that is, in fact, a reference to the request you made on

17    February 12th, and we discussed that, or you were asked

18    questions about that by counsel, but let's just turn to, I

19    think it's, page 54 of the administrative record.

20         I should say, it's a request that Ms. Rowell made on

21    your behalf on the 12th, but I just want to make sure we're

22    talking about the same thing.

23         THE WITNESS:  Let me find that page quick.

24         THE COURT:  Thank you.

25         THE WITNESS:  This is OPM-54?

P5TKAME5

1           THE COURT:  54.

2           THE WITNESS:  53...

3           Yes, since this was -- since there is clearly --

4    since, clearly, I had already requested this review on the

5    12th, I could not have requested it on the 16th.

6           THE COURT:  Good.  And I just assumed that was just an

7    inadvertent error.

8           So, on paragraph 12, you describe how the GWES project

9    was carried out, and that career OPM staff were the individuals

10   who extracted data elements that were used by DOGE agents to

11   create that email system.

12          Was that ever done, to your knowledge, by OPM staff

13   for other projects that DOGE agents were working on?

14          THE WITNESS:  You're asking specifically if anyone

15   would have taken email addresses used for sending emails for

16   purposes other than sending emails?  Is that what you're

17   asking?

18          THE COURT:  No.  Thank you for making clear I didn't

19   ask a very precise question.

20          Let me put it this way:  Here, at paragraph 12, you

21   describe the creation of the GWES system that showed a level of

22   cooperation between career OPM employees and DOGE agents?

23          THE WITNESS:  Yes.

24          THE COURT:  Are you aware of any other tasks that was

25   performed in this way in which information was extracted by

P5TKAME5

1   career OPM employees from OPM databases containing PII and

2   given to DOGE agents?

3        THE WITNESS:  Let me think through the projects that

4   we have worked on.

5        (Pause)

6        THE WITNESS:  When you say "DOGE agents," what's your

7   definition of DOGE agents?

8        THE COURT:  Yes, I'll ask government counsel.  I think

9   he stated it earlier.

10       MR. FARBER:  I think that's newly onboarded employees

11   at OPM who are performing tasks in furtherance of executive

12   orders involving the DOGE service.

13       THE WITNESS:  Can you explain the last part there, the

14   DOGE service?  Can you repeat that last part of the sentence?

15   I'm not sure I exactly understand what that means.

16       MR. FARBER:  So the understanding of DOGE agents is

17   that these are OPM employees who were newly onboarded on or

18   after January 20th, and they are performing work in furtherance

19   of the executive orders involving the DOGE service — so the

20   DOGE executive order itself, hiring freeze, other executive

21   orders that reference DOGE service.

22       THE WITNESS:  And the question is whether any federal

23   employees extracted data from systems with PII and gave it to

24   people that we're calling those DOGE employees, correct?

25       THE COURT:  Yes.

P5TKAME5

1          THE WITNESS:  I know that there is a retirement

2    services modernization project that I can't say for certain,

3    but, for example, may have something like that, for example.

4          THE COURT:  Thank you.

5          Paragraph 13, you describe an automatic revocation of

6    privileges after 60 days of inactivity.  And you describe this

7    specifically as applying to one system, the USA Performance

8    system.

9          Does it apply to other systems as well?

10          THE WITNESS:  Other systems may have other similar

11    user access limits or time limits on user access, and this is

12    just one example.  I believe there are several other systems,

13    but it would not be all systems.

14          THE COURT:  Thank you.

15          If you made a request for administrative access for an

16    OPM employee, how long, normally, does it take for that access

17    to be effected?

18          THE WITNESS:  It could vary greatly based on the

19    system and if someone facilitated rapidly executing that

20    request.  So it could be on the order of minutes, if you make a

21    request and then follow up with someone quickly, or it could be

22    days, if it goes into a queue and those people are busy that

23    would execute that request normally.

24          THE COURT:  Thank you.

25          Do you understand the principle of least privilege

P5TKAME5

1      to --

2                  THE WITNESS:  Yes.

3                  THE COURT:  -- concern both-- thank you.

4                  -- but to concern both an issue about the scope of the

5      authority being granted and also the duration of that grant of

6      authority?  Does it have those two elements?

7                  THE WITNESS:  It definitely has the scope.  The

8      duration?  I would not immediately -- my instinct would not say

9      the duration is part of the application of it, but the only way

10     that you can effectively implement it would be to periodically

11     review who has access and ensure you remove that access when it

12     is no longer needed.

13                 THE COURT:  Thank you.

14                 So, I'm done with my questions except for one, and I

15     don't know if the government would prefer or really would

16     object to me asking it, so I'm going to invite, and I am not

17     going to ask it if the government objects.

18                 So, turning to 103, page 103, which is part of the

19     administrative record, I think the record now before me is

20     unclear as to these individuals — that is, has administrative

21     access been revoked as to all of them, OPM 2 through 19 — and

22     I'd love to ask the question, but I won't if the government

23     objects.

24                 MR. FARBER:  Your Honor, the government does not have

25     an objection to the extent the witness knows, off the top of

P5TKAME5

1    his head, those answers.

2                    THE COURT:  Great.

3            So, if you know, looking at page 103, which has

4    information about OPM employees 2 through 18, has

5    administrative access been revoked for each of these

6    individuals, for each of the systems listed?

7                    THE WITNESS:  There would be -- there have been

8    changes in both directions, I would say, because we remove

9    people's access as they no longer need it.  So, some of them

10   would still have access, some of them would not.

11                   THE COURT:  Okay.  That's fair enough.

12                   Counsel, excuse me one second.

13                   (Pause)

14                   THE COURT:  Thank you very much, Mr. Hogan.  Just hold

15   on one second here.

16           Counsel, I have a matter, which will take about a half

17   an hour, in a criminal case.  If there are additional questions

18   for Mr. Hogan based on the questions I've just put to him, I'm

19   going to let counsel inquire.

20                   Do the plaintiffs have additional questions?

21                   MR. WARREN:  Very limited, yes, your Honor.

22                   THE COURT:  How many?  How long?

23                   MR. WARREN:  Two minutes.

24                   THE COURT:  Okay.

25                   Does the government have additional questions?

P5TKAME5

1          MR. FARBER:  No, your Honor.

2          THE COURT:  Okay.

3          Counsel, two minutes.

4          (Continued on next page)

P5T1AME6                        Hogan - Recross

1    RECROSS EXAMINATION

2    BY MR. WARREN:

3    Q.  Mr. Hogan, the Court asked you some questions about the

4    ability for people with access to their laptops being able to

5    transmit data outside of OPM.  Do you recall that?

6    A.  Yes, I do.

7    Q.  And you said that it could be possible, and you said that

8    it's not clear whether there would be an audit trail——rather,

9    not necessarily there would be an audit trail for doing so,

10   correct?

11   A.  I don't have the depth of knowledge to say for certain that

12   there would be no way for that to happen.  I know the intention

13   is that there would be no way for that to happen, though.

14   Q.  And in addition to being able to send it outside, it's

15   possible that somebody with that access could also save data to

16   a thumb drive or a flash drive, correct?

17           MR. FARBER:  Objection.  Beyond the scope.

18           THE COURT:  Overruled.

19   A.  I would have to check if we have a policy.  I believe——I

20   would have to check if we have a policy that blocks thumb

21   drives in our laptops.

22   Q.  And to make sure I understand, I'm not asking whether it

23   would be in violation of policy; I'm asking whether it would be

24   possible for somebody to do that.

25   A.  Yes, I apologize.  I meant a——a security policy in the

P5T1AME6                         Hogan - Recross

1    technical sense, if the——if the laptops block USB drives being

2    plugged into them such that you cannot put files——such that you

3    cannot transfer files to them.

4    Q.  Understood.  You don't know that sitting here today.

5    A.  Correct.  I don't know off the top of my head.  I don't

6    want to say either way because I don't know for certain.

7    Q.  And you don't——

8    A.  But that would be——that would be one of the——that would be

9    something that should be considered when attempting to secure a

10   system so that you can't easily exfiltrate data, which I know

11   is a goal of our security.

12   Q.  And there wouldn't necessarily be an audit trail if someone

13   was able to do that either, correct?  By that I mean——

14   A.  I certainly——

15   Q.  I'm sorry.  Just for the record, by that I mean save data

16   to a thumb drive or a flash drive.

17   A.  There are very in-depth audit logs for what people do on

18   their laptops, and there may very well be, I would actually

19   expect, logs that do show files being transferred on the

20   system.

21   Q.  Okay.  And one other topic.  The Court asked you a

22   question——and this is in regard to your Declaration 2,

23   paragraph 9, where you reference four examples of improper

24   things that somebody can do, and you said you're not aware of

25   any attempt for anyone to have done that.  Do you recall that

P5T1AME6                    Hogan - Recross

1    question and answer from the Court?

