```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
AMERICAN FEDERATION OF GOVERNMENT       :
EMPLOYEES, AFL-CIO, et al.,             :
                                        :    25cv1237 (DLC)
                    Plaintiffs,         :
                                        :    OPINION AND
          -v-                           :    ORDER
                                        :
U.S. OFFICE OF PERSONNEL MANAGEMENT,    :
an agency of the United States, et      :
al.,                                    :
                                        :
                    Defendants.         :
                                        :
--------------------------------------- X
```

APPEARANCES:

For plaintiffs:

Rhett O. Millsaps II
Mark P. McKenna
Christopher J. Sprigman
Mark A. Lemley
Lex Lumina LLP
745 Fifth Avenue, Suite 500
New York, NY 10151

F. Mario Trujillo
Victoria Noble
Cindy Cohn
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109

Norman L. Eisen
Andrew H. Warren
State Democracy Defenders Fund
600 Pennsylvania Avenue SE #15180
Washington, DC 20009

Subodh Chandra
The Chandra Law Firm LLC
1265 W. 6th Street, Suite 400

Cleveland, OH 44113

For defendants:

Jeffrey Oestericher
David E. Farber
United States Attorney's Office, Southern District of New York
86 Chambers Street, 3rd Floor
New York, NY 10007

DENISE COTE, District Judge:

Following President Trump's inauguration, the U.S. Office

of Personnel Management ("OPM") granted individuals associated

with the Department of Government Efficiency ("DOGE") broad

access to systems of records that contain the personal

information of tens of millions of Americans.  In June, the

Court granted the plaintiffs' motion for a preliminary

injunction, concluding that the plaintiffs had proven a

likelihood of success in establishing that OPM had violated the

law.

The parties have submitted two motions that are to be

addressed before this action proceeds to summary judgment.  The

defendants have moved to dismiss this action as moot, pointing

to internal procedures recently adopted by OPM and other factual

developments that, according to the defendants, provide

assurance that the law will not be violated.  The plaintiffs

have moved for extra-record discovery, arguing that the

administrative record produced by the Government, which has not

2

been certified as complete, is insufficient.  For the reasons described below, both motions are denied.

## Procedural History

This action was filed on February 11, 2025.  The complaint includes five claims for relief: two claims under the Privacy Act of 1974, 5 U.S.C. § 552a ("Privacy Act"); two claims under the Administrative Procedure Act, 5 U.S.C. § 701 et seq. ("APA"); and an ultra vires claim.  There are two sets of defendants: the "OPM Defendants," which consist of OPM and its former Acting Director Charles Ezell; and the "DOGE Defendants," which consist of the United States DOGE Service ("USDS"), its Acting Director, the U.S. DOGE Service Temporary Organization, and Elon Musk.

The plaintiffs are individuals currently or formerly employed by the federal Government and unions representing federal Government employees.  They seek an injunction "prohibiting further disclosure of their information, prohibiting use of information already obtained unlawfully, and requiring return or destruction of any copies of their personal information maintained by DOGE Defendants."  They also seek a declaration that the decision to implement a system by which the DOGE Defendants may access OPM's records and the plaintiffs' personal information contained in those records is unlawful.

On February 14, the plaintiffs brought a motion for a temporary restraining order ("TRO").  The defendants filed an opposition on February 19, in which they requested that the motion for a TRO be converted into a motion for a preliminary injunction.  Instead of filing a reply, the plaintiffs joined that request on February 23 and indicated that they would seek expedited discovery.

The plaintiffs filed a motion for expedited discovery on February 27, which became fully submitted on March 6.  The defendants argued that it was premature for the plaintiffs to seek discovery before the administrative record had been produced.  An Order of March 7 instructed the defendants to provide the plaintiffs with the administrative record and other relevant materials that had been produced in a related action in the District of Maryland, American Federation of Teachers v. Bessent, No. 25cv430 (D. Md.) ("Maryland OPM Action").[1]

On March 14, the defendants filed a motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6), Fed. R. Civ.

---

[1] The Maryland OPM Action was filed against OPM and two Departments of the federal government for violations of the Privacy Act and the APA.  A TRO was issued on February 24 and was converted to a preliminary injunction on March 24.  Am. Fed'n of Tchrs. v. Bessent, 772 F. Supp. 3d 608, 628, 661 (D. Md. 2025).  The Fourth Circuit later stayed that preliminary injunction and then vacated it on August 12.  Am. Fed'n of Tchrs. v. Bessent, 152 F.4th 162, 167-68 (4th Cir. 2025).

P.  That motion became fully submitted on March 31.  An Opinion of April 3 dismissed the two claims brought under the Privacy Act, except insofar as they serve as a predicate to the plaintiffs' other claims, and otherwise denied the defendants' motion to dismiss.  Am. Fed'n of Gov't Emps. v. OPM, No. 25cv1237, 777 F. Supp. 3d 253 (S.D.N.Y. 2025).  The Opinion found that the complaint adequately pleaded a violation of the Privacy Act and the APA based on the disclosure of OPM records to individuals who were not OPM employees or did not have a need for such access in the performance of their duties at OPM.  Id. at 271-77.

On April 23, OPM filed an updated administrative record that only provided information about events that had occurred through March 6.  The plaintiffs filed a motion for a preliminary injunction on April 25, and that motion became fully submitted on May 23.  A preliminary injunction hearing was held on May 29.  Gregory Hogan, who was then OPM's Chief Information Officer ("CIO"), testified on behalf of the defendants.  David Nesting, a former Deputy CIO at OPM and a former Director of Engineering at the U.S. Digital Service, testified on behalf of the plaintiffs.

