**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL-CIO, *et al*.,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. OFFICE OF PERSONNEL MANAGEMENT, *et al*.,<br><br>Defendants. | Case No. 1:25-cv-01237-DLC |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Pages(s)

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES .............................................................................................. iii

PRELIMINARY STATEMENT ......................................................................................... 1

FACTUAL BACKGROUND ............................................................................................... 2

STANDARD OF REVIEW ................................................................................................ 12

ARGUMENT ...................................................................................................................... 13

    I.      PLAINTIFFS HAVE STANDING ................................................................... 13

            A.    Plaintiffs' Injuries Are Concrete. ...................................................... 14

            B.    Plaintiffs' Injuries Are Particularized ............................................... 15

            C.    Plaintiffs' Injuries Are Both Actual and Imminent ........................... 15

            D.    Plaintiffs' Injuries Are Caused by Defendants and Redressable by this Court ........................................................................................... 16

            E.    Plaintiffs' Claims Are Ripe and Not Moot. ....................................... 16

    II.     DEFENDANTS VIOLATED THE PRIVACY ACT ....................................... 17

            A.    Defendants Violated Section (b) of the Privacy Act. ......................... 17

                   1.    Defendants "disclosed" records to DOGE agents. ................. 18

                   2.    DOGE agents did not "need" the records they obtained, as OPM officials admit and Plaintiffs' experts agree ................. 19

                   3.    Many DOGE agents at OPM were functionally employees of other agencies when they received records. ......................... 22

            B.    Defendants Violated Section (e)(10) of the Privacy Act. ................... 24

    III.   DEFENDANTS VIOLATED THE ADMINISTRATIVE PROCEDURES ACT ........ 26

            A.    Defendants' Actions Were Contrary to Law and an Abuse of Discretion ........... 26

            B.    Defendants Engaged in Final Agency Action ....................................... 27

    C.    Plaintiffs Do Not Have Adequate Alternative Remedies ..................................... 27

IV.   PLAINTIFFS DO NOT MOVE FOR SUMMARY JUDGMENT ON THEIR ULTRA VIRES CLAIM...................................................................................... 28

V.    REMEDIES.. ...................................................................................................... 28

CONCLUSION.............................................................................................................. 29

CERTIFICATE OF COMPLIANCE ............................................................................. 31

# TABLE OF AUTHORITIES

Pages(s)

**Cases**

*AFGE v. OPM*,
777 F. Supp. 3d 253 (S.D.N.Y. 2025) ................................................................. 14, 27

*AFGE v. OPM*,
786 F. Supp. 3d 647 (S.D.N.Y. June 9, 2025) ................................................. *passim*

*AFL-CIO v. Dep't of Labor*,
778 F. Supp. 3d 56 (D.D.C. 2025) .............................................................................. 22

*AFSCME v. Social Security Admin.*,
No. 25-1411, 2026 WL 969670 (4th Cir. Apr. 10, 2026) .......................................... 14

*AFT v. Bessent*,
152 F.4th 162 (4th Cir. 2025) ............................................................................. 20, 21

*Ahrens v. Bowen*,
852 F.2d 49 (2d Cir. 1988) ......................................................................................... 17

*Am. Cruise Lines v. United States*,
96 F.4th 283 (2d Cir. 2024) ....................................................................................... 27

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................................... 24

*Bakery Drivers Pension Fund v. Pension Benefit Guar. Corp.*,
136 F.4th 26 (2d Cir. 2025) ....................................................................................... 12

*Bennett v. Spear*,
520 U.S. 154 (1997)..................................................................................................... 27

*Bigelow v. Dep't of Def.*,
217 F.3d 875 (D.C. Cir. 2000).................................................................................... 19

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)..................................................................................................... 12

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)..................................................................................................... 13

*Citizens United v. Chestnut Ridge*,
98 F.4th 386 (2d Cir. 2024) ....................................................................................... 13

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019)..................................................................................... 19

*Hadwan v. U.S. Dep't of State*,
  139 F.4th 209, 221 (2d Cir. 2025) .............................................................. 12

*In re OPM Breach Litig.*,
  928 F.3d 42 (D.C. Cir. 2019).............................................................. 15, 24

*Jud. Watch, Inc. v. Dep't of Energy*,
  412 F.3d 125 (D.C. Cir. 2005).................................................................. 22

*Melito v. Experian*,
  923 F.3d 85 (2d Cir. 2019) ........................................................................ 14

*Mhany Mgt. v. County of Nasau*,
  819 F.3d 581 (2d Cir. 2016) ...................................................................... 17

*Safe Haven Home Care, Inc. v. HHS*,
  130 F.4th 305 (2d Cir. 2025) ..................................................................... 12

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021)...................................................................... 13, 15, 16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016)................................................................................... 27

**Statutes**

40 U.S.C. § 11331............................................................................................ 26

44 U.S.C. § 3554(a)(1)(A) ............................................................................... 26

5 U.S.C. § 1103........................................................................................... 19, 20

5 U.S.C. § 2105(a)(3)........................................................................................ 22

5 U.S.C. § 552a(a)(4) ....................................................................................... 20

5 U.S.C. § 552a(b) ...................................................................................... *passim*

5 U.S.C. § 552a(c)(1).................................................................................. 26, 29

5 U.S.C. § 552a(e)(10)..................................................................................... 24

5 U.S.C. § 706(2)(A)................................................................................... 12, 26

Pub. L. No. 93-579, § 2(a)(4)............................................................................. 1

**Other Authorities**

83 Fed. Reg. 55931-01 ............................................................................................ 20

Exec. Order No. 14,158, 90 C.F.R. 8441 (2025) ................................................... *passim*

H.R. Rep. No. 93-1416 ............................................................................................. 1

Meryl Kornfield, "Whistleblower claims ex-DOGE member says he took Social Security
   data to new job," *Washington Post* (March 10, 2026) .................................... 5

NIST SP 800-53 Revision 5.1, IR-8(1) ................................................................. 29

NIST Special Publication 800-53 Revision 5.1, SI-14(2) ............................... 26, 29

Restatement (Third) Of Agency § 7.03(d)(2) (2006) ........................................... 22

Restatement of Torts § 625B ................................................................................. 14

**Rules**

Fed. R. Civ. P. 12(d) ............................................................................................. 13

Fed. R. Civ. P. 65(a)(2) ........................................................................................... 6

Fed. R. Evid. P. 201(b) ............................................................................................ 6

Fed. R. of Civ. P. 54(d)(2) .................................................................................... 29

**PRELIMINARY STATEMENT**

In enacting the Privacy Act in 1974, Congress proclaimed that the "right to privacy is a personal and fundamental right protected by the Constitution …" Pub. L. No. 93-579, § 2(a)(4). Congress also recognized that "the increasing use of computers and sophisticated information technology … has greatly magnified the harm to individual privacy that can occur from any collection, maintenance, use, or dissemination of personal information." *Id.* § 2(a)(2). The House Report emphasized the ways that federal agencies used new technologies during the McCarthy and Watergate eras to intrude on the information privacy of the public and the federal workforce. H.R. Rep. No. 93-1416 at 5, 8–9.

Thus, the Privacy Act strictly limits the power of agencies to needlessly disclose personal information between agencies and employees. The Privacy Act also requires the government to adopt high levels of data security against both internal and external threats. On January 20, 2025, such a threat materialized as the so-called Department of Government Efficiency ("DOGE") deployed agents across the government, including at the Office of Personnel Management ("OPM")—the federal government's human resources department.