2    A.   Yes.

3    Q.   And then the Court asks whether you had made that

4    representation based on information you had at the time or

5    whether you had conducted some sort of investigation, and your

6    response was, "I was at that moment not aware, and I believe I

7    was aware of the work that was being done which these

8    people——and it was to do things like which by implement

9    executive orders for the hiring freeze."  I'm sorry.  I don't

10   understand that.  So did you undertake any investigation before

11   you made that representation that's in paragraph 9?

12            MR. FARBER:  Objection, your Honor.  Asked and

13   answered.

14            THE COURT:  Sustained.

15            MR. WARREN:  Nothing further, your Honor.

16            THE COURT:  Thank you.

17            Any redirect based on counsel's questions?

18            MR. FARBER:  No, your Honor.

19            THE COURT:  Thank you, Mr. Hogan.  You're excused.

20            THE WITNESS:  Thank you.

21            (Witness excused)

22            THE COURT:  So counsel, I'm going to take a recess

23   now.  I think when we resume, the government will offer its

24   exhibits on its defense case, I expect rest, and then we'll

25   have summations.  Good.  Thank you.

P5T1AME6                         Summation - Mr. Millsaps

```
 1                (Recess)

 2                THE COURT:  Please be seated.

 3                So, counsel, did you want to make an offer to complete

 4      the government's offer of evidence in this case?

 5                MR. FARBER:  Yes, your Honor.  I have a defendant's

 6      exhibit list similar to plaintiff's exhibit list that I can

 7      bring up.

 8                THE COURT:  Thank you.

 9                And what number should I give to this exhibit list?

10                MR. FARBER:  I would note that D15, your Honor.

11                THE COURT:  Thank you.  And do you make an offer of

12      the exhibits on D15?

13                MR. FARBER:  Some of them have already been entered as

14      we went through the questioning.  I think the Exhibits D10, 11,

15      12, and 14 were already entered into evidence.  But we would

16      make an offer to enter the remainder of defendant's exhibits.

17      The joint exhibits are already in evidence.  We would make that

18      offer at this time.

19                THE COURT:  Any objection?

20                MR. WARREN:  None, your Honor.

21                THE COURT:  Received.

22                (Defendant's Exhibits listed on D15 received in

23      evidence)

24                THE COURT:  So I believe the evidentiary record is

25      closed, and so I think we now move to summations.  And as we
```

P5T1AME6                    Summation - Mr. Millsaps

1    discussed in our phone call earlier this week, plaintiffs will

2    lead off since they bear the burden, and plaintiffs will have

3    an opportunity for a brief rebuttal.

4              Counsel.

5              MR. MILLSAPS:  Thank you, your Honor.

6              It's clear today that the Court knows the record and

7    came very prepared for this, so I won't review all of the

8    evidence that's already in the record.  What I'd like to talk

9    about briefly is what we've heard in the testimony today and

10   how it relates to the record and plaintiff's prior submissions.

11             First, the government's job here is to provide an

12   administrative record that shows that there's no basis for an

13   injunction, and the administrative record that the government——

14             THE COURT:  So, whoa, whoa, whoa.  I'm not sure that

15   that's——I think, since it's the plaintiff's motion, the

16   plaintiff bears the burden of proof, appropriate for a

17   preliminary injunction motion.

18             MR. MILLSAPS:  Yes, your Honor.

19             THE COURT:  The government has presented an

20   administrative record.  It has not represented that it is a

21   complete record.  It has previously objected to the plaintiff's

22   taking discovery, and the record with respect to their position

23   on that issue is what it is.  And the government has

24   acknowledged that it has a right and opportunity to present an

25   administrative record, and it has done so in this case.  Good.

1              MR. MILLSAPS:  Thank you, your Honor.

2              Maybe I should have been more specific that under the

3    Privacy Act, once the plaintiffs have shown and demonstrated

4    that access to systems containing protected information were

5    disclosed, then it's the government's burden to show that one

6    of the exceptions to the Privacy Act applies.  And the

7    administrative record in this case certainly shows the opposite

8    of that, your Honor.  And Mr. Hogan's testimony today further

9    confirmed that.

10             At the top, Mr. Hogan very glaringly did not certify

11   the completeness of the administrative record here, in stark

12   contrast in the Maryland case.  When he was asked why he didn't

13   certify the completeness of the record in this case, he gave no

14   reason other than discussions with counsel.  Defendants have

15   acknowledged errors and discrepancies in the administrative

16   record here, but they've never tried to correct the record in

17   the Maryland case, despite having an obligation to do so there,

18   as far as we're aware.

19             Also, the administrative record in this case only goes

20   up to March 6, which is nearly three months have elapsed since

21   the time when the administrative record in this case ends, and

22   you heard Mr. Hogan testify today regarding access privileges,

23   whether those have——further access privileges have been revoked

24   or granted, that that's gone in both directions, he believes,

25   meaning some people's privileges might have been revoked, some

P5T1AME6                    Summation - Mr. Millsaps

1    people might have been given new privileges, but we don't know

2    because the administrative record doesn't contain anything

3    after March 6.  So the Court should infer that the

4    administrative record is incomplete in this case based on all

5    of that in Mr. Hogan's testimony.

6         And the Court should infer that access was given to

7    other DOGE agents that isn't reflected in the administrative

8    record, and that's particularly based on Mr. Hogan's testimony

9    on cross-examination today, where he was confronted with

10   inconsistencies demonstrated in the administrative record and

11   Mr. Hogan was not aware of these inconsistencies and could not

12   explain them.  For instance, he was shown two versions of an

13   access log showing who had been given access to certain systems

14   that also contradicted his own declaration, and Mr. Hogan's

15   response to that was, well, those might be different depending

16   on who was asking the question, who was asking to create those

17   access logs.  That answer just makes no sense.  Either those

18   access logs are complete and they show who was given access and

19   who wasn't, or they're not complete.  But there was no credible

20   explanation given for the inconsistencies in the record on

21   that.

22        Mr. Hogan's testimony today confirmed the government's

23   MO of shooting first and asking questions and cleaning things

24   up later, which is the opposite of what the Privacy Act

25   requires.  By law——it's not a guideline, it's a law passed by

P5T1AME6                    Summation - Mr. Millsaps

1    Congress, that these agencies are required to follow.

2              Mr. Hogan admitted today that broad access was granted

3    to OPM's systems containing PII without any known current need

4    at the time.  Mr. Hogan would not say today that the principle

5    of least privilege was followed, and he admitted that access

6    was granted to DOGE agents so they could "potentially" perform

7    actions that required those permissions, which was essentially

8    an admission that they didn't have a need at the time.  Again,

9    in clear violation of the Privacy Act.

10             Mr. Hogan testified today——and I'm quoting him

11   here——"I believe when access was granted to those individuals,

12   in all cases I'm aware of, the intention was that they may have

13   a need to use those permissions."  Again, that is contrary to

14   what the Privacy Act requires as a matter of law.

15             Mr. Hogan testified today that when broad access was

16   granted to 17 DOGE agents on January 27th, it was based on "the

17   possibility that they would use it," not a particular need for

18   them to be granted access, as the Privacy Act requires.

19             Mr. Hogan would not say that the need to know

20   requirement was used.  In fact, on cross-examination, he

21   testified that the need to know requirement is not a blanket

22   requirement, that it's dependent on the systems that you're

23   talking about.  Well, the need to know requirement is not just

24   a guideline for systems containing PII.  The need to know

25   requirement is a matter of law under the Privacy Act, which

P5T1AME6                    Summation - Mr. Millsaps

1    requires, if the government is going to rely on that exception

2    to the prohibition on disclosure without authorization, which

3    is, they've not identified any other exceptions that they're

4    relying on here aside from need to know, then that is required

5    under the Privacy Act.  That's not simply a guideline that OPM

6    can ignore based on the system, as long as you're talking about

7    a system that contains PII.

8            THE COURT:  And I think he ultimately did testify——of

9    course the record will reflect what he said precisely, but I

10   think he ultimately said that if the system contains PII, then

11   the need to know requirement applies.

12           MR. MILLSAPS:  He may have.  It's unclear.  We would

13   need to review the transcript, your Honor.  You may be right

14   about that.  He might have ultimately conceded that point.

15           But the record clearly shows here, based on what I

16   just discussed, that broad access to systems, that he admitted

17   contained PII, were granted to these DOGE agents without any

18   need to know at the time.  It was simply on the basis of, well,

19   they might need to know for some possibility of what they might

20   do in the future.  And then Mr. Hogan was asked——this was very,

21   very telling——did you review the access granted to DOGE agents

22   before offering his conclusion in his declaration that OPM

23   followed appropriate safeguards, and Mr. Hogan testified:  I

24   wouldn't have considered who had access to be relevant to

25   whether appropriate safeguards were followed.  That is in

P5T1AME6                      Summation - Mr. Millsaps

1    direct violation of the Privacy Act, which requires a

2    consideration of who is granted access as part of the

3    security——the appropriate safeguards that are required under

4    the Privacy Act.

5           And again, we heard Mr. Hogan today, who was asked

6    why——in his declaration, he testified that all adequate and

7    appropriate safeguards were followed in these processes at OPM.