An Opinion of June 9 found that the plaintiffs had shown that they were entitled to a preliminary injunction.  Am. Fed'n

of Gov't Emps. v. OPM ("June 9 Opinion"), 786 F. Supp. 3d 647,
657 (S.D.N.Y. 2025).  The Opinion found first that the
plaintiffs had carried their burden at that stage of the
proceedings to establish Article III standing.  Id. at 677-83.
Next, the Opinion found that the plaintiffs had shown a
likelihood of proving that the Privacy Act was violated on two
grounds: (1) OPM records were disclosed to individuals
affiliated with DOGE who were not OPM employees or did not have
a need for the records in the performance of their duties at
OPM, and (2) OPM had failed in its duty to safeguard the
plaintiffs' records, having set aside its established safeguards
in connection with individuals brought into OPM to pursue the
DOGE agenda.  Id. at 683-90.  The Opinion also found that these
claims are reviewable under the APA.  Id. at 690-92.

Pursuant to an Order of June 9, the parties offered
proposed terms for a preliminary injunction on June 12.  On June
13, the Court circulated a draft preliminary injunction and held
a conference.  The parties proposed revisions to the Court's
draft injunction on June 19, and another conference was held on
June 20.  In their June 19 letter, the defendants argued that
the Court does not have authority to order OPM to undertake a
forensic audit, but noted as well that any such audit would be
"in addition to" three audits concerning "DOGE Access" that were

already being conducted.  These were an audit by the Government

Accountability Office, an audit being conducted by OPM's Office

of the Inspector General, and a regular annual audit conducted

by OPM.

A preliminary injunction was issued on June 20.  It

required the Government to file two reports.  The first report,

which the Government filed on July 18, described the procedures

OPM had put in place since March 6 to ensure adherence to the

requirements of the Privacy Act with respect to any new grant of

access permissions by OPM to any records containing personally

identifiable information ("PII") of the plaintiffs.  The

Government filed the second report on August 1 and a corrected

version of the second report on September 30.  This report

provided information regarding access permissions that had been

granted to "DOGE Agents," as defined in the preliminary

injunction,[2] and were in effect as of the date of the preliminary

---

[2] The definition of "DOGE Agents" in the preliminary injunction,
which is also adopted in this Opinion, is the following:
    (1) the individuals listed on page OPM-103 of the
    administrative record; (2) any individuals employed by
    [USDS] and detailed to OPM; (3) any individuals
    employed by OPM and detailed to USDS; (4) any
    individuals employed by OPM who are detailed to any
    other federal agency for the principal purpose of
    implementing initiatives that are directed by USDS;
    and (5) any individuals who were not employees or
    contractors of OPM prior to January 20, 2025 and who
    have been given access to any OPM system of records
    containing PII for the principal purpose of

injunction, June 20.  Pursuant to an Order of June 27, the Government supplemented the administrative record on August 29.

Meanwhile, in a letter of June 19, the parties indicated their preference that this action be brought to a resolution through cross-motions for summary judgment, with the Government being the first to file.  In a joint letter of September 15, however, the parties proposed a different schedule for further proceedings.  In that letter the parties proposed that the plaintiffs would seek extra-record discovery and the defendants would move to dismiss this action as moot.  An Order of September 16 adopted the schedule proposed by the parties for those two motions.  That schedule was delayed by the federal Government shutdown, which ended on November 12.  An Order of November 14 instructed that the parties' proposed motions must be fully submitted by December 17.

The plaintiffs filed a motion for extra-record discovery on November 24.  The plaintiffs have not attached proposed discovery requests or otherwise explained with specificity what discovery they seek.  They instead describe their requested discovery in the following broad terms:

> Extra-record discovery is warranted regarding four
> categories of information: (1) the scope of and need

---

implementing initiatives that are directed by USDS.
Excluded from this definition are Charles Ezell,
Gregory Hogan, Amanda Scales, and James Sullivan.

8

for access that has been granted; (2) the current
security of OPM systems; (3) the use of data
unlawfully accessed; and (4) mitigation steps taken,
if any.  Plaintiffs will be able to obtain the
information needed for the Court to determine the
nature of the permanent injunction and the declaratory
relief warranted through a combination of document
requests, interrogatories, and a few depositions.

The defendants filed an opposition on December 12.  The
plaintiffs filed a reply on December 17.  The defendants
requested leave to file a sur-reply in a letter of December 17,
but an Order of December 18 instructed that a sur-reply was
unnecessary.

Meanwhile, the defendants filed a letter on November 24
stating that they had "elected not to file their contemplated
motion to dismiss at this time."  In a letter of December 4,
however, the defendants reported that they intended to file
their motion to dismiss on December 5.  An Order of December 5
set a schedule for that motion.

The defendants moved to dismiss this action as moot on
December 5.  That motion is accompanied by a declaration of
OPM's Acting CIO Perryn Ashmore,[3] an excerpt of an updated OPM
Cybersecurity and Privacy Policy released on November 18, and a
supplemental administrative record.  The Ashmore declaration
indicates that the Government's motion was delayed because OPM's

---

[3] Ashmore replaced Hogan, OPM's previous CIO, on September 2.

database administrators had identified permissions that had been granted to OPM-3[4] in January and required additional time to review those permissions.  The plaintiffs filed an opposition on December 15.  The defendants filed a reply on December 17.

## Factual Background

I.   Grants of Access to OPM Data Systems

Most of the relevant facts regarding OPM's grants of access to individuals working on the DOGE agenda were described in detail in the June 9 Opinion, and are only summarized here.  As noted, however, the plaintiffs' motion for a preliminary injunction was decided based on an administrative record that had been truncated at March 6.  The following summary incorporates certain new information from the September 30 revised access report, the Ashmore declaration, and the supplemental administrative record.