Nearly a year ago, this Court found a clear and substantial likelihood that Defendants violated the law when OPM systematically disclosed millions of personnel records to DOGE agents—regardless of need, employment status, proper vetting or training, or cybersecurity safeguards. The legal arguments establishing the Privacy Act violations today are largely the same as they were then. But now, even more undisputed evidence shows that DOGE agents at OPM functionally work for DOGE itself and never needed the records that OPM gave them. For example, a new DOGE agency roster shows that at least ten DOGE agents at OPM worked for DOGE, a fact Defendants omitted from the administrative record in this case. Defendants also

1

have failed to mitigate the cybersecurity harms they created. Therefore, Plaintiffs are entitled to judgment as a matter of law based on Defendants' willful violations of the Privacy Act, and in turn the Administrative Procedures Act.

At this stage, Defendants no longer mount a serious legal defense of the challenged conduct they deliberately engaged in, but they continue to insist on its legality. Based on the administrative record before it, the Court should now provide an effective remedy for Defendants' illegal conduct by prohibiting Defendants from misapplying records disclosure exceptions in the Privacy Act; by cutting off DOGE agents' access to OPM records inside and outside OPM systems; and by requiring Defendants to create and accounting for such disclosures and mitigate the ongoing cybersecurity harms that their willful violations created.

## FACTUAL BACKGROUND

### Early Action in the Administration

On January 20, 2025, President Trump signed an executive order establishing the U.S. DOGE Service ("DOGE" or "USDS") ostensibly for "modernizing federal technology and software." Exec. Order No. 14,158, 90 C.F.R. 8441 (2025) ("E.O."). Among other things, the E.O. mandates that "Agency Heads shall take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems." E.O. § 4(b).

Starting that same day, OPM began to give 16 DOGE agents[1] administrative access to at least 14 computer systems, and OPM thereby disclosed the highly sensitive records of millions

---

[1] "DOGE agent" refers to the Court's definition in its Preliminary Injunction order, ECF. No 134 at 3; "OPM-000001" refers to the administrative record, ECF Nos. 78-2 & 168-3 ("Administrative Record"); "Def. Br." refers to Defendants' opening summary judgment brief, ECF No. 201; and citations to page numbers in the docket refer to the blue ECF page numbers.

of Americans in those systems. OPM-000089–91; OPM-000103. The OPM systems that contain personal records include: the Electronic Official Personnel Folder ("eOPF"); the Enterprise Human Resources Integration Data Warehouse ("EHRI"); USA Performance; USA Staffing; USAJobs; Federal Employee Health Benefits (FEHB"); Postal Service Health Benefits ("PSHB"); and OPM Data. *Id.*[2] These systems contain personal records, such as social security numbers, banking information, and health care information, including information about family members' health care, according to these systems' Privacy Impact Assessments. *See* ECF Nos. 85-9, 85-10, 85-11, 85-12. Plaintiffs' and their members are current and former government employees, and their records reside in those databases. ECF. No. 30 ¶¶ 9–11 ("Kelley Decl."); ECF No. 29 ¶¶ 6–11 ("Ramrup Decl."); ECF No. 31 ¶¶ 4–6 ("Toussant Decl.").

OPM disclosed these sensitive personal records to DOGE agents in a chaotic and insecure fashion. Following a "911-esque" call around January 20, 2025, OPM's IT team gave three DOGE engineers (Akash Bobba, Gavin Kliger, and Brian Bjelde) administrative access to sensitive records systems. OPM-000107. On January 28, 2025, OPM's IT director told the team that three other DOGE engineers (Riccardo Biasini, Edward Coristine, and Nikhil Rajpal) "need to have access today," describing it as an "urgent request from political tech staff." OPM-000108. By February 7, 2025, every DOGE agent had administrative access to at least one OPM records system. OPM-000103.

OPM's then-Acting Director Chuck Ezell dismissed the need to follow standard security protocols, writing that DOGE engineers "won't have a lot of time to go through a lot of

---

[2] Defendants dispute that USA Performance contains information protected by the Privacy Act. Def. Br. 11 n.5. In fact, Plaintiffs have previously introduced a publicly accessible Privacy Impact Assessment describing the protected records in USA Performance. *See* ECF No. 85-11 at 6 (listing "full name, social security number, grade, series, work location, work email address, organization, work phone number, position title, and supervisory status.")

presentations on what the systems are and what the program officers feel about the programs, etc." OPM-000027. At the same time, career staff in OPM's Office of the Chief Information Officer were stripped of their own access permissions, preventing them from seeing what DOGE engineers were doing. OPM-000026. Many DOGE agents received administrative access to sensitive records systems before acknowledging completion of even basic cybersecurity training, and many others never completed that training at all. IT and cybersecurity experts—including David Nesting, Ann Lewis, and Bruce Schneier—raised alarm about these actions. *See* ECF. No. 86 ("Lewis Decl."); ECF No. 87 ("Nesting Decl."); ECF No. 88 (Schneier Decl."); ECF No. 110 ("Second Nesting Decl.").

OPM tried to justify its massive disclosures of personal records to DOGE agents by claiming the agency needed to be prepared for some unknown future event. As first articulated by Ezell on January 27, 2025: "Right now we don't have immediate plans to change anything but if we need to we might need to move quickly." OPM-000028–29.

**Preliminary Injunction and Current Harm**

On June 9, 2025, the Court ruled that Plaintiffs were entitled to a preliminary injunction, finding that OPM likely violated the Privacy Act's disclosure and cybersecurity requirements. *AFGE v. OPM*, 786 F. Supp. 3d 647, 677 (S.D.N.Y. June 9, 2025) ("*June 9 Opinion*").

On November 18, 2025, OPM updated its Cybersecurity and Privacy Policy in a section titled "Access Control." ECF No. 168-2. On September 30, 2025, OPM's acting Chief Information Officer Perryn Ashmore declared that no DOGE agents "currently" have access to the plaintiffs' PII in any OPM system. ECF No. 148 at 5. Two DOGE Agents remain at OPM: Biasini and Noah Peters. Def. Br. 5. As of at least December 24, 2025, DOGE records showed

that at least five DOGE agents at OPM remained at DOGE itself: Biasini, Bobba, Anthony

Armstrong, Christopher Stanley, and Peters. *Infra* 6–12.

Today, the Privacy Act violations and resulting harm remain. The DOGE executive order

remains in effect, and OPM continues to misconstrue it in a manner that violates the Act.

Namely, Defendants continue to erroneously maintain that the need "to be prepared" is an

appropriate justification for disclosure of records to DOGE agents under the Act, and they have

not disclaimed invoking this justification in the future. *See* ECF No. 148 at 6–7 ("access was

granted in order to be prepared to implement changes"). Multiple DOGE agents remain

employed by OPM or DOGE. Separately, OPM has not implemented required cybersecurity

measures to mitigate harm of past illegal disclosures, though OPM's then-CIO Greg Hogan

testified that OPM employees extracted personal information and gave it to DOGE agents on at

least two occasions. *June 9 Opinion*, 786 F. Supp. 3d at 676, 681. Indeed, OPM explicitly chose

not to investigate or address any movement of records from OPM systems to DOGE systems or

elsewhere, even after revelations that this happened at other agencies. ECF No. 148 at 5 ("No

further mitigation procedures are contemplated with respect to past access granted to such

DOGE agents.").