8    When he was asked today what the basis for that conclusion was,

9    he couldn't provide a basis on questioning for why he made that

10   conclusion in his declaration.

11          Your Honor, the Court heard Mr. Hogan testify when he

12   was asked why he revoked certain access in early February to

13   some of the DOGE agents, you know, whether that was in response

14   to the news articles in the *Washington Post* or the litigation

15   that had been commenced in this court and another jurisdiction,

16   and you heard Mr. Hogan testify that he couldn't remember why

17   he revoked access on that particular date, and apparently, you

18   know, the Court is expected to believe that's just a

19   coincidence that an audit was started in early February and

20   access was revoked on the same day as a major *Washington Post*

21   article identifying the concerns identified in that article and

22   also immediately on the heels of litigation being filed in two

23   jurisdictions.  This is another example where plaintiffs would

24   submit that the Court should not find Mr. Hogan's testimony on

25   that point particularly credible.

P5T1AME6                    Summation - Mr. Millsaps

1              Mr. Hogan was asked about the admitted rush that OPM

2     officials took to give these DOGE agents access when they came

3     into OPM, you know, around January 20th or shortly thereafter,

4     and all that he could point to as the justification for that

5     rush was the executive order relating to the hiring freeze.

6     Now the executive order relating to the hiring freeze is what

7     resulted in the documents that we saw, the changes that were

8     made in the system that allowed the pop-up screen to be

9     created.  Mr. Hogan gave no explanation as to why broad access

10    to systems, and particularly access to PII of plaintiffs or

11    others, why that access was necessary to create those pop-up

12    screens for the users of the system that we saw, and Mr. Hogan

13    was able to provide no other reason for this urgency, this

14    rush, this 911-esque call that's described in the

15    administrative record without any further information, and

16    again, your Honor, this is evidence that defendants plainly

17    were acting in contravention of the Privacy Act because they

18    didn't follow the appropriate safeguards and they didn't have a

19    need for that rush.  There was no need articulated in the

20    record, and Mr. Hogan was not able to articulate any sufficient

21    need during his testimony today.

22             Mr. Hogan, on the Court's questioning, testified that

23    he believes he understands what the DOGE agents were doing, but

24    he testified that he made no inquiry to inform his belief about

25    that.

P5T1AME6                        Summation - Mr. Millsaps

1              Mr. Hogan testified today that it's important for

2      security to periodically review access and remove access when

3      it's no longer needed, but the last full audit reflected in the

4      administrative record provided by the government is in early

5      February, and there are no materials in the administrative

6      record past March 6 to indicate that any such audit has been

7      conducted or any such periodic review has been conducted since

8      then.

9              Mr. Hogan also testified early on that he has no

10     understanding of what a standard MOU for data sharing between

11     agencies looks like, and whether such an MOU should include

12     confidentiality provisions and safeguards that are required by

13     the Privacy Act.

14             Your Honor, Mr. Hogan——

15             THE COURT:  So on the MOU, I thought you were going to

16     establish that the one MOU that's in the administrative record

17     doesn't deal with OPM confidentiality perhaps as broadly as it

18     should, since it's a three-agency MOU, and that we don't have

19     MOUs for the several DOGE employees who were DOGE agents who

20     are working at multiple agencies.  But that's not the point

21     you're making.  You're making a point that the witness didn't

22     seem to know what MOU should contain?

23             MR. MILLSAPS:  So the point that your Honor just made

24     is a very valid point that I was going to get to next.

25             THE COURT:  Okay.

1          MR. MILLSAPS:  The first point, that he didn't

2     understand, or he didn't seem to understand what that process

3     was and whether those MOUs should be signed——and they're

4     clearly not in the record, as your Honor just pointed out——also

5     goes to the fact that this was arbitrary and capricious action

6     under the APA.  So I would say it's both of those points, your

7     Honor.

8          So your Honor, that's what we've heard today out of

9     Mr. Hogan's own mouth.  Your Honor knows the administrative

10    record.  I'm happy to answer any questions that you have about

11    that, but plaintiffs would submit that we have well met our

12    burden of showing that under the law in the circuit, that

13    plaintiffs have met their burden of showing irreparable harm if

14    the defendants are not enjoined from what appears to be ongoing

15    access, contrary to the law.

16          I don't know if the Court has any questions.

17          THE COURT:  I don't right now.  Thank you.

18          MR. MILLSAPS:  Thank you, your Honor.

19          THE COURT:  Thank you.

20          MR. FARBER:  Do you mind if I go to the podium?

21          THE COURT:  That would be great.

22          MR. FARBER:  Okay.

23          I might go a little bit longer than plaintiff's

24    counsel, your Honor.

25          Your Honor, plaintiffs' suit was really prompted by

1    this erroneous information contained in news reports claiming

2    that OPM was improperly disclosing sensitive data to DOGE, and

3    your Honor's already ruled that you're not going to consider

4    that hearsay evidence in the news articles and give it weight

5    on this motion for preliminary injunction.  But that is the sum

6    total of what plaintiffs have about their allegations

7    concerning what happened at OPM between January 20th and

8    March 6.

9         THE COURT:  So I should tell counsel——and I want to

10   give the government an opportunity to be heard——I don't think

11   that this element of those press reports is disputed, and the

12   government's administrative record does not include anything

13   about it, and that is, to the extent——and this applies

14   principally to OPM——to the nine prior employment or even the

15   OPM executives appears in those newspaper articles but not in

16   the administrative record.  I don't think it's anything that's

17   controversial.  There's been no effort to say that their prior

18   employment was other than what was reported.  That is the only

19   thing I can think of I would use in terms of factual findings,

20   to the extent you could say that.

21        MR. FARBER:  Well, we would definitely strenuously

22   push back on news articles concerning the prior employment, for

23   instance, of OPM-4.

24        THE COURT:  OPM-4 is in a different category.  I don't

25   think there is any dispute about where he was employed, but

P5T1AME6                        Summation - Mr. Farber

there is an assertion of why he lost a job or in connection
with a certain investigation, his employment was terminated.
That I am not taking for the truth.  And I think it's fair,
however, to inquire whether or not the government did anything
after that published report to make sure that he was an
appropriately hired individual given access to sensitive
information.  The record is silent as to whether OPM or any
other government agency with whom OPM-4 was working did
anything to investigate that press report, and so I would put
that in a separate category.

MR. FARBER:  My response to that, your Honor, would be
that absence of evidence is not evidence of absence, right?  I
mean, the OPM administrative record is what it is, but the
other thing here is vetting.  There is continuous vetting,
right, for employees.  But unsubstantiated——

THE COURT:  I don't know that.  I don't know that.

MR. FARBER:  Okay.  Well, I mean, we can refer to the
Hilliard declaration.  When he discusses OPM-4, they talk about
the fact that they did review the OF 306 for that employee, and
they had no concerns with that OF 306.

THE COURT:  So I found it was very interesting, the
Hilliard affidavit, at paragraph 19.  It was a fascinating
sentence.  As far as I could tell, what it said to me is, we
looked at the information OPM-4 provided in his hiring package,
and determined that that information that he gave us warranted

P5T1AME6                       Summation - Mr. Farber

1    no additional review or investigation.  I'm at page 12-13.

2              MR. FARBER:  Okay.

3              All right.

4              THE COURT:  Did I read that wrong?

5              MR. FARBER:  No.  I don't think you did.

6              THE COURT:  Oh, okay.  Okay.  So I didn't read that,

7    once we became aware of press reports, we decided to ask him

8    some questions or contact the prior employer or do anything.

9              MR. FARBER:  So I guess the Court's suggesting that an

10   inference might be drawn that they didn't do those things?  I

11   mean——

12             THE COURT:  No.  I'm saying the administrative record

13   is silent.

14             MR. FARBER:  That's for sure, you know, on that point.

15   It is silent.  Plaintiffs did have the opportunity to

16   cross-examine Mr. Hilliard.  They saw three declarants, they

17   chose one.  So the unrebutted testimony in the record is that

18   the security folks at OPM conducted that vetting process like

19   the professionals that they are, all right?  These are not

20   folks who mess around.  And I can tell you, having spoken with

21   these individuals——not that it matters that I'm vouching for

22   them because they've submitted declarations sworn to under oath

23   that there is no cutting corners here, and that's what

24   Mr. Hilliard says at paragraph 24.  No one asked him to cut

25   corners.  No one told him to disregard established procedures

1    and vetting.  And that is the only evidence in the record on

2    this point.

3              So I think, to just back up a little bit, is that on a

4    preliminary injunction motion, the Court can't draw reasonable

5    inferences in favor of plaintiffs.  This isn't a motion to

6    dismiss.  You know, the plaintiffs have the burden of showing

7    that they are entitled to the extraordinary remedy of a

8    preliminary injunction.  And it's a high burden, and rightfully

9    so, because it is an extraordinary remedy.

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MR. FARBER:  (Continuing)  On a preliminary injunction

2    motion, the burden for showing standing is that they have to

3    prove standing with the same level of proof that they would if

4    it were a summary judgment motion.