On January 20, 2025, the day of his inauguration, President Donald J. Trump signed Executive Order 14,158 (the "DOGE Executive Order").  The DOGE Executive Order established the "Department of Government Efficiency" and renamed the U.S. Digital Service as the United States DOGE Service.  The DOGE

---

[4] The individuals discussed in this Opinion who are not in public-facing roles are referred to by anonymized monikers, such as OPM-3.

Executive Order instructed agency heads to ensure, "to the maximum extent consistent with law," that USDS has "full and prompt access to all unclassified agency records, software systems, and IT systems." USDS was instructed to "adhere to rigorous data protection standards." The DOGE Executive Order stated that it "shall be implemented consistent with applicable law" and should not "be construed to impair or otherwise affect . . . the authority granted by law to an executive department or agency."

Beginning on January 20, the day of President Trump's inauguration, OPM gave individuals working on the DOGE agenda access to at least fourteen OPM systems, most of which contain PII. OPM conducted two early audits of this access, a "February Audit" and a "March Audit," and there are certain unexplained discrepancies between these audits.[5] June 9 Opinion, 786 F. Supp. 3d at 671-72. The March Audit identified twenty DOGE-related individuals who were granted access to OPM systems during the period January 20 to March 6. Almost all of that access was "administrative" access.

---

[5] In their December 12 brief filed in opposition the plaintiffs' motion for extra-record discovery, the defendants explain that where discrepancies exist between the two audits, the February Audit is more reliable.

Among those twenty individuals, three were in leadership positions at OPM: Ezell, the Acting Director; Hogan, the CIO; and Amanda Scales, the Chief of Staff to the OPM Director.  The June 9 Opinion also discussed a "Group of Seven," consisting of OPM-2 through OPM-7 and James Sullivan (formerly known as OPM-8), and a "Group of Ten," consisting of OPM-9 through OPM-18.  Id. at 672-75.  Individuals in the Group of Seven tended to have a background in the technology industry, and some were unusually young and inexperienced.  Most individuals in the Group of Seven appeared not to work solely or even primarily for OPM, having either performed work for other agencies or not having received paychecks from OPM.  The record contains relatively little information regarding individuals in the Group of Ten.[6]

As explained in the June 9 Opinion, the plaintiffs are likely to succeed in showing that at least OPM-3 through OPM-6 are not OPM employees within the meaning of the Privacy Act -- a holistic assessment that involves evaluating what work they do,

---

[6] In opposing the plaintiffs' motion for a preliminary injunction, the Government took the position that it did not need to provide documents pertaining to the Group of Ten in the administrative record because the March Audit did not reflect that as of March 6 those ten individuals had logged in to OPM systems.  Pursuant to an Order of June 27, certain documents pertaining to the Group of Ten have been included in the supplemental administrative record.  Nonetheless, there is still little information in the record about these individuals.

who supervises them, and other circumstances of the
relationship.  Id. at 686.  OPM-3 through OPM-6 have been
appointed or detailed to other agencies concurrently with OPM.
Id. at 672-74.

The plaintiffs are also likely to succeed in showing that
individuals working on the DOGE agenda did not need the access
that OPM gave them.  The record reflects that few of the
relevant individuals ever logged in to OPM systems, despite
having administrative access to those systems.  Id. at 687.
Ezell and Hogan made statements indicating that access had been
granted in anticipation that it might be needed, which does not
qualify as a showing of need under the Privacy Act.  Id.  Any
"need" for such anticipatory grants of access was also
undermined by Hogan's testimony that a request for access can be
satisfied within minutes.  Id.

OPM's disclosures were not limited to granting the ability
to directly access OPM systems.  Individuals working on the DOGE
agenda also accessed PII in OPM systems through career OPM
staff, a scenario in which only career OPM staff needed to log
in to the system.  For example, PII was extracted by OPM career
staff and made available to at least OPM-2 and Hogan when OPM
created the Government-Wide Email System.  Id. at 681, 686 n.36.
Hogan also testified at the preliminary injunction hearing that

13

OPM career staff may have extracted data for individuals working on the DOGE agenda on other occasions, including for a retirement services modernization project.  Id.

OPM ignored many of its privacy and cybersecurity safeguards in connection with DOGE Agents.  While incoming OPM employees are ordinarily required to complete its Cybersecurity and Privacy Awareness Training, many DOGE Agents only acknowledged their completion of the training weeks after each of them had been given access to OPM systems.  Id. at 674-75, 689.  In granting the DOGE Agents administrative access, OPM also violated core cybersecurity principles that it purports to follow, such as the principle of least privilege.  Id. at 689.

OPM has represented, both in the September 30 revised access report and in the December 5 Ashmore declaration, that no DOGE Agents currently have access to the plaintiffs' PII in any OPM system.  Only five DOGE Agents presently remain at OPM -- OPM-2, OPM-3, OPM-5, OPM-10, and OPM-18.[7]  Ezell, Hogan, and Scales (who are not defined as DOGE Agents) are also no longer at OPM.  The Government also represents that no "DOGE Team" exists at OPM.

---

[7] As of June 20, four DOGE Agents -- OPM-2, OPM-3, OPM-5, and OPM-6 -- had access to the plaintiffs' PII.  In total, eight DOGE Agents were still at OPM at that time: OPM-2, OPM-3, OPM-4, OPM-5, OPM-6, OPM-10, OPM-16, and OPM-18.