At other agencies like the Social Security Administration (SSA), DOGE affiliates took

personal records from SSA and sent them to the DOGE agency or other places. *See AFSCME v*

*SSA*, 1:25-cv-00596-ELH, ECF No. 197 (D. Md.) ("Trujillo Decl., Ex. A").[3] In particular, a

member of the DOGE team at SSA emailed at least 1,000 people's records to Steve Davis, who

worked as a senior advisor at the DOGE agency. *Id.* at 2–3. During that time, Davis also

---

[3] *See also* Meryl Kornfield, "Whistleblower claims ex-DOGE member says he took Social
Security data to new job," *Washington Post* (March 10, 2026) ("Trujillo Decl., Ex B").

5

supervised numerous DOGE agents at OPM. *See* OPM-000253; OPM-000286. Separately, DOGE affiliates sent and stored SSA records on an unapproved third-party server. Trujillo Decl., Ex. A at 6. Two DOGE agents at OPM (Bobba and Rajpal) also worked at SSA. *Infra* at 6–12.

**Biography of DOGE agents**

Below is a biographical summary for each DOGE agent at OPM. Because Defendants' Administrative Record and declarations contain omissions and misstatements—ECF No. 171 at 14–16 (listing examples)—this summary is supplemented with court filings from other cases. *See The Authors Guild v. NEH*, 1-25-cv-03923-CM, ECF No.122-2 (S.D.N.Y Feb. 17, 2026) ("Trujillo Decl., Ex. C"). News reports are cited to identify previous employment.[4] *See* ECF 37-14 ("Musk Watch Article"); "Elon Musk's Demolition Crew," *ProPublica* (Feb. 6, 2025) ("Trujillo Decl., Ex. D"). Plaintiffs have also created a summary of this information and attached it as an exhibit, solely for ease of reference. *See* Trujillo Decl., Ex. E.

*Riccardo Biasini (OPM-2):* From January 20, 2025, to the present, Biasini has worked as a senior advisor at OPM. OPM-000006–08; OPM-000178; Def. Br. 5. He does so on an "intermittent scheduled basis." ECF No. 148 at 8. He is known as a "DOGE engineer" by OPM colleagues. OPM-000026-000027. Biasini did not receive a paycheck from OPM. OPM-000007. Biasini also has been detailed to DOGE from January 27, 2025, to the present. *See* Trujillo Decl., Ex. C at 1. While at OPM, Biasini has received administrative access to OPM Data, FEHB,

---

[4] Earlier, the Court properly relied on news reports to identify previous employment. *June 9 Opinion*, 786 F. Supp. 3d at 674 n.24. *See also* Fed. R. Civ. P. 65(a)(2) ("[E]vidence that is received on the [preliminary injunction] motion and that would be admissible at trial becomes part of the trial record and need not be repeated at trial."). The Court may also take judicial notice of these reports because they are not subject to reasonable dispute. *See* Fed. R. Evid. P. 201(b).

PSHB, and USA Performance, as well as access to eOPF and EHRI. OPM-000103. Biasini previously worked for the Boring Company, according to the Musk Watch Article.

*Akash Bobba (OPM-3):* From January 20, 2025, to March 7, 2026, Bobba worked as a "expert" at OPM. OPM-000010; ECF. No 202-1. He worked on an "intermittent scheduled basis." ECF No. 148 at 8. He was known as a "DOGE engineer" by OPM colleagues. OPM-000026–27. Bobba did not receive a paycheck from OPM. OPM-000012. Bobba also has been detailed to DOGE from January 27, 2025, to the present. *See* Trujillo Decl., Ex. C at 1. Bobba also worked at the Department of Education and SSA. OPM-000013. While at OPM, Bobba received administrative access to OPM Data and USA Performance, and access to eOPF Azure PROD SQL Account, eOPF Azure PROD Subscription Access, eOPF Azure PROD Storage Account Access, and eOPF Azure PROD Key Vault Access. OPM-000103; ECF No. 148 at 9. Bobba previously interned for Meta and Palantir, according to the Musk Watch Article. While OPM declared that Bobba acknowledged completing cybersecurity training on February 19, 2025, ECF No. 96 ¶ 18, there is no supporting evidence in the record.

*Edward Coristine (OPM-4):* From January 24 to at least May 13, 2025, 19-year-old Coristine worked as an "expert" at OPM. OPM-000014; 000192; ECF No. 168 ¶ 12. Plaintiffs are aware of no documentary evidence of him leaving OPM. *Id.* He is known as a "DOGE engineer" and "DOGE employee" by OPM colleagues. OPM-000026-000027; OPM-000194. Coristine did not receive a paycheck from OPM. OPM-000015. Coristine also was detailed to DOGE from January 20 to June 9, 2025. *See* Trujillo Decl., Ex. C at 4. Coristine also worked at the General Services Administration (GSA) and Department of Health and Human Services (HHS). ECF No. 96 ¶ 9; ECF No. 85-1 at 11–12. While at OPM, Coristine received administrative access to USA Performance, OPM Data, FEHB, and PSHB, as well as access to

eOPM and EHRI. OPM-000103. Coristine previously worked for Path Networks, where he was fired after "an internal investigation into the leaking of proprietary company information that coincided with his tenure," according to a February 7, 2025, Bloomberg article. ECF No. 85-7 at 3. Even after learning of this report, OPM did not further investigate it. *June 9 Opinion*, 786 F. Supp. 3d at 673. He previously interned for Neuralink, according to the Musk Watch Article. While OPM declared that Coristine acknowledged completing cybersecurity training on February 19, 2025, ECF No. 96 ¶ 18, there is no supporting evidence in the record. Press reports indicate that he is known online as "Big Balls." *June 9 Opinion*, 786 F. Supp. 3d at 673.

*Gavin Kliger (OPM-5):* From January 20 to December 27, 2025, Kliger worked as a senior advisor at OPM. OPM-000017; ECF No. 202-2. He has since moved to an unknown agency inside the government. ECF No. 202-2. He worked at OPM on an "intermittent scheduled basis." ECF No. 148 at 8. He was known as a "DOGE engineer" by OPM colleagues. OPM-000026–27. Kliger was paid $195,200 per year by OPM. OPM-000017. Kliger also worked at the U.S. Agency for International Development (USAID), U.S. Agency for Global Media (USGM), the Department of Agriculture, GSA, and the Internal Revenue Service (IRS). ECF No. 96 ¶ 11. While at OPM, Kliger received administrative access to OPM Data, USA Performance, FEHB, PSHB, and GWES-Mailbox Access. OPM-000103; ECF No. 148 at 9. Kliger previously worked for Twitter, according to the Musk Watch Article. On January 18, 2025, Kliger acknowledged completing cybersecurity training. OPM-000176.

*Nikhil Rajpal (OPM-6):* From January 24 to July 02, 2025, Rajpal worked as an "expert" at OPM. OPM-000021–22; OPM-000301. He was known as a "DOGE engineer" and "DOGE employee" by OPM colleagues. OPM-000026–000027; OPM-000194. Rajpal did not receive a paycheck from OPM. OPM-000021. Rajpal also was detailed to DOGE from January 27 to June

9, 2025. Trujillo Decl., Ex. C at 1. Rajpal also worked at the Department of Commerce, the Consumer Financial Protection Bureau (CFPB), and SSA. ECF No. 96 ¶ 13. While at OPM, Rajpal received administrative access to OPM Data, USA Performance, USA Staffing, Agency talent Portal, EHRI, GWES-Mailbox Access, FEHB, and PSHB. OPM-000103; ECF No. 148 at 9. Rajpal previously worked for Twitter. Trujillo Decl., Ex. D. While OPM declared that Rajpal acknowledged completing cybersecurity training on February 19, 2025, ECF No. 96 ¶ 18, there is no supporting evidence in the record.