5          THE COURT:  I saw that argument legal argument.

6          MR. FARBER:  Yes.  That's *Do No Harm v. Pfizer*, a

7    Second Circuit case from 2025, black-letter, right?

8          THE COURT:  Well, I don't want to have my silence -- I

9    don't want to keep interrupting.

10          MR. FARBER:  I appreciate it.

11          THE COURT:  I read your legal argument.

12          MR. FARBER:  No, I appreciate that because I want to

13    answer the Court's questions on these points, but I think that

14    that's very important to understand, that plaintiffs, you

15    cannot draw reasonable inferences to benefit plaintiffs on a

16    preliminary injunction motion.  That's also Second Circuit law.

17          So what are we left with?  We're left with an argument

18    that plaintiffs' counsel has made that I thought was for a

19    motion to supplement the record or for extra-record discovery.

20    He said, this isn't in the administrative record, and that's

21    not in the administrative record, and we don't have evidence of

22    this, and they don't respond to that.  All right, well, if

23    there's not evidence to support plaintiffs' burden on a motion

24    for preliminary injunction, then the decision should be easy.

25    The PI should be denied, and we can go on, and we can talk

1    about what needs to be supplemented in the administrative

2    record.  We can go and complete the administrative record.  We

3    have never said that it's complete, and we can do so.

4             THE COURT:  You never said to this Court?

5             MR. FARBER:  That's right, never said to this Court.

6    Never represented that to plaintiffs or to this Court.  We were

7    directed by this Court to provide the OPM administrative record

8    that was provided in the Maryland District Court.  We did that.

9    And then once the motion to dismiss came down, your Honor

10   properly noted that at some point, we're going to need to know

11   if these people were properly appointed to OPM.  At some point,

12   we're going to need to know if they were properly vetted.  And

13   we went back, and we supplemented the administrative record to

14   specifically add in documentation in response to the Court's

15   decision on the motion to dismiss.  That's what we did in

16   connection with the administrative record.

17            By no means -- we're talking about a, quote-unquote,

18   final agency action that really is very difficult to pin down,

19   right?  We don't have a memo for each individual that we can

20   show the Court, with formal justifications for needs for

21   access.  That's just not how it works.  It's not how it works

22   at any agency, with any employee.  You heard that from

23   plaintiffs' own expert, that he didn't fill out memos for each

24   person that justified the need for access.  And so that's the

25   difficulty here, right?

1              But the fact that there's a lack of evidence doesn't

2      mean that plaintiffs win on a preliminary injunction motion.

3      The burden is properly on plaintiffs, on all respects, and

4      especially in the APA context.  The argument that somehow you

5      look beyond the APA, to the underlying predicate violation,

6      when it's acting arbitrary or capricious or not in accordance

7      with law, that you would somehow import the fact that there are

8      affirmative defenses and then shift the burden to the

9      government, in an APA case, there's absolutely no case law to

10     that support that proposition.

11             At summary judgment in this case, plaintiffs will have

12     the burden to show that the APA was violated, right?  There's

13     no burden-shifting in the APA, and there's a presumption of

14     regularity that the Court has to apply in the APA context.

15             And, in addition, the Supreme Court has said

16     repeatedly that the Court can't substitute its judgment for

17     that of the agency.  There's definitely a hard look.  We agree

18     with that, right?  There's *Overton*, Supreme Court says, you

19     know, that doesn't mean that the Court shouldn't make a

20     searching review, but it can't substitute its judgment for that

21     of the agencies.  And plaintiffs and plaintiffs' experts

22     definitely cannot substitute their judgment for that of the OPM

23     officials.  And that is very clear from Second Circuit case law

24     in *Safe Haven*, that we cite in our opposition brief, a case,

25     again, from 2025, making clear that expert declarations that

1   second-guess agency officials' decision on the merits cannot be

2   considered in the context of the APA, right?

3           So, I think that we really need to set the ground

4   rules of whose burden is it?  It's the plaintiffs' burden on

5   everything — on standing, on the merits, on irreparable harm,

6   on the balance of equities — down the line.  And they have to

7   win on each of those issues in order to show a likelihood of

8   success on the merits sufficient to overturn this agency

9   action.  Here, they're asking for a change of the status quo.

10  They have to make a strong showing that they're entitled to

11  this preliminary injunction.

12          And, really, they just have not made that showing

13  whatsoever.  They can't point to the absence of evidence and

14  say, that's evidence of absence.  They can't point to the

15  absence of evidence and say, well, that means something

16  nefarious happened, because that's just drawing an inference in

17  favor of plaintiffs that really is just not warranted.

18          But let's talk about what the record evidence does

19  show.  What the record evidence does show is that each

20  individual at issue was properly appointed to OPM by career HR

21  staff.  In addition, each individual at issue was properly

22  vetted by career OPM security officials according to

23  established procedures.

24          I just want to walk through that very quickly with

25  your Honor --

1     THE COURT:  So, one thing I don't know — and that's

2   just fine — if it is customary, with a change of

3   administration, to have so many individuals as temporary

4   appointments, who are then — which means, essentially, no

5   background checks — fingerprinted, but that's it, and then

6   given immediate access to highly sensitive databases, with

7   administrative authority over them, and then a few weeks,

8   months in, change to full-time staff, which comes with

9   background checks.

10     MR. FARBER:  Taking your question point by point:

11   There are publicly available presidential transition documents

12   that talk about appointing folks as special government

13   employees in temporary positions that last less than 180 days

14   in order to get those people onboard and on the ground working.

15   And that's important, right?  If every presidential transition,

16   you had to wait three to four -- six months for a full

17   background check in order to get your people in and working on

18   the ground, I think that the government would simply fall

19   apart, right?

20     Now, there are definitely rules and limitations on how

21   many special government employees you can have at particular

22   agencies, and those regulations were followed to a T here,

23   right?  The plaintiffs have pointed to no issue with the fact

24   that these folks were properly appointed.

25     In their moving brief, they said, oh, well, one of

1   these people didn't fill out a standard form, a personnel

2   notification form, SF50, but that person doesn't fill that out;

3   that's the HR department, and they explained that there isn't

4   an SF50 for a good reason.  OPM 4 was originally appointed at

5   GSA, then four days later, he had another appointment on a

6   temporary basis at OPM, and they share the same system, and

7   they couldn't generate this computer form, but he definitely

8   was appointed as an employee at OPM.

9         In their reply brief, they double down and say, well,

10  now we see the document, but, oh, he was appointed to a

11  one-year position at OPM, and he should have had a full

12  background check.  But if you go to the regulation, at

13  5 CFR 731.104(a)(3), it says that if an individual is appointed

14  to a position for less than 180 days in the aggregate, that's

15  when you don't need this full background check.

16        If you look at the document, look at Exhibit A to the

17  declaration of Carmen Garcia-Whiteside, you'll see — and we can

18  pull it up — that she was appointed to a position in the

19  aggregate of 130 days.  So we're under the 180-day limit.  So

20  everyone's following the rules here, right?  Plaintiffs are

21  just trying to make assertions in their papers without bringing

22  in Ms. Garcia-Whiteside to cross-examine her, making the same

23  assertions about improper vetting without bringing in

24  Mr. Hilliard to cross-examine him, and, if anything, the Court

25  should -- the only evidence in the record are their unrebutted

P5TKAME7                       Summation - Mr. Farber

1    representations that every OPM employee at issue was properly

2    appointed and properly vetted, and they didn't deviate from the

3    safeguards.

4              THE COURT:  I think this is very helpful, and thank

5    you, counsel.

6              But to me, one of the issues here is not were they

7    brought onboard at OPM properly, but were they given access to

8    OPM data systems properly.  So just because you're an OPM

9    employee and have been properly onboarded and vetted,

10   et cetera, does not mean you get access to secure databases.

11             MR. FARBER:  That's for sure, right.  Under the

12   552a(b)(1) exception to the Privacy Act, you have to be an

13   employee of the agency that maintains the data system, right,

14   and then you also need to have a need for the record in

15   performance of the duty.  For sure, there are two elements to

16   that exception, right?  And that's what plaintiffs focus on,

17   the need.  And we can talk about that, and I definitely do want

18   to talk about that.  I think that the arguments that plaintiffs

19   have made is that, well, they really haven't shown -- first of

20   all, they say the burden is on defendants, right, to show the

21   exception of the Privacy Act, which is incorrect.  They don't

22   have the Privacy Act claims anymore — you dismissed those.

23   They have claims under the APA and in their ultra vires claim,

24   which is not at issue.  It doesn't involve the Privacy Act.

25   They have the burden of showing that there's a lack of need,

1    right?  That's the case law.

2          But for the record here, I think Mr. Hogan credibly

3    testified that OPM properly granted these access permissions to

4    individuals because they had a demonstrated need for access at

5    the time such access was granted.  And this is the need for

6    access:  OPM believed Chuck Ezell and others, like Mr. Hogan,

7    believed these individuals would need privileged access

8    permissions to make system changes, right?  They thought the

9    need could arise.  We may have to move quickly.  That's what

10   Chuck Ezell said, we may need to make changes quickly, and so

11   that's why we need to have these folks in with these access

12   permissions.  But it turned out, in hindsight — hindsight is

13   always 20/20 — that such access wasn't actually needed, right?