The record contains the following relevant background about the DOGE Agents remaining at OPM:

- OPM-2 was appointed on January 20 as an expert in the OPM Office of the Director, for a temporary appointment not to exceed 180 days. On March 18, clearance was requested to convert him to permanent appointment. On May 29, a background investigation was favorably adjudicated and he was cleared for a permanent appointment. OPM-2 does not receive a paycheck from OPM and works at OPM on an intermittent schedule basis. According to a February 3 Musk Watch article, he previously worked at the Boring Company, which is owned by Musk. OPM-2 had access to OPM systems containing PII between January 28 and July 30.

- OPM-3 was appointed on January 20 as an expert in the Office of the Director, with a temporary appointment not to exceed 180 days. After OPM-3's temporary employment expired on July 18, it was requested that his position be converted to a permanent appointment. A prior background investigation that closed on April 21 was reviewed, and OPM-3 was "reciprocally approved" for a permanent position on August 7. He has also been appointed to the Social Security Administration ("SSA"), which pays his salary, and the Department of Education ("DOE"). This arrangement was detailed in an inter-agency memorandum of understanding executed on February 12 and 13 by OPM, SSA, and DOE. He does not receive a paycheck from OPM. He works at OPM on an intermittent schedule basis. OPM-3 was 21 years old when appointed to OPM. According to the February 3 Musk Watch article, he previously interned at Meta and Palantir. OPM-3 had access to OPM systems containing PII between January 20 and July 21, when his network credentials were deactivated after his temporary employment expired. His network credentials were reactivated on August 8, but he has not been granted access permissions to systems containing the plaintiffs' PII since then. He was also added to two access groups in January and only removed from them on November 26, but OPM has determined after an investigation that he lacked additional elements that would have enabled him to view PII through those access groups.

- OPM-5 was appointed on January 20 as a Senior Advisor to the Director for Information Technology, with a temporary

transitional appointment.  On January 29, it was
requested that his position be converted to a permanent
appointment. He became a permanent employee on February
18, the requirement of completing a pre-appointment
background investigation having been waived.  A
background investigation was completed on March 18 and
favorably adjudicated on March 21.  He has also been
detailed to the General Services Administration, the
Internal Revenue Service, the U.S. Agency for
International Development, the Department of Agriculture,
and the U.S. Agency for Global Media.  He is also a
member of the DOGE team at the Department of the
Treasury.  He has been identified by courts as having
been involved in workforce reductions at USAID and CFPB.
Does 1-26 v. Musk, No. 25cv462, 771 F. Supp. 3d 637,
655-56 (D. Md. Mar. 18, 2025) (USAID); Nat'l Treasury
Emps. Union v. Vought, No. 25cv0381, 778 F. Supp. 3d 144,
148-49 (D.D.C. Apr. 18, 2025) (CFPB).  Emails contained
in an administrative record produced by USDA in separate
litigation indicate that he has also been involved in
workforce reductions at that agency.  OPM-5 was 25 years
old when appointed to OPM.  He receives a paycheck from
OPM but works at OPM on an intermittent schedule basis.
According to the February 3 Musk Watch article, he
previously worked at Twitter.  OPM-5 had access to OPM
systems containing PII between January 20 and September
22.

- OPM-10 is a lawyer associated with DOGE.  He was
  appointed on January 30 as a Senior Advisor in the OPM
  Office of the Director.  He has been detailed to USDS and
  reports to the USDS Administrator, although OPM continues
  to pay his salary.  This arrangement is detailed in an
  inter-agency memorandum of understanding executed on
  February 7 and 10 by OPM and USDS.  OPM-10 had access to
  OPM systems containing PII beginning on February 7, and
  no longer had such access as of June 20.

- OPM-18 was appointed on January 20 as a Senior Advisor in
  the OPM Office of the Director.  OPM-18 had access to OPM
  systems containing PII beginning on January 24, and no
  longer had such access as of June 20.

On multiple occasions, OPM removed permissions from DOGE

Agents shortly before filing reports in this litigation.  Access

16

to multiple OPM systems was removed for OPM-2, OPM-3, and OPM-6 between July 21 and July 30, not long before the August 1 report.  As noted, the corrected September 30 report reflected other permissions that had been overlooked in the August 1 report.  Those permissions were removed on August 8, September 22, and September 29.[8]

The record continues to reflect that few DOGE Agents logged into the OPM systems to which they were given access.  According to the March Audit, only Hogan, Scales, Sullivan, and OPM-6 logged in to any systems between January 20 and March 6.  In addition, the September 30 revised access report reflects that OPM-3, OPM-5, and OPM-6 logged in to certain systems between April and July.

II.  Additional Procedures Implemented by OPM

As noted, pursuant to the preliminary injunction, the Government filed a report on July 18 that described procedures that had been put in place by OPM since March 6 to ensure adherence to the requirements of the Privacy Act with respect to any new grant of access permissions by OPM to any records containing PII of the plaintiffs.  OPM began the July 18 report,

---

[8] These are not the first examples of the defendants taking action on the eve of filings in this litigation.  For example, certain DOGE Agents completed training on February 19, the day that the defendants filed a TRO opposition brief.  June 9 Opinion, 786 F. Supp. 3d at 687-88.

however, by claiming that its "established processes and procedures that were in place prior to March 6, 2025" were already "adequate to ensure compliance with the Privacy Act."

OPM then described two additional procedures that it had implemented after March 6.  First, since April, OPM had documented "the applicable Privacy Act provision(s) which allow for access to PII in a specified OPM data system for individuals who will be granted access in connection with high profile initiatives, which include projects that could be construed as falling under the 'DOGE agenda.'"  Second, OPM had adopted interim protocols "in response to this court's preliminary injunction opinion and order," which were described in an internal OPM memorandum sent by Hogan on July 18, the day of the report.  These protocols were to be followed before granting new access to PII contained in OPM systems to "(1) any [USDS] employee, contractor, or detailee, or (2) any OPM employee, contractor, or detailee hired after January 20, 2025, and who requires access for the primary purpose of working on an initiative or project involving DOGE."