*Brian Bjelde (OPM-7):* From January 20 to May 16, 2025, Bjelde worked as an "expert" at OPM. OPM-000111; OPM-000303. Bjelde did not receive a paycheck from OPM. OPM-000113. While at OPM, Bjelde received administrative access to USA Performance and USA Staffing. OPM-000103. Bjelde previously worked for Space X, according to the Musk Watch Article. On January 19, 2025, Bjelde acknowledged completing cybersecurity training. OPM-000175.

*Anthony Armstrong (OPM-9)*: From January 20 to June 6, 2025, Armstrong worked as an "expert" at OPM. OPM-000238; OPM-000245. Armstrong did not receive a paycheck from OPM. OPM-000238. Armstrong has volunteered at DOGE from January 27, 2025, to the present. Trujillo Decl., Ex. C at 1. While at OPM, Armstrong received administrative access to OPM Data, USA Performance, FEHB, and PSHB. OPM-000103. There is no evidence in the record that Armstrong completed cybersecurity training.

*Austin Raynor (OPM-10):* From January 30 to December 22, 2025, Raynor worked as a senior advisor at OPM. OPM-000249; ECF No. 202-3. Raynor was paid $195,200 per year by OPM. OPM-000249. Raynor also was detailed to DOGE from February 5 to December 19, 2025. Trujillo Decl., Ex. C at 1. While at OPM, Raynor received administrative access to USA

9

Performance. OPM-000103. There is no evidence in the record that Raynor completed cybersecurity training.

*Bryanne-Michelle Mlodzianowski (OPM-11):* From February 3 to March 5, 2025, Mlodzianowski worked as an "expert" at OPM. OPM-000256; OPM-000257. Mlodzianowski did not receive a paycheck from OPM. OPM-000256. While at OPM, Mlodzianowski received administrative access to USA Performance. OPM-000103. Mlodzianowski previously worked for Space X. Trujillo Decl., Ex. D. There is no evidence in the record that Mlodzianowski completed cybersecurity training.

*Christina Hanna (OPM-12):* From February 3 to March 5, 2025, Hanna worked as an "expert" at OPM. OPM-000260; OPM-000261. Hanna did not receive a paycheck from OPM. OPM-000260. While at OPM, Hanna received administrative access to USA Performance. OPM-000103. Hanna previously worked for Space X. Trujillo Decl., Ex. D. There is no evidence in the record that Hanna completed cybersecurity training.

*Christopher Stanley (OPM-13):* From January 28 to February 16, 2025, Stanley worked as an "expert" at OPM. OPM-000264; OPM-000266. Stanley did not receive a paycheck from OPM. OPM-000264. Stanley also has worked as an employee at DOGE from January 31, 2025, to the present. Trujillo Decl., Ex. C at 4. While at OPM, Stanley received administrative access to USA Performance. OPM-000103. Stanley previously worked for X and SpaceX. Trujillo Decl., Ex. D. There is no evidence in the record that Stanley completed cybersecurity training.

*Christopher Young (OPM-14):* From January 30 to June 6, 2025, Young worked as an "expert" at OPM. OPM-000270; OPM-000274. His standard Form 50 was not approved, however, until April 09, 2025. OPM-000270. Young did not receive a paycheck from OPM. OPM-000270. Young also was detailed to DOGE from February 5 to June 13, 2025. Trujillo

10

Decl., Ex. C at 1. Young also worked at the CFPB. OPM-000272–73. While at OPM, Young received administrative access to USA Performance. OPM-000103. Young previously worked for a political organization started by Elon Musk. Trujillo Decl., Ex. D. There is no evidence in the record that Young completed cybersecurity training.

*Stephen Duarte (OPM-15):* From February 3 to March 5, 2025, Duarte worked as an "expert" at OPM. OPM-000278–79. Duarte did not receive a paycheck from OPM. OPM-000278. While at OPM, Duarte received administrative access to USA Performance. OPM-000103. Duarte previously worked for Space X. Trujillo Decl., Ex. D. There is no evidence in the record that Duarte completed cybersecurity training.

*Jacob Altik (OPM-16):* From January 24 to June 27, 2025, Altik worked as a senior advisor at OPM. OPM-000282; OPM-000287. Altik was paid $195,200 per year by OPM. OPM-000282. Altik also was detailed to DOGE from January 27 to June 27, 2025. Trujillo Decl., Ex. C at 1. While at OPM, Altik received administrative access to USA Performance. OPM-000103. There is no evidence in the record that Altik completed cybersecurity training.

*Justin Monroe (OPM-17):* From January 28 to June 6, 2025, Monroe worked as an "expert" at OPM. OPM-000291; OPM-000294. Monroe did not receive a paycheck from OPM. OPM-000291. While at OPM, Monroe received administrative access to USA Performance. OPM-000103. Monroe previously worked for Space X. Trujillo Decl., Ex. D. There is no evidence in the record that Monroe completed cybersecurity training.

*Noah Peters (OPM-18):* From January 20, 2025, to the present, Peters has worked as a senior advisor at OPM. OPM-000298; Def. Br. 5. Peters is paid $195,200 per year by OPM. OPM-000298. Peters also has been detailed to DOGE from January 24, 2025, to the present. Trujillo Decl., Ex. C at 1. While at OPM, Peters received administrative access to USA

Performance. OPM-000090. There is no evidence in the record that Peters completed cybersecurity training.

## STANDARD OF REVIEW

"Under Rule 56(c), summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Under the Administrative Procedure Act, [courts] must 'hold unlawful and set aside [any] agency action' that is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Hadwan v. U.S. Dep't of State*, 139 F.4th 209, 221 (2d Cir. 2025) (quoting 5 U.S.C. § 706(2)(A)).

In APA cases, courts are generally confined to the administrative record, but there are circumstances where extra-record evidence is appropriate:

> The first is when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers. The second is where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice. The third is when the district court needs to supplement the record with background information in order to determine whether the agency considered all of the relevant factors.

*Safe Haven Home Care, Inc. v. HHS*, 130 F.4th 305, 324 (2d Cir. 2025) (cleaned up).

When evaluating a contrary-to-law claim under the APA, courts "exercise independent judgment" and judges themselves "interpret" the federal statutes at issue. *Bakery Drivers Pension Fund v. Pension Benefit Guar. Corp.*, 136 F.4th 26, 29 (2d Cir. 2025).

Under the APA, agency decisions must also "be reasonable and reasonably explained" to satisfy the arbitrary and capricious standard. *Hadwan*, 139 F.4th at 221. "[J]udges generally must

12

assess the lawfulness of an agency's action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Id.*

The Presumption of regularity "is not to shield [agency] action from a thorough, probing, in-depth review." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). And that presumption can be rebutted, as it has been in this case. *June 9 Opinion*, 786 F. Supp. 3d at 688. *See also* ECF No. 172-2 (listing examples from other cases).

**ARGUMENT**

"The plaintiffs have an interest in avoiding the 'Big Brother' government monitoring that the Privacy Act is designed to prevent." *June 9 Opinion*, 786 F. Supp. 3d at 694.

## I.    PLAINTIFFS HAVE STANDING

For Article III standing, a plaintiff must show (1) "an injury in fact that is concrete, particularized, and actual or imminent," (2) the defendant likely caused it, and (3) judicial relief likely would redress it. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiffs demonstrated standing to obtain a preliminary injunction. *June 9 Opinion*, 786 F. Supp. 3d at 677–83. The standing test at that stage was "no less demanding" than it is now for summary judgment. *AFGE v. OPM*, 2025 WL 3687548, at *11 (S.D.N.Y. Dec. 19, 2025) ("*Dec. 19 Opinion*"). The *Dec. 19 Opinion* again confirmed Plaintiffs' standing based on a similar factual record. *See* Fed. R. Civ. P. 12(d). Defendants no longer seriously contest standing, though they preserve this argument for appeal. Def. Br. 6.[5]

---

[5] The union Plaintiffs have associational standing. *See Citizens United v. Chestnut Ridge*, 98 F.4th 386, 395 (2d Cir. 2024); *June 9 Opinion*, 786 F. Supp. 3d at 678 n.31; Kelley Decl. ¶¶ 3, 6, 8–11; Ramrup Decl. ¶¶ 3, 5–6, 8–11.