14   But that doesn't mean that there was an ex ante violation of

15   the Privacy Act, because it turned out that those individuals

16   didn't need the access.  I mean, that can't be how the

17   Privacy Act works, right?  If the Privacy Act --

18         THE COURT:  So, counsel, this is the core of the

19   issue, isn't it?

20         MR. FARBER:  I think that this is the core of the

21   issue on the likelihood of success on the merits, but there's

22   also standing, right?  We have to talk about standing, because

23   I know your Honor found that there was intrusion upon

24   seclusion, right, but that was based on defendants' allegations

25   in their complaint.  Intrusion upon seclusion requires not only

1    intrusion.  We have less than four or five folks actually

2    logging into these systems.  I mean, I don't think granting

3    access permissions alone without even logging in at all can be

4    called an intrusion.  But let's set that aside.

5            The intrusion has to be highly offensive to a

6    reasonable person.  And in your own decision on the motion to

7    dismiss, your Honor, you noted that it was highly offensive

8    because plaintiffs had alleged that they disregarded all the

9    rules, these people were not government employees, they weren't

10   properly appointed, they hadn't been vetted at all, they didn't

11   undergo any training, and then they were demanded immediate

12   access from OPM employees, in total disregard of all the rules.

13   But what does the record evidence show?  Every employee at

14   issue was properly appointed.  Every employee at issue was

15   properly vetted.  The demand for immediate access didn't come

16   from DOGE defendants.  It came from Acting Director Chuck Ezell

17   and the chief of staff, Amanda Scales, and they requested it,

18   they didn't demand it.

19           So, on the whole, your Honor is going to have to

20   decide, is that highly offensive?

21           THE COURT:  I don't think this witness, who wasn't

22   Mr. Ezell --

23           MR. FARBER:  What's that?

24           THE COURT:  This witness wasn't Mr. Ezell and could

25   not say why Mr. Ezell made the demands he did.

1              MR. FARBER:  That's right.  It's plaintiffs' burden to

2    show a highly offensive -- an intrusion that's highly offensive

3    to a reasonable person.  That is the black-letter law.

4    Plaintiffs have the burden to show standing on a preliminary

5    injunction, and if they can't show that it's highly offensive,

6    with evidence that would be competent, right, on the same type

7    of evidence that you would need for a motion for summary

8    judgment -- you can't rely on hearsay in connection with a

9    summary judgment motion, right?  You can't say, well, there's

10   all these news articles that say it was really bad, and they

11   came in, and they swooped in, and they disregarded everything.

12   That's out.  You cannot look at that evidence for standing,

13   especially for standing.

14             Setting aside whether you want to maybe look at it for

15   notice issues for the merits or whatever, on standing, it's

16   very clear, right, the Second Circuit has said, it has to be

17   the same standard as summary judgment.

18             THE COURT:  So, I'm not sure I read the law the way

19   did, but I will not be granting preliminary injunction, if I

20   do, based on news reports.

21             MR. FARBER:  Exactly.

22             And so then, what are you left with to show that there

23   was a highly offensive intrusion upon seclusion, right?  It has

24   to be highly offensive to a reasonable person.  The record

25   evidence, the evidence in the record is, everyone was properly

1    appointed, everyone was properly vetted, they requested access

2    from career OPM staff, right?  Acting Director Ezell and Chief

3    of Staff Scales requested that access from career OPM staff,

4    the associate chief information officer at the time.  And you

5    know what the associate chief information officer responded to

6    Director Ezell on January 27th when he asked for access for

7    those three individuals?  Okay, sure.

8          There was no coercion here.  First of all, there's

9    absolutely no evidence of coercion whatsoever.  There was a

10   request and grants of access, right?  And so I don't see how

11   you could even draw an inference that there was somehow

12   pressure or a demand, and definitely not a demand from anyone

13   outside of OPM.  I mean, the record evidence shows that these

14   access requests came from Chuck Ezell and the chief of staff,

15   Amanda Scales, who was chief of staff of OPM at the time,

16   right?  That's all the record evidence shows.

17         So, if you're not going to look at those news articles

18   for standing, I just don't know where you get a highly

19   unreasonable intrusion upon seclusion, and that's the issue

20   here for standing.

21         There was also -- in your Honor's decision on the

22   motion to dismiss, there was a subsidiary argument that it

23   increases the risks, right, to OPM data systems.  But

24   Mr. Nesting didn't provide any evidence, any concrete evidence,

25   that there's a substantial risk to OPM data systems.  He

admitted he really didn't have a lot of knowledge about

Microsoft Entra ID, he didn't know, you know, what sort of

security protocols there were.  He agreed that plaintiffs'

expert, Ann Lewis, was completely wrong that folks could

destroy audit logs, right — that, we can throw out — and, you

know, the other plaintiffs' experts, they rely, as well, on

just these unsubstantiated news reports to claim that people

are getting administrative access and looking at everyone's

data and sharing it with everyone, right?  But I think one of

the best ways to really illustrate this for your Honor is this

idea of they granted access to these individuals when they

didn't even know they had PIV Cards or government laptops.  And

I have my government laptop right here.  I have -- I'm a

government employee.  I have to do the same thing.  I have a

PIV Card, I put it in my card reader on my government laptop,

and I have to enter a PIN, and it's multifactor authentication,

right?

          Now, OPM suffered a cybersecurity event in 2015

because they didn't use PIV Cards, they didn't have multifactor

authentication on all their systems.  And now you heard from

Mr. Hogan that he believes it's almost every system.  He

couldn't say with certainty that it was every single one,

right, that's why he put "most" in his declaration, but

definitely all of the systems that are at issue and are listed

in the OPM administrative record, they are covered by this

P5TKAME7                    Summation - Mr. Farber

1   Entra ID requirement that you have to have a PIV Card, you have
2   to have GFE, you have to have multifactor authentication to get
3   into these systems.  So the idea that there's somehow some
4   increased cybersecurity risk, there's just no explanation for
5   why that would come about by granting access to -- I think we
6   have 18 people, really only six or seven that actually have
7   administrative access to any systems of note.  There are, I
8   think, a dozen or so individuals who had access to USA
9   Performance, but never logged in, right?  I just don't see how
10  that increases the threat risk for cybersecurity incidents,
11  et cetera, beyond some metaphysical idea that it could be an
12  increased risk, right?
13          THE COURT:  So, I think one reading of the record is
14  that this rushed, indeed chaotic, grant of access in early
15  weeks was without regard to well-established standards for
16  granting access to systems that contained PII and without
17  complying with the Privacy Act's standard or requirement of
18  need to know, and in violation of FISMA's requirements through
19  the NIST standards of -- well, there are various NIST standards
20  that are at issue here.
21          Now, at some point, perhaps because of press reports
22  or perhaps because of litigation that's filed, all of a sudden,
23  things get tightened up, perhaps.  And perhaps today — I don't
24  know — things are tightened up, but I'm a little concerned
25  because I don't think the record that's created here by this

administrative record is one to be proud of.  I mean, to me,

the parties are largely in agreement about many things —

computer security is important, OPM databases need to be

protected — on the other hand, a president has a right to set

their own agenda and priorities and to see those effectuated.

And, certainly, one of those modernization of IT systems is a

very important priority.  It's been a priority in multiple

administrations.  It certainly is one of this administration,

as cited by the executive order and Mr. Hogan's declaration,

but I'm a little concerned that you don't see a less than

perfect record in those early weeks, these broad grants of

access to, let's say, 17 individuals who are not executives —

we're not talking about Mr. Ezell or Ms. Scales — that they

don't need -- there's no record they needed access, and

certainly not on that expedited basis, and that that wouldn't

pose some kind of systems-wide risk that you're giving

administrative access to people without a need for that access

and without a careful assessment of the least amount of

privilege necessary for this individual, for this task,

et cetera.

        MR. FARBER:  Look, I'm not going to say that

everything in this record shows that every decision that was

made was a hundred percent the best decision made, right?  We

have the declaration of Carmen Garcia-Whiteside that talks

about the training, for instance, and your Honor pointed out

P5TKAME7                     Summation - Mr. Farber

1    there were several individuals who completed that privacy and

2    cybersecurity awareness training late, completed it on

3    February 19th, the same date that Mr. Hogan put in his first

4    declaration.  I'm not going to run away from that fact.

5    Everyone else, except for Chief of Staff James Sullivan, we

6    know when they took that privacy and cybersecurity awareness

7    training; it's in the declaration.  There's documentation where

8    it's not privileged.  There's documentation in the

9    administrative record that backs up that they took that

10   training and acknowledged taking that training.

11       James Sullivan, I can tell you, I can represent to the

12   Court, that he's taken the training on the Learning Management

13   System since then, because we couldn't verify it, and OPM is

14   committed to making sure they're following the rules and

15   they're going to follow the rules, right?