The December 5 Ashmore declaration explains that OPM has now formalized the interim protocols described in the July 18 report and clarified "that they apply to all new employee[s] and contractors requiring access to OPM systems containing PII."

These protocols have been made part of OPM's updated
Cybersecurity and Privacy Policy, which was approved by OPM
Director Scott Kupor on November 18 and announced via email to
all OPM employees on November 20.  Specifically, the protocols
are as follows:

> The following protocols shall be used for new
> employees and contractors requiring access to OPM
> systems containing PII.  Before an individual is
> provided with access to an OPM system or systems
> containing PII, the SO [system owner] must take the
> following steps:
>
> > i.  Confirm with CISO [the Cybersecurity
> > Information Officer] that the person has
> > completed Cybersecurity and Privacy Awareness
> > training and completed [the] Rules of Behavior
> > acknowledgement which are included as part of the
> > training.
> >
> > ii.  Confirm with CHCO [the Chief Human Capital
> > Officer] that the individual has been properly
> > appointed or detailed.
> >
> > iii.  Confirm with FSEM [Facilities, Services,
> > and Emergency Management] that the individual has
> > been appropriately vetted and they have been
> > cleared for entrance on duty.
> >
> > iv.  Confirm with SAOP [Senior Agency Official
> > for Privacy] that the above steps have been
> > taken, provide an explanation for need to access
> > the system(s), and receive written approval from
> > the SAOP that the access fits within the "need to
> > know" criteria of the Privacy Act.

## Discussion

III. The Defendants' Motion to Dismiss

The defendants primarily move to dismiss based on mootness, but also argue that the plaintiffs' claims are no longer ripe. As explained below, both arguments fail.

A.   Mootness

Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2.  "The mootness doctrine is derived from that constitutional requirement -- it ensures that a litigant's interest in the outcome continues to exist throughout the life of the lawsuit." Neurological Surgery Prac. of Long Island, PLLC v. United States Dep't of Health & Hum. Servs., 145 F.4th 212, 223 (2d Cir. 2025) (citation omitted).  "A case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome, making it impossible for a court to grant any effectual relief whatever to the prevailing party." Doe v. McDonald, 128 F.4th 379, 385 (2d Cir. 2025) (citation omitted).  "The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." Neurological Surgery Prac., 145 F.4th at 223 (citation omitted).  "When that happens and the parties lack a legally cognizable interest in the outcome, a case is moot and

the federal court is divested of jurisdiction over it."  Id.
(citation omitted).  "As long as the parties have a concrete
interest, however small, in the outcome of the litigation, the
case is not moot."  Chafin v. Chafin, 568 U.S. 165, 172 (2013)
(citation omitted).  A request for declaratory relief becomes
"moot if the dispute is no longer embedded in any actual
controversy about the plaintiffs' particular legal rights."
Already, LLC v. Nike, Inc., 568 U.S. 85, 91 (2013) (citation
omitted).

The parties discuss two exceptions to the mootness
doctrine.  Under one exception, a suit is not moot "if it
targets conduct which is capable of repetition, yet evading
review."  Doe, 128 F.4th at 386 (2d Cir. 2025) (citation
omitted).  "This rule applies only in exceptional situations
where (1) the challenged action is in its duration too short to
be fully litigated prior to its cessation or expiration, and (2)
there is a reasonable expectation that the same complaining
party would be subjected to the same action again."  Id. at
386-87 (citation omitted).  There is a "reasonable expectation"
of repetition if repetition is "probable" rather than a "mere
physical or theoretical possibility."  Id. at 387 (citation
omitted).  "[M]ere speculation . . . does not rise to the level
of a reasonable expectation or demonstrated probability of

21

recurrence." Town of Newburgh v. Newburgh EOM LLC, 151 F.4th 96, 102 (2d Cir. 2025) (citation omitted). If the suit is otherwise moot, the party seeking application of this exception "bears the burden of demonstrating that this controversy is indeed 'capable of repetition, yet evading review.'" Video Tutorial Servs., Inc. v. MCI Telecommunications Corp., 79 F.3d 3, 6 (2d Cir. 1996).

As another exception to the mootness doctrine, "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." Neurological Surgery Prac., 145 F.4th at 223 (citation omitted). "Instead, to render the case moot, a defendant must demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." Id. (citation omitted). This is a "formidable burden" for a defendant, including the Government, to carry. FBI v. Fikre, 601 U.S. 234, 241 (2024) (citation omitted). This exception addresses the possibility that "the defendant, after being sued, tries strategically to moot the case by voluntarily ceasing its allegedly unlawful conduct, only to pick up where it left off

after the case is declared moot." <u>Town of Newburgh</u>, 151 F.4th
at 102 (citation omitted).

   1. Failure to Establish Mootness

  This action is not moot.  The legal issues raised by the
plaintiffs are serious.  The claims filed in this lawsuit and
related Privacy Act litigation have prompted and continue to
prompt significant responses from the Government.  Shortly
before filing this motion to dismiss, OPM formally adopted new
security protocols.  Five DOGE Agents remain at OPM and may have
indirect access to PII in OPM data systems.  Moreover, the
plaintiffs seek declaratory and injunctive relief.  Whether they
are entitled to either will be determined with the benefit of
the parties' summary judgment briefing.