13

### A.    Plaintiffs' Injuries Are Concrete.

Defendants' Privacy Act violations caused Plaintiffs to suffer "concrete injury analogous to intrusion upon seclusion." *June 9 Opinion*, 786 F. Supp. 3d at 679.[6] *Accord AFSCME v. Social Security Admin.*, No. 25-1411, 2026 WL 969670, at *4 (4th Cir. Apr. 10, 2026) ("disclosing plaintiffs' members' personally identifiable information to DOGE inflicts a harm that is a 'close … analogue' to the common law tort of intrusion upon seclusion"). This common law injury occurs when a tortfeasor "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns … if the intrusion would be highly offensive to a reasonable person." Restatement of Torts § 625B; *Melito v. Experian*, 923 F.3d 85, 93 (2d Cir. 2019).

Here, OPM's unlawful grant to DOGE agents of access to Plaintiffs' information is, by itself, highly offensive and comprises concrete injury. *June 9 Opinion*, 786 F. Supp. 3d at 681; *AFGE v. OPM*, 777 F. Supp. 3d 253, 268–69 (S.D.N.Y. 2025) ("*April 3 Opinion*"); ECF No. 67 at 17–19. "The records at issue concern the plaintiffs' most sensitive private affairs. They include social security numbers, health care information, banking information, and information about family members." *June 9 Opinion*, 786 F. Supp. 3d at 679. Nonetheless, OPM gave more than a dozen "individuals access to at least fourteen OPM systems, and the access it gave them was almost always administrative access." *Id. See also* OPM-000028–29; OPM-000089–04; OPM-0000107; OPM-000110.

No more is required to show a highly offensive intrusion. But there is more: DOGE agents repeatedly used this access. *June 9 Opinion*, 786 F. Supp. 3d at 680–81. Four logged in

---

[6] Plaintiffs also suffer concrete injury analogous to disclosure of private fact, unconstitutional search, and breach of confidence. *See* ECF No. 67 at 19–22; ECF No. 84 at 20.

during early 2025. *Id*; OPM-000103. Three logged in later that year. *Dec. 19 Opinion*, 2025 WL 3687548, *6; ECF No. 148 at 9. One obtained data from career staff and used it for the GWES. *June 9 Opinion*, 786 F. Supp. 3d at 680–81; OPM-000117–19; May 29, 2025, Tr., ECF No. 125 at 171:8–23. Hogan testified that such extraction of data by career OPM employees and transfer to DOGE agents happened at other times, too. *June 9 Opinion*, 786 F. Supp. 3d at 681.

Moreover, OPM's onboarding of DOGE agents was "chaotic, irregular, and risky." *June 9 Opinion*, 786 F. Supp. 3d at 680; *see generally* OPM-000026–29; OPM-000089–103; OPM-000107–08; OPM-000190; OPM-000193; Lewis Decl. ¶¶ 7–8, 17; Nesting Decl. ¶¶ 42–43; Schneier Decl. ¶¶ 5, 28, 32–35, 42–54; ECF No. 148 at 4.

## B.    Plaintiffs' Injuries Are Particularized.

An Article III injury must be "particularized." *TransUnion*, 594 U.S. at 423. Here, OPM provided DOGE agents with access to personal data of millions of Americans. *See In re OPM Breach Litig.*, 928 F.3d 42, 63 (D.C. Cir. 2019) (OPM systems contain records on more than "twenty-one million people"). This includes the individual Plaintiffs and the union Plaintiffs' 800,000 members. Kelley Decl. ¶ 2.

## C.    Plaintiffs' Injuries Are Both Actual and Imminent.

An Article III injury must be "actual or imminent." *TransUnion*, 594 U.S. at 423. Here, it is both. "In addition to having shown concrete harm based on the improper access that has already been granted to OPM records, the plaintiffs have also demonstrated risk of future harm." *June 9 Opinion*, 786 F. Supp. 3d at 682. For example: "The Government does not dispute that a retreat from basic cybersecurity safeguards increases the risk of confidentiality breaches, integrity breaches, and availability breaches." *Id*. Yet here, "The record shows that instead of following the principles of least privilege and separation of duties, the OPM Defendants adopted

15

a principle of maximum privilege for DOGE agents …" *Id*. *See also* OPM-000026–29; OPM-00089–103; OPM-000108; OPM-000110; OPM-000190; OPM-000193; Lewis Decl. ¶¶ 7–8, 17; Schneier Decl. ¶¶ 5, 28, 32–35, 42–59, 63–67, 78; Nesting Decl. ¶¶ 42–43.

There also is risk that DOGE agents will misuse Plaintiffs' data. Kelley Decl. ¶ 11; Toussant Decl. ¶ 6; Ramrup Decl. ¶ 11. That risk is particularly significant and imminent because DOGE agents have done the same at other agencies. At SSA, a DOGE affiliate improperly sent SSA records to the DOGE agency. Trujillo Decl., Ex. A at 2–3. A DOGE affiliate also signed an agreement with "a political advocacy group" that asked them "to analyze state voter rolls … to find evidence of voter fraud and to overturn election results in certain States." *Id.* Moreover, a former DOGE agent told their new coworkers that they still possessed sensitive SSA databases and wanted to use them at the company, according to a whistleblower. Trujillo Decl., Ex. B

### D.      Plaintiffs' Injuries Are Caused by Defendants and Redressable by this Court.

A plaintiff must show causation and redressability. *TransUnion*, 594 U.S. at 423. Here, Defendants caused Plaintiffs' injuries, and the Court can redress them by enjoining Defendants to stop violating the Privacy Act and to remedy ongoing harms of past violations. *June 9 Opinion*, 786 F. Supp. 3d at 682–83.

### E.      Plaintiffs' Claims Are Ripe and Not Moot.

Defendants incorporate and preserve their mootness and ripeness arguments. Def. Br. 6. These arguments lack merit. *Dec. 19 Opinion*, 2025 WL 3687548, *7–11; ECF No. 171 at 19–35. Defendants concede that OPM still employs two DOGE agents. Def. Br. 5. Citing a months-old declaration, Defendants assert neither has access to Plaintiffs' information, *id.*, but

16

Defendants still "offer no assurance that DOGE Agents' access to OPM systems will not be restored." *Dec. 19 Opinion*, 2025 WL 3687548, *9.

Defendants also cannot show that "there is no reasonable expectation that the alleged violation will recur." *Mhany Mgt. v. County of Nasau*, 819 F.3d 581, 603 (2d Cir. 2016). Rather, Defendants continue to insist that "all" DOGE agents who received access "had a need" for it. Def. Br. 8 n.3. "It is precisely [this] insistence on the validity of the challenged practice that makes it 'reasonable' to expect that the conduct will be repeated." *Ahrens v. Bowen*, 852 F.2d 49, 53 (2d Cir. 1988).

## II.   DEFENDANTS VIOLATED THE PRIVACY ACT

### A.   Defendants Violated Section (b) of the Privacy Act.

The Privacy Act's non-disclosure rule provides that "[n]o agency shall disclose any record which is contained in a system of records," with enumerated exceptions. 5 U.S.C. § 552a(b).