16       Now, for the ethics training, individuals were

17   granted -- I think your Honor brought this up, that individuals

18   were granted access before they completed their ethics

19   training.  But if you actually look at the declaration of

20   Ms. Garcia-Whiteside, she explains and cites to the CFR that

21   that ethics training is not required on day one.  It has to be

22   completed within the first 90 days, right?  That's the

23   regulation.  But there's no requirement that you have to

24   complete your ethics training before being granted access to

25   privacy systems.

1          THE COURT:  Now, those are apples and oranges.  You

2    have to complete your ethics training, as an employee, within a

3    period of time, 90 days, whatever.  Then a different part of

4    OPM is in charge of monitoring access.  I think it sits within

5    the CIO's department, but I think the -- does the CISO also

6    have a role here --

7          MR. FARBER:  That's correct.

8          THE COURT:  -- to decide which employees get access to

9    which systems, and at what level?  So, they don't make that

10   decision — just because you're an OPM employee, you get access;

11   it's a different set of standards — do you need to know, what

12   is the purpose of asking, for example, for administrative

13   access?

14          So, I have no idea whether they take into account

15   somebody hasn't had their ethics training, but, to me, those

16   are two separate issues.

17          MR. FARBER:  Okay, yeah, if I may address that, your

18   Honor:  The CISO team is -- you heard it from Mr. Nesting —

19   that when he was CIO, he relied on the vetting that was done by

20   Mr. Hilliard, right?  He's not performing his own vetting, he's

21   not performing his own background checks.  He relies on the

22   vetting that's performed by the security personnel at OPM.  And

23   that's what they did here.

24          The declaration of Mr. Hilliard and Mr. Hogan note

25   that once you get vetted and you are approved for clearance to

P5TKAME7                          Summation - Mr. Farber

1    enter on duty, you've passed your criminal background check,

2    your automated checks, they've done a review of your paperwork

3    and you are cleared to enter on duty, then you get this Logical

4    Access Card, and that's the PIV card.  It's not a full-fledged

5    PIV card because you haven't gone through the full background

6    check yet, but you do have the temporary access to the network,

7    just like you would have a PIV card, you know, to put into your

8    government laptop, right?  And that's what you need in order to

9    be able to be assigned roles in Entra ID.

10            Now, I don't know there's any testimony that I've

11   heard, from any expert, that says someone at CISO independently

12   evaluates whether individuals have some demonstrated need for

13   access to a particular system.  I just don't think that that

14   exists, right?  If that were the case, there would have to be

15   an email or memo that was created for each employee who would

16   want administrative access -- granted administrative access to

17   a system, right?

18            THE COURT:  So, I don't want to confuse this.

19            So, the CSIO's primary responsibility is about

20   security?

21            MR. FARBER:  That's correct.

22            THE COURT:  Okay.

23            To get access to these systems containing PII, you

24   have to have involvement of the CIO, or that office?

25            MR. FARBER:  That's correct, the office of the CIO

1    yes.  And you saw, like Ozie Foster, other folks that are in

2    the record, MC Price, Teresa Curtis — these are all career OPM

3    staff — and they said, yep, okay, sure, you know, we're giving

4    you that access.  No one pushed back.  No one said, you know,

5    that's not okay.

6            There were emails in the record that don't include

7    Ezell or Scales or any other government employee, and they say,

8    yeah -- Teresa Curtis says, yeah, MC Price actually approved

9    all that access on January 20th.  She didn't say that was, you

10   know, oh, yeah, that was really terrible, she got coerced into

11   doing it, or they demanded it or there was some -- I mean, all

12   of this is -- plaintiffs are asking you to draw these

13   inferences based on really this atmosphere of people don't like

14   DOGE or people -- I guess that's what it is.

15           If we're not looking at the news articles, I struggle

16   to see where in the record you would point to and say, well,

17   that's evidence of coercion, right?

18           THE COURT:  I think we're moving the goalposts here.

19           MR. FARBER:  Okay.  The need-to-know — I think

20   need-to-know is an issue that came up with plaintiffs' expert,

21   Mr. Nesting.  I asked him, you know, you don't always know, you

22   can't always tell exactly what you're going to need before you

23   get in to make a system change?  And he agreed with that.

24   Right?

25           It can't be that you've to have perfect, prescient

1    knowledge of exactly what you'll need every time you get

2    granted access to a data system, before you're going to

3    implement it.  Because what if you get in there and decide, I

4    actually don't need to look at any of that data to make this

5    change, I was wrong, and now I want to go somewhere else?  Is

6    that a violation of the Privacy Act, because you didn't

7    actually use the access that you were granted?

8          Isn't it better, frankly, that these OPM employees

9    were granted access permissions but they never logged in

10    because they never needed to access those systems in the first

11    place?  Doesn't that demonstrate that they are acting

12    reasonably, that they are not abusing the privileges that may

13    have been granted on day one, not knowing exactly how these

14    systems worked, that they know they're going to have to make

15    changes on day one, because the hiring freeze comes down on day

16    one, because other executive orders about workplace reform come

17    down on day one and they know they have to hit the ground

18    running, they know there's going to be system changes for a

19    hiring freeze?  In order to implement that, you have to be able

20    to prevent, or at least put up gates, confirmation pop-ups, to

21    make sure that HR specialists who are in the government are not

22    just hiring people, sending out job offers, job letters, right?

23          So they knew that they were going to have to make some

24    changes; they just didn't know what.  And I think if the answer

25    is, well, you need to know exactly what you want to do in a

1    data system before you get access to a system that has PII in

2    it, I don't know that that's a workable standard for the

3    Privacy Act.

4            THE COURT:  So, I'm planning to rely on OPM's own

5    training documents about the requirements and government

6    published materials, NIST standards, and the law under the

7    Privacy Act about need-to-know.

8            So, it's my understanding that the government's

9    position is that these standards are important and it wants to

10   comply with them, and that need-to-know, actually, that

11   standard has major security implications if it is not complied

12   with.  There are major risks associated, and the OPM's own

13   documents describe those risks.

14           MR. FARBER:  Yes, so I think if you don't have a need

15   for access to the record and you get access to that record, you

16   actually access it, that's right, that there would be -- and

17   there was no other exception that applied, right — there's a

18   laundry list of exceptions, there's routine-use exceptions —

19   that if they didn't have a need for access to records, your

20   Honor finds that, that's one element of the preliminary

21   injunction analysis.  There's standing, you know, there is --

22   you're going to have to decide that this APA -- this wasn't

23   day-to-day operations, that it was still somehow some sweeping

24   change from their past practice, like -- they properly

25   appointed everybody, they properly vetted everybody, still

1    some, like, sweeping change.  I don't know, I think what you

2    have is discrete day-to-day decisions.  You don't have the

3    inferences that you can draw on a motion to dismiss in favor of

4    plaintiffs on that point.

5              So, it seems like an uphill battle, to me, but I take

6    it -- I'm not going to push back on that, but I do want to just

7    bring up this FISMA point, NIST.  And I think it's important

8    because they've said, well, this is a rule, you violated the

9    principle of least privilege, you violated the principle of

10   separation of duties.  They're not rules, right?  They're not

11   requirements that you can violate.  These are best practices.

12   We established that with Mr. Nesting.  These are things where

13   the agencies have discretion to implement.

14             And, in fact — and I want to point out to the Court

15   just some case law on this — FISMA, the NIST standards are not

16   subject -- there's at least one court that's found they're not

17   subject to APA review.  The D.C. Circuit has found that we

18   probably -- the failure to follow a NIST standard wouldn't be

19   subject to APA review, and they're not required by the Privacy

20   Act, by any means.  Nothing in the Privacy Act says you have to

21   follow FISMA or NIST or anything like that.

22             I'm happy to offer that case law to your Honor because

23   I think it's very important.  If you're going to rely on the

24   fact that NIST standards were violated, I don't think that you

25   can in the APA context, to say that NIST standards were

P5TKAME7                    Summation - Mr. Farber

1    violated, or you would have to distinguish case law that shows

2    to the contrary, that NIST standards are not subject to APA --

3    you know, sorry, adhering to NIST standards is not subject to

4    APA review.

5         THE COURT:  I don't see it quite in terms of a

6    violation, but I do see it as highly relevant.  And, again, I'm

7    not sure the plaintiffs and the government are very far apart

8    here on fundamental principles.  Security of these record

9    systems is important.  It's important to the plaintiffs, but

10   it's important to the government.  And I don't think the

11   government's going to argue it's not important.  And the

12   government's own documents reflect how important it is.  And

13   there's all kinds of security training and systems in place to

14   try to protect these sensitive records.  And the threats are

15   myriad, again, as described in OPM's own documents, and that's

16   why process is important.  And I think everything I've just

17   said the parties agree upon.  I don't think there's any dispute

18   here.  If there is, tell me.