  Despite the continued relevance of the plaintiffs' claims,
the defendants argue that two actions taken by OPM have rendered
this lawsuit moot and deprive this Court of jurisdiction.  They
assert that OPM's adoption in November of the new internal
protocols for access to PII in its data systems ensure that OPM
will adhere to its obligations under the Privacy Act, and that
none of the DOGE Agents "currently" have access to the
plaintiffs' PII in any OPM systems.  Neither of these actions
have rendered the plaintiffs' claims moot.

To begin with, this lawsuit does not accuse the Government of having failed to create sufficient procedures to protect OPM's systems from risks to privacy and security.  Indeed, as was explained at length in the June 9 Opinion, the Government has many laws, standards, and procedures to protect against such risks, which OPM has long purported to uphold.  See June 9 Opinion, 786 F. Supp. 3d at 662-67.  The plaintiffs do not dispute that.  Nor does the Government claim that it has discovered any gap in its procedures.  To the contrary, the Government has taken the position that "OPM already had established processes and procedures that were in place prior to March 6, 2025, to ensure adherence to the requirements of the Privacy Act -- including appointment, training, vetting, and other data protection and privacy policies and procedures."

Thus, what this lawsuit is fundamentally about is not whether OPM had sufficient procedures to safeguard its systems from risks to privacy and security, but whether OPM violated the law in spite of its procedures when it granted individuals working on the DOGE agenda broad access to highly sensitive and legally protected records.  It should be clear, then, that this lawsuit is unlikely to be mooted by the Government creating more procedures.  While the defendants represent that "OPM heard the Court's concerns . . . and addressed them in its formalized

access control protocols," it is ultimately no more difficult for OPM to ignore these new protocols than to ignore its old procedures.

Even if it could be assumed for purposes of this analysis that OPM will always follow its new protocols, that still would not moot this lawsuit. An important feature of the protocols is that they require "an explanation for need to access the system(s)" and "written approval from the SAOP [Senior Agency Official for Privacy] that the access fits within the 'need to know' criteria of the Privacy Act." But the defendants still take the position that the "need to know" criteria of the Privacy Act was satisfied in January 2025 when OPM granted DOGE Agents broad access to OPM systems because that access might later be needed -- a rationale that the Court has rejected. June 9 Opinion, 786 F. Supp. 3d at 687. The defendants argue that "OPM's election not to appeal this Court's preliminary injunction decision shows that OPM is not vigorously defending its prior conduct," yet at the same time they maintain that OPM "does not concede" that its prior grants of access violated the law. With that context, the defendants have failed to show that OPM's new protocols, however admirable, will prevent OPM from improperly deeming the "need to know" criteria to be satisfied based on similar anticipatory grants of access.

Nor is that the only type of Privacy Act violation that could still occur under the new protocols. For example, the new protocols do not verify that only individuals who are OPM employees within the meaning of the Privacy Act will be given access to OPM systems containing PII, as is legally required when invoking the exception under 5 U.S.C. § 552a(b)(1). See id. at 686. Moreover, the new protocols only address the circumstances in which an individual is given direct access to an OPM system. But the record reflects that individuals working on the DOGE agenda also accessed PII extracted from OPM systems by career OPM staff, which only involves the career OPM staff logging in to the system. The protocols do not address the possibility of a Privacy Act violation through that type of disclosure.

The Government's representation that DOGE Agents do not "currently" have access to OPM data systems fares no better. The Government offers no assurance that DOGE Agents' access to OPM systems will not be restored. In fact, the Government's submissions appear to contemplate restoring access to DOGE Agents, and doing so in a manner that would likely violate the Privacy Act. The June 9 Opinion found that the plaintiffs are likely to succeed in showing that OPM-3 and OPM-5 are not OPM employees. Id. The same could well be true of OPM-2 and

OPM-10.  But, without any effort to address those concerns about
the requirement when invoking the exception under § 552a(b)(1)
that disclosures only be made to OPM employees, the Government
indicates that it could again choose to grant access to some of
these DOGE Agents:

> And to the extent OPM decides to grant access to
> certain systems in the future to OPM-2, OPM-3, and
> OPM-5 -- the three current employees of OPM who
> previously had access to Plaintiffs' PII -- they have
> all been properly appointed, vetted, and received the
> appropriate training, and are subject to the same
> access control protocols.

The defendants also argue that this lawsuit is moot because
"the course of events that occurred at OPM in the very first
days of the administration, when operational needs were
admittedly unclear, is unlikely to recur on similar facts and in
the same context."  But the record does not demonstrate that the
situation has changed so fundamentally that this litigation is
now moot.  Again, there has been no admission of wrongdoing by
the Government, and the executive orders that the defendants use
to justify their actions are still in place.  To be sure, as was
explained in the June 9 Opinion, the broad access that OPM
granted was in no way necessitated by any executive order, and
in fact violated the DOGE Executive Order itself.  Id. at
687-89, 691.  But, with the relevant executive orders still in
place and there still being no admission of wrongdoing, the

passage of time since the inauguration does not moot this
litigation.

For the above reasons, the defendants have failed to show
that this lawsuit is moot.  The rejection of the defendants'
arguments, however, should not be read as an expansion of the
claims brought by the plaintiffs, the inquiry to be conducted at
the summary judgment stage, or the relief to which the
plaintiffs may be entitled.  It is simply a determination that
the issues in this case remain live.  In a similar vein, this
rejection does not imply that OPM's new protocols are unwelcome
or irrelevant.  Indeed, the changes in factual circumstances
that the defendants have identified could well be relevant to a
determination of what additional injunctive relief, if any, the
plaintiffs are entitled to.  On this motion, however, the
defendants have taken on the difficult burden of showing that
the Court is deprived of jurisdiction due to mootness.  They
have failed to carry that burden.