Defendants press only one of the Privacy Act's exceptions from this non-disclosure rule: for disclosures "to those officers and employees of the agency which maintains the record who have a need for the record in the performance of their duties." 5 U.S.C. § 552a(b)(1). For this exception to apply, Defendants must show both OPM employment and need. *Cf.* Def. Br. 9 (erroneously stating that employment status "ends the inquiry"). Defendants fail on both fronts. First, no DOGE agent "need[s]" the records they were given in the performance of their official duties, as many have already admitted. Second, many DOGE agents are "officers or employees of" DOGE and other agencies, not OPM.

For the purposes of this summary judgment motion, the actions of all DOGE agents from January 2025 to present are relevant. Those actions show the consummation of Defendants'

17

deliberate decision to begin a practice of illegal and unsecure disclosure of personal records, the systematic execution of that practice, and the ongoing violations and continuing harms that must be remedied. *Cf.* Def. Br. 8.

### 1.    Defendants "disclosed" records to DOGE agents.

Defendants admit that they gave DOGE agents comprehensive access to at least 14 OPM record systems, including eOPF, EHRI, and several others that contain Plaintiffs' sensitive personal records. OPM-000089–110. This alone establishes that Defendants "disclosed" OPM records in violation of 5 U.S.C. § 552a(b). *Contra* Def. Br. 8 n.3. As this Court ruled, "OPM records were disclosed to all of the DOGE agents when they were given access to records, regardless of whether they actually logged in to OPM systems or reviewed the records." *June 9 Opinion*, 786 F. Supp. 3d at 685.

There also is evidence that DOGE agents reviewed and/or used the records—further showing disclosure. For example, Defendants admit: Bobba logged into the eOPF system; Kliger logged into USA Performance; Rajpal logged into OPM Data, USA Staffing, OPM's Agency Talent Portal database and the EHRI database; and Bjelde logged into the USA Staffing database. ECF No. 148 at 9; OPM-000103. In other instances, career OPM employees extracted data from OPM records systems and gave it to DOGE agents. The latter used these records to create a government-wide email system, among other things. OPM-000119; May 29, 2025, Tr., ECF No. 125 at 171:8–23. Such OPM staff disclosure and DOGE agent use happened again on at least one other occasion for a "retirement service modernization project," *id.* at 173:1–3.

At SSA, employees working with DOGE obtained SSA records and moved them to the DOGE agency itself and an unapproved server. Trujillo Decl., Ex. A at 6. Two DOGE agents in this case (Bobba and Rajpal) also worked for SSA. *Supra* at 7–9.

### 2.     DOGE agents did not "need" the records they obtained, as OPM officials admit and Plaintiffs' experts agree.

In determining whether an official has a "need'" for a record within the meaning of § 552a(b)(1), courts consider "whether the official examined the record in connection with the performance of duties assigned to him and whether he had to do so in order to perform those duties properly." *Bigelow v. Dep't of Def.,* 217 F.3d 875, 877 (D.C. Cir. 2000). Importantly, a "belief that there may be a need for access in the future does not qualify as a showing of need under Exception (b)(1)." *June 9 Opinion*, 786 F. Supp. 3d at 687. Rather, if a legitimate need arises, OPM can quickly grant access. May 29, 2025, Tr., ECF No. 125 at 173:15–23.

OPM officials' statements demonstrate the absence of "need" in this case. OPM's then-Director Chuck Ezell admitted that there was no need for DOGE agent access to records: "Right now we don't have immediate plans to change anything but if we need to we might need to move quickly." OPM-000029. Later, then-CIO Greg Hogan admitted that the DOGE agents "never needed" the access they were given. OPM-000027. He then suggested unwinding "currently unnecessary" access. OPM-000029. Hogan testified that DOGE agents were given access because "they may have a need to use those permissions" in the future. May 29, 2025, Tr., ECF No. 125 at 123:8–10.

Defendants have no answer for these admissions. Instead, they offer improper post-hoc rationalizations, rather than any "contemporaneous explanation." *Dep't of Com. v. New York*, 588 U.S. 752, 780 (2019). After more than a year of litigation, Defendants for the first time argue that OPM's authorizing statute, 5 U.S.C. § 1103, shows that OPM employees need "aggregated workforce data." Def. Br. 9. Even if that were true, at least 16 DOGE agents at OPM obtained much more than "aggregate" workforce data. They obtained administrative access to millions of employees' individual personal "records," which are tied to each employee's "name, or the

19

identifying number, symbol, or other identifying particular." 5 U.S.C. § 552a(a)(4). Moreover, OPM's authorizing statute does not give OPM employees a broad right to access every employee's records. The sections of law that Defendants cite merely call for "preparing . . . rules" and "recommending policies" to the President, § 1103(a)(7), and "design[ing] a set of systems" for other agencies to follow, § 1103(c)(1). This amounts to writing "regulations," § 1103(c)(2), that have already been written. *See* 83 Fed. Reg. 55931-01 ("Pursuant to 5 U.S.C. 1103(c), this subpart defines a set of systems, including standards and metrics, for assessing the management of human capital by Federal agencies."). That doesn't require access to every employee's personal records.

Defendants' selective citation to the DOGE E.O. also fails. It only allows disclosure of records "consistent with law," E.O. § 4(b), meaning that agencies must continue to comply with the Privacy Act. *See Parks v. IRS*, 618 F.2d 677, 681 (10th Cir. 1980) (an executive order alone "does not license the defendants to violate the Privacy Act"). Moreover, the E.O. instructs agencies to ensure that "USDS" (the agency itself) has full and prompt access to records. E.O. § 4(b). Therefore, OPM cannot rely on § 552a(b)(1) to justify this agency-to-agency disclosure outlined in the E.O.

There are good reasons not to follow the out-of-circuit opinion in *AFT v. Bessent*, 152 F.4th 162 (4th Cir. 2025). That decision of the divided three-judge panel is subject to a pending petition for rehearing en banc, for which the Fourth Circuit stayed the mandate and requested a response. *See AFT v. Bessent*, No 25-1282, ECF No. 57-59.

More importantly, the two-judge *AFT* majority ruled at the preliminary injunction stage on a record less developed than the record here. That opinion is qualified by language like "appears difficult," "likely needs," and "would seem." *AFT*, 152 F.4th at 176–77. On the key

20

issue here of "need," that opinion boils down to the intuition of a judge who was educated in the law and not cybersecurity: "[I]t does not stretch the imagination to think that an employee tasked with modernizing an agency's software and IT systems would require administrator-level access to those systems[.]" 152 F.4th at 177.

The expert testimony here, which is absent at the Fourth Circuit, shows that the panel's intuition is mistaken.[7] Experts Nesting and Lewis agree that IT modernization does not necessarily require access to confidential personal records. Nesting stated that in his long experience with government systems, "it is not only possible, but vastly preferable to modernize IT systems without access to the data." Nesting Decl. ¶ 21. Nesting described several IT modernization projects across various government agencies in which he personally participated where there was no need for access to data, even for projects that required substantial code changes. *Id.* ¶¶ 20–31 (Affordable Care Act system, Consular Consolidated Database, visa process systems, U.S. Refugee Admissions Program's case management system). Directly contradicting the Fourth Circuit's attempted analogy to modernizing a "local library," *AFT*, 152 F.4th at 176, Nesting explained, "a team trying to modernize bank vaults doesn't need to have access to the contents of everyone's vaults." Nesting Decl. ¶ 15.