19        So, I think the issue really becomes fairly narrow,

20   which is:  Based on the record presented for this hearing — not

21   news reports but the record presented at this hearing — does

22   the government see that what happened in the early weeks was

23   not in order with best practices within OPM, and it would like

24   to assure me that things have been tightened up since then, and

25   access is not given willy-nilly because somebody might some day

1    need access, but, instead, principles about need-to-know and

2    least privilege and other principles that are in its own

3    documents are taken seriously and the agency has an interest in

4    being fully compliant with its own statements about its

5    security needs and risks?

6             MR. FARBER:  I think that, to the extent your Honor is

7    going to decide — which I kind of can see where things are

8    going — to the extent your Honor is going to decide that there

9    was a violation here, I don't know that the extraordinary

10   remedy of a PI is appropriate, but if that's where things are

11   going, then definitely not an injunction that bars everybody

12   from access without, like you said, providing assurances that

13   people have been properly trained now, or that they have, I

14   guess, a memorandum that justifies a need for access.

15            I guess the only concern there, your Honor, and the

16   concern that we've raised in other cases before Judge Vargas in

17   *New York v. Trump*, is that it really just turns your Honor into

18   the chief information officer and the head of HR of OPM,

19   because now we have to submit to you justifications, right?

20   The agency no longer is determining this person needs access or

21   doesn't need access; now we have to go to the Court, and you

22   have to -- you're a highly capable jurist, I understand that,

23   but --

24            THE COURT:  I have a day job.  It's okay.

25            MR. FARBER:  Yeah, there are agency officials, though,

1    who do the vetting and do this type of thing all the time for a

2    living.  And I just don't know why the Court would want to

3    supplant that, because there is a concern that, frankly, hasn't

4    been fully borne out by the record.  Plaintiffs admit that

5    there is just not evidence of this, not evidence of that.

6          THE COURT:  Oh, I don't know that they're admitting so

7    much.  But, again, I think there is a lot of common ground

8    here, and I don't hear a full-throated defense of what happened

9    in those early weeks, but maybe I'm wrong — maybe you think

10   that OPM acted just the way it was supposed to — but the

11   testimony from Mr. Hogan really was, well, they may need it,

12   they might some day.  And as he admitted, actually, on an

13   emergency basis, to get access, it's a matter of minutes, if

14   anybody actually, on an emergency basis, needed access.

15         So, can we take a five-minute break here and ask

16   counsel to talk with each other, plaintiffs' counsel and

17   defense counsel.  I know that the government may wish to

18   continue its summation, and certainly there's a chance for

19   rebuttal summation, but did you appear before Judge Vargas as

20   well?  Were you representing the government?

21         MR. OSTREICHER:  I confess that I did, your Honor.

22         THE COURT:  Well, how efficient, then.

23         I looked at, in particular, as I'm sure you know so

24   well, two of her injunctions, the one from February 11th and

25   the one from February 21, as things that might provide a basis,

P5TKAME7                         Summation - Mr. Farber

1    a reasonable basis, for a meeting of minds, to just make sure

2    that going forward OPM is operating in the way its own

3    documents wish it to operate and taking into account all the

4    very important security considerations that those documents

5    reflect, and then, just going, sort of retrospectively, to

6    making sure that any risk that was created is identified and

7    mediated, should there be one identified.

8              I just think maybe a five-minute recess would be

9    helpful for counsel to discuss this with each other.

10             MR. OSTREICHER:  Sure.

11             May I make one point?

12             THE COURT:  Yes.

13             MR. OSTREICHER:  I wasn't planning to speak.

14             But is the Court open -- to the extent we go down this

15   road and the agency attempts to show that it has tightened its

16   systems and addressed the concerns that the plaintiffs have in

17   that other case before Judge Vargas, we made numerous

18   supplemental submissions with declarations laying out the facts

19   of how things operate now, as opposed to how they operated

20   before, and I'm not sure whether the Court is suggesting that

21   it would be open to receiving those kinds of submissions now or

22   in the future, or whether you are thinking something else?

23             THE COURT:  I am prepared to be flexible — I am

24   prepared to rule fairly expeditiously on the motion that's

25   before me; I am prepared to move in stages; I am prepared to,

1   after I hear from counsel, be very practical in how we address

2   these issues — because I do think, fundamentally, there isn't

3   any disagreement between the plaintiffs and the government

4   about — you know, I've listed the items.  A new president has a

5   right and obligation to put his priorities into effect so long

6   as they comply with the law; we would expect no less.  The

7   compliance with the law is important.  And when it comes to

8   OPM, the security of its data systems is very important, as the

9   law points out and as OPM's own documents indicate.  And the

10  administrative record for what happened in the early days here,

11  I'm happy to discuss it at length in a filed opinion, or we

12  could just sort of focus on making sure things are tightened up

13  now, and that any risks that were created in the past are

14  addressed and mitigated.

15          MR. OSTREICHER:  Understood, your Honor.

16          Is there any chance we could get closer to ten

17  minutes?  I need to speak with Mr. Farber before we speak with

18  them.

19          THE COURT:  Sure.  Let me just talk with the court

20  reporter one minute.

21          (Pause)

22          THE COURT:  Ten minutes it is.

23          MR. OSTREICHER:  Thank you, your Honor.

24          (Recess)

25

P5T1AME8                        Summation - Farber

1              THE COURT:  Please be seated.

2              Mr. Farber.

3              MR. FARBER:  Your Honor, the parties have conferred,

4       and I think that we have a plan for the rest of this hearing

5       and for possible discussions.

6              We both think that it's important to just finish out

7       the argument——I'm going to keep it as short as possible——and

8       rebuttal.  But then the parties are interested in pursuing this

9       idea of talking things out, and I think that we need some time

10      to do that on both sides.  And so the request would be that we

11      would have until the end of Monday to put in a status report,

12      or a status letter, really, just, you know, giving an update on

13      those discussions, and if they're fruitful or not.  And if

14      they're fruitful, hopefully we can give, you know——we may ask

15      for more time or whatever it may be.  If they're not, then, you

16      know, the Court can proceed to decide the motion.

17             So plaintiff's counsel had also requested that

18      defendants stipulate that this short delay until Monday would

19      not be held against them on the irreparable harm point, and I'm

20      happy to so stipulate, you know, to that.

21             So if there's anything else that I missed, after a

22      long day of a PI hearing, plaintiff's counsel can correct the

23      record on that.

24             THE COURT:  Thank you.  That sounds like an excellent

25      plan, and I do think it makes sense to just finish out the

1    arguments here.  So if counsel want me to rule, you don't have

2    to come back to do that.  Good.

3              MR. FARBER:  I agree.

4              So your Honor, I won't belabor the underlying APA

5    Privacy Act claims, but with respect to plaintiff's *ultra vires*

6    claim, I think that really there's just no evidence that DOGE

7    defendants——not DOGE agents but DOGE defendants, Elon Musk or

8    anybody from DOGE——you know, demanded access, immediate access

9    to OPM data systems.  So to the extent there is a PI, I think,

10   you know, that definitely should not be part of the analysis.

11             You had asked us to be prepared to talk about the

12   proposed PI order, and I think your Honor has already gone

13   where we were going to suggest.  To the extent the Court

14   believes that OPM moved too quickly or did not properly

15   document justifications for the need for access, then

16   defendants submit that at most, the Court should require OPM

17   to, you know, supply that information and that we would point

18   to the most recent amended order in the *New York v. Trump*

19   litigation before Judge Vargas.  I think that is the model,

20   right, for what that PI order should look like.  And really,

21   you know, the proposed PI order really just gives more relief

22   to plaintiffs than they could secure if they actually succeeded

23   on the merits of their APA claims, and albeit it would be

24   temporary.  At most the Court would vacate, you know, the

25   decision to grant access, and remand to the agency, right, to

1    show that future access was appropriate, but an injunction

2    against future grants of access would I think be improper

3    without allowing for some process to actually get folks access

4    to these OPM data systems.

5           Second, the proposed PI order is not narrowly tailored

6    to data systems that contain PI.  I think it's overly broad in

7    that sense, and really——

8           THE COURT:  I do think that the proposed preliminary

9    injunction order would need to be modified.

10          MR. FARBER:  Okay.

11          THE COURT:  But my goal would be to give counsel an

12   opportunity——based on this record, if I grant a preliminary

13   injunction, if the parties need me to rule, then either I would

14   propose one or I'd invite counsel, on very short turnaround

15   time, to propose one.

16          MR. FARBER:  Okay.

17          THE COURT:  But I wouldn't be planning to enter an

18   unmodified proposed preliminary injunction order.

19          MR. FARBER:  Got it.

20          And I think really, the last point on this is, there

21   needs to be carveouts for the OPM director, chief of staff, CIO

22   Hogan.  I mean, I think he credibly testified, and he is

23   running the ship, right?  And so if he can't have access to

24   these data systems, it does put a big wrench into the

25   operations at OPM.

P5T1AME8                    Rebuttal - Mr. Millsaps

1      I have to, you know, just point your Honor to Federal

2  Rule of Civil Procedure 65(c) that there should be a bond, a

3  security in an amount that the Court believes is appropriate.

4  We think, you know, that plaintiffs should post a substantial

5  bond given the potential disruptions to OPM's operations, but

6  that we understand that it is totally up to the discretion of

7  the Court.