2.  Voluntary Cessation

In essence, the defendants' motion is an effort to meet the
burden imposed by the voluntary cessation doctrine.  The
defendants acknowledge that "the formalization of OPM's access
control protocols was spurred by this and other Privacy Act-
related litigation."  OPM formally adopted the new protocols

less than a week before the original November 24 deadline for it
to file this motion.  OPM also voluntarily revoked access to OPM
data systems from DOGE Agents, and the record indicates that
this was done in waves as the defendants made their various
submissions in this litigation.  Therefore, the doctrine of
voluntary cessation requires the defendants to demonstrate that
"(1) there is no reasonable expectation that the alleged
violation will recur and (2) interim relief or events have
completely and irrevocably eradicated the effects of the alleged
violation."  Neurological Surgery Prac., 145 F.4th at 223
(citation omitted).  After all, a case "does not automatically
become moot when a defendant suspends its challenged conduct."
Fikre, 601 U.S. at 243.

     For the reasons discussed above, the defendants have not
shown that there is "no reasonable expectation" that the alleged
violations will recur.  OPM's new protocol does not prevent all
violations of the Privacy Act, and it can be set aside with no
more difficulty than OPM's longstanding policies.  While there
are presently few DOGE Agents at OPM, and none that have direct
access to OPM systems, the Government does not provide adequate
assurance that DOGE Agents will not be granted improper access
in the future.  Moreover, the record reflects that most of the
developments to which the defendants point were prompted by this

and related litigation.  Meanwhile, the executive orders that purportedly permitted OPM's broad and rushed grants of access remain in place and OPM has still admitted no wrongdoing. Although not required, a party's "repudiation of its past conduct may sometimes help demonstrate that conduct is unlikely to recur."  Fikre, 601 U.S. at 244.

The defendants also have not shown that the effects of the alleged Privacy Act violations have been completely and irrevocably eradicated.  As noted, the record reflects that data was extracted from OPM systems and made available to DOGE Agents.  The defendants have previously informed the plaintiffs that three audits are proceeding to address the impact of the access given to DOGE Agents, but the record does not include the current status or results of these audits.  The Government now states that "there is no evidence in the record that anyone's PII has been extracted from OPM systems and disseminated in violation of the Privacy Act."  While that is true, the record is also too sparse to make a determination that such extraction of PII did not occur and did not violate the Privacy Act, or that any PII that was extracted in this manner is still secure or properly remediated.

B.   Ripeness

The defendants argue that, to the extent that there is
reason to expect any future violation of the Privacy Act, any
future violation is not ripe for review.  To be ripe, a case
"must present a real, substantial controversy, not a mere
hypothetical question."  <u>Wildlife Preserves, Inc. v. Romero</u>, 153
F.4th 192, 199 (2d Cir. 2025) (citation omitted).  Ripeness
"overlaps with the standing doctrine, and usually a
determination that a plaintiff has Article III standing is
enough to render its claim constitutionally ripe."  <u>Variscite NY</u>
<u>Four, LLC v. New York State Cannabis Control Bd.</u>, 152 F.4th 47,
58 (2d Cir. 2025) (citation omitted).  "Ripeness has both a
constitutional and a prudential dimension."  <u>Id.</u> (citation
omitted).  Its constitutional dimension derives from Article
III's requirement that there be "a live controversy affecting a
party's rights."  <u>Id.</u> (citation omitted).  Meanwhile, "[t]he
prudential ripeness doctrine allows a court to determine that
the case will be better decided later."  <u>Id.</u> (citation omitted).

The same test is applicable to constitutional ripeness and
prudential ripeness.  <u>Wildlife Preserves, Inc.</u>, 153 F.4th at 199
n.5.  "Determining whether a dispute is ripe for review requires
a two-pronged analysis of (1) whether the issues presented are
fit for review, and (2) what hardship the parties will suffer in

the absence of review." Id. at 199 (citation omitted).  The
fitness inquiry requires courts to consider whether the case
presents a "concrete dispute between the parties," as opposed to
seeking "judicial review of a nonfinal proposed policy" or
presenting "abstract disagreements over administrative
policies."  Id. at 199-200 (citation omitted).  The hardship
inquiry requires courts to "ask whether the challenged action
creates a direct and immediate dilemma for the parties."  Id. at
201 (citation omitted).

The plaintiffs demonstrated Article III standing when
moving for a preliminary injunction, thereby satisfying a
standard no less demanding than that required on a motion for
summary judgment.  June 9 Opinion, 786 F. Supp. 3d at 677-83.
The reasoning in the June 9 Opinion also establishes ripeness.

The defendants' argument that this lawsuit has stopped
being ripe is essentially an argument that litigation over their
past conduct is moot, while litigation over any future conduct
is not ripe.  This argument therefore fails for largely the same
reasons as their argument that this lawsuit is moot.  This
lawsuit is fit for review because it still presents a concrete
dispute between the parties, not an abstract disagreement.  As
explained in the June 9 Opinion, the record reflects likely
violations of the law.  Whether the plaintiffs are entitled to

injunctive or declaratory relief will be addressed when the
parties make their arguments for summary judgment.

There is also a continuing possibility of hardship to the
plaintiffs.  The records at issue in this litigation concern
their most sensitive private affairs.  Relying on the existence
of three audits, the defendants have not yet explained what
happened to any data that was extracted directly or indirectly
by DOGE Agents.  Accordingly, the defendants' assertion that
they have "completely and irrevocably eradicated the effects of
the alleged violation" of the Privacy Act is unsupported by the
record.