Similarly, Lewis, who most recently served as the Director of the GSA's Technology Transformation Services, explained that "DOGE's access to sensitive OPM information is unnecessary for the purposes expressed by DOGE—and ignores vital security protocols." Lewis Decl. ¶ 7. While Government IT modernization is important, DOGE's actions are "inconsistent

---

[7] The Fourth Circuit panel opinion also did not benefit from the aforementioned live testimony from Greg Hogan, May 29, 2025, Tr., ECF No. 125 at 123:8–10; or from the Declaration of Perryn Ashmore, ECF No. 148 at 7–8 ("access was granted in order to be prepared to implement changes to the system.").

with both the need to successfully modernize these systems and to do so securely." Lewis Decl. ¶ 23.

### 3. Many DOGE agents at OPM were functionally employees of other agencies when they received records.

Many DOGE agents at OPM are functionally controlled and supervised by agencies other than OPM, including DOGE itself, given the full context of their work. Thus, these DOGE agents are not employees "of the" OPM, and Defendants cannot rely on exemption (b)(1) to the Privacy Act's non-disclosure rule.

To be employed by an agency, an employee must be "subject to the supervision" of that agency. 5 U.S.C. § 2105(a)(3) (defining "employee"). "While an individual may be detailed to multiple agencies, they cannot be deemed an employee of multiple agencies at the same time." *June 9 Opinion*, 786 F. Supp. 3d at 686. When an employee works at multiple agencies, courts take a functional approach. *Jud. Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 131–32 (D.C. Cir. 2005); *see also AFL-CIO v. Dep't of Labor*, 778 F. Supp. 3d 56, 83–84 (D.D.C. 2025) (describing initiatives, purposes, and supervision as relevant); Restatement (Third) Of Agency § 7.03(d)(2) (2006) (describing "lent employees").

Here, taking this functional approach, the evidence shows that DOGE agents at OPM were employed by DOGE or other agencies—not OPM. First, all DOGE agents are supervised by DOGE because they were hired in "consultation with" DOGE and must "coordinate their work" with DOGE. E.O. § 3(c). Similarly, all DOGE agents focus their work on the "DOGE agenda," not OPM's agenda. *Id.*

Second, at least 12 DOGE agents did not receive a paycheck from OPM: Biasini, Bobba, Coristine, Rajpal, Bjelde, Armstrong, Mlodzianowski, Hanna, Stanley, Young, Duarte, and Monroe. *Supra* 6–12.

22

Third, at least 10 DOGE agents simultaneously were detailed to, employed by, or volunteered with DOGE during their time at OPM: Biasini, Bobba, Coristine, Rajpal, Armstrong, Raynor, Stanley, Young, Altik, and Peters. Trujillo Decl., Ex. C. DOGE's standard detail agreement with employees notes that employees detailed to the agency will be supervised by the DOGE administrator, report to DOGE, and work in DOGE's office. *See, e.g.*, OPM-000284–86. Additionally, employees detailed to DOGE are typically allowed to disclose records to outside parties with DOGE (rather than OPM) approval. *Id.* at 000285. And five DOGE agents also worked at numerous other agencies: Bobba, Coristine, Kliger, Rajpal, and Young. *Supra* 6–12.

Fourth, many DOGE agents were known within OPM as affiliated with DOGE. At least five DOGE agents were referred to as "DOGE engineers": Biasini, Bobba, Coristine, Kliger, and Rajpal. OPM-000026-000027. And at least two DOGE agents were referred to as "DOGE employees": Coristine and Rajpal. OPM-000194.

Fifth, at least four DOGE agents worked at OPM only on an "intermittent schedule basis": Biasini, Bobba, Kliger, and Rajpal. ECF No. 148 at 8.

Finally, at least 11 DOGE agents previously worked at organizations affiliated with Elon Musk, who ran the DOGE agency early in the Trump administration. They include Biasini, Coristine, Kliger, Rajpal, Bjelde, Mlodzianowski, Hanna, Stanley, Young, Duarte, and Monroe. *Supra* 6–12.

Defendants' arguments on this point address only two individuals and misstate the facts. Def. Br. 8–9. Defendants claim Biasini and Peters were not "detailed to or from another agency." *Id.* at 8. Likewise, on September 30, 2025, OPM's Perryn Ashmore declared that Biasini "has not been detailed to, and does not simultaneously hold an appointment at, any other federal agency or the U.S. DOGE service." ECF No. 148 at 8. But no documentary evidence supports this claim,

and the job of chief information officer does not give Ashmore first-hand knowledge of the detail assignments of all employees.

DOGE's own records show the exact opposite: Biasini and Peters were detailed to DOGE from January 2025 to the present. Trujillo Decl., Ex. C at 1. This new evidence is consistent with the record that shows Biasini worked at OPM only on an intermittent basis, ECF No. 148 at 8, and was known as a "DOGE engineer." OPM-000026–27. Here, the "quantum and quality of proof" matters. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986). DOGE's own records contradict the unsupported declaration of a person without first-hand knowledge, creating no genuine dispute.

**B.      Defendants Violated Section (e)(10) of the Privacy Act.**

Defendants OPM and DOGE failed to "establish appropriate administrative, technical, and physical safeguards" to "insure the security and confidentiality of records" and "protect against any anticipated threats or hazards." § 552a(e)(10). This security provision requires agencies to "take basic, known, and available steps" to protect personal records. *In re OPM Breach Litig.*, 928 F.3d at 63. These safeguards are especially important at OPM, which in 2014 suffered a "staggering" data breach. *Id.* at 49. Government employees themselves can be a cybersecurity threat. *See* OPM-000157–58 (describing malicious, negligent, and accidental insiders).

Defendants disregarded established safeguards in numerous ways, by: giving DOGE agents access to more than a dozen government databases that they did not need; granting them the highest administrative access; doing so in a chaotic manner; stripping career employees of oversight of new DOGE agents; failing to train DOGE agents before giving them access; and failing to set inter-agency use and sharing limitations.

24

OPM's cybersecurity failures are all rooted in the agency's decision to give DOGE agents high-level administrative access to multiple databases of sensitive personal records that they did not need. Plaintiffs' experts explained that it is the "wholesale assignment of these privileges" that creates security and privacy risks. Second Nesting Decl. ¶ 12 ("Regardless of whether the individuals given this access exercised it, the fact that the privileged credentials were issued in the first place creates risk."); *see also id.* ¶¶ 13, 36.

But the problems do not end there. OPM granted this records access in an "urgent," "rush[ed]," and "desperat[e]" manner. OPM-0000108; OPM-0000194. OPM's acting director sought access following a "911-esque" call, OPM-000107, and he stripped OPM career staffs' own "original permissions" and oversight. OPM-000026.

Only three DOGE agents (Biasini, Kliger, and Bjelde) acknowledged completing cybersecurity training prior to obtaining access to OPM databases. While there are no records to prove it, OPM says three other DOGE agents (Bobba, Coristine, and Rajpal) completed training *after* receiving database access on February 19, 2025, ECF No. 96 ¶ 18, on a date that happened to coincide with an important filing deadline in this case. ECF No. 40 ¶ 13. There is no evidence that the 10 other DOGE agents ever completed cybersecurity training. This is no surprise, given that OPM's acting director told career staff that DOGE engineers "won't have a lot of time" to understand the sensitive records systems and "what the program officers feel about the programs." OPM-000027.

Similarly, the record shows that most DOGE agents working for multiple agencies did not sign inter-agency agreements limiting the sharing of OPM data with other agencies. When agreements were signed, they typically did not protect OPM's own data, and they did not require DOGE agents to get permission from OPM before disclosing records to DOGE. *See, e.g.*, OPM-

25

000252 & OPM-000285 ("Detailee will not disclose nonpublic information to outside parties *without prior approval from USDS*") (emphasis added).