8      And we would request formally, if the Court enters a

9  PI order, for a stay to allow for an appeal.  To the extent the

10 Court issues a preliminary injunction, we request that the

11 injunction's effective date be delayed until two weeks after

12 the date on which any PI order is issued so that there could be

13 an opportunity for appeal to the circuit.

14     And that's all I have, your Honor.

15     THE COURT:  Thank you so much.

16     MR. MILLSAPS:  Your Honor, if I may, just a brief

17 rebuttal?

18     THE COURT:  Yes.

19     MR. MILLSAPS:  There are a couple of points I want to

20 bring to the Court's attention in case the Court needs to rule.

21     The first is that defendants keep telling the Court,

22 just trust us, everything's fine, we're doing everything

23 properly, but they're playing games with the Court here with

24 the administrative record because Mr. Hogan certified under

25 oath in Maryland that the administrative record was complete,

1    and it's the same administrative record that they produced in

2    this case, without his certification in this case, but they

3    haven't withdrawn his certification under oath before the

4    Maryland court.  So the Court should take that into

5    consideration when evaluating the administrative record in this

6    case.

7            You know, I think when your Honor said a couple of

8    times that you were a little concerned that the defendants

9    don't see the problem with how things were handled in the early

10   weeks, that really underscores how palpable the irreparable

11   harm is here and the need for the Court's intervention because

12   defendants have not demonstrated or acknowledged that there was

13   anything wrong with that.  Their position is that everything is

14   fine on this administrative record, and so that's a good

15   indication that they will not actually comply with the Privacy

16   Act and the law unless this Court makes them do so.

17           Your Honor I think is very right that this comes down

18   to need, whether there was need for the access that was given,

19   and the administrative record as well as Mr. Hogan's testimony

20   today here shows pretty conclusively that there was no

21   legitimate need for that.  The only need that Mr. Hogan could

22   point to was the hiring freeze and the pop-up, you know,

23   windows that were made, which clearly were not a sufficient

24   need for granting broad access to systems that contain PII.

25   There's no indication that PII was needed to accomplish that

P5T1AME8                          Rebuttal - Mr. Millsaps

1    task.  And if there was a need every time the executive says

2    there's a need, just because they said, we need it, then the

3    Privacy Act itself would be meaningless, right?  Congress

4    passed the Privacy Act to enact these safeguards that the

5    executive has to follow, the agencies have to follow.

6              Now defendants have said a couple of times in their

7    briefs and here that we have a higher standard because we are

8    seeking a mandatory preliminary injunction, but——and we've put

9    this in our papers, I'm sure your Honor has read it——we're

10   seeking a prohibitory injunction here, which does not have the

11   higher standard, because we are——the status quo is not what the

12   DOGE agents have been doing in OPM since they came in.  The

13   status quo is January 19th, before any controversy arose, so it

14   would be blocking them from having that access, you know, and

15   essentially making the government back up and start from

16   scratch here to do the proper vetting, training, and need

17   analysis to determine who would be given access.

18             I think that your Honor understands the legal

19   standards on irreparable harm and all of that.  I won't rehash

20   that.  You know, the standard here is that plaintiffs bear the

21   burden under the Privacy Act to show that access was granted,

22   which we've done here.  The administrative record and Mr. Hogan

23   shows that.  Once that is shown, then the burden is on

24   defendants to show, you know, that there was an exception that

25   applied here.  And it's not just that there isn't evidence in

P5T1AME8                        Rebuttal - Mr. Millsaps

1  the record.  We're not asking the Court to look at an absence

2  of evidence.  The administrative record and Mr. Hogan's

3  testimony today are the evidence that shows there was no need

4  to do all of this.  And that includes for the rushing around

5  and the chaotic manner in which it was done, which is the

6  arbitrary and capricious component of it.  There was no

7  articulated need in the record or by Mr. Hogan why there was a

8  911-esque call.  And we think that the Court should remember

9  also that the administrative record shows not only were these

10 DOGE agents just brought in and immediately given this broad

11 access on this rushed emergency basis, with no discernible

12 need, but at the same time, they were sidelining career OPM

13 employees and revoking their access.  So that heightens the

14 security concerns here and the nature of the irreparable harm

15 of exposing plaintiffs' PII.

16        And then I think the last thing that I would say, your

17 Honor, is, if your Honor is leaning towards doing what Judge

18 Vargas did with that preliminary injunction in that case, so

19 there's one distinction with that case, which is important

20 here, which is that in that case, Judge Vargas only ruled on

21 the arbitrary and capricious prong of the APA claims.  She did

22 not rule that plaintiffs would succeed on the Privacy Act

23 violation because——

24        THE COURT:  I plan to reach both prongs of the APA.

25        MR. MILLSAPS:  Thank you, your Honor.

P5T1AME8                          Rebuttal - Mr. Millsaps

1          And so, you know, what Judge Vargas did in that case

2    was a model for why the Court would not turn into an HR

3    department here, right?  The defendants are telling us, just

4    let us submit a couple of declarations and tell you we're in

5    compliance and we can all go home.  They're doing that at the

6    same time they're telling us, the administrative record is

7    complete in the Maryland case, it's the same one you have with

8    a few extra documents we gave you, and we're not certifying

9    it's complete here, so your Honor can understand why plaintiffs

10   are wary of taking a, you know, a representation like that and

11   just going home.  We think that the way Judge Vargas did it,

12   which was to issue a preliminary injunction, setting out the

13   problems and what needed to happen, and then having the

14   defendants come to the Court, certifying, in that case, what

15   they did for training and vetting and all of that, which would

16   apply here, in addition to determining how need is determined

17   before access is given, you would have both of those things,

18   because we do have the Privacy Act claim here that——and I would

19   note for your Honor that in the latest ruling by Judge Vargas,

20   she declined to dissolve the preliminary injunction.  She said,

21   what we did with this prior employee where you came to me and

22   you showed me what you did to vet them and that you were in

23   compliance, as long as you follow that with all the other

24   employees, you're in compliance; you don't need to come back to

25   me.  But it did leave open the door for the plaintiffs to come

P5T1AME8                    Rebuttal - Mr. Millsaps

1    back to the court if in fact it turned out that the government

2    was not complying, and we would suggest that that would be an

3    appropriate route in this case.

4            THE COURT:  Well, that certainly is something the

5    parties can discuss with each other.

6            So thank you.  Thank you for your excellent

7    presentations today.  It's very helpful.  And thank you to the

8    two witnesses for making themselves available.

9            So I will get a status letter by the end of Monday.

10   I'm going to give you a time on Thursday, not that you have to

11   be here, but just in case anybody needs another conference, if

12   that's helpful to you, we'll give you a date and time for

13   Thursday.

14           THE DEPUTY CLERK:  2:30 p.m.

15           THE COURT:  And——

16           MR. MILLSAPS:  Your Honor?

17           THE COURT:  Yes.

18           MR. MILLSAPS:  Would it be possible to do that

19   remotely?  Because a number of counsel have flown in to New

20   York for this and——of plaintiffs' counsel, at least.

21           THE COURT:  So maybe I shouldn't schedule anything.

22   Absolutely fine to have a telephone conference if that's

23   appropriate to the request.  Depending on what the parties'

24   request is, it should be an in-person conference.  I just don't

25   know what the task is right now.  But I do telephone

1    conferences all the time.  So depending on what the need is, we

2    may not even have a conference.  Okay.

3           And I'm a great admirer of Judge Vargas and how she

4    managed that litigation, but it was a different agency, and I'm

5    not suggesting that any relief ordered in this case, either on

6    consent or by the Court, will be identical.  This is the record

7    for this agency of what happened and what the risks are for

8    this agency and its recordkeeping systems.  I know you all

9    appreciate that.

10          Thank you so much.

11          THE DEPUTY CLERK:  All rise.

12                           o0o

```
1                        INDEX OF EXAMINATION
2    Examination of:                              Page
3    DAVID NESTING
4    Cross By Mr. Farber . . . . . . . . . . . . .19
5    Redirect By Mr. Warren . . . . . . . . . . . .62
6    Recross By Mr. Farber . . . . . . . . . . . .80
7    GREGORY J. HOGAN
8    Direct By Mr. Farber . . . . . . . . . . . . .84
9    Cross By Mr. Warren . . . . . . . . . . . . .87
10   Redirect By Mr. Farber . . . . . . . . . . . 155
11   Recross By Mr. Warren . . . . . . . . . . . 177
12                     PLAINTIFF EXHIBITS
13   Exhibit No.                               Received
14    99    . . . . . . . . . . . . . . . . . . .16
15                     DEFENDANT EXHIBITS
16   Exhibit No.                               Received
17    14    . . . . . . . . . . . . . . . . . . .29
18    12    . . . . . . . . . . . . . . . . . . .52
19    10    . . . . . . . . . . . . . . . . . . .56
20    11    . . . . . . . . . . . . . . . . . . .60
21   listed on D15  . . . . . . . . . . . . . 180
22
23
24
25
```