IV.  The Plaintiffs' Motion for Extra-Record Discovery

As noted, the plaintiffs seek extra-record discovery
regarding four broad categories of information: "(1) the scope
of and need for access that has been granted; (2) the current
security of OPM systems; (3) the use of data unlawfully
accessed; and (4) mitigation steps taken, if any."  They seek to
obtain this discovery through "a combination of document
requests, interrogatories, and a few depositions."

"[I]n reviewing agency action, a court is ordinarily
limited to evaluating the agency's contemporaneous explanation
in light of the existing administrative record."  Dep't of Com.
v. New York, 588 U.S. 752, 780 (2019).  "That principle reflects

33

the recognition that further judicial inquiry into executive

motivation represents a substantial intrusion into the workings

of another branch of Government and should normally be avoided."

Id. at 780-81 (citation omitted).  The principle that discovery

should not be obtained outside the administrative record "exerts

its maximum force when the substantive soundness of the agency's

decision is under scrutiny."  Esch v. Yeutter, 876 F.2d 976, 991

(D.C. Cir. 1989).

Courts permit supplementation of the administrative record

only under "unusual circumstances."  Animal Legal Def. Fund,

Inc. v. Perdue, 872 F.3d 602, 611 (D.C. Cir. 2017) (citation

omitted).  Such circumstances have been recognized in the

following situations:

> (1) The agency deliberately or negligently excluded
> documents that may have been adverse to its decision;
> (2) the [court needs] to supplement the record with
> background information in order to determine whether
> the agency considered all of the relevant factors; or
> (3) the agency failed to explain administrative action
> so as to frustrate judicial review.

Id. (citation omitted).  Overall, exceptions to the principle

that review should only be based on the administrative record

"are primarily limited to cases where the procedural validity of

the agency's action remains in serious question, or the agency

affirmatively excluded relevant evidence."  Banner Health v.

Price, 867 F.3d 1323, 1335 (D.C. Cir. 2017) (citation omitted).

34

The plaintiffs have not shown that this lawsuit presents
unusual circumstances that warrant extra-record discovery.  It
is a normal feature of litigation against federal agencies that
parties rely on the administrative record produced by the
Government.  Extra-record discovery is rare and constitutes "a
substantial intrusion into the workings of another branch of
Government."  Dep't of Com., 588 U.S. at 780-81 (citation
omitted).  It follows that any extra-record discovery would need
to be targeted and carefully circumscribed.  But the plaintiffs
have made that a difficult task, as they have not described the
discovery they seek with specificity.  Instead, the plaintiffs
request that the Court generally open the door to ordinary civil
discovery for the four broad categories they identify.

The plaintiffs' argument that the current record frustrates
judicial review fails to justify extra-record discovery.
Indeed, the plaintiffs concede that "this Court would be well
within its authority to enter a final judgment against
Defendants based on the existing record."  The plaintiffs also
argue that extra-record discovery is needed in order to fashion
appropriate injunctive relief, but they do not specify what
discovery is needed for that purpose or why.  And while the
plaintiffs point to discrepancies between the February Audit and
the March Audit, those issues do not frustrate judicial review.

The plaintiffs' claim that the defendants have shown bad faith by providing an "incomplete and misleading" record fails. While the plaintiffs correctly point out that the February 19 Hogan declaration was misleading, the defendants provided the relevant information that was missing from that declaration. Likewise, while the defendants' August 1 status report contained an error, the defendants filed a corrected version on September 30. Overall, the plaintiffs do not make a persuasive showing that "the agency affirmatively excluded relevant evidence." Banner Health, 867 F.3d at 1335 (citation omitted). And, once again, the plaintiffs have not explained with specificity what discovery is necessitated by these issues or why.

The plaintiffs also argue in their reply brief that discovery outside the administrative record should be permitted for their ultra vires claim. Because this argument was not raised in the plaintiffs' opening brief, it has been waived. In any event, the plaintiffs have not shown that discovery would be warranted for the ultra vires claim particularly since, in moving for a preliminary injunction, they failed to show a likelihood of success on that claim. As the June 9 Opinion explained, "relief pursuant to the ultra vires claim is inappropriate because the APA already gives the plaintiffs

meaningful relief for the violation of their rights." June 9
Opinion, 786 F. Supp. 3d at 693.

Two other issues raised in the parties' submissions bear
further discussion.  First, although the defendants have
included certain documents post-dating February 11 in the
supplemental administrative record, they argue that the
plaintiffs agreed at the June 20 conference that the proper
temporal scope of the administrative record is January 20
through February 11.  The plaintiffs claim that they only agreed
to this as the temporal scope of the administrative record "for
purposes of identifying the final agency action."  It may be of
assistance to the parties to resolve this dispute, even though
it is not determinative of whether the plaintiffs are entitled
to extra-record discovery.  The defendants are correct as to the
nature of the parties' agreement at the June 20 conference.  The
plaintiffs agreed at that conference that January 20 through
February 11 is the proper temporal scope of the administrative
record, stating as follows: "Your Honor, We agree with the
defendants.  The final agency action was the decision to grant
access to DOGE agents, it preceded the date of the complaint,
and that's when the administrative record should end."

Second, the plaintiffs raise a concern that Government has
not certified the completeness of the administrative record in

37

this action, even though it did so in the <u>Maryland OPM Action</u>. The plaintiffs are correct that the wording of the certifications in this action leaves uncertainty as to the status of the administrative record.  A separate Order will address this issue.

### Conclusion

The plaintiffs' November 24 motion for extra-record discovery is denied.  The Government's December 5 motion to dismiss is denied.

Dated:    New York, New York
          December 19, 2025

                        _____
                            DENISE COTE
                   United States District Judge