Aside from declaring six months ago that "currently" no DOGE agent "listed in this report" has "access permissions to OPM data systems containing Plaintiffs' PII," OPM Defendants have taken no mitigation measures "with respect to past access granted to such DOGE Agents." ECF No. 148 at 5. They have not created a complete and accurate accounting of disclosures made, as required by 5 U.S.C. § 552a(c)(1). Despite requirements from the National Institute of Standards and Technology (NIST), OPM Defendants have not required DOGE agents to delete any unlawfully disclosed data they retain outside OPM systems, NIST Special Publication 800-53 Revision 5.1, SI-14(2) ("Non-persistence"), nor performed an incident response. *Id.* at IR-8(1) ("Incident response plan, breaches"). *See also* 44 U.S.C. § 3554(a)(1)(A); 40 U.S.C. § 11331; Schneier Decl. ¶¶ 72-77.

## III.    DEFENDANTS VIOLATED THE ADMINISTRATIVE PROCEDURES ACT

### A.    Defendants' Actions Were Contrary to Law and an Abuse of Discretion.

Under the APA, courts shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Since Defendants violated the Privacy Act, as described above, their actions are "not in accordance with law" and thus violate the APA, too.

Additionally, OPM's rushed decision to give DOGE agents administrative access to sensitive record systems regardless of their need, employment status, training, or cybersecurity precautions was a gross departure from OPM' obligations under the Privacy Act, its existing cybersecurity practices, and even the DOGE executive order. *June 9 Opinion*, 786 F. Supp. 3d at 690. The challenged decision thus also is "arbitrary and capricious" in violation of the APA,

26

because the agency failed to "consider an important aspect of the problem" and separately because it "offered an explanation" for its decision that is "counter to the evidence" and "implausible." *Am. Cruise Lines v. United States*, 96 F.4th 283, 286 (2d Cir. 2024).

### B.    Defendants Engaged in Final Agency Action.

Defendants no longer seriously contest that their activity constitutes final agency action, though they preserve this argument for appeal. Def. Br. 6. This Court already ruled that "OPM engaged in final agency action." *June 9 Opinion*, 786 F. Supp. 3d at 691. *See also Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016). Within days of the start of the administration, OPM made a final decision that DOGE agents are entitled to broad administrative access to sensitive records databases—regardless of need, employment status, training, or cybersecurity protections. While flawed, OPM made this final decision in an attempt to carry out the E.O. Through a "911-esque" phone call and emailed instructions, OPM consummated this decision and implemented it. Legal consequences flowed from OPM's decision: it deprived Plaintiffs of their statutory privacy rights, and OPM disclosed records to many DOGE agents who have no legal right to access them.

### C.    Plaintiffs Do Not Have Adequate Alternative Remedies.

Plaintiffs have no adequate alternative remedies. Defendants no longer seriously contest this, though they preserve this argument for appeal. Def. Br. 6. Damages—which Plaintiffs do not seek—would provide only "doubtful and limited" relief. *April 3 Opinion*, 777 F. Supp. 3d at 281. And the Court ruled that the Privacy Act does not provide the injunctive relief Plaintiffs seek. *June 9 Opinion*, 786 F. Supp. 3d at 692. *See also April 3 Opinion*, 777 F. Supp. 3d at 281.

27

If that remains so, then Plaintiffs have no adequate recourse to remedy the ongoing harm other than injunctive relief under the APA.

## IV.   PLAINTIFFS DO NOT MOVE FOR SUMMARY JUDGMENT ON THEIR ULTRA VIRES CLAIM

Plaintiffs do not move for summary judgment on their ultra vires claim at this time, given the Court's ruling that the APA "already gives the plaintiffs meaningful relief for the violation of their rights." *June 9 Opinion*, 786 F. Supp. 3d at 693. Nonetheless, there is ample evidence that DOGE coordinated and participated in these Privacy Act violations. *Contra* Def. Br. 12–13. The E.O. instructs DOGE agents to "coordinate their work" with the DOGE agency. E.O. § 3(c). At least 10 DOGE agents were detailed to, supervised by, and worked in offices of the DOGE agency. Trujillo Decl., Ex. C. *See also* OPM-000251–53; OPM-000284–86. DOGE agency Senior Advisor Steven Davis acted as a point of contact for DOGE agents at OPM. *Id.*

## V.   REMEDIES

Plaintiffs have proved that Defendants' actions violate the APA both because they are not in accordance with law and because they are arbitrary and capricious. Plaintiffs seek a remedy to vacate and set aside OPM's systematic practice of disclosing records to DOGE agents, regardless of need, employment status, training, or cybersecurity safeguards, and an injunction and declaration doing the same. This includes an Order commanding the following:

1. Setting aside Defendants' misapplication of Privacy Act disclosure exceptions by:

   a. Prohibiting OPM from disclosing records to any OPM employee under § 552a(b)(1) based on a "need to be prepared" for future events; and

   b. Prohibiting OPM from disclosing records to the DOGE agency, or DOGE agents, under § 552a(b)(1).

2. Setting aside Defendants' ongoing unlawful records disclosure by:

28

    a. Requiring OPM to remove all DOGE agent access to OPM records systems; and

    b. Requiring Defendants to remove all DOGE agent access to OPM records that have been previously extracted from OPM records systems and moved elsewhere, including requiring the DOGE agency, DOGE agents, and any third party to delete or expunge such copies they possess, in line with NIST SP 800-53 Revision 5.1, SI-14(2) ("Non-persistence").

3. Setting aside Defendants' ongoing cybersecurity threats and hazards by:

    a. Requiring OPM to create an accurate accounting of disclosures made to DOGE agents, in accordance with 5 U.S.C. § 552a(c)(1); and

    b. requiring OPM to create and execute a plan to mitigate the ongoing effects of OPM's illegal practice of disclosing records to DOGE agents, regardless of need, employment status, training, or cybersecurity safeguards, in line with NIST SP 800-53 Revision 5.1, IR-8(1) ("Incident response plan, breaches").

4. Determining that Plaintiffs are entitled to attorney's fees and related costs, and reserve consideration of the amount of such fees for a subsequent motion filed under Fed. R. of Civ. P. 54(d)(2).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant their motion for summary judgment, deny Defendants' motion for summary judgment, and enter an appropriate order and permanent injunction redressing Defendants' violations of the law.

Dated: April 15, 2026

Respectfully submitted,

*/s/ F. Mario Trujillo*
F. Mario Trujillo (admitted pro hac vice)
Victoria Noble
Cindy Cohn (admitted pro hac vice)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

Rhett O. Millsaps II
Mark A. Lemley (admitted pro hac vice)
Mark P. McKenna (admitted pro hac vice)
Christopher J. Sprigman
LEX LUMINA LLP
745 Fifth Avenue, Suite 500
New York, NY 10151
(646) 898-2055

Norman L. Eisen (admitted pro hac vice)
Andrew Warren
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue SE #15180
Washington, DC 20003

Subodh Chandra (admitted pro hac vice)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th Street, Suite 400
Cleveland, OH  44113

*Counsel for Plaintiffs*

30

**CERTIFICATE OF COMPLIANCE**

I certify that, excluding the caption, table of contents, table of authorities, signature block, and this certification, the foregoing contains 8,746 words, calculated using Microsoft Word for Mac, which complies with Rule 7.1(c) if the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York.

*/s/ F. Mario Trujillo*